## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x
:
In re:                                             :  Chapter 11
                                                   :
RESTORA HEALTHCARE HOLDINGS, LLC,                  :  Case No. 14-10367 (____)
*et al.*,[1]                                       :
                                                   :  (Joint Administration Requested)
                  Debtors.                         :
-----------------------------------------------------------------x

## MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507, BANKRUPTCY RULES 2002, 4001, 6004, AND 9014 AND LOCAL RULE 4001-2 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

Restora Healthcare Holdings, LLC and certain of its subsidiaries and affiliates, as debtors

and debtors in possession (collectively, the "Debtors"), by and through their proposed

undersigned attorneys, hereby file this motion (the "Motion"), pursuant to sections 105(a), 361,

362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 of title 11 of the United

States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2

of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court

for the District of Delaware (the "Local Rules"), for entry of an interim order on an expedited

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Restora Healthcare Holdings, LLC (2837); Restora Hospital of Mesa, LLC (8773); and Restora Hospital of Sun City, LLC (1028).  The mailing address for the Debtors, solely for purposes of notices and communications, is 2550 Northwinds Parkway, Suite 160, Alpharetta, Georgia 30009.

basis (the "Interim Order"), substantially in the form annexed hereto as Exhibit A, and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"), (i) authorizing the Debtors to (a) enter into a financing arrangement on an interim basis on the terms as set forth in the debtor in possession financing term sheet attached hereto as Exhibit B (the "DIP Term Sheet") and on a final basis under a debtor in possession financing agreement containing terms and conditions substantially similar to those set forth in the DIP Term Sheet, and (b) use Cash Collateral (as defined below), (ii) granting liens and providing super-priority administrative expense status, (iii) granting adequate protection to the Debtors' prepetition secured lender, (iv) scheduling a final hearing pursuant to Bankruptcy Rule 4001, and (v) granting related relief (the "Motion").[2]  In support of this Motion, the Debtors respectfully represent as follows:

## SUMMARY OF RELIEF REQUESTED

1.      In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their liquidity needs and operate their long-term acute care (LTAC) hospitals.  In addition, the Debtors require access to sufficient liquidity to fund these chapter 11 cases while working towards a successful sale transaction with respect to substantially all of the Debtors' assets.  Postpetition financing, in addition to the use of cash collateral, is necessary in order for the Debtors to have access to sufficient liquidity to maintain ongoing day-to-day operations, ensure proper patient care at their hospital facilities, and fund their working capital needs.  Absent postpetition financing and the use of cash collateral, the Debtors will be forced to wind-down their operations due to a lack of funds.  It is therefore imperative that the Debtors have access to sufficient liquidity to avoid imminent irreparable harm and successfully consummate a sale transaction as quickly as possible.

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Interim Order or the DIP Term Sheet.  To the extent that there is any conflict between this Motion and the Interim Order, the Interim Order shall control.

2.      Accordingly, by this Motion, the Debtors are seeking, *inter alia*:

(a)      authorization for the Debtors to obtain senior secured postpetition financing consisting of a revolving credit facility in an amount not to exceed $7,000,000 at any one time outstanding (the "DIP Facility") in accordance with, (i) prior to entry of the Final Order, the DIP Term Sheet among Restora Mesa and Restora Sun City, as borrowers (the "Borrowers"), Restora Holdings, as guarantor (the "Guarantor"), and Healthcare Finance Group, LLC ("HFG") and its assigns, as lender (the "DIP Lender") and administrative agent (the "DIP Agent" and, together with the DIP Lender, the "DIP Lender Parties"), and (ii) following entry of the Final Order, the Debtor-In-Possession Loan and Security Agreement with terms consistent with the DIP Term Sheet and to be agreed upon among the Borrowers, the Guarantor, and the DIP Lender Parties (the "DIP Loan Agreement" and, together with such other documents and agreements required by the DIP Lender Parties, the "DIP Facility Documents");[3]

(b)      authorization for the Debtors to obtain from the DIP Lender on the Initial Funding Date (as defined in the DIP Term Sheet) and from time to time thereafter pending the Final Hearing (as defined below) revolving advances ("Revolving Loans") in amounts not to exceed a maximum outstanding principal amount of $4,000,000 (the "Interim Amount") in accordance with the DIP Term Sheet and the Interim Order, which Interim Amount will include the amount of Existing Revolving Debt (as defined below) assumed by the Debtors in accordance with the DIP Term Sheet and which will constitute part of the DIP Facility;

(c)      authorization for the Debtors to assume the Existing Revolving Debt as an obligation under the DIP Facility and to deem all outstanding Existing Revolving Debt, including, without limitation, all principal, interest, fees and other expenses, to constitute obligations under the DIP Facility that are valid, binding, and enforceable against the Debtors without further action by the Debtors or the DIP Lender Parties;

(d)      authorization for the Debtors to obtain from the DIP Lender upon entry of the Final Order revolving advances in amounts not to exceed a maximum outstanding principal amount of $7,000,000 (the "Total Commitment") in accordance with the DIP Loan Agreement, the DIP Facility Documents and the Final Order, which Total Commitment includes the amount of Existing Revolving Debt assumed by the Debtors in accordance with the DIP Term Sheet;

(e)      authorization for the Debtors to execute and deliver the DIP Term Sheet, the DIP Loan Agreement and the DIP Facility Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

---

[3]    The Debtors expect to file an executed copy of the DIP Loan Agreement (which remains subject to negotiation by the parties) with the Court and serve such agreement on all parties receiving notice of this Motion no later than five (5) days prior to the date of the Final Hearing (as defined herein).

(f)      authorization for the Debtors to grant to the DIP Lender Parties assurances for the full and timely payment of the Debtors' obligations under the DIP Facility by granting to the DIP Lender Parties (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim (a "<u>Superpriority Administrative Expense Claim</u>") having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carveout (as defined below), and (ii) pursuant to section 364(c)(2), (3) and (d) of the Bankruptcy Code, liens on, and security interests in, any and all of the DIP Collateral (as defined below), subject only to the Carveout and Senior Liens (as defined below);

(g)      authorization to use cash collateral within the meaning of section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>"), and authorization to use the proceeds of the DIP Facility in accordance with a certain budget in form and substance satisfactory to the DIP Agent, including to fund the costs associated with the Debtors' chapter 11 cases, to fund postpetition operating expenses of the Debtors during the chapter 11 cases, and to assume certain of the Debtors' prepetition secured indebtedness;

(h)      pursuant to sections 361 and 363 of the Bankruptcy Code, authorization to grant adequate protection to the Existing Term Lender Parties (as defined below);

(i)      pursuant to section 362 of the Bankruptcy Code, modification of the automatic stay to the extent set forth in the DIP Term Sheet and DIP Facility Documents;

(j)      pursuant to Bankruptcy Rule 4001, to schedule a preliminary hearing on this Motion and obtain authorization, from the entry of the Interim Order until the final hearing (the "<u>Final Hearing</u>"), to obtain credit under the terms contained in the DIP Term Sheet and to utilize Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates; and

(k)      pursuant to Bankruptcy Rule 4001, to schedule a Final Hearing on this Motion to consider entry of the Final Order authorizing the Debtors to borrow the balance of the DIP Facility on a final basis on the terms and conditions set forth in the DIP Loan Agreement.

## <u>JURISDICTION</u>

3.      This Court has jurisdiction over the Debtors, their estates, and this matter pursuant to 28 U.S.C. §§ 157 and 1334.   This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).   Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.   The statutory predicates for the relief requested in this Motion are sections 105(a), 361, 362, 363,

364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2.

## BACKGROUND

**A.    General Background.**

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

6.      The Debtors operate two long-term acute care (LTAC) hospitals that provide high intensity acute level care to patients requiring longer hospitalizations—typically ranging from a few weeks to several months. The two hospitals are 120-bed, licensed, freestanding hospitals located in the Greater Phoenix area.  Restora Hospital of Mesa, LLC ("Restora Mesa") is located in Mesa, Arizona and Restora Hospital of Sun City, LLC ("Restora Sun City") is located in Sun City, Arizona.  Both hospitals are Medicare and Medicaid certified, and offer a continuum of services including specialty acute care and sub-acute care provided in an on-site transitional care unit (TCU).

7.      Restora Mesa and Restora Sun City provide a wide variety of programs and services, including a pulmonary/ventilator program, wound care, low toleration rehabilitation services, and post-surgical care.  Restora Mesa and Restora Sun City treat patients who require multiple concurrent care modalities such as ventilator case, intravenous therapy, nutritional

support, tube feedings, antibiotic management, dialysis, and complex wound/skin care management.

8.      Restora Mesa and Restora Sun City patients typically are critically ill and/or have multi-system failures that require extended acute care treatment after discharge from a traditional acute care hospital.  Patients often come to the hospitals directly from an intensive care unit. Upon admission, each patient is evaluated by an interdisciplinary team of professionals to develop an appropriate plan of action depending on the patient's particular needs, and the length of stay of patients will vary depending on the diagnosis, patient age, and acuity level.

9.      Revenue is earned from fees for services rendered and is due from patients and third party payors, including both Medicare and Medicaid and various insurance companies.  Net patient revenue at Restora Mesa for the period of January 2013 through September 2013 was $15,688,593, and net patient revenue at Restora Sun City for the same period was $13,014,048.

10.      A more detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of George D. Pillari in Support of Chapter 11 Petitions and First Day Motions* (the "Pillari Declaration"), filed contemporaneously herewith and incorporated herein by reference.

**B.      The Prepetition Secured Indebtedness.**

11.      The Debtors are parties to a Revolving and Term Loan and Security Agreement, dated as of June 29, 2012 (as amended, modified, and supplemented from time to time, the "Prepetition Loan Agreement"), with Healthcare Finance Group, LLC, as revolving lender, term lender, and administrative agent (in its capacity as lender, the "Prepetition Secured Lender," and in its capacity as administrative agent, the "Prepetition Administrative Agent" and, collectively,

the "Existing Lender Parties").   Pursuant to the Prepetition Loan Agreement, the Prepetition

Secured Lender, in its capacity as term lender (the "Existing Term Lender" and, together with

the Prepetition Administrative Agent as agent for the Existing Term Lender, the "Existing Term

Lender Parties"), agreed to make a term loan to the Borrowers in the initial principal amount of

$3 million ("Term Loan A") and a separate term loan to the Borrowers in the initial principal

amount of $2 million ("Term Loan B" and, together with Term Loan A, the "Term Loans").

Term Loan B was not advanced to the Borrowers.

12.     In addition, the Prepetition Loan Agreement provides for certain revolving

advances (the "Revolving Commitment" and, together with the Term Loans, the "Prepetition

Loans") to be made by the Prepetition Secured Lender to the Borrowers subject to availability as

requested from time to time by the Borrowers.   The Revolving Commitment is subject to a

borrowing base based on the net value of the Borrowers' receivables, certain reserves, and a cap

of $7 million.

13.     The non-default interest rate per annum on the outstanding balance of the Term

Loans is equal to LIBOR plus 6.0% and the non-default interest rate per annum on the

outstanding balance of the obligations under the Revolving Commitment is equal to LIBOR plus

4.25%.  The default rate of interest on all Prepetition Loans is equal to the otherwise applicable

non-default rate of interest plus 4.0%.  The Borrowers' obligations to the Existing Lender Parties

under the Prepetition Loan Agreement are guaranteed by the Guarantor pursuant to a Parent

Guaranty, dated as of June 29, 2012 (the "Parent Guaranty").

14.     As security for the Borrowers' obligations to the Existing Lender Parties under

the Prepetition Loan Agreement and the Guarantor's obligations to the Prepetition Secured

Lender under the Parent Guaranty, each Debtor granted to the Prepetition Administrative Agent,

as agent for the Prepetition Secured Lender, a security interest in substantially all of each Debtor's assets (collectively, the "Prepetition Collateral").  The liens and security interests in favor of the Prepetition Secured Lender, in its capacity as term lender, in and to certain Prepetition Collateral (including general intangibles, goods, inventory, contracts, leases, instruments, investment property, securities, security entitlements, securities accounts, equity interests held by the Debtors, and records related to the foregoing) (such liens being the "Existing Term Loan Liens" and such collateral being the "Existing Term Loan Collateral") are senior to the liens and security interests in favor of the Prepetition Secured Lender, in its capacity as Revolving Commitment lender, in and to such Prepetition Collateral, and the liens and security interests in favor of the Prepetition Secured Lender, in its capacity as Revolving Commitment lender, in and to the remaining Prepetition Collateral (including receivables, deposit accounts, cash, and records related to the foregoing) are senior to the liens and security interests in favor of the Prepetition Secured Lender, in its capacity as Existing Term Lender, in and to such remaining Prepetition Collateral.

15.    The Existing Lender Parties also have a security interest in the Cash Collateral, including amounts on deposit in the Debtors' deposit accounts and all proceeds of the collateral realized prepetition or postpetition.  In addition, as further security for the Borrowers' and Guarantor's obligations to the Prepetition Secured Lender in connection with the Prepetition Loan Agreement, the Guarantor executed a Pledge Agreement, dated as of June 29, 2012, in favor of the Prepetition Secured Lender pursuant to which the Guarantor pledged to and granted the Prepetition Secured Lender a security interest in its 100% limited liability company interests in each of the Borrowers.

16.     The Debtors are in default of their obligations under the Prepetition Loan Agreement and related documents.   As of the Petition Date, the aggregate amount of the obligations outstanding under the Term Loans was approximately $2,600,000 (the "Existing Term Loan Debt") and the aggregate amount of the obligations outstanding under the Revolving Commitment was approximately $3,000,000 (the "Existing Revolving Debt").

**C.     Events Leading to the Chapter 11 Filings and Marketing Efforts.**

17.     As discussed in more detail in the Pillari Declaration, the Borrowers have experienced significant liquidity issues that have hindered their ability to pay obligations in the ordinary course of business.   To address the liquidity issues, the Debtors sought to implement a number of restructuring initiatives over the last year, including making appropriate adjustments in staffing, negotiating with vendors and suppliers, and seeking out additional sources of funding.   In addition, in November 2013 the Debtors retained the services of Alvarez & Marsal Healthcare Industry Group to provide a Chief Restructuring Officer.

18.     After careful consideration and consultation with their advisors, the Debtors ultimately determined that it was necessary to pursue a sale or other restructuring transaction with one or more potential purchasers or other strategic partners.   The Debtors, together with their advisors, contacted a number of potential purchasers or strategic partners in connection with a potential sale or other restructuring transaction, and executed non-disclosure agreements with thirteen (13) such entities, all of which were granted access to a dataroom established by the Debtors' advisors to assist such entities in their due diligence efforts.

19.     The Debtors and their advisors were in regular contact with these entities and facilitated such entities' due diligence efforts, including by coordinating on-site visits and management meetings.   A number of parties expressed interest in a transaction with the Debtors,

including through a chapter 11 plan, section 363 sale, and/or a management structure.   The

Debtors and their advisors negotiated with each of these parties regarding potential transaction

structures and economic and other terms of a deal, but no such party, individually or together,

was willing to enter into a binding agreement to consummate such a transaction.

20.   Several parties with which the Debtors had been engaged in discussions,

including several creditors of the Debtors, ultimately submitted to the Debtors a joint term sheet

for a proposed transaction to acquire the Debtors' business operations.   The parties submitting

the term sheet were HFG, American Realty Capital and certain of its affiliates (collectively, the

"Landlord"), Acuity Healthcare, L.P. ("Acuity"),[4] HealthCap Partners, LLC ("HealthCap"), and

Tutera & Co. ("Tutera" and, together with HFG, the Landlord, Acuity, and HealthCap, the

"Transaction Parties").   The proposal provides for the formation of a new entity by HealthCap,

Acuity, and Tutera, with each Transaction Party, other than HFG, contributing cash funding to

the new entity, and HFG assigning to the new entity all of its rights, title, and interest as lender

and agent in and to all prepetition and postpetition indebtedness owing to it by the Debtors in

connection with the Prepetition Loans and the DIP Facility described in this Motion.   The newly

formed entity, PHX Hospital Partners, LLC (the "Stalking Horse Purchaser"), will serve as a

stalking horse bidder in connection with a sale transaction pursuant to section 363 of the

Bankruptcy Code involving substantially all of the Debtors' assets, subject to higher or otherwise

better offers.   The Debtors, together with their advisors, engaged in extensive negotiations with

---

[4]   Acuity currently provides financial management services, including billing and collection services, to
the Borrowers pursuant to the terms of a Financial Management Services Agreement.

the Stalking Horse Purchaser,[5] while at the same time continuing discussions with other potentially interested parties.

21.     Ultimately, the Debtors were able to reach an agreement with the Stalking Horse Purchaser regarding the terms of a stalking horse asset purchase agreement (the "Stalking Horse Agreement") involving a sale transaction pursuant to section 363 of the Bankruptcy Code, subject to higher or otherwise better offers.  The consideration being provided under the Stalking Horse Agreement consists of (a) $5,000,000 payable by the Stalking Horse Purchaser in the form of a credit bid under section 363(k) of the Bankruptcy Code with respect to a portion of the aggregate secured obligations owing by the Debtors in connection with the Prepetition Loans and the DIP Facility, (b) a waiver by the Landlord of certain cure costs with respect to the two real property leases between the Debtors and the Landlord for the hospital locations, including a waiver of certain past due basic rental obligations under the leases as of the closing of the sale transaction, and (c) the assumption by the Stalking Horse Purchaser of certain liabilities set forth in the Stalking Horse Agreement and the payment of all cure costs relating to executory contracts and unexpired leases to be assumed and assigned to the Stalking Horse Purchaser.

22.     Contemporaneously herewith, the Debtors are filing a motion seeking, among other things, (a) approval of certain auction and bidding procedures in connection with the sale of substantially all of the Debtors' assets, (b) approval of the Stalking Horse Agreement, and (c) to schedule an auction and sale approval hearing (the "Sale Motion").

23.     The Debtors, together with their advisors, carefully considered all options and determined in their business judgment that the commencement of these chapter 11 cases and the pursuit of a post-petition marketing and sale process as described in the Sale Motion, with the

---

[5]     References to the Stalking Horse Purchaser shall hereafter include the Transaction Parties and PHX Hospital Partners, LLC.

offer submitted by the Stalking Horse Purchaser serving as a floor bid at an auction, will maximize the value of the Debtors' assets and is in the best interest of all constituencies, including the patients at the Debtors' hospitals and creditors of the Debtors.  The Debtors did not have sufficient liquidity to continue operating outside of bankruptcy, and the pursuit of a sale transaction during these chapter 11 cases presents the best available option to (a) ensure the continued operation of the Debtors' LTAC hospitals, (b) ensure the continued provision of proper patient care and support, and (c) maximize value for the Debtors' estates.

**D.    The Debtor in Possession Financing.**

24.     In connection with the Debtors' restructuring efforts, the Debtors engaged in extensive negotiations with the Existing Lender Parties, which, following the occurrence and continuation of defaults under the Prepetition Loan Agreement, continued to provide funding to the Debtors under the Prepetition Loan Agreement to ensure continued operations and to bridge a smooth transition for the Debtors into chapter 11.  The Existing Lender Parties also provided the Debtors with a term sheet for potential debtor in possession financing, which was negotiated among the parties and culminated in the DIP Term Sheet.  Under DIP Term Sheet, the Existing Lender Parties agreed to provide continued revolving financing to the Debtors subject to a receivables-based borrowing base and an agreed overadvance component.

25.     During this time, the Debtors and their advisors were also engaged in discussions with other parties regarding potential debtor in possession financing for the Debtors, including supplemental debtor in possession financing, or other financing outside of bankruptcy.  After careful consideration, the Debtors ultimately decided that the proposal for debtor in possession financing advanced by the Existing Lender Parties was the best available under the

circumstances and adequately addressed the Debtors' reasonably foreseeable working capital needs in the near term.

26.     Immediate access to postpetition financing and the use of Cash Collateral is necessary to enhance the Debtors' liquidity, provide necessary working capital during the pendency of these chapter 11 cases, and provide patients, employees, vendors, suppliers, regulatory agencies and other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course while working towards a sale transaction in accordance with the bidding procedures described in the Sale Motion.  The Debtors determined that the use of cash collateral alone would not provide sufficient liquidity for the Debtors to operate their businesses in an appropriate manner.  If the Debtors are unable to access this postpetition financing and use Cash Collateral, the Debtors' business operations, ability to effectively consummate the sale transaction, and ability to provide proper patient care will be irreparably harmed.  For the foregoing reasons, the DIP Facility is in the best interest of the Debtors' estates, creditors, and other parties in interest.

## THE DIP FINANCING

27.     Consistent with Bankruptcy Rule 4001(c)(1) and this Court's requirements under Local Rule 4001-2(a)(ii), the principal terms of the DIP Facility and Interim Order are as follows:[6]

|  |  |
|---|---|
| Borrowers: | Restora Hospital of Mesa, LLC and Restora Hospital of Sun City, LLC (together, the "Borrowers"). |

---

[6]   The terms and conditions of the DIP Facility set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such.  This summary is qualified in its entirety by the provisions of the DIP Term Sheet and the Interim Order.  The Debtors reserve all rights in connection with the Interim Order.  Unless otherwise specified, terms used in this section have the same definitions as those in the DIP Term Sheet.

| | |
|---|---|
| Guarantor: | Restora Healthcare Holdings, LLC (the "Guarantor"). |
| Administrative Agent: | Healthcare Finance Group, LLC or an assignee thereof, in its capacity as administrative agent (the "DIP Agent"). |
| DIP Lender: | Healthcare Finance Group, LLC or an assignee thereof, in its capacity as lender (the "DIP Lender"). |
| DIP Facility: | A senior secured revolving credit facility in an amount not to exceed $7,000,000 at any one time outstanding, subject to a borrowing base and applicable reserves including a reserve for the Carveout (as defined below).  Prior to entry of a Final Order, the aggregate principal amount of the DIP Facility shall not exceed $4,000,000 (the "Interim Amount"). |
| Use of Proceeds: | The proceeds of the DIP Facility shall be used by the Borrowers for the purpose of (i) assuming the Debtors' Existing Revolving Debt, (ii) funding the Debtors' costs and expenses associated with the bankruptcy cases and providing for the Debtors' postpetition operating expenses and general working capital needs during these chapter 11 cases, and (iii) paying any fees and expenses of the Debtors incurred in connection with the transactions contemplated by the DIP Facility Documents, all in accordance with a certain budget in form and substance acceptable to the DIP Agent (the "Budget"), the form of which is attached hereto as Exhibit C.[7] |
| Maturity Date: | The date that is one-hundred and twenty (120) days after the Petition Date. |
| Carveout: | The liens, security interests, and Superpriority Administrative Expense Claims (as defined below) granted in favor of the DIP Lender Parties in connection with the DIP Facility shall be subject to a carveout (the "Carveout") for (i) payment of up to $20,000 of fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code, (ii) the payment of U.S. Trustee fees, (iii) the payment of all fees and expenses incurred during the Case in accordance with the Budget (without regard to any variance permitted by the DIP Term Sheet) prior to the occurrence of an Event of Default (as defined below) under the DIP Facility, but that remain unpaid as of such date, of professionals retained by the Debtors, professionals retained |

---

[7]   The Debtors believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget.

by the official committee of unsecured creditors, once appointed (the "Committee"), and any patient care ombudsman appointed in the Case (collectively, the "Professional Fees") in an amount not to exceed (a) $250,000 prior to entry of the Final Order and (b) $500,000 following entry of the Final Order, and (iv) an amount up to $150,000 for the payment of Professional Fees incurred from and after the occurrence of an Event of Default under the DIP Facility following entry of the Final Order.  So long as no Event of Default shall have occurred and be continuing, the Carveout shall not be reduced by the payment of Professional Fees in accordance with and subject to the Budget. Other than the Carveout, the DIP Facility shall not otherwise be subject to any carveout for Professional Fees.

Advance Rate:
The aggregate principal amount of the DIP Facility outstanding at any one time shall not exceed the lesser of $7,000,000 and 85% of the collectible value of eligible receivables of the Borrowers, as determined by the DIP Agent consistent with the criteria in place under the Prepetition Loan Agreement and subject to any reserves and liquidity blocks consistent with the Prepetition Loan Agreement, as otherwise determined in the DIP Lender Parties' discretion, and on account of the amount of the Carveout; provided that the DIP Lender agrees to make overadvances, at the Borrowers' request, subject to the Budget, in an amount up to (i) $2,300,000 following entry of the Interim Order and (ii) $2,600,000 following entry of the Final Order.  Following the Sale, the DIP Lender Parties shall have no further obligation to make advances to the Borrower.

Interest:
Interest shall be payable on the first Business Day of each month and shall accrue on the average daily outstanding balance of the DIP Facility during the prior month at a rate of LIBOR (subject to a floor of 1.25%) plus 6.50% per annum.

Default Interest:
4% per annum in excess of the otherwise applicable interest rate.

Facility Fee:
1.5% of the Committed Amount earned in full at the commencement of the DIP Facility and payable on the earliest of the Maturity Date (without regarding to any agreed extension thereof), an Event of Default, and the

consummation of a plan of reorganization.

| | |
|---|---|
| Non-Utilization Fee: | 0.50% per annum, payable monthly, on the difference between the Committed Amount (or prior to the entry of the Final Order, the Interim Amount) and the average outstanding balance of the DIP Facility. |
| Collateral Monitoring Fee: | $2,500 per month. |
| Security: | The obligations in respect of the DIP Facility, including all principal, interest, expenses, fees and other amounts owing in respect thereof, shall be secured by first priority senior liens on, and security interests in, all of the Borrowers' and Guarantor's assets including, without limitation, whether now existing or owned or hereafter arising or acquired, all receivables, all general intangibles and payment intangibles, contract rights, deposits and deposit accounts, goods, inventory, machinery and equipment, goodwill and investment property, membership rights, privileges and interests in any person, real property and leasehold interests, and all cash and non-cash proceeds of the foregoing (collectively, the "DIP Collateral"), subject only to (i) the Carveout, (ii) the Existing Term Loan Liens, and (iii) the existing liens set forth on Exhibit 1 to the DIP Term Sheet in each case to the extent valid, enforceable and non-avoidable (collectively, together with the Existing Term Loan Liens, the "Senior Liens").  The Debtors are not aware of any Senior Liens other than the Existing Term Loans.  Following the entry of the Final Order, the DIP Collateral shall also include all avoidance actions and all cash and non-cash proceeds thereof. |
| Superpriority Administrative Expense Claim: | The indebtedness of the Debtors under the DIP Facility Documents shall constitute, in accordance with section 364(c) of the Bankruptcy Code, a superpriority administrative claim having priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject to the Carveout. |
| Conditions Precedent to Interim Advances: | The obligations of the DIP Lenders to make the interim advances under the DIP Facility are subject to the satisfaction in full of the following conditions precedent:

(i) The Interim Order shall have been entered within two (2) Business Days following the Petition Date, and shall not have been reversed, vacated, modified, amended or stayed, |

except for modifications and amendments that are reasonably acceptable to the DIP Lender Parties and Existing Lender Parties.

(ii) The execution and delivery of the DIP Term Sheet and such other definitive loan documentation in form and substance satisfactory to the DIP Lender Parties.

(iii) Implementation of a cash management system satisfactory to the DIP Agent, which shall include, among other things, exclusive collection and other remittance procedures (without netting or offsets) and lockbox collection procedures. The existing cash management system maintained by the Debtors is acceptable to the DIP Lender Parties.

Conditions Precedent to Full DIP Advances:

The obligations of the DIP Lenders to make the full amount of the advances available under the DIP Facility are subject to the satisfaction in full of the following condition precedent:

(i) The Final Order shall have been entered not later than 25 days after the Petition Date and shall not have been reversed, vacated, modified, amended or stayed, except for modifications and amendments that are reasonably acceptable to the DIP Lender Parties and Existing Lender Parties.

(ii) The execution and delivery of the DIP Facility Documents and such other definitive loan documentation in form and substance acceptable to the DIP Lender Parties.

Conditions Precedent to All DIP Advances:

The obligations of the DIP Lenders to make all advances, including the interim advances, under the DIP Facility are subject to the satisfaction in full of the following conditions precedent:

(i) There shall exist no Event of Default (or event which would constitute an Event of Default with the giving of notice or lapse of time or both), and any representations and warranties stated in the DIP Term Sheet or DIP Loan Agreement, as applicable, and any borrowing certificate shall be true and correct in all material respects, immediately prior to, and after giving effect to, such extension of credit.

(ii) The DIP Lender Parties shall have received the Budget, including revised "to date" projections and cash flows, in form and substance acceptable to them.

(iii) The DIP Lender Parties shall have received such approvals, opinions or documents as they may reasonably request.

Milestones:

The DIP Term Sheet contains the following milestones (the "Milestones"), each of which may be extended by an agreement in writing between the Borrowers and the DIP Lender Parties:

(i) Within one business day of the Petition Date, the Borrowers shall have filed the Sale Motion to establish bidding procedures for the sale of substantially all of their assets (the "Purchased Assets") and to approve the sale of the Purchased Assets (the "Sale"), which motion shall be in form and substance reasonably acceptable to the DIP Lender Parties.

(ii) Within 25 days of the Petition Date, the Bankruptcy Court shall have entered an order approving bidding procedures for the Sale, which order shall be in form and substance reasonably acceptable to the Lender Parties.

(iii) On or before April 25, 2014, the Bankruptcy Court shall have entered an order approving a Sale to the entity that submits the highest and best offer for the Purchased Assets on terms reasonably acceptable to the DIP Lender Parties (a "Qualified Sale"), which order shall be in form and substance reasonably acceptable to the DIP Lender Parties.

(iv) On or before April 30, 2014, a Qualified Sale shall have been consummated.

(v) In the case of a Qualified Sale that does not include the receivables as a Purchased Asset, on or before the closing of the Qualified Sale, the Borrowers shall have engaged a servicer for the billing and collection of the Borrowers' receivables reasonably acceptable to the DIP Lender Parties and on terms of service reasonably acceptable to the DIP Lender Parties. Such servicer must be in position to perform billing and collection services as of the date of such closing

Events of Default:    The following constitute Events of Default under the DIP Term Sheet and are expected to constitute Events of Default under the DIP Loan Agreement:

(i) The Final Order is not entered within 25 days following the entry of the Interim Order.

(ii) The Debtors' chapter 11 cases shall be dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

(iii) Upon receipt of notice of default from the Lender Parties following the filing of a proposed plan of reorganization by the Borrowers (or, if exclusivity has terminated, by any party) that does not provide for the indefeasible payment in full in cash of the Debtors' obligations under the DIP Facility Documents and Prepetition Loan Agreement as of the effective date of such plan or which plan is not reasonably acceptable to the DIP Lender Parties and the Existing Lender Parties.

(iv) Upon receipt of notice of default from the Lender Parties following the entry of an order confirming a plan of reorganization that does not require repayment in full of the Debtors' obligations under the DIP Facility Documents and Prepetition Loan Agreement as of the effective date of such plan or which plan is not reasonably acceptable to the DIP Lender Parties and the Existing Lender Parties.

(v) Appointment of a trustee under section 1104 of the Bankruptcy Code or an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code.

(vi) Entry of an order amending, supplementing, staying, vacating, revoking, reversing or otherwise modifying the DIP Facility, the DIP Orders, the DIP Term Sheet, or the DIP Facility Documents in any material respect, without the prior written consent of the DIP Lender Parties.

(vii) Entry of an order permitting any claim against, or obligation of, the Borrowers (now existing or hereafter arising, of any kind or nature whatsoever), to have priority equal or superior to the priority of the DIP Lender Parties in respect of the Debtors' obligations under the DIP Facility Documents and Prepetition Loan Agreement and

the liens securing such debt (including any adequate protection liens), other than the Carveout and the Senior Liens.

(viii) Any attempt by the Borrowers to invalidate, reduce or otherwise impair the DIP Lender Parties' rights, claims or liens under the DIP Facility, the DIP Term Sheet, the DIP Facility Documents and the DIP Orders, or the Existing Lender Parties' rights, claims or liens under the Prepetition Loan Agreement and the DIP Orders, or any such rights, claims or liens shall, for any reason, cease to be valid.

(ix) The entry of an order that subjects the DIP Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code.

(x) Upon receipt of notice of default from the Lender Parties following any material payment is made on, or application for authority to pay (which is supported, directly or indirectly, by the Borrowers, or is not being actively contested by the Borrowers in good faith), any material prepetition claim (other than amounts provided for in the Budget) without the DIP Lender Parties' consent.

(xi) An order is entered granting any creditor material relief from the automatic stay to exercise rights with respect to property of the estates having a value of more than $50,000 or which has a material effect on the ability of the Borrowers to operate the business consistent with current practice.

(xii) Breach of any obligation of the Borrowers set forth in the DIP Term Sheet, DIP Loan Agreement, or the DIP Orders, which breach is not cured within 5 days of the Borrowers' receipt of written notice of such breach by the DIP Agent.

(xiii) Advances or the Carveout is utilized to prosecute actions, claims, demands or causes of action against the DIP Lender Parties and the Existing Lender Parties or to object to or contest in any manner or to raise any defense in any pleading to the validity, perfection, priority or enforceability of the DIP Facility, the Prepetition Term Loan Obligations, of the rights, claims, liens and security interests granted to the DIP Lender Parties under the DIP

Facility and the DIP Orders, or of the rights, claims, liens and security interests granted to the Existing Lender Parties under the Prepetition Loan Agreement and the DIP Orders; provided that up to an aggregate of $25,000 of the Prepetition Collateral including the Cash Collateral, advances under the DIP Facility, or the Carveout may be used by the Committee (if any) to investigate the validity, enforceability, perfection and priority of the Existing Debt and the Existing Lender Parties' security interests and liens on the Prepetition Collateral.

(xiv) Offset or recoupment by any governmental entity of overpayments or other amounts in an amount greater than $50,000 in contravention of DIP Orders.

(xv) Upon receipt of notice of default from the Lender Parties following an application for any of the orders or actions described in clauses (ii), (v), (vi), (vii), (viii), (ix), (xi), (xiii) or (xiv) above shall be made by any person, including the unsecured creditors' committee, and such application either is supported, directly or indirectly, by the Borrowers, or is not actively contested by the Borrowers in good faith within the applicable objection period.

(xvi) The Borrowers shall have failed to satisfy any of the Milestones without the consent of the Lender Parties.

(xvii) Upon receipt of notice of default from the Lender Parties following the occurrence of (1) a material adverse effect on the business, assets, liabilities, operations, patient census, prospects or condition (financial or other) of either Borrower, recognizing that the Borrowers are filing the chapter 11 cases; (2) the material impairment of the ability of the Borrowers to meet their obligations substantially as set forth in the Budget or to otherwise perform their obligations in connection with the DIP Facility; (3) the imposition of any obligation on the DIP Lender or DIP Agent, compliance with which would materially impair such person's ability to receive its contemplated economic benefits under the DIP Term Sheet; (4) the material impairment of the validity or enforceability of, or the rights, claims, liens, remedies or benefits available to the DIP Lender Parties under, the DIP Orders, the DIP Term Sheet, the DIP Loan Agreement or any other loan document; or (5) the material impairment of the validity, perfection or priority of any lien granted in favor of the

DIP Lender Parties and the Existing Lender Parties.

(xviii)  Upon receipt of notice of default from the Lender Parties following a material variance from the Budget tested on a weekly basis as follows: (a) Actual disbursements ("Total Operating Cash Outflows" plus "Total Chapter 11 Items") in the aggregate being more than 110% of projected disbursements in the Budget; (b) Actual disbursements on a line item basis being more than 110% of projected disbursements in the Budget and more than $25,000 of such projected disbursements; or (c) "Net Cash Flow" in the Budget, if negative, being more than 110% of, and not more than $100,000 less than, the projected "Net Cash Flow" in the Budget, and, if positive, being less than 90% of, and not less than $100,000 less than, the projected "Net Cash Flow" in the Budget.

| | |
|---|---|
| Limitation on Charging Expenses Against Collateral: | Subject to the Final Order, no expenses of administration of the chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under any chapter of the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of the DIP Agent. |
| Representations and Warranties: | The DIP Loan Agreement is expected to contain representations and warranties customarily found in loan agreements for similar debtor in possession financings, including, without limitation, with respect to organization in good standing, validity of agreements, tax status, compliance with laws, litigation and the Borrowers' billing and collection policies and procedures. |
| Adequate Protection for Existing Term Lender Parties: | The Borrowers shall grant adequate protection liens (the "Adequate Protection Liens") in the DIP Collateral to the Existing Term Lender Parties to secure any diminution in value of the Existing Term Loan Liens in the Prepetition Collateral, which Adequate Protection Liens shall be senior liens in all DIP Collateral subject only to (i) the Carveout, (ii) the liens securing the Debtors' obligations under the DIP Facility, and (iii) the Senior Liens.  In addition, (a) interest on the Existing Term Loan Debt shall accrue during the chapter 11 cases at the default rate set forth in the Prepetition Loan Agreement, and (b) the Borrowers shall pay the fees and expenses of the professionals retained by the Existing |

Term Lender Parties in connection with Borrowers' chapter 11 cases.

**Borrowers' Stipulations in Favor of Existing Lender Parties:**

Subject to the right of other parties in interest with standing, the Borrowers shall (i) stipulate to the amount, validity, enforceability, perfection and unavoidability of the Existing Term Loan Debt and Existing Revolving Debt and any liens in respect thereof, (ii) stipulate that as of the Petition Date, to the best of Borrowers' knowledge, the value of the Prepetition Collateral exceeds the Existing Term Loan Debt and the Existing Revolving Debt, (iii) acknowledge that as of the date hereof no affirmative claims exist in favor of Borrowers or Guarantor against the Existing Lender Parties with respect to any matters, and (iv) release and waive any such matters, including affirmative causes of action and objections to claims, with respect to the Existing Lender Parties as of the date hereof. To the best of their knowledge, the Debtors believe that the contemplated stipulations are accurate.

**Release:**

In connection with the indefeasible payment in full in cash of the DIP Facility obligations and the termination of the DIP Facility, the Borrowers and Guarantor covenant and agree that at such time they shall execute and deliver in favor of the DIP Lender Parties a valid and binding termination and release agreement, in form and substance acceptable to the DIP Lender Parties.

**Indemnity:**

The Borrowers and Guarantor will indemnify and hold harmless the DIP Lender Parties and their respective members, officers, directors, employees, affiliates, successors, assigns, agents, counsel and other advisors (collectively, the "Indemnified Parties") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of, or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with (a) the DIP Facility, the transactions contemplated thereby, and any use made or proposed to be made with the proceeds thereof, (b) the Debtors' chapter 11 cases, or (c) the actual or alleged presence of hazardous materials on any property of the Borrowers or the Guarantor or any environmental action or proceeding relating in any way to the Borrowers, the Guarantor or any of their properties, in each case, whether or

not such investigation, litigation or proceeding is brought by the Borrowers, the Guarantor, their shareholders or creditors or an Indemnified Party, or an Indemnified Party is otherwise a party thereto, except to the extent such claim, damage, loss, liability or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

### Highlighted Provisions Under Local Rule 4001-2(a)(i)

28.     Local Rule 4001-2(a)(i) requires the Debtors to highlight certain provisions included in the DIP Term Sheet and the Interim Order.  As discussed herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these cases and should be approved.  The provisions under Local Rule 4001-2(a)(i) included in the DIP Term Sheet and Interim Order are as follows:

(a)     Local Rule 4001-2(a)(i)(A) requires the disclosure of provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors.  Neither the DIP Term Sheet nor the Interim Order contains any such provision.

(b)     Local Rule 4001-2(a)(i)(B) requires the disclosure of provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition liens or the waiver of claims against the secured creditor without first giving parties in interest an opportunity to conduct an investigation.  Although the DIP Term Sheet and Interim Order contain stipulations by the Debtors with respect to, among other things, the validity, perfection, and amount of liens held by the Existing Lender Parties, the Interim Order provides that any party in interest with standing to do so shall have until the earlier of (i) 75 days after the Petition Date or (ii) 60 days following the formation of a creditors' committee pursuant to section 1102 of the Bankruptcy Code to challenge the validity, enforceability, priority or extent of the prepetition secured obligations or the prepetition liens on the Prepetition Collateral.  (Interim Order at ¶¶ B and 27).

(c)     Local Rule 4001-2(a)(i)(C) requires the disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  It is contemplated that the Final Order will provide for a waiver of rights under section 506(c) of the Bankruptcy Code with respect to the Prepetition Collateral and the DIP Collateral.  The Interim Order does not so provide.  (Interim Order at ¶¶ 9 and 21).

(d)     Local Rule 4001-2(a)(i)(D) requires the disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code.  The DIP Term Sheet and the Interim Order provide for the granting of liens in favor of the DIP Lender Parties on the Debtors' claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code; however, such grant of such liens is subject to the entry of the Final Order.  (DIP Term Sheet at p. 5; Interim Order at ¶ 11).

(e)     Local Rule 4001-2(a)(i)(E) requires the disclosure of provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(a) of the Bankruptcy Code.  Under the DIP Term Sheet and Interim Order, the Existing Revolving Debt under the Prepetition Loan Agreement (but not the Existing Term Loan Debt) shall be assumed by the Debtors and deemed postpetition debt under the DIP Facility Documents.  (DIP Term Sheet at p. 2; Interim Order at ¶ 6).  The assumption of the Existing Revolving Debt as postpetition debt remains subject to the effects of a timely challenge by any party in interest to the validity, enforceability, priority, or extent of the prepetition secured obligations or the prepetition liens on the Prepetition Collateral.

(f)     Local Rule 4001-2(a)(i)(F) requires the disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carveout.  Neither the DIP Term Sheet nor the Interim Order provide any such disparate treatment.

(g)     Local Rule 4001-2(a)(i)(G) requires the disclosure of provisions that prime any secured lien without the consent of that lienor.  Neither the DIP Term Sheet nor the Interim Order provide for the priming of any secured lien without the consent of the lienor.

(h)     Local Rule 4001-2(a)(i)(H) requires the disclosure of provisions that seek to affect the Court's power to consider the equities of the cases under 11 U.S.C. § 552(b)(1).  The Interim Order does not contain any such provision.  It is contemplated that the Final Order will contain such a provision.

29.     In addition, as noted above, the DIP Lender Parties may assign to the Stalking Horse Purchaser all of their rights, interests, and obligations in, to, and under the DIP Facility, with the Stalking Horse Purchaser credit bidding, among other things, all or a portion of the obligations owing under the DIP Facility in connection with a sale transaction for substantially all of the Debtors' assets in accordance with section 363(k) of the Bankruptcy Code.

**BASIS FOR RELIEF**

**A.    THE REQUESTED RELIEF SHOULD BE GRANTED PURSUANT
TO SECTIONS 364(c) AND 364(d)(1) OF THE BANKRUPTCY CODE.**

30.    As set forth above, the Debtors' ability to maximize the value of their estates and successfully sell their business operations hinges upon their being able to access postpetition financing.  Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis. Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to super-priority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.  See 11 U.S.C. § 364(c).

31.    Under section 364 of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A)    the [debtor] is unable to obtain credit otherwise; and
>
> (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

I.      **The Debtors Have Exercised Their Business Judgment in Entering Into the DIP Facility.**

32.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); see also In re Farmland Indus., Inc., 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment."); In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors.").

33.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money.  See, e.g., In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court").  Further, one court has noted that "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

34.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary

and capricious.  See In re Curlew Valley Assocs., 14 B.R. 506, 511–13 (Bankr. D. Utah 1981); see also In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor).  Bankruptcy courts generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Curlew Valley, 14 B.R. at 513–14.

35.    The Debtors have exercised sound business judgment in determining the appropriateness of the DIP Facility and have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Term Sheet.  The use of Cash Collateral alone is insufficient to meet the Debtors' working capital needs to operate their businesses in the ordinary course.  The DIP Term Sheet contains terms and conditions that are the best available under the circumstances and provides the Debtors with sufficient liquidity during the period of the Budget.  In addition, the Debtors' assumption of the Existing Revolving Debt as set forth in the DIP Term Sheet should result in increased availability under the DIP Facility.  Absent assumption of such debt and/or a non-consensual use of Cash Collateral, prepetition receivables would need to be applied towards the Existing Revolving Debt, which may not result in any additional availability to the Debtors under the DIP Facility until such Existing Revolving Debt is paid in full.  In connection with the DIP Facility and the contemplated assumption of the Existing Revolving Debt thereunder, the DIP Lender has agreed to make overadvances to supplement the Debtors' liquidity.  In addition, the Interim Order preserves the rights of other parties in interest, including any statutory committee of unsecured creditors, to investigate and challenge the validity, enforceability, perfection, and priority of the Existing Revolving Debt and the liens and security interests granted in connection therewith.

36.     The funds provided by the DIP Facility are essential to enable the Debtors to continue to operate during the course of these chapter 11 cases while working towards a sale transaction that is in the best interest of the estates.  Indeed, failure to obtain approval of the DIP Facility will lead to a wind-down of the Debtors' business operations which, in turn, will preclude any sale of the Debtors' assets and adversely affect the value ultimately received by stakeholders.

37.     Accordingly, pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors respectfully submit that they should be granted authority to obtain financing from the DIP Lenders on the terms set forth in the DIP Term Sheet.

## II.     The DIP Facility Represents the Best Financing Available.

38.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source.   See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

39.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."   In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D.

Ga. 1989); see also In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); In re Ames Dep't Stores, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

40.     The Debtors and their advisors have solicited proposals from and negotiated with several institutions in an effort to secure debtor in possession financing on the best terms available.  The Debtors have determined that the terms and conditions of the DIP Facility are the best available under the circumstances and address the Debtors' working capital needs. Postpetition financing is not otherwise available without granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the DIP Collateral pursuant to section 364(c) and (d) of the Bankruptcy Code.  The Debtors are unable to obtain the necessary postpetition financing that they need on terms more favorable than those provided by the DIP Facility.  Accordingly, the Debtors' efforts to obtain postpetition financing satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.

**III.     The DIP Facility Is Necessary to Maintain the Debtors' Ongoing Business Operations and to Successfully Consummate a Sale of the Debtors' Assets in These Cases.**

41.     The DIP Facility, if approved, will provide essential working capital, allowing the Debtors to maintain the value of their assets and their ongoing business operations while working towards a sale of the Debtors' assets in these chapter 11 cases.  In addition, the DIP Facility will

provide the Debtors' various constituencies, including patients, employees, vendors, service providers, and regulatory agencies with confidence in the Debtors' ability to maintain operations while working towards a sale transaction.

42.    If the relief sought in this Motion is denied or delayed, the Debtors likely will experience business disruptions, the Debtors' ability to provide proper patient care will be hindered, and the Debtors' ability to consummate a sale transaction and maximize value for the estates may be irreparably damaged.  Accordingly, the DIP Facility is necessary to maximize value for the Debtors' estates and inures to the benefit of creditors and all parties in interest, including patients.

### IV.    The Terms of the DIP Facility Are Fair, Reasonable, and Adequate Under the Circumstances.

43.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  See In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  See Transcript of Record at 740:4–6, In re Lyondell Chem. Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions reasonable here and now.").

44.    The terms and conditions of the DIP Facility were negotiated in good faith and at arm's length among the parties, culminating in the DIP Term Sheet that is designed to provide the Debtors with essential working capital and maintain the Debtors' ongoing business

operations while working towards a sale of the Debtors' assets.  Indeed, when viewed in its

totality, the DIP Facility reflects the Debtors' exercise of prudent business judgment consistent

with their fiduciary duties and is supported by fair consideration.

**V.      Section 364(e) Protections Should Apply to the DIP Facility.**

45.      The terms and conditions of the DIP Facility are fair and reasonable, and were

negotiated extensively by well-represented, independent parties in good faith and at arm's length.

Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the

meaning of Bankruptcy Code section 364(e), and are entitled to all of the protections afforded by

that section.

**B.      THE DEBTORS' REQUEST FOR USE OF CASH COLLATERAL
          AND THE PROPOSED ADEQUATE PROTECTION IS APPROPRIATE.**

46.      The Debtors' use of property of the estates is governed by section 363 of the

Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . .
> . of this title and unless the court orders otherwise, the [debtor] may enter into
> transactions, including the sale or lease of property of the estate, in the ordinary
> course of business, without notice or a hearing, and may use property of the estate
> in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

47.      Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize

the Debtors to use cash collateral as long as the applicable secured creditors consent or are

adequately protected.  See In re McCormick, 354 B.R. 246, 251 (Bankr. C D. Ill. 2006) (to use

the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor

or must establish to the Court that the secured creditor's interest in the cash collateral is

adequately protected).  "Cash Collateral" is defined as, "cash, negotiable instruments, documents

of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest."  11 U.S.C. § 363(a).

48.     The Debtors have an urgent need for the immediate use of the Cash Collateral pending the final hearing on this Motion and seek to use all Cash Collateral existing on or after the Petition Date.  The Debtors require the use of the Cash Collateral to, among other things, maintain their ongoing business operations and to pay the costs and expenses associated with the administration of these chapter 11 cases.  Absent the use of Cash Collateral, the Debtors' ability to ensure proper patient care and treatment would be diminished and the value of the Debtors' business as a going concern would be irreparably impaired.

49.     In addition, the Prepetition Secured Lender and Prepetition Administrative Agent, which are the only parties holding a security interest in the Cash Collateral, have consented to the use of Cash Collateral as requested herein, subject to their receipt of the adequate protection provided for in the Interim DIP Order.  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief.  See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985).  The focus of the requirement is to protect a secured creditor from the diminution in value of its interest in the particular collateral during the period of use.  See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

50.     Courts have also held that adequate protection may be demonstrated by showing that the secured creditor's interest in the collateral is preserved by the debtor's use of the cash collateral in a manner that maintains or enhances the collateral's value.  See In re Salem Plaza

<u>Assocs.</u>, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was adequately protected when cash collateral was used to pay necessary operating expenses); <u>In re Constable Plaza Assocs., L.P.</u>, 125 B.R. 98, 105–06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion); <u>accord</u> in re Atrium Dev. Co., 159 B.R. 464, 471 (Bankr. E.D. Va. 1993) ("Adequate protection is typically established by the fact that cash is being used to maintain and enhance the value of the underlying income producing real property in which the creditor also usually holds a security interest."); <u>McCombs Props. VI, Ltd. V. First Tex. Sav. Ass'n (In re McCombs Props. VI, Ltd.)</u>, 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (holding that committing to use cash collateral for operating expenses substantially eliminated the risk of diminution in the secured creditor's interest in the collateral).

51.     The proposed adequate protection is typical and appropriate under the circumstances.  Specifically, as adequate protection for the Existing Term Lender Parties with respect to, and solely to the extent of, any diminution of value in the Existing Term Loan Collateral, the Existing Term Lender Parties shall receive replacement liens in and to the DIP Collateral, subject to the Carveout, the liens and security interests of the DIP Lender Parties in and to such DIP Collateral, and any Senior Liens to be identified in the DIP Loan Agreement.  In addition, default interest will accrue on the Existing Term Loan Debt during the course of the Debtors' chapter 11 cases and the Debtors will pay all reasonable out of pocket expenses and professional fees incurred by the Existing Term Lender Parties in connection with the Debtors or these chapter 11 cases.

52.     The Existing Term Lender Parties have consented to these forms of adequate protection.  In addition, the Debtors will use Cash Collateral to operate their business, which will

maintain and enhance the value of the prepetition collateral.  Accordingly, the Debtors should be authorized to use Cash Collateral as set forth herein.

## C.    MODIFICATION OF THE AUTOMATIC STAY ON A LIMITED BASIS IS WARRANTED.

53.    The relief requested herein contemplates a modification of the automatic stay pursuant to Bankruptcy Code section 362 to the extent necessary to permit the DIP Agent to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Term Sheet, the DIP Facility Documents, the Interim Order, and the Final Order, after three (3) business days' notice thereof, and to take various actions without further order of or application to the Court.

54.    Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Term Sheet and DIP Facility Documents and the proposed DIP Orders.

## D.    INTERIM APPROVAL AND SCHEDULING OF FINAL HEARING.

55.    As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

56.     Absent relief on an interim basis pursuant to the Interim Order, the Debtors will be unable to satisfy their immediate and projected payment obligations, including payroll and other operating expenses.  Given the immediate and irreparable harm to be suffered by the Debtors absent interim relief, the Debtors respectfully request that the Court schedule and conduct a preliminary hearing on the Motion and (a) authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the DIP Term Sheet and to utilize Cash Collateral, and (b) schedule the Final Hearing.

**E.      WAIVER OF BANKRUPTCY RULES 6004(a) AND (h).**

57.     The Debtors believe an efficient and expeditious approval and implementation of the DIP Facility is in the best interests of their creditors and other parties in interest, including patients.  Accordingly, the Debtors seek waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of orders authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**NOTICE**

58.     No trustee, examiner, or statutory committee of unsecured creditors has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion on: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' twenty largest unsecured creditors on a consolidated basis; (c) counsel to the Existing Lender Parties; (d) counsel to the DIP Lender Parties; (e) Wells Fargo Bank, N.A.; (f) counsel to the Debtors' landlords; (g) all applicable health regulatory agencies and taxing authorities; (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue Service; and (j) all known parties that may be asserting a lien against the DIP Collateral (collectively, the "Notice

Parties"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

## **NO PRIOR REQUEST**

59.     No prior request for the relief sought herein has been made to this or any other court.

[*Text Continues on the Next Page*]

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form of the proposed Interim Order attached hereto as Exhibit A, (ii) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court, and (iii) grant such other and further relief as this Court deems just and proper.

Dated: February 24, 2014
      Wilmington, Delaware

**DLA PIPER LLP (US)**

/s/ Stuart M. Brown
Stuart M. Brown (DE 4050)
Daniel N. Brogan (DE 5723)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email:    Stuart.Brown@dlapiper.com
             Daniel.Brogan@dlapiper.com

-and-

Thomas R. Califano (*pro hac vice* admission pending)
Daniel G. Egan (*pro hac vice* admission pending)
1251 Avenue of the Americas
New York, New York  10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Email:  Thomas.Califano@dlapiper.com
        Daniel.Egan@dlapiper.com

*Proposed Attorneys for the Debtors and Debtors in Possession*