**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------------x
                                          :
In re:                                    :   Chapter 11
                                          :
RESTORA HEALTHCARE HOLDINGS, LLC,         :   Case No. 14-10367 (____)
et al.,[1]                                :
                                          :   (Joint Administration Requested)
                Debtors.                  :
-------------------------------------------------------------x
```

**MOTION OF DEBTORS FOR ENTRY OF ORDERS (I) (A) APPROVING
AUCTION AND BIDDING PROCEDURES IN CONNECTION WITH THE
SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS,
(B) AUTHORIZING ENTRY INTO A STALKING HORSE AGREEMENT,
SUBJECT TO HIGHER OR OTHERWISE BETTER OFFERS,
(C) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D)
SCHEDULING AUCTION AND SALE APPROVAL HEARING, (E) APPROVING THE
FORM AND MANNER OF SALE NOTICE, AND (F) GRANTING RELATED RELIEF,
AND (II) (A) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS, (B) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by

and through their proposed undersigned attorneys, hereby file this motion (the "Motion")

pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11

U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9006 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax
      identification number, are: Restora Healthcare Holdings, LLC (2837); Restora Hospital of Mesa, LLC
      (8773); and Restora Hospital of Sun City, LLC (1028).  The mailing address for the Debtors, solely
      for purposes of notices and communications, is 2550 Northwinds Parkway, Suite 160, Alpharetta,
      Georgia 30009.

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of (i) an order, substantially in the form annexed hereto as Exhibit A (the "Bidding Procedures Order"), (a) approving certain auction and bidding procedures in connection with the sale of substantially all of the Debtors' assets, substantially in the form annexed hereto as Exhibit D (the "Bidding Procedures"), (b) authorizing the Debtors to enter into a stalking horse purchase agreement, subject to higher and better offers, (c) approving procedures relating to the assumption and assignment of executory contracts and unexpired leases, (d) scheduling an auction and sale approval hearing, (e) approving the form and manner of sale notice, and (f) granting related relief, and (ii) an order, substantially in the form annexed hereto as Exhibit B (the "Sale Order"), (a) authorizing and approving the sale of substantially all of the Debtors' assets free and clear of all liens, claims, encumbrances, and other interests, (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases, and (c) granting related relief.   In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      The Court has jurisdiction over the Debtors, their estates, and this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested in this Motion are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9006, and Local Rule 6004-1.

## BACKGROUND

**A.    General Background.**

2.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

4.    The Debtors operate two long-term acute care (LTAC) hospitals that provide high intensity acute level care to patients requiring longer hospitalizations—typically ranging from a few weeks to several months. The two hospitals are each 120-bed, licensed, freestanding hospitals located in the Greater Phoenix area.  Restora Hospital of Mesa, LLC ("Restora Mesa") is located in Mesa, Arizona and Restora Hospital of Sun City, LLC ("Restora Sun City" and, together with Restora Mesa, "Restora") is located in Sun City, Arizona.  Both hospitals are Medicare and Medicaid certified, and offer a continuum of services including specialty acute care and sub-acute care provided in an on-site transitional care unit (TCU).

5.    Restora provides a wide variety of programs and services, including a pulmonary/ventilator program, wound care, low toleration rehabilitation services, and post-surgical care.  Restora treats patients who require multiple concurrent care modalities such as ventilator case, intravenous therapy, nutritional support, tube feedings, antibiotic management, dialysis, and complex wound/skin care management.

6.    Restora patients typically are critically ill and/or have multi-system failures that require extended acute care treatment after discharge from a traditional acute care hospital. Patients often come to the hospitals directly from an intensive care unit.  Upon admission, each

patient is evaluated by an interdisciplinary team of professionals to develop an appropriate plan of action depending on the patient's particular needs, and the length of stay of patients will vary depending on the diagnosis, patient age, and acuity level.

      7.      Revenue is earned from fees for services rendered and is due from patients and third party payors, including both Medicare and Medicaid and various insurance companies. Net patient revenue at Restora Mesa for the period of January 2013 through September 2013 was $15,688,593, and net patient revenue at Restora Sun City for the same period was $13,014,048.

      8.      A more detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of George D. Pillari in Support of Chapter 11 Petitions and First Day Motions* (the "Pillari Declaration"), filed contemporaneously herewith and incorporated herein by reference. Mr. Pillari is the Debtors' proposed chief restructuring officer.

      **B.**      **The Prepetition Secured Indebtedness.**

      9.      The Debtors are parties to a Revolving and Term Loan and Security Agreement, dated as of June 29, 2012 (as amended, modified, and supplemented from time to time, the "Prepetition Loan Agreement"), with Healthcare Finance Group, LLC ("HFG"), as revolving lender, term lender, and administrative agent (in its capacity as lender, the "Prepetition Secured Lender," and in its capacity as administrative agent, the "Prepetition Administrative Agent" and, collectively, the "Existing Lender Parties"). Pursuant to the Prepetition Loan Agreement, the Prepetition Secured Lender, in its capacity as term lender (the "Existing Term Lender" and, together with the Prepetition Administrative Agent as agent for the Existing Term Lender, the "Existing Term Lender Parties"), agreed to make a term loan to Restora in the initial principal amount of $3 million ("Term Loan A") and a separate term loan to Restora in the initial

principal amount of $2 million ("Term Loan B" and, together with Term Loan A, the "Term Loans"). Term Loan B was not advanced to Restora.

10.     In addition, the Prepetition Loan Agreement provides for certain revolving advances (the "Revolving Commitment" and, together with the Term Loans, the "Prepetition Loans") to be made by the Prepetition Secured Lender to Restora subject to availability as requested from time to time by Restora. The Revolving Commitment is subject to a borrowing base based on the net value of Restora's receivables, certain reserves, and subject to a cap of $7 million.

11.     The non-default interest rate per annum on the outstanding balance of the Term Loans is equal to LIBOR plus 6.0% and the non-default interest rate per annum on the outstanding balance of the obligations under the Revolving Commitment is equal to LIBOR plus 4.25%. The default rate of interest on all Prepetition Loans is equal to the otherwise applicable non-default rate of interest plus 4.0%. Restora's obligations to the Existing Lender Parties under the Prepetition Loan Agreement are guaranteed by debtor Restora Healthcare Holdings, LLC ("Restora Holdings") pursuant to a Parent Guaranty, dated as of June 29, 2012 (the "Parent Guaranty").

12.     As security for Restora's obligations to the Existing Lender Parties under the Prepetition Loan Agreement and Restora Holdings' obligations to the Prepetition Secured Lender under the Parent Guaranty, each Debtor granted to the Prepetition Administrative Agent, as agent for the Prepetition Secured Lender, a security interest in substantially all of each Debtor's assets (collectively, the "Prepetition Collateral"). The liens and security interests in favor of the Prepetition Secured Lender, in its capacity as term lender, in and to certain Prepetition Collateral (including general intangibles, goods, inventory, contracts, leases,

instruments, investment property, securities, security entitlements, securities accounts, equity interests held by the Debtors, and records related to the foregoing) (such liens being the "Existing Term Loan Liens" and such collateral being the "Existing Term Loan Collateral") are senior to the liens and security interests in favor of the Prepetition Secured Lender, in its capacity as Revolving Commitment lender, in and to such Prepetition Collateral, and the liens and security interests in favor of the Prepetition Secured Lender, in its capacity as Revolving Commitment lender, in and to the remaining Prepetition Collateral (including receivables, deposit accounts, cash, and records related to the foregoing) are senior to the liens and security interests in favor of the Prepetition Secured Lender, in its capacity as Existing Term Lender, in and to such remaining Prepetition Collateral.

13.     The Debtors are in default of their obligations under the Prepetition Loan Agreement and related documents.   As of the Petition Date, the aggregate amount of the obligations outstanding under the Term Loans was approximately $2,600,000 (the "Existing Term Loan Debt") and the aggregate amount of the obligations outstanding under the Revolving Commitment was approximately $3,000,000 (the "Existing Revolving Debt").

14.     As discussed in more detail in the Pillari Declaration, subject to the approval of this Court, HFG has also agreed to provide postpetition debtor in possession financing to the Debtors pursuant to a revolving credit facility in an amount not to exceed $7,000,000 at any one time outstanding (the "DIP Facility"), subject to a borrowing base and certain reserves.

### C.     Events Leading to the Chapter 11 Filings.

15.     As discussed in more detail in the Pillari Declaration, Restora has experienced significant liquidity issues that have hindered its ability to pay obligations in the ordinary course of business.   To address the liquidity issues, the Debtors sought to implement a number of restructuring initiatives over the last year, including making appropriate adjustments in

staffing, negotiating with vendors and suppliers, and seeking out additional sources of funding. In addition, in November 2013, the Debtors retained the services of Alvarez & Marsal Healthcare Industry Group to provide a Chief Restructuring Officer.

16.     After careful consideration and consultation with their advisors, the Debtors ultimately determined that it was necessary to pursue a sale or other restructuring transaction with one or more potential purchasers or other strategic partners.  The Debtors, together with their advisors, contacted a number of potential purchasers or strategic partners in connection with a potential sale or other restructuring transaction, and executed non-disclosure agreements with thirteen (13) such entities, all of which were granted access to a dataroom established by the Debtors' advisors to assist such entities in their due diligence efforts.

17.     The Debtors and their advisors were in regular contact with these entities and facilitated such entities' due diligence efforts, including by coordinating on-site visits and management meetings.  A number of parties expressed interest in a transaction with the Debtors, including through a chapter 11 plan, section 363 sale, and/or a management structure. The Debtors and their advisors negotiated with each of these parties regarding potential transaction structures and economic and other terms of a deal, but no such party, individually or together, was willing to enter into a binding agreement to consummate such a transaction.

18.     Several parties with which the Debtors had been engaged in discussions, including several creditors of the Debtors, ultimately submitted to the Debtors a joint term sheet for a proposed transaction to acquire the Debtors' business operations.  The parties submitting the term sheet were HFG, American Realty Capital and certain of its affiliates (collectively, the

"Landlord"), Acuity Healthcare, L.P. ("Acuity"),[2] HealthCap Partners, LLC ("HealthCap"), and

Tutera & Co. ("Tutera" and, together with HFG, the Landlord, Acuity, and HealthCap, the

"Transaction Parties").  The proposal provides for the formation of a new entity by HealthCap,

Acuity, and Tutera, with each Transaction Party, other than HFG, contributing cash funding to

the new entity, and HFG assigning to the new entity all of its rights, title, and interest as lender

and agent in and to all prepetition and postpetition indebtedness owing to it by the Debtors in

connection with the Prepetition Loan Agreement and related documents and the DIP Facility.

The newly formed entity, PHX Hospital Partners, LLC (the "Stalking Horse Purchaser"), will

serve as a stalking horse bidder in connection with a sale transaction pursuant to section 363 of

the Bankruptcy Code involving substantially all of the Debtors' assets, subject to higher or

otherwise better offers.  The Debtors, together with their advisors, engaged in extensive

negotiations with the Stalking Horse Purchaser,[3] while at the same time continuing discussions

with other potentially interested parties.

        19.    Ultimately, the Debtors were able to reach an agreement with the Stalking Horse

Purchaser regarding the terms of a stalking horse asset purchase agreement, a copy of which is

attached hereto as Exhibit C (the "Stalking Horse Agreement"), involving a sale transaction

pursuant to section 363 of the Bankruptcy Code, subject to higher or otherwise better offers.

The consideration being provided under the Stalking Horse Agreement consists of

(a) $5,000,000, payable by the Stalking Horse Purchaser in the form of a credit bid under

section 363(k) of the Bankruptcy Code with respect to a portion of the aggregate secured

---

[2]    Acuity currently provides financial management services, including billing and collection services, to Restora Mesa and Restora Sun City pursuant to the terms of a Financial Management Services Agreement.

[3]    References to the Stalking Horse Purchaser shall hereafter include the Transaction Parties and the PHX Hospital Partners, LLC.

obligations owing by the Debtors under the Prepetition Loan Agreement and DIP Facility, (b) a waiver by the Landlord of certain cure costs with respect to the two real property leases between the Debtors and the Landlord for the hospital locations, including a waiver of certain past due basic rental obligations under the leases as of the closing of the sale transaction, and (c) the assumption by the Stalking Horse Purchaser of certain liabilities set forth in the Stalking Horse Agreement and the payment of all cure costs relating to executory contracts and unexpired leases to be assumed and assigned to the Stalking Horse Purchaser.

20.     The Stalking Horse Agreement was negotiated in good faith and at arm's length, and the Debtors believe the terms thereof are fair and reasonable. In addition, the Debtors believe that the proposed post-petition marketing process described herein will provide sufficient time and opportunity for any other interested party to submit a higher or otherwise better offer for the Debtors' assets. Notably, the Debtors have already implemented an extensive marketing process prior to the Petition Date and have negotiated with a number of parties regarding a potential transaction. Accordingly, the Debtors believe it is likely that any other party that may submit a competing bid will have already conducted extensive diligence on the Debtors and their assets.

21.     The Debtors, together with their advisors, carefully considered all options and determined in their business judgment that the commencement of these chapter 11 cases and the pursuit of a post-petition marketing and sale process as described herein will maximize the value of the Debtors' assets and is in the best interest of all constituencies, including the patients at the Debtors' hospitals and creditors of the Debtors. The Debtors did not have sufficient liquidity to continue operating outside of bankruptcy, and the pursuit of a sale transaction during these chapter 11 cases presents the best available option to (a) ensure the

continued operation of the Debtors' LTAC hospitals, (b) ensure the continued provision of proper patient care and support, and (c) maximize value for the Debtors' estates.

**RELIEF REQUESTED**

22.    By this Motion, the Debtors request entry of the Bidding Procedures Order:

(i)    approving Bidding Procedures, the form of which are attached hereto as <u>Exhibit D</u>, for (a) submitting bids for the purchase of the Acquired Assets (as defined below), and (b) conducting an auction for the Acquired Assets (the "<u>Auction</u>"), in the event that the Debtors receive two or more Qualified Bids (as defined below) for the Acquired Assets;

(ii)    authorizing the Debtors to enter into the Stalking Horse Agreement with the Stalking Horse Purchaser, subject to higher or otherwise better, for the purpose of establishing a minimum acceptable bid for the Acquired Assets (the "<u>Stalking Horse Bid</u>");

(iii)    approving procedures (the "<u>Assumption and Assignment Procedures</u>") for the assumption and assignment of the Designated Contracts (as defined below) in connection with the sale of the Acquired Assets and resolution of any objections thereto;

(iv)    scheduling (a) a deadline to submit bids for the Acquired Assets of April 21, 2014 at 5:00 p.m. (prevailing Eastern Time), (b) the date of the Auction for April 23, 2014 at 10:00 a.m. (prevailing Eastern Time), and (c) the date of the hearing to consider approval of the proposed sale of the Acquired Assets (the "<u>Sale Approval Hearing</u>") for on or before April 25, 2014 at 10:00 a.m. (prevailing Eastern Time), subject to this Court's availability;

(v)    approving the form and manner of notice of the deadline to submit bids for the Acquired Assets, the date and time of the Auction and the date and time of the Sale Approval Hearing; and

(vi)    granting certain related relief.

23.    In addition, at the Sale Approval Hearing, the Debtors will request entry of the Sale Order:

(i)    approving the sale of the Acquired Assets in accordance with the terms of the asset purchase agreement executed by the Successful Bidder, which shall be free and clear of all liens, claims, encumbrances, and other interests, including rights or claims;

    (ii)    approving the assumption and assignment of certain executory contracts and unexpired leases related to the Acquired Assets; establishing the cure amount, if any; and approving the Successful Bidder's provision of adequate assurance of future performance; and

    (iii)   granting certain related relief.

### **Stalking Horse Bid**

24.    The Debtors, in their business judgment, believe that the terms of the Stalking Horse Agreement are fair and reasonable and will initiate a sale process that will maximize value for the Debtors' estates.  Negotiations with the Stalking Horse Purchaser regarding the terms and conditions of the Stalking Horse Agreement were conducted in good faith and at arm's length, with all parties, including each individual Transaction Party, represented by separate counsel.  A summary of certain principal terms of the Stalking Horse Agreement, including the terms required to be highlighted under Local Rule 6004-1(b)(iv), is as follows:[4]

| Amount and Form of Consideration | The purchase price (the "Purchase Price") for the purchase, sale, assignment and conveyance of the Debtors' right, title and interest in, to and under the Acquired Assets (as defined below) shall consist of (a) $5,000,000, payable by the Stalking Horse Purchaser in the form of a credit bid under section 363(k) of the Bankruptcy Code with respect to a portion of the aggregate secured obligations owing under the Prepetition Loan Agreement and DIP Facility, (b) a waiver by the Landlord of certain cure costs with respect to the two real property leases between the Debtors and the Landlord for the hospital locations, including a waiver of certain past due basic rental obligations under the leases as of the closing of the sale transaction, and (c) the assumption by the Stalking Horse Purchaser of certain liabilities set forth in the Stalking Horse Agreement and the payment of cure |

---

[4] This summary contains a description of only certain principal terms of the Stalking Horse Agreement. The Stalking Horse Agreement itself should be consulted for a full description of the terms thereof. To the extent that there are any inconsistencies between the terms set forth herein and in the actual terms set forth in the Stalking Horse Agreement, the terms of the Stalking Horse Agreement shall control. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Stalking Horse Agreement.

| | |
|---|---|
| | costs up to $450,000 relating to executory contracts and unexpired leases to be assumed and assigned to the Stalking Horse Purchaser (collectively, the "Designated Contracts"). |
| Acquired Assets | The Stalking Horse Purchaser shall purchase substantially all of the operating assets of the Debtors (collectively, the "Acquired Assets"), other than Excluded Assets.  The Acquired Assets include all tangible property, accounts, machinery, equipment, inventories, tenant improvements, goodwill, software and computer programs, hardware, intellectual property, prepaid expenses (other than prepaid insurance or prepaid other assets) and deposits, Designated Contracts, books and records (including all patient charts and records since January 1, 2010, patient lists and appointment books relating to patients treated by the Debtors to the extent transferable under applicable law), any policies and procedures relating to the Debtors' business, telephone and facsimile numbers, all licenses and permits to the extent transferable, and all benefits, proceeds and other amounts payable under any policy of insurance relating to the Debtors' business. |
| Excluded Assets | The following are not included in the Acquired Assets and are not being sold to the Stalking Horse Purchaser (collectively, the "Excluded Assets"): (i) cash, (ii) cash equivalents, (iii) income tax receivables, (iv) deferred tax assets, (v) employee advances, (vi) prepaid insurance including prepaid professional liability insurance, (vii) contracts and leases that are not Designated Contracts, (viii) the Purchase Price and all rights of the Debtors' under the Stalking Horse Agreement, (ix) any rights, claims or causes of action of any Debtor against third parties relating to assets, properties, losses, business or operations of any Debtor, including any actions under chapter 5 of the Bankruptcy Code, (x) all personnel records and other books, records, and files that the Debtors are required by law to retain in their possession, (xi) any patient records with respect to which the applicable patient(s) has objected to a transfer of such patient records to the Stalking Horse Purchaser, (xii) any claim, right or interest of any Debtor in or to any refund, rebate, abatement or other recovery for taxes, together with any interest due thereon or penalty rebate arising therefrom, (xiii) investments (including Restora Holdings' membership interests in Restora Mesa and Restora Sun |

| | |
|---|---|
| | City), (xiv) any other prepaid assets or properties expressly set forth on Schedule 1.2 to the Stalking Horse Agreement, and (xv) any books and records relating to any of the foregoing. |
| Assumed Liabilities | The Stalking Horse Purchaser shall, effective as of the Closing Date, assume those liabilities and obligations (i) under the Prepetition Loan Facility and DIP Facility and (ii) arising from events occurring on or after the Closing Date under any Designated Contracts.  The Stalking Horse Purchaser also shall be responsible for payment of Cure Costs related to the Designated Contracts up to $450,000. |
| Excluded Liabilities | The Stalking Horse Purchaser shall not assume or be deemed to have assumed any liabilities of the Debtors other than the Assumed Liabilities. |
| Assumption and Assignment of Contracts and Leases | At the Closing, the Debtors shall assign to the Stalking Horse Purchaser each of the Designated Contracts.  In connection with the assumption and assignment of the Designated Contracts the Stalking Horse Purchaser shall pay cure costs which the Bankruptcy Court, pursuant to a Final Order, orders to be paid in connection with the Debtors' assumption and assignment to Stalking Horse Purchaser of such Designated Contracts in accordance with section 365 of the Bankruptcy Code up to a maximum of $450,000 in the aggregate. |
| Representations, Warranties, and Covenants | The Stalking Horse Agreement contains usual and customary representations, warranties, and covenants for similar bankruptcy section 363 sale transactions, including representations and warranties by the Stalking Horse Purchaser that it has the requisite authority and has obtained the necessary consents to consummate the transactions contemplated by the Stalking Horse Agreement. |
| Regulatory Approvals | The Stalking Horse Purchaser and the Debtors will each use commercially reasonable efforts to obtain necessary regulatory approvals for the transaction, including but not limited to, any required approvals by the Arizona Department of Health Services and the Centers for |

| | |
|---|---|
| | Medicare and Medicaid Services. If any governmental approval is determined to be necessary and cannot be timely obtained, the parties agree to work in good faith to modify the terms of the transaction as necessary to ensure compliance with all federal, state, or other governmental laws, rules, and regulations while providing the same economic result to the Stalking Horse Purchaser. |
| Conditions to Closing **(Local Rule 6004-1(b)(iv)(E))** | The material conditions and contingencies for the Stalking Horse Purchaser's obligations to close include: <br><br> (a) All representations and warranties made by the Debtors in the Stalking Horse Agreement and in any written statements delivered to the Stalking Horse Purchaser under the Stalking Horse Agreement shall be substantially true and correct as of the Effective Date and as of the Closing Date as though made on such dates. <br><br> (b) The Debtors shall have performed, satisfied and complied in all material respects with all obligations and covenants required by the Stalking Horse Agreement to be performed or complied with by them on or prior to the Closing Date. <br><br> (c) The Debtors shall have executed and delivered to the Stalking Horse Purchaser the Assignment and Assumption and Bill of Sale, dated and effective as of the Closing Date. <br><br> (d) The Debtors shall have delivered to the Stalking Horse Purchaser all other documents required to be delivered by them under the Stalking Horse Agreement, and all such documents shall have been properly executed by each of them, if applicable. <br><br> (e) The Stalking Horse Purchaser shall have received all Third Party Consents and Governmental Approvals, if any, in form and substance satisfactory to it, effective as of the Closing Date. <br><br> (f) The Bankruptcy Court shall have entered an order authorizing the assumption and assignment of the Real Property Leases and approving any modifications to such leases in form and substance satisfactory to the Stalking Horse Purchaser and the lessors. |

| | |
|---|---|
| | (g) Delivery of all schedules and exhibits attached to the Stalking Horse Agreement. |
| | (h) The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become final and non-appealable. |
| | (i) All of the Assigned Contracts and Assigned Personal Property Leases shall have been validly assumed and assigned under section 365 of the Bankruptcy Code to the Stalking Horse Purchaser pursuant to the Sale Order. |
| | (j) The Stalking Horse Purchaser has not received any notice or notices pursuant to Section 6.2 of the Stalking Horse Agreement that in the aggregate could be reasonably expected to be materially adverse to the condition (financial or otherwise), properties, assets, liabilities, businesses, operations, results of operations or prospects of the Practice or the Acquired Assets. |
| Break-Up Fee | The Stalking Horse Agreement does not provide for any break-up fee or expense reimbursement in favor of the Stalking Horse Purchaser. |
| As Is, Where Is | The Stalking Horse Purchaser is accepting the Acquired Assets at the Closing "as is, where is, and with all faults," and, except as otherwise expressly provided in the Stalking Horse Agreement, the Debtors are making no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Acquired Assets. |
| Other Highlighted Terms Under Local Rule 6004-1(b)(iv) | • Local Rule 6004-1(b)(iv)(A).   To the best of the Debtors' knowledge, the Stalking Horse Purchaser is not an insider within the meaning of section 101(31) of the Bankruptcy Code.  HealthCap, however, which is one of the Transaction Parties, is an affiliate of HCCG, LLC, which holds an 81.63% membership interest in Restora Holdings.<br><br>• Local Rule 6004-1(b)(iv)(B).   The Debtors have not discussed or entered into agreements with management or key employees regarding compensation or future employment.<br><br>• Local Rule 6004-1(b)(iv)(C).    This Motion is not |

seeking a release in favor of any entity.

- <u>Local Rule 6004-1(b)(iv)(D)</u>.  As discussed in more detail below, an auction is contemplated and the Debtors have not entered into any agreement to not solicit competing offers.

- <u>Local Rule 6004-1(b)(iv)(F)</u>.  The Debtors are not requiring the Stalking Horse Purchaser to submit a good faith deposit due to the secured obligations owing by the Debtor to the Stalking Horse Purchaser.

- <u>Local Rule 6004-1(b)(iv)(G)</u>.  The Debtors do not currently have any interim management or other agreement with the Stalking Horse Purchaser.  One or more Debtors is a party to (i) a Financial Management Services Agreement with Acuity (one of the Transaction Parties), (ii) a Consulting Agreement with Acuity Healthcare Management, LLC (an affiliate of Acuity), and (iii) a Consulting and Accounts Receivable Collection Agreement with Tutera Senior Living & Healthcare, LLC (an affiliate of Tutera, which is one of the Transaction Parties).  In the event the Debtors determine it is appropriate to enter into any other agreement with the Stalking Horse Purchaser or any Transaction Party that is outside the ordinary course of business, the Debtors will promptly notify the Court and any such agreement will be subject to Court approval.   In addition, the Debtors will allow the Stalking Horse Purchaser, subject to applicable law and confidentiality, full access to management and operations during the pendency of the chapter 11 cases and prior to the closing of a sale, and the Stalking Horse Purchaser may designate a representative to be physically present at the Debtors' facilities during such time with access to the Debtors' employees and records.

- <u>Local Rule 6004-1(b)(iv)(H)</u>.  The Debtors are not seeking to release any sale proceeds without further order of the Court.  The Debtors do intend to agree with the Stalking Horse Purchaser on an allocation of the Purchase Price to the Acquired Assets, as set forth in Section 2.3 of the Stalking Horse Agreement.

- <u>Local Rule 6004-1(b)(iv)(I)</u>.  The Debtors are not seeking to have the sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code.

|  | <ul><li>Local Rule 6004-1(b)(iv)(J). The Debtors are retaining or will have reasonable access to all books and records to enable them to administer these chapter 11 cases.</li><li>Local Rule 6004-1(b)(iv)(K). The Debtors are not seeking to sell any avoidance actions.</li><li>Local Rule 6004-1(b)(iv)(L). The Debtors are seeking to sell the Acquired Assets free and clear of successor liability claims, other than Permitted Encumbrances.</li><li>Local Rule 6004-1(b)(iv)(M). The Debtors are seeking to sell the Acquired Assets free and clear of liens, claims, and interests, other than Permitted Encumbrances, to the fullest extent permitted under section 363 of the Bankruptcy Code, but are not seeking to sell property free and clear of any possessory leasehold interest or license.</li><li>Local Rule 6004-1(b)(iv)(N). The Debtors are not seeking to disallow or restrict any party's right to credit bid its allowed secured claim under section 363(k) of the Bankruptcy Code, and are expressly permitting the Stalking Horse Purchaser to credit bid its secured claims in connection with the Prepetition Loan Agreement and DIP Facility.</li><li>Local Rule 6004-1(b)(iv)(O). As discussed in more detail below, the Debtors are seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h).</li></ul> |
|---|---|

25.     As discussed herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved.

26.     The Debtors believe that their entry into the Stalking Horse Agreement will provide substantial benefit to the estates and will help maximize value in any sale of the Acquired Assets. Specifically, the Stalking Horse Purchaser will establish a minimum bid for the Auction and a complete set of offer terms with respect to the Acquired Assets.

27.     The Debtors believe that, unless a sale is consummated, there will be a deterioration in the value of their assets and businesses and it is likely that they will have to wind-down their businesses.   Accordingly, a prompt sale will maximize the value of the Debtors' estates for the benefit of creditors and other interested parties, ensure the continuity of quality patient care and services, and preserve jobs for and business relationship with hundreds of employees, contract and lease counterparties, and vendors.

### The Bidding and Auction Procedures

28.     To obtain the highest or otherwise best bid for the Acquired Assets, the Debtors intend to implement the Bidding Procedures attached hereto as <u>Exhibit D</u>.   The Bidding Procedures set forth, among other things, the availability of due diligence for potential bidders, the deadline and requirements for submitting a Qualified Bid (as defined below), the procedures for conducting the Auction, and the criteria for determining the highest or otherwise best Qualified Bid for the Acquired Assets (the "<u>Successful Bid</u>").

29.     The following summary highlights the material terms of the Bidding Procedures, including those terms required to be highlighted under Local Rule 6004-1(c).   All parties in interest are referred to the text of the attached Bidding Procedures for additional information regarding the proposed procedures.[5]

### A.     Bid Deadline.

30.     A potential bidder that desires to make a bid shall deliver copies of its bid package by email to:   (i) counsel to the Debtors, DLA Piper LLP (US), 1251 Avenue of the Americas,     New     York,     NY     10020     (Attn:     Thomas     R.     Califano,     Esq.

---

[5]   Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Bidding Procedures.  To the extent that there are any inconsistencies between the description of the Bidding Procedures contained herein and the actual Bidding Procedures attached hereto, the terms of the actual Bidding Procedures attached hereto control.

(thomas.califano@dlapiper.com) and Daniel G. Egan, Esq. (daniel.egan@dlapiper.com)), and DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, DE 19801 (Attn: Stuart Brown, Esq. (stuart.brown@dlapiper.com)); (ii) the Debtors' Chief Restructuring Officer, Alvarez & Marsal Healthcare Industry Group, LLC, 100 Pine Street, Suite 900, San Francisco, CA 94111 (Attn: George D. Pillari (gpillari@alvarezandmarsal.com)); (iii) counsel to HealthCap, as agent for the Stalking Horse Purchaser for noticing purposes, Polsinelli P.C., 2501 N. Harwood, Suite 1900, Dallas, TX 75201 (Attn: James H. Billingsley, Esq. (jbillingsley@polsinelli.com)); (iv) counsel to the Debtors' secured lender, Kaye Scholer, LLP, 425 Park Avenue, New York, NY 10022 (Attn: Benjamin Mintz, Esq. (benjamin.mintz@kayescholer.com)); (v) counsel to the Landlord, Arent Fox LLP, 1675 Broadway, New York, NY 10019 (Attn: Andrew I. Silfen, Esq. (andrew.silfen@arentfox.com)); and (vi) counsel to any official committee of unsecured creditors appointed in these chapter 11 cases (the "Committee"), so as to be actually received on or before the date set by the Court as the deadline to submit Qualified Bids (the "Bid Deadline"). The Debtors propose **April 21, 2014 at 5:00 p.m. (prevailing Eastern Time)** as the Bid Deadline and seek authority in their business judgment to extend the Bid Deadline without further order of the Court. No bids submitted after the Bid Deadline shall be considered by the Debtors.

## B. Due Diligence.

31.    Subject to a potential bidder entering into a confidentiality agreement satisfactory to the Debtors in their business judgment, the Debtors may afford any potential bidder, whom the Debtors, in consultation with their advisors, believe has the wherewithal to close a sale transaction and operate the hospitals, the opportunity to conduct a reasonable due diligence review in the manner determined by the Debtors in their discretion. The Debtors shall not be obligated to furnish access to any due diligence information of any kind after the Bid

Deadline.  The Debtors intend to use reasonable efforts to provide to all potential qualified bidders certain information in connection with the proposed sale and assumption and assignment of Designated Contracts, including, among other things, the proposed Bidding Procedures and the Stalking Horse Agreement, but the failure to deliver any such information to any potential bidders shall not affect the validity, effectiveness or finality of the Auction (as defined below) or the sale process.  All diligence inquiries must be directed to Alvarez & Marsal Healthcare Industry Group, LLC; provided, however, potential bidders are encouraged to speak directly with representatives of HFG and the Landlord in connection with their due diligence in respect of the potential to assume HFG claims and liens through participation in the Auction and lease modifications with Landlord, respectively, notwithstanding their status as Transaction Parties.

### C.    Bid Requirements.

32.    A bid submitted will be considered a qualified bid and the potential bidder will be considered a qualified bidder only if the bid is submitted by a bidder that in the Debtors' business judgment, in consultation with their advisors, complies with all of the following requirements (a "Qualified Bid" and "Qualified Bidder," respectively), any of which may be modified or waived by the Debtors, in consultation with their advisors, in their discretion at or prior to the Auction (as defined below):

a) it states that the potential qualified bidder offers to purchase, in cash, the Acquired Assets (or offers to purchase less than all of the Acquired Assets, including the exclusion of the Debtors' accounts receivable) upon the terms and conditions that the Debtors in their business judgment, in consultation with their advisors, reasonably determine are no less favorable to the Debtors than those set forth in the Stalking Horse Agreement;

b) it includes a signed writing that the potential qualified bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such potential qualified bidder is selected as (A) the Successful Bidder, its offer shall remain irrevocable until the earlier of (i) the outside date by which all regulatory

approvals and other conditions to closing shall have been satisfied or waived, (ii) the date the Sale Order is entered if the sale transaction with such potential qualified bidder is denied or (iii) the date that is thirty (30) days after the Sale Approval Hearing, or (B) the Next Best Bidder (as defined below) its offer shall remain irrevocable until the earlier of (i) the closing of the sale to the Successful Bidder, (ii) the date that is thirty (30) days after the earlier of (I) the outside date by which all regulatory approvals or other conditions to closing under the Successful Bidder's asset purchase agreement shall have been satisfied or waived, or (II) the date that is thirty (30) days after the Sale Approval Hearing;

c) that there are no conditions precedent to the potential qualified bidder's ability to enter into a definitive enforceable agreement and that all necessary internal and shareholder approvals have been obtained prior to the Bid Deadline;

d) it includes a duly authorized and executed copy of an asset purchase agreement (an "<u>Asset Purchase Agreement</u>"), including the purchase price for the Assets (the "<u>Proposed Purchase Price</u>"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement and the proposed order to approve the sale by the Bankruptcy Court;

e) it includes written evidence of a firm, irrevocable commitment for debt or equity financing, or other evidence of ability to consummate the proposed sale transaction, that will allow the Debtors in their business judgment, in consultation with their advisors, to make a determination as to the bidder's financial, regulatory, and other capabilities to consummate the sale transaction contemplated by the Asset Purchase Agreement;

f) it has a cash value to the Debtors, in the Debtors' reasonable discretion, after consultation with their advisors, that is greater than or equal to $5,000,000, which is the amount of the credit bid being submitted by the Stalking Horse Purchaser, plus (ii) $100,000 (the "<u>Initial Overbid</u>");

g) it identifies with particularity which executory contracts and unexpired leases the potential qualified bidder designates to assume, and provides details of the potential qualified bidder's proposal for the payment (or treatment) of related cure costs with respect to the Designated Contracts;

h) it includes an acknowledgement and representation that the potential qualified bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Acquired Assets and Designated Contracts prior to making its bid; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets and Designated Contracts in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Acquired Assets and Designated Contracts or the completeness of any information provided in

connection therewith or with the Auction, except as expressly stated in the Asset Purchase Agreement; and (iv) is not entitled to and waives any right to assert a claim for any expense reimbursement, break-up fee, or similar type of payment in connection with its due diligence and bid;

i) it includes evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the potential qualified bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement, and any amendments thereto negotiated or occasioned by its participation in the Auction;

j) it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of Restora Holdings (or such other party as the Debtors may determine) in an amount equal to ten percent (10%) of the Proposed Purchase Price (the "Good Faith Deposit");

k) it contains sufficient information concerning the potential qualified bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases;

l) it commits to supplement the bid with other information reasonably requested by the Debtors before or after the Bid Deadline; and

m) it is received by the relevant parties set forth in the Bidding Procedures prior to the Bid Deadline.

33.     The Debtors and their professionals will review each potential qualified bid received from a potential qualified bidder to ensure that both the bid and the bidder meet the requirements set forth above.  A potential qualified bid received from a potential qualified bidder that the Debtors determine in their business judgment meets the above requirements, and subject to approval by the patient care ombudsman, if any, of the potential bidder as a Qualified Bidder, which approval shall not be unreasonably withheld or delayed, will be considered a "Qualified Bid" and each potential bidder that submits a Qualified Bid will be considered a "Qualified Bidder."  The Debtors, in their business judgment, reserve the right to reject any bid, without limitation.  Notwithstanding the foregoing, the Stalking Horse Agreement shall be a

Qualified Bid for all purposes and the Stalking Horse Purchaser is a Qualified Bidder for all purposes and requirements pursuant to the Bidding Procedures at all times.

### D.       Evaluation of Competing Bids.

34.      The Debtors may value a Qualified Bid based upon any and all factors that the Debtors deem pertinent, including, among others, the following: (a) the Proposed Purchase Price of the Qualified Bid and the assumption of cure obligations respecting the assumption and assignment of executory contracts and unexpired leases; (b) the risks and timing associated with consummating a transaction with the Qualified Bidder, including, without limitation, all necessary regulatory approvals; (c) the risks associated with and extent of any non-cash consideration in any Qualified Bid; (d) any excluded assets or executory contracts or unexpired leases; (e) the Qualified Bidder's experience and ability in managing healthcare systems, including long-term acute care hospitals; and (f) any other factors that the Debtors may deem relevant to the proposed transaction.

### E.       No Qualified Bids.

35.      If the Debtors do not receive any Qualified Bids other than from the Stalking Horse Purchaser, they will not hold an Auction and the Stalking Horse Purchaser will be named the Successful Bidder.

### F.       The Auction.

36.      If more than one Qualified Bid has been received, the Debtors will conduct an auction (the "Auction") for the sale of the Acquired Assets.  Prior to the Auction, the Debtors shall send a copy of all Qualified Bids to all Qualified Bidders.  The Debtors propose that the Auction take place on **April 23, 2014 at 10:00 a.m. (prevailing Eastern Time)** at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020, or such later time or such other place as the Debtors shall designate in a subsequent notice to all Qualified

Bidders.   The Auction may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Auction.  The Debtors reserve the right to cancel the Auction in their reasonable discretion.

37.     The bidding at the Auction shall start at the amount offered in the highest or otherwise best Qualified Bid, as determined and announced by the Debtors in their business judgment, in consultation with their advisors, and will continue in increments of $100,000 (the "Overbid Increments") until the bidding ceases.  The Stalking Horse Purchaser will have the right to credit bid additional indebtedness that may be owing under the Prepetition Loan Agreement and DIP Facility, as of the anticipated Closing Date, that is not already included in the Purchase Price under the Stalking Horse Agreement.

38.     Notwithstanding anything contained in the Bidding Procedures, the Debtors may modify or waive any provisions of the Bidding Procedures at the Auction if, in their reasonable judgment, such modification or waiver will better promote the goals of the Auction, without providing any advance notice to the Stalking Horse Purchaser or any other party.

39.     Immediately prior to the conclusion of the Auction, in consultation with their advisors, the Debtors will (a) review the last bid by each Qualified Bidder made at the Auction on the basis of financial and contractual terms and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, (b) determine the Successful Bid for the Acquired Assets at the Auction, and (c) notify all Qualified Bidders at the Auction, prior to its conclusion, of the name of the Successful Bidder. Only Qualified Bidders may participate in the Auction.  Each Qualified Bidder will be required to confirm at the commencement of and from time to time during the Auction that it has not engaged in any collusive behavior with respect to the bidding or the Auction.  The Auction will

be conducted openly and all creditors will be permitted to attend and observe.  Bidding at the Auction will be videotaped and/or transcribed.

40.     After determining the Successful Bid, the Debtors may, in consultation with their advisors, determine which Qualified Bid is the next best bid (the "<u>Next Best Bid</u>").  If the Successful Bidder does not close the sale by the date set forth in the Successful Bid or otherwise agreed to by the Debtors and the Successful Bidder, then the Debtors shall be authorized to close with the party that submitted the Next Best Bid (the "<u>Next Best Bidder</u>"), without a further court order.  The party that submits the Next Best Bid shall be required to close the sale by the date set forth in the Next Best Bid (excusing the time between the Auction and the date the Next Best Bidder is advised that the Debtors will seek to close under the Next Best Bid) or otherwise agreed to by the Debtors and the Next Best Bidder.

### G.     Return of Deposits.

41.     The Good Faith Deposits of all potential qualified bidders who are determined not to be Qualified Bidders shall be returned promptly by the Debtors.  The Good Faith Deposits of Qualified Bidders shall be held in escrow by the Debtors.  The Good Faith Deposits of all Qualified Bidders, other than the Successful Bidder and the Next Best Bidder, shall be returned within two (2) business days after the conclusion of the Sale Approval Hearing.  The Good Faith Deposit of the Next Best Bidder shall be returned within two (2) business days after the consummation of the sale transaction with the Successful Bidder, but in no event later than sixty (60) days after the Sale Approval Hearing.

### H.     Credit Bid.

42.     On or before the Bid Deadline, parties holding a valid lien on some or all of the Acquired Assets that secures an allowed secured claim may submit a credit bid for some or all

of such Acquired Assets to the fullest extent permitted under section 363(k) of the Bankruptcy Code.

### I.    Reservation of Rights.

43.    The Debtors may (a) determine, in their reasonable discretion, which bid or bids, if any, to present to the Bankruptcy Court as the highest or otherwise best offer for the Acquired Assets, (b) reject, at any time before entry of an order of the Bankruptcy Court approving any bid as the Successful Bid, any bid that, in the Debtors' reasonable discretion, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors and their bankruptcy estates and creditors; provided, that the Stalking Horse Purchaser's bid and the Stalking Horse Agreement, after approval of the Bidding Procedures, may not be rejected under (i), (ii) or (iii) of this provision, (c) withdraw, in their business judgment, the Motion if pursuing approval of the Motion is determined to be contrary to the best interests of the Debtors and their bankruptcy estates and creditors, and (d) cancel, in their business judgment, the Auction and pursue an alternative transaction if such alternative transaction is determined to be in the best interests of the Debtors and their bankruptcy estates and creditors.

44.    The Debtors may extend or alter any deadline contained in the Bidding Procedures that will better promote their receipt of higher or otherwise better offers for the Acquired Assets and Designated Contracts (the "Extension Right").  The Bidding Procedures are solely for the benefit of the Debtors and their bankruptcy estates.  The Debtors may waive or modify the provisions in the Bidding Procedures or adopt additional procedures as they see fit in their business judgment (the "Modification Right").

**J.      As Is, Where Is.**

45.      The sale shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their estates, or their agents or representatives.   Except as otherwise expressly provided in the Bidding Procedures, the Stalking Horse Agreement, or any applicable Asset Purchase Agreement, each Potential Bidder that submits a bid shall be deemed to acknowledge and represent that it (a) has had an opportunity to conduct any and all reasonable due diligence regarding the Acquired Assets prior to making its bid, (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith.

**K.      Sale Approval Hearing.**

46.      The sale of the Acquired Assets and applicable Asset Purchase Agreement shall be presented for authorization and approval by the Court at the Sale Approval Hearing, which the Debtors propose be held on or before **April 25, 2014 at 10:00 a.m. (prevailing Eastern Time)**, subject to the availability of the Court.  The Sale Approval Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Approval Hearing.

**Notice Procedures**

47.      The Debtors also request approval of the proposed form and manner of notice of the Bid Deadline, the Auction and the Sale Approval Hearing.  Within two (2) business days after entry of the Bidding Procedures Order, the Debtors will serve notice of the Bid Deadline,

the Auction and the Sale Approval Hearing, substantially in the form attached hereto as

Exhibit E (the "Sale Notice"), by first class mail on:

> (i)    counsel to Healthcare Finance Group, LLC;
>
> (ii)   counsel to the HealthCap Partners, LLC, as agent to the Stalking Horse Purchaser for noticing purposes;
>
> (iii)  counsel to the Landlord;
>
> (iv)   all applicable health regulatory agencies and taxing authorities;
>
> (v)    the Office of the United States Trustee for the District of Delaware;
>
> (vi)   the United States Attorney's Office for the District of Delaware;
>
> (vii)  any entity known or reasonably believed to have asserted a security interest in or lien against any of the Acquired Assets;
>
> (viii) the Debtors' twenty (20) largest creditors on a consolidated basis or counsel for the Creditors' Committee, if one has been appointed;
>
> (ix)   any party that has filed a notice of appearance in these cases; and
>
> (x)    any party who has expressed an interest in purchasing the Acquired Assets, investing in the Debtors, or participating in a restructuring transaction, and who the Debtors reasonably believe could consummate a transaction, or who the Debtors or their professionals believe would have such an interest.

48.    Within five (5) business days of the entry of the Bidding Procedures Order, the

Debtors will publish a notice, in a form to be submitted to the Court (the "Publication Notice"),

in *The New York Times (National Edition)* and/or such other publication(s) as the Debtors and

their advisors deem appropriate.

**<u>Assumption and Assignment Procedures</u>**

49.    To facilitate and consummate the sale of the Acquired Assets, the Debtors seek

authority to assume and assign certain Designated Contracts to the Successful Bidder.  Due to

the nature of the bidding process, it is impossible for the Debtors currently to identify which

Designated Contracts will be designated for assumption and assignment to the Successful

Bidder.  As such, the Debtors further seek authority to establish the Assumption and Assignment Procedures described below.

50.    <u>Cure Notice</u>.  Within five (5) business days after entry of the Bidding Procedures Order and again after selection of the Successful Bid, to the extent required because of differences, the Debtors will file the Cure Notice, substantially in the form attached hereto as <u>Exhibit F</u> (the "<u>Cure Notice</u>"), with the Court and serve such Cure Notice on the non-Debtor counterparties to such Designated Contracts.  The Cure Notice will include (a) the titles of the Designated Contracts to be assumed, (b) the names of the counterparties to such Designated Contract, (c) the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default under such Designated Contracts in accordance with sections 365(b) and (f)(2) of the Bankruptcy Code (the "<u>Cure Amount</u>"), (d) the proposed effective date of the assignment, and (e) the deadline by which any counterparties to such Designated Contracts must object.  The Debtors reserve the right to supplement and modify the Cure Notice at any time, provided that to the extent that the Debtors add a Designated Contract to the Cure Notice or modifies the Cure Amount, the affected party shall receive a separate notice and an opportunity to object to such addition or modification.

51.    <u>Objection to Assumption and Assignment of Designated Contracts</u>.  Any objection to the assumption and assignment of any Designated Contract identified on the Cure Notice, including, without limitation, any objection to the Cure Amount set forth on the Cure Notice or to the ability of the Successful Bidder to provide adequate assurance of future performance under such Designated Contract, must (a) be in writing, (b) set forth the basis for the objection as well as any cure amount that the objector asserts to be due (in all cases with appropriate documentation in support thereof), and (c) be filed with the Clerk of the Court,

United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Wilmington, Delaware 19801, and served on the following:  (i) counsel to the Debtors, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn: Thomas R. Califano, Esq. and Daniel G. Egan, Esq.) and DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, DE 19801 (Attn: Stuart Brown, Esq.); (ii) counsel to HealthCap, as agent for the Stalking Horse Purchaser for noticing purposes, Polsinelli P.C., 2501 N. Harwood, Suite 1900, Dallas, TX 75201 (Attn: James H. Billingsley, Esq.); (iii) counsel to Healthcare Finance Group, LLC, Kaye Scholer, LLP, 425 Park Avenue, New York, NY 10022 (Attn: Benjamin Mintz, Esq.); (iv) counsel to the Landlord, Arent Fox LLP, 1675 Broadway, New York, NY 10019 (Attn: Andrew I. Silfen, Esq.); (v) counsel to any statutory committee of unsecured creditors appointed in these cases; (vi) counsel to the Successful Bidder; and (vii) the Office of the United States Trustee, U.S. Trustee, 844 King Street, Suite 2207, Lockbox #35, Wilmington, Delaware, 19899 (Attn:  Benjamin A. Hackman, Esq.), **so as to be _actually received_ no later than 12:00 p.m. (prevailing Eastern Time) on the date that is fifteen (15) days after the filing of the Cure Notice** (the "Assignment and Cure Objection Deadline").

52.    Requests for Adequate Assurance.   Any request for adequate assurance information regarding the Successful Bidder (a "Request for Adequate Assurance") must include an email address, postal address and/or facsimile number to which a response to such request will be sent.  Upon receiving a Request for Adequate Assurance, the Debtors shall promptly provide such party with any non-confidential information reasonably related to adequate assurance by email, facsimile or overnight delivery.

53.    Resolution of Objections.  If no objection to the proposed assumption and assignment of a Designated Contract is timely received by the Assignment and Cure Objection

Deadline, then the assumption and assignment is authorized and the respective Cure Amount set forth in the Cure Notice shall be binding upon the counterparty to the Designated Contract for all purposes and will constitute a final determination of total Cure Amount required to be paid by the Debtors or the Successful Bidder, as applicable, in connection with such assumption and assignment to the Successful Bidder.

54.    To the extent that any entity does not timely object as set forth above, such entity shall be (a) forever barred from objecting to the assumption and assignment of its respective Designated Contracts identified on the Cure Notice, including, without limitation, asserting any additional cure payments or requesting additional adequate assurance of future performance, (b) deemed to have consented to the applicable Cure Amount, if any, and to the assumption and assignment of the applicable Designated Contract, (c) bound to such corresponding Cure Amount, if any, (d) deemed to have agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code, (e) deemed to have agreed that all defaults under the applicable Designated Contract arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the applicable Designated Contract shall remain in full force and effect for the benefit of the Successful Bidder and such entity in accordance with its terms, (f) deemed to have waived any right to terminate the applicable Designated Contract or designate an early termination date under the applicable Designated Contract as a result of any default that occurred and/or was continuing prior to the assignment date, (g) deemed to have agreed that the Debtors are not obligated under the Designated

Contracts following the effective date of the assumption and assignment, and (h) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Designated Contract.

55.     If an objection is timely received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at a later date set by the Court.  The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Designated Contract or the sale of the Acquired Assets to the Successful Bidder.  If an objection is filed only with respect to the cure amount listed on the Cure Notice, the Debtors may file a Certificate of No Objection as to assumption and assignment only and the dispute with respect to the cure amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court.  The Debtors intend to cooperate with the counterparties to the Designated Contracts to be assumed and assigned by the Debtors to attempt to reconcile any difference in a particular Cure Amount.

56.     <u>Anti-Assignment Provisions in Contracts or Leases</u>.  The Debtors further request that the Court find that any anti-assignment provisions within the purview of Bankruptcy Code 365(f) included in, or otherwise purporting to affect, any Designated Contracts to be assumed and assigned by the Debtors are unenforceable under section 365(f) of the Bankruptcy Code.

<b><u>BASIS FOR RELIEF REQUESTED</u></b>

**I.      A Sale of the Acquired Assets Under
        <u>Section 363 of the Bankruptcy Code is Warranted</u>.**

57.     Ample justification exists for approval of the proposed sale of the Acquired Assets.  Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

58.     The decision to sell assets outside of the ordinary course of business is based upon the sound business judgment of the debtor.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 289, 295 (3d Cir. 1996); In re Titusville Country Club, 128 BR. 396 (W.D. Pa. 1991); In re Delaware & Hudson Ry. Co., 124 BR. 169, 176 (D. Del. 1991); see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983).

59.     The paramount goal in any proposed sale of property of the estate is to maximize the value received by the estate.  See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res., Inc., 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the. . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the sale appears to enhance a debtor's estate, court approval of a debtor in possession's or trustee's decision to sell should only be withheld if the debtor in possession's or trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.  See GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd., 331 B.R. 251, 255 (N.D. Tex. 2005); In re Lajijani, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); In re WPRV-TV, Inc., 143 B.R. 315, 319 (D. P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property. Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

60.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business and not under a plan may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  See, e.g., In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986).  Once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  In re Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).  Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions.  See Pitt v. First Wellington Canyon Assocs.  (In re First Wellington Canyon Assocs.), Case No. 89-C-593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

61.    The Debtors submit that the proposed sale of the Acquired Assets and assumption and assignment of the Designated Contracts is within their sound business judgment.  The Debtors were in active negotiations with a number of parties in the months leading up to the bankruptcy filings regarding a potential transaction, whether through a section 363 sale or chapter 11 plan.  After considering all alternatives, including all transaction proposals from other

parties, the Debtors, with the assistance of their advisors, determined that the sale of the Acquired Assets through a consensual 363 sale process governed by the Bidding Procedures will maximize the value of the Debtors' estates and is in the best interests of their estates, creditors, and patients.  The terms and conditions of the Stalking Horse Agreement, including the proposed purchase price, are fair and reasonable and were negotiated between the parties in good faith and at arm's length.  The Debtors have limited funds available to them, making it imperative that they move forward expeditiously with a bidding process and consummation of a sale.

62.     The proposed sale process provides the best mechanism to maximize value under the circumstances and is a valid exercise of the Debtors' business judgment.  The Debtors' highest priority in these cases is to continue providing the highest levels of care to its patients while also preserving value.  An expeditious sale process will further these goals as it will allow the ultimate purchaser and new operator of the Debtors' LTAC hospital operations to immediately focus on caring for and treating patients without the worries and distractions inherent in any liquidity crunch or bankruptcy case.  Accordingly, the Debtors respectfully request that the sale of the Acquired Assets in accordance with the procedures set forth herein be approved.

## II.     The Sale of the Acquired Assets Should Be Free and Clear of Liens, Claims, and Encumbrances.

63.     In the interest of attracting the best bids for the Acquired Assets, the Debtors submit that the sale of the Acquired Assets should be free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims and encumbrances attaching to the proceeds of such sale.

64.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

      (1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;

      (2)      such entity consents;

      (3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

      (4)      such interest is in bona fide dispute; or

      (5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

65.     Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the assets "free and clear" of liens and interests.  See In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions is met, the debtor has the authority to conduct the sale free and clear of all liens.") (citing Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988)); In re Dundee Equity Corp., Case No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

66.     The Debtors submit that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale of the Acquired Assets.  In particular, section 363(f)(2) will be met in connection with the transactions proposed because each of the parties holding liens, claims or encumbrances attaching to the Acquired Assets will

consent, or absent any objection to this Motion, will be deemed to have consented, to the sale. Further, any such lien, claim or encumbrance will be adequately protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto.

67.     The Debtors also submit that it is appropriate to sell the Acquired Assets free and clear of successor liability relating to the Debtors' businesses.  Such a provision ensures that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free and clear from successor liability relating to the debtor's business.  See, e.g., In re Trans World Airlines, Inc., 322 F.3d 283, 288–90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); In re Insilco Techs., Inc., 351 B.R. 313, 322 (Bankr. D. Del. 2006) (363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); see also In re General Motors Corp., 407 B.R. 463, 505–06 (Bankr. S.D.N.Y. 2009) ("[T]he law in this Circuit and District is clear: the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009).

68.     Accordingly, the Debtors request that the Acquired Assets be sold and transferred to the Successful Bidder free and clear of all liens, claims and encumbrances, including successor liability, pursuant to section 363(f) of the Bankruptcy Code.

### III.    The Successful Bidder Should Be Afforded All Protections
### Under Section 363(m) of the Bankruptcy Code as a Good Faith Purchaser.

69.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

70.    Section 363(m) fosters the "policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely."  In re Abbotts Dairies of Penn., Inc., 788 F.2d at 147; see also Allstate Ins. Co. v. Hughes, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

71.    The Debtors submit, and will present evidence at the Sale Approval Hearing, if necessary, that the selection of the Successful Bidder shall be the product of arm's length, good faith negotiations in an anticipated competitive sale process.  Accordingly, the Debtors request that the Court make a finding at the Sale Approval Hearing and in the Sale Order that the Successful Bidder has purchased the Acquired Assets in good faith and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

### IV.    The Bidding Procedures are Reasonable and Appropriate.

72.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or public auction.  The Debtors have determined that

the sale of the Acquired Assets by public auction, pursuant to the Bidding Procedures, will ensure that the bidding process with respect to the Acquired Assets is fair, transparent, and reasonable and will yield the maximum value for the Debtors' estates and their creditors.

73.     Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales.  See In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997) (D.I. 377); In re Fruehauf Trailer Corp., Case No. 96-01563 (PJW) (Bankr. D. Del. Jan. 31, 1997) (D.I. 439); In re Financial News Network, Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates.").

74.     The Bidding Procedures set forth the schedule for conducting the Auction and the Sale Approval Hearing.  A section 363 sale process that provides adequate time for marketing and solicitation of bids is the best mechanism to maximize value under the circumstances.  The Bidding Procedures promote transparency and are fair and appropriate under the circumstances and are designed to facilitate orderly yet competitive bidding to maximize the net value realized from the sale of assets by the estates.  In addition, the Debtors' extensive prepetition marketing efforts should only further facilitate a thorough process during these cases.  Indeed, the Debtors believe that any party that may submit a competing bid for the Debtors' assets will have already conducted diligence prior to the commencement of these cases.  Therefore, such parties will be familiar with the Debtors' assets and operations and will have limited need to conduct postpetition diligence.

75.     The Bidding Procedures contemplate an open-auction process that provides potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid and compete for the right to be selected the Successful Bidder during the Auction.  At the same time, the Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and select the highest or otherwise best offer.  Accordingly, the Debtors request that the Court approve the Bidding Procedures.

**V.      The Notice Procedures are Reasonable and Appropriate.**

76.     Pursuant to Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Acquired Assets, including a disclosure of the time and place of the Auction, the terms and conditions of the proposed sale, and the deadline for filing objections.  The Debtors submit that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the proposed sale of the Acquired Assets, the Bidding Procedures, the Auction, the Cure Amount, and the Sale Approval Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well all those parties that have expressed a bona fide interest in acquiring the Acquired Assets.  Based upon the foregoing, the Debtors respectfully request that the Court approve the notice procedures proposed herein, including the form and manner of service of the Sale Notice.

**VI.     Assumption and Assignment of Executory**
        **Contracts and Unexpired Leases Should Be Approved.**

**A.      Assumption and Assignment Based on Debtors' Business Judgment.**

77.     As stated above, to facilitate and effectuate the sale of their assets, the Debtors also seek authority to assume and assign certain Designated Contracts to the Successful Bidder.

Section 365(a) and (b) of the Bankruptcy Code authorizes debtors in possession to assume executory contracts or unexpired leases subject to the Court's approval, and requires such debtors in possession to satisfy certain requirements at the time of assumption.   Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."   11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing in relevant part that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

78.   The standard that is applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in its economic best interests.  See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113); In re III Enters., Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), aff'd, 169 B.R. 551 (E.D. Pa. 1994).

79.     It is well established that courts should approve a debtor's motion to assume or reject an executory contract if the debtor's decision is based on its business judgment.  See In re Decora Indus., Inc., Case No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002); Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.), 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard."); see also Phar Mor, Inc. v. Strouss Bldg. Assocs., 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).

80.     To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances."  In re Exide Techs., 340 B.R. at 239 ("This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate.").  Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." Network Access Solutions, 330 B.R. at 75.   Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion.  See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003); Lubrizol Enters. v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985).

81.     The procedures set forth herein for the Debtors' assumption and assignment of certain Designated Contracts to the Successful Bidder meets the business judgment standard and

satisfies the requirements of section 365 of the Bankruptcy Code.   The assumption and assignment of Designated Contracts are necessary for any Successful Bidder to conduct business going forward, and since no purchaser would take the Acquired Assets without the Designated Contracts, the assumption and assignment of such Designated Contracts is essential to inducing the highest or otherwise best offer for the Acquired Assets.   Further, upon consummation of the proposed sale of the Acquired Assets, the Debtors will no longer continue to operate their businesses and will, therefore, have no use for any of the Designated Contracts utilized in the businesses.   Lastly, the proposed Assumption and Assignment Procedures ensure that all counterparties to Designated Contracts will receive the Cure Notice, providing them with ample notice of the proposed assumption and assignment and opportunity to contest any asserted Cure Amount, as well as the ability of the Successful Bidder to provide adequate assurance of future performance.

82.      Consequently, the Debtors submit that the Assumption and Assignment Procedures are fair and reasonable and respectfully request that the Court approve the Assumption and Assignment Procedures and authorize the Debtors to assume and assign any Designated Contracts to the Successful Bidder.

### B.      Adequate Assurance of Future Performance.

83.      A debtor in possession may assign an executory contract or unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.   11 U.S.C. § 365(f)(2).

84.      The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139

B.R. 585, 592 (S.D.N.Y. 1992); In re Rachels Indus., Inc., 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); see also In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("[a]though no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

85.     Adequate assurance of future performance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

86.     Pursuant to the Bidding Procedures, in order to submit a Qualified Bid for the Acquired Assets, all Qualified Bidders must provide evidence of such Qualified Bidder's ability to provide adequate assurance of future performance under the Designated Contracts to be assumed and assigned.  Moreover, the Assumption and Assignment Procedures permit the non-Debtor counterparties to such Designated Contracts to request adequate assurance information regarding the Successful Bidder, and afford such counterparties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under such Designated Contracts.  Accordingly, in this regard, the Assumption and Assignment Procedures are reasonable and appropriate and support approval of the assumption and assignment of Designated Contracts to the Successful Bidder.

C.      **Anti-Assignment Provisions Should be Deemed Unenforceable.**

87.      To facilitate the assumption, assignment, and sale of Designated Contracts, the Debtors also request that the Court enter an order providing that any anti-assignment or similar economic impairment provisions contained in, or otherwise purporting to affect, the Designated Contracts to be assumed and assigned shall not restrict, limit or prohibit the assumption, assignment and sale of such Designated Contracts, and that such provisions are deemed and found to be unenforceable within the meaning of section 365(f) of the Bankruptcy Code.

88.      Section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of or impose an economic impairment to an executory contract or unexpired lease.  See, e.g., Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.), 127 F. 3d 904, 910–11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365."), cert. denied, 522 U.S. 1148 (1998). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (finding that section 365(f)(3) prohibits enforcement of any lease clause creating a right to a terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

89.      Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced.  See In re Rickel Home Centers, Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 356(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright,

but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in In re Mr. Grocer, Inc., the court noted the following:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).

90.    Accordingly, the Debtors request that any anti-assignment and economic impairment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of any Designated Contracts to the Successful Bidder and be deemed and found to be unenforceable within the meaning of section 365(f) of the Bankruptcy Code.

## VII.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.

91.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." Here, an expeditious closing of a sale is necessary and appropriate to maximize value for the estates. Accordingly, the Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## RESERVATION OF RIGHTS

92.    The Debtors expressly reserve the right to amend, modify, and/or supplement the relief requested in this Motion in all respects, including, but not limited to, the proposed Bidding Procedures attached hereto, prior to or at the applicable hearing (and the Bidding Procedures

prior to or during the Auction) and reserves the right to withdraw this Motion, in whole or in part, prior to or at the applicable hearing.

## NOTICE

93.    No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion on:  (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' twenty largest unsecured creditors on a consolidated basis; (c) counsel to the Existing Lender Parties; (d) counsel to the Debtors' postpetition lender; (e) counsel to HealthCap, as noticing agent for the Stalking Horse Purchaser; (f) counsel to the Landlord; (g) all applicable health regulatory agencies and taxing authorities; (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue Service; (j) any entity known or reasonably believed to have asserted a security interest in or lien against any of the Acquired Assets; and (k) any party who has expressed an interest in purchasing the Acquired Assets within the past three (3) months (collectively, the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

## NO PRIOR REQUEST

94.    No prior request for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully requests that the Court grant the relief requested herein and grant such other and further relief as this Court deems just and proper.

Dated: February 24, 2014
      Wilmington, Delaware

**DLA PIPER LLP (US)**

/s/ Stuart M. Brown
Stuart M. Brown (DE 4050)
Daniel N. Brogan (DE 5723)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email:    Stuart.Brown@dlapiper.com
          Daniel.Brogan@dlapiper.com

-and-

Thomas R. Califano (*pro hac vice* admission pending)
Daniel G. Egan (*pro hac vice* admission pending)
1251 Avenue of the Americas
New York, New York  10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Email:  Thomas.Califano@dlapiper.com
       Daniel.Egan@dlapiper.com

*Proposed Attorneys for the Debtors and Debtors in Possession*