## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
                             :

In re:                           :    Chapter 11
                             :

RESTORA HEALTHCARE HOLDINGS, LLC,    :    Case No. 14-10367 (____)
*et al.*,[1]                        :
                             :    (Joint Administration Requested)
          Debtors.               :
-------------------------------------------------------------x

## DECLARATION OF GEORGE D. PILLARI IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

     I, George D. Pillari, being duly sworn, depose and say:

     1.      I am the Chief Restructuring Officer ("CRO") of Restora Healthcare Holdings, LLC ("Restora Holdings"), which holds 100% of the membership interests of Restora Hospital of Mesa, LLC ("Restora Mesa") and Restora Hospital of Sun City, LLC ("Restora Sun City" and, together with Restora Holdings and Restora Mesa, the "Debtors"), the above-captioned debtors and debtors in possession.

     2.      I have been advising the Debtors' for more than two months and have been involved in all aspects of the Debtors' affairs, including business operations, strategic planning, financial reporting, human resources, legal affairs, and other management activities. I also have been involved in the Debtors' efforts to address their current financial difficulties and prepare for the transition to chapter 11.

     3.      I have over twenty-five (25) years of experience in the healthcare industry and

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Restora Healthcare Holdings, LLC (2837); Restora Hospital of Mesa, LLC (8773); and Restora Hospital of Sun City, LLC (1028). The mailing address for the Debtors, solely for purposes of notices and communications, is 2550 Northwinds Parkway, Suite 160, Alpharetta, Georgia 30009.

have served as an advisor and officer for hospital systems, clinical laboratories, and managed-care and other healthcare organizations.  I previously founded, managed and sold several businesses in the healthcare industry, including a firm that managed consumer healthcare finances, a health-benefits outsourcing company, and a firm that provided database, software and analytical services relating to the assessment of clinical performance and outcomes and the management of healthcare service delivery and healthcare costs.  Prior to joining Alvarez & Marsal Healthcare Industry Group ("A&M"), I was the CEO of CBCA Inc., a health-benefits outsourcing company that managed more than $1 billion of medical costs annually on behalf of corporate customers.  Prior to CBCA Inc., I was co-founder and chief executive officer of Solucient, a leading provider of healthcare information technologies and services to hospitals, health plans, and pharmaceutical companies.  I led Solucient from its start-up phase through its initial public offering and managed it as a public company for four (4) years before it was acquired by The Thomson Corporation.

4.      I joined A&M in 2007.  Recently, I served as CRO for Victor Valley Community Hospital and Nevada Cancer Institution.  As an advisor and officer, I assisted in maximizing and expediting recoveries in a variety of healthcare cases.

5.      I earned a Bachelor's Degree from The Johns Hopkins University, where I also worked at The Johns Hopkins Center for Healthcare Finance and Management.  I have authored numerous articles and studies, and have served as a speaker and commenter across the healthcare industry.  I was named an Ernst & Young Healthcare Entrepreneur of the Year.

6.      Accordingly, I have substantial experience in the healthcare industry and, in my capacity as CRO of the Debtors, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the

Debtors, and I am authorized to submit this Declaration on behalf of the Debtors.  In addition, I have been personally involved in the marketing efforts and negotiations of potential transactions involving the Debtors and their assets.

7.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

8.    The Debtors have filed or anticipate filing the following motions and applications (collectively, the "First Day Motions"):

(a)    Motion of the Debtors for Entry of an Order Directing the Joint Administration of Their Chapter 11 Cases (the "Joint Administration Motion");

(b)    Motion of the Debtors for Entry of an Order Authorizing the Debtors to File (I) a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (II) a Consolidated List of the Debtors' Twenty Largest Unsecured Creditors (the "Consolidated Creditor List Motion");

(c)    Motion of the Debtors for Entry of an Order (I) Approving the Continued Use of the Debtors' Cash Management System, Existing Bank Accounts and Business Forms, and (II) Extending the Deadline to Comply with the Deposit and Investment Requirements of Section 345 of the Bankruptcy Code (the "Cash Management Motion");

(d)    Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Them to Pay Certain Employee Obligations and Maintain and Continue Employee Benefits and Programs, (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Issued Checks and Electronic Payment Requests Relating to the Foregoing, and (III) Scheduling a Final Hearing on the Motion (the "Wage Motion");

(e)    Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Invoices, (II) Determining

that the Utilities are Adequately Assured of Future Payment, and (III) Establishing Procedures for Determining Adequate Assurance of Payment  (the "Utilities Motion");

(f)     Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Existing Insurance Policies and Pay All Obligations Arising Thereunder, (B) Maintain Financing of Insurance Premiums and Pay All Obligations in Connection Therewith, and (C) Renew, Revise, Extend, Supplement, Change, or Enter Into New Insurance Policies, and (II) Granting Certain Related Relief (the "Insurance Motion");

(g)     Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain Critical Vendors and Service Providers, and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Issued Checks and Electronic Payment Requests Relating to the Foregoing (the "Critical Vendor Motion");

(h)     Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2 (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Super-priority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief (the "DIP Financing and Cash Collateral Motion");

(i)     Application of the Debtors for Entry of an Order Pursuant to 28 U.S.C. § 156(c) Approving the Retention and Appointment of Rust Consulting/Omni Bankruptcy as the Claims and Noticing Agent to the Debtors, Effective *Nunc Pro Tunc* To The Petition Date (the "Claims Agent Application"); and

(j)     Motion of the Debtors to Shorten Notice and Objection Periods for the Motion of the Debtors for Entry of an Order (I) Approving Auction and Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Assets, (II) Authorizing Entry into a Stalking Horse Agreement, Subject to Higher or Otherwise Better Offers, (III) Approving Procedures Related to the Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling Auction and Sale Approval Hearing, (V) Approving the Form and Manner of Sale Notice, and (VI) Granting Related Relief (the "Motion to Shorten").

9.      Additionally, the Debtors anticipate filing at the outset of these chapter 11 cases, among other things, (a) a motion seeking authorization to sell substantially all of the Debtors'

assets and approval of bidding procedures related thereto (the "Sale Motion"), (b) applications seeking authorization for the Debtors to retain certain professionals in connection with these cases, and (c) a motion seeking to establish interim compensation procedures for such professionals.

10.     I am submitting this Declaration in support of the Debtors' chapter 11 petitions and First Day Motions.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition, and information provided to me by management, advisors, employees or other representatives of the Debtors.  If I were called as a witness, I would testify consistently with the facts set forth in this Declaration.

11.     This Declaration provides an overview of the Debtors and the circumstances leading to the commencement of these chapter 11 cases.  Section I of this Declaration provides an overview of the Debtors' operations.  Section II recounts the events preceding the bankruptcy filings.  Section III affirms and incorporates facts that support the relief requested in the First Day Motions.

**I.      Overview of the Debtors' Business.**

**A.      Description of Debtors' Operations.**

12.     The Debtors operate two long-term acute care (LTAC) hospitals that provide high intensity acute level care to patients requiring longer hospitalizations—typically ranging from a few weeks to several months. The two hospitals are 120-bed, licensed, freestanding hospitals located in the Greater Phoenix area.  Restora Mesa is located in Mesa, Arizona and Restora Sun City is located in Sun City, Arizona.  Both hospitals are Medicare and Medicaid certified, and offer a continuum of services including specialty acute care and sub-acute care provided in an

on-site transitional care unit (TCU).

13.     Restora Holdings acquired the hospital assets now owned by Restora Mesa and Restora Sun City pursuant to the terms of an Operations Acquisition Agreement with Hearthstone Hospital – Mesa, LLC and Hearthstone Hospital – Sun City, LLC, as sellers (together, the "Trillium Sellers"), dated as of April 16, 2012 (the "Trillium Acquisition Agreement").  As part of the consideration provided by Restora Holdings for such assets under the Trillium Acquisition Agreement, and as discussed in more detail in Section I.C. below, Restora Holdings issued two unsecured promissory notes in favor of the Trillium Sellers in the aggregate principal amount of $3,500,000.

14.     Restora Mesa and Restora Sun City provide a wide variety of programs and services, including a pulmonary/ventilator program, wound care, low toleration rehabilitation services, and post-surgical care.  Restora Mesa and Restora Sun City treat patients who require multiple concurrent care modalities such as ventilator case, intravenous therapy, nutritional support, tube feedings, antibiotic management, dialysis, and complex wound/skin care management.

15.     Restora Mesa and Restora Sun City patients typically are critically ill and/or have multi-system failures that require extended acute care treatment after discharge from a traditional acute care hospital.  Patients often come to the hospitals directly from an intensive care unit. Upon admission, each patient is evaluated by an interdisciplinary team of professionals to develop an appropriate plan of action depending on the patient's particular needs, and the average length of stay of patients will vary depending on the diagnosis, patient age, and acuity level.

16.     Revenue is earned from patient fees for services rendered and is due from patients

and third party payors, including both Medicare and Medicaid.  Net patient revenue at Restora

Mesa for the period of January 2013 through September 2013 was $15,688,593, and net patient

revenue at Restora Sun City for the same period was $13,014,048.

17.    The Debtors are subject to monitoring and inspection by several regulatory

agencies and organizations, including the Arizona Department of Health Services, the Arizona

Long Term Care Ombudsman, and the Centers for Medicare and Medicaid Services.  To the best

of my knowledge, the Debtors are currently in compliance with the rules and regulations of each

of these agencies and organizations and have not received any notice of delinquency or non-

compliance from any such agency or organization.  In addition, the Debtors maintain a policy

regarding the privacy and use of patient healthcare information and other personally identifiable

information, and have a Notice of Privacy Practices posted on the Debtors' website at

www.restorahealthcare.com.

**B.    Organizational Structure of the Debtors.**

18.    Restora Holdings holds 100% of the membership interests in both Restora Mesa

and Restora Sun City.  HCCG, LLC, a non-debtor, holds an 81.63% membership interest in

Restora Holdings, with certain individual non-debtors holding the remaining 18.37%

membership interests in Restora Holdings.  No Debtor holds a substantial or controlling interest

in any entity that is not a publicly traded corporation or a debtor in a case under the Bankruptcy

Code.

**C.    The Debtors' Prepetition Capital Structure.**

(i)    HFG Loan and Security Agreement.

19.    The Debtors are parties to a Revolving and Term Loan and Security Agreement,

dated as of June 29, 2012 (the "HFG Loan Agreement"), with Healthcare Finance Group, LLC

("HFG"), as revolving lender, term lender, and administrative agent.   Pursuant to the HFG Loan

Agreement, HFG, as term lender, agreed to make a term loan to Restora Mesa and Restora Sun City (the "Borrowers") in the initial principal amount of $3,000,000 ("Term Loan A") and a separate term loan to the Borrowers in the initial principal amount of $2,000,000 ("Term Loan B" and, together with Term Loan A, the "Term Loans").  Term Loan B was not advanced to the Borrowers.

20.    In addition, the HFG Loan Agreement provides for certain revolving advances (the "Revolving Commitment" and, together with the Term Loans, the "HFG Loans") to be made by HFG, as revolving lender, to the Borrowers as requested from time to time by the Borrowers. The Revolving Commitment is subject to a borrowing base based on the expected net value of the Borrowers' receivables and is subject to a cap of $7,000,000.

21.    Pursuant to the terms of the HFG Loan Agreement, the non-default interest rate per annum on the outstanding balance of the Term Loans is equal to LIBOR plus 6.0% and the non-default interest rate per annum on the outstanding balance of the Revolving Commitment is equal to LIBOR plus 4.25%.  The default rate of interest on all loans is equal to the otherwise applicable non-default rate of interest plus 4.0%.  The Borrowers' obligations to HFG under the HFG Loan Agreement are guaranteed by Restora Holdings pursuant to a Parent Guaranty, dated as of June 29, 2012 (the "Parent Guaranty").

22.    As security for the Borrowers' obligations to HFG under the HFG Loan Agreement and Restora Holdings' obligations to HFG under the Parent Guaranty, each Debtor granted to HFG a security interest in substantially all of each Debtor's assets (collectively, the "Collateral").  The rights of HFG, as term lender, in and to certain Collateral (including general intangibles, goods, inventory, contracts, leases, instruments, investment property, securities, security entitlements, securities accounts, equity interests held by the Debtors, and records

related to the foregoing) is senior to the rights of HFG, as revolving lender, in and to such Collateral, and the rights of HFG, as revolving lender, in and to the remaining Collateral (including receivables, deposit accounts, cash, and records related to the foregoing) is senior to the rights of HFG, as term lender, in and to such remaining Collateral.  In addition, as further security for the Borrowers' and Restora Holdings' obligations to HFG in connection with the HFG Loan Agreement and Parent Guaranty, Restora Holdings executed a Pledge Agreement, dated as of June 29, 2012, in favor of HFG pursuant to which Restora Holdings pledged to and granted HFG a security interest in its 100% limited liability company interests in each of the Borrowers.

23.    The Debtors are in default of the obligations under the HFG Loan Agreement and related documents.  As of the Petition Date, the aggregate amount outstanding in connection with the Term Loans was approximately $2,600,000 and the aggregate amount outstanding in connection with the Revolving Commitment was approximately $3,000,000.  Notwithstanding such defaults, HFG has continued to fund the Debtors pre-petition under a reservation of rights.

(ii)    Subordinated Promissory Notes.

24.    As noted above, as partial consideration for Restora Holdings' obligations under the Trillium Acquisition Agreement, Restora Holdings issued the following two subordinate promissory notes in favor of the Trillium Sellers: (a) a Subordinate Promissory Note [First Promissory Note], dated as of June 29, 2012, in the original principal amount of $2,000,000 (the "First Seller Note"); and (b) a Subordinate Promissory Note [Second Promissory Note], dated as of June 29, 2012, in the original principal amount of $1,500,000 (the "Second Seller Note" and, together with the First Seller Note, the "Seller Notes").

25.    The Seller Notes are unsecured obligations of Restora Holdings.  The First Seller Note bears interest at a rate of (a) eight percent (8%) per annum during the first year after the

date of issuance, (b) ten percent (10%) per annum during the period from and after the first anniversary of the date of issuance through the third anniversary of the date of issuance, and (c) twelve percent (12%) per annum from and after the third anniversary of the date of issuance. The Second Seller Note bears interest at a rate of ten percent (10%) per annum.

26.     Pursuant to a certain Subordination and Intercreditor Agreement, dated as of June 29, 2012, by and among Restora Holdings, HFG, as agent, and the Trillium Sellers, the payment of any and all of the indebtedness owing to the Trillium Sellers in connection with the Seller Notes is subordinate and subject in right and time of payment to the payment in full of all indebtedness owing to HFG in connection with the HFG Loan Agreement.

27.     As of January 31, 2014, the aggregate amount outstanding in connection with the First Seller Note was $2,151,004 and the aggregate amount outstanding in connection with the Second Seller Note was $1,769,023.

28.     In addition, Restora Holdings issued a Restated Subordinate Convertible Promissory Note, dated as of September 30, 2013, in favor of HCCG, LLC ("HCCG"), as agent on behalf of certain lenders as set forth therein, in the principal amount of $1,681,186.92 (the "HCCG Note").  The HCCG Note amends and restates a Subordinate Convertible Promissory Note previously issued by Restora Holdings in favor of HCCG, as agent, on April 11, 2013.  The HCCG Note is an unsecured obligation of Restora Holdings and bears interest at a rate of 7.25% per annum.  Pursuant to a certain Subordination and Intercreditor Agreement, dated as of April 11, 2013 (as amended), by and among Restora Holdings, HFG, as agent, and HCCG, as agent, the payment of any and all of the indebtedness owing to HCCG in connection with the HCCG Note is subordinate and subject in right and time of payment to the payment in full of all indebtedness owing to HFG in connection with the HFG Loan Agreement.

29.     As of January 31, 2014, the aggregate amount outstanding in connection with the HCCG Note was $1,722,639.

(iii)   Other Indebtedness.

30.     In addition, the Debtors regularly receive goods, services, and supplies from various vendors and providers in the ordinary course of the Debtors' operations, including pharmaceuticals, blood supplies, and medical imaging services.   The Debtors also have indebtedness owing under their real property lease agreements with ARHC RHMESAZ01, LLC and ARHC RHSUNAZ01, LLC.   As of January 31, 2014, an aggregate amount of more than $8,000,000 was due and owing to prepetition vendors, service providers, and landlords.

## II.    Events Leading to Chapter 11.

31.     Over the course of the past year and a half, Restora Mesa and Restora Sun City have experienced significant liquidity issues that have hindered their ability to pay obligations in the ordinary course of business.   Since the acquisition of the hospital facilities from the Trillium Sellers in 2012, the Debtors have experienced delays in construction at the facilities, difficulty collecting on certain accounts receivable, and a decrease in patient referrals due to an overhaul in the medical staffs at Restora Mesa and Restora Sun City.   In addition, the Greater Phoenix area experiences unique seasonal issues, with many elderly residents relocating during the hotter summer months.   As such, beginning in the summer of 2013, patient admission and referral rates began to dip even further, and average patient days in terms of length of stay, particularly at Restora Sun City, have declined.

32.     Further, revenues from patients and third party payors have decreased since the acquisition of the hospitals from the Trillium Sellers in part due to the competitive environment in the Greater Phoenix area and from increased competition resulting from the expiration at the

end of 2012 of a government moratorium on the issuance of new long-term acute care hospital bed licenses.

33.    To address these issues, the Debtors sought to implement a number of restructuring initiatives over the last year, including making appropriate adjustments in staffing, increasing negotiations with vendors and suppliers, and seeking out additional sources of funding.  In addition, the Debtors retained the services of Alvarez & Marsal Healthcare Industry Group to provide a CRO.

34.    After careful consideration and consultation with their advisors, the Debtors ultimately determined that it was necessary to pursue a restructuring transaction with one or more potential purchasers or other strategic partners.  The Debtors, together with their advisors, contacted a number of potential purchasers or strategic partners in connection with a potential sale or other restructuring transaction, and executed non-disclosure agreements with thirteen (13) such entities, all of which were granted access to a dataroom established by the Debtors' advisors to assist such entities in their due diligence efforts.

35.    The Debtors and their advisors were in regular contact with these entities and facilitated such entities' due diligence efforts, including by coordinating on-site visits and management meetings.  A number of parties expressed interest in a transaction with the Debtors, including through a chapter 11 plan, section 363 sale, and/or a management structure.  The Debtors and their advisors negotiated with each of these parties regarding potential transaction structures and economic and other terms of a deal, but no such party, individually or together, was willing to enter into a binding agreement to consummate such a transaction.

36.    Several parties with which the Debtors had been engaged in discussions, including several creditors of the Debtors,  ultimately submitted to the Debtors a joint term sheet

for a proposed transaction to acquire the Debtors' business operations.  The parties submitting the term sheet were HFG, American Realty Capital and certain of its affiliates (collectively, the "Landlord"), Acuity Healthcare, L.P. ("Acuity"), HealthCap Partners, LLC ("HealthCap"), and Tutera & Co. ("Tutera" and, together with HFG, the Landlord, Acuity, and HealthCap, the "Transaction Parties").  The Transaction Parties' proposal provides for the formation of a new entity by HealthCap, Acuity, and Tutera,, with each Transaction Party, other than HFG, contributing cash funding to the new entity, and HFG assigning to the new entity all of its rights, title, and interest as lender and agent in and to all prepetition and postpetition indebtedness owing to it by the Debtors in connection with the Prepetition Loan Agreement and related documents and the DIP Facility (as defined below).  In these cases, the Debtors are seeking to have the newly formed entity, Phoenix Hospital Partners, LLC (the "Stalking Horse Purchaser"), serve as a stalking horse bidder in connection with a sale transaction pursuant to section 363 of the Bankruptcy Code involving substantially all of the Debtors' assets, subject to higher or otherwise better offers.  The Debtors, together with their advisors (including myself), engaged in extensive negotiations with the Stalking Horse Purchaser,[2] while at the same time continuing discussions with other potentially interested parties.

37.     Ultimately, the Debtors were able to reach an agreement with the Stalking Horse Purchaser regarding the terms of a stalking horse asset purchase agreement (the "Stalking Horse Agreement"), a copy of which is attached to the Sale Motion, involving a sale transaction pursuant to section 363 of the Bankruptcy Code, subject to higher or otherwise better offers.  The consideration being provided under the Stalking Horse Agreement consists of (a) $5,000,000 payable by the Stalking Horse Purchaser in the form of a credit bid under section 363(k) of the

---

[2]     References to the Stalking Horse Purchaser shall hereafter include the Transaction Parties and PHX Hospital Partners, LLC.

Bankruptcy Code with respect to a portion of the aggregate secured obligations owing by the Debtors under the Prepetition Loan Agreement and DIP Facility, (b) a waiver by the Landlord of certain cure costs with respect to the two real property leases between the Debtors and the Landlord for the hospital locations, including a waiver of certain past due basic rental obligations under the leases as of the closing of the sale transaction, and (c) the assumption by the Stalking Horse Purchaser of certain liabilities set forth in the Stalking Horse Agreement and the payment of all cure costs relating to executory contracts and unexpired leases to be assumed and assigned to the Stalking Horse Purchaser.

38.     The Debtors, together with their advisors, carefully considered all options and determined in their business judgment that the commencement of these chapter 11 cases and the pursuit of a post-petition marketing and sale process will maximize the value of the Debtors' assets and is in the best interest of all constituencies, including the patients at the Debtors' hospitals and creditors of the Debtors.  The Debtors did not have sufficient liquidity to continue operating outside of bankruptcy, and the pursuit of a sale transaction during these chapter 11 cases presents the best available option to (a) ensure the continued operation of the Debtors' LTAC hospitals, (b) ensure the continued provision of proper patient care and support, and (c) maximize value for the Debtors' estates.

**III.    Facts in Support of First Day Motions.**[3]

39.     Contemporaneously with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions.  The Debtors request that each of the First Day Motions described below be granted, as each constitutes a critical element in ensuring a successful outcome for the Debtors and their estates in these chapter 11 cases.

---

[3]     Capitalized terms used but not defined in this Section III shall have the meanings ascribed to them in the applicable First Day Motion.

A.      **Joint Administration Motion.**

40.      By the Joint Administration Motion, the Debtors request that the Bankruptcy Court authorize and direct the joint administration of these chapter 11 cases and the consolidation thereof only for procedural purposes pursuant to Bankruptcy Rule 1015.  In addition, the Debtors request that the Clerk of the Bankruptcy Court make an entry on the docket of each of the Debtors' cases, other than the Restora Holdings case, stating that an order has been entered directing joint administration of these chapter 11 cases and that all further pleadings and other papers shall be filed in and all further docket entries shall be made in the Restora Holdings' docket.

41.      The Debtors are all related entities and are filing petitions in the same Bankruptcy Court.  I believe that joint administration will be less costly and burdensome than separate procedural administration of the estates due to the combined docket and combined notice to creditors and parties in interest.  Many applications, motions, orders, hearings and notices will be made in these cases and will affect all of the Debtors and their estates.  Joint administration will keep all parties informed of matters related to these cases without the inconvenience and confusion of reviewing separate dockets.  In addition, since the Debtors are seeking only administrative consolidation by this motion, rather than substantive consolidation, I do not believe creditors' interests will be impacted.

42.      I believe that if each Debtor's case was administered independently, there would be a number of duplicative pleadings and overlapping service.  This unnecessary duplication of identical documents would be wasteful of the Debtors' resources, as well as other parties' and this Bankruptcy Court's resources.

43.      Therefore, I believe that the chapter 11 cases should be jointly administered for procedural purposes only, and the Joint Administration Motion should be approved.

### B.    Consolidated Creditor List Motion.

44.    By the Consolidated Creditor List Motion, the Debtors request authorization to file (a) a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, and (b) a consolidated list of the Debtors' twenty (20) largest unsecured creditors.  The Debtors do not presently maintain lists of the names and addresses of their creditors on a Debtor-specific basis, and I believe requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.  In addition, each Debtor's list of its twenty (20) largest general unsecured creditors has significant overlap with the lists of the other Debtors in these cases.

45.    I believe that authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor and to file a consolidated list of the Debtors' twenty (20) largest unsecured creditors will promote efficiency and conserve the Debtors' resources.  Therefore, I believe that the relief requested in the Consolidated Creditor List Motion should be granted.

### C.    Insurance Motion.

46.    By the Insurance Motion, the Debtors seek authorization to (a) maintain existing insurance policies and pay all obligations arising thereunder, (b) maintain financing of their insurance premiums and pay all obligations in connection therewith, and (c) renew, revise, extend, supplement, change, or enter into new insurance policies as needed in their business judgment.

47.    The Debtors maintain nine (9) Insurance Policies that are administered by several third-party Insurance Carriers and collectively provide coverage for, among other things (a) general liability, which includes medical practice liability, (b) automobile liability, (c) special coverage, (d) property, (e) excess liability, (f) director and officer liability, (g) workers'

compensation fees, and (h) surety bonds.  In many cases, the coverage provided by the Insurance Policies is required by the regulations, laws and contracts that govern the Debtors' business activities.  The premiums for the Insurance Policies with the exception of the Insurance Policy covering workers' compensation fees (the "Financed Insurance Policies") are financed through a certain Premium Financing Agreement with First Insurance Funding Corporation.  Under the Premium Finance Agreement, the Debtors financed the Financed Insurance Policies, and the balance as of the date of this Motion is $96,467.89.  Pursuant to the terms of the Premium Finance Agreement, the Debtors are obligated to pay $32,871.11 in monthly installments due on the 29th day of each month (or the 28th day in the case of February).  The next monthly insurance premium installment is due on February 28, 2014.

48.    In addition, the Debtors make monthly payments to SCF Western Insurance Company for its workers' compensation fee liability coverage in the approximate amount of $11,000 (the "Workers' Compensation Premium").  The Workers' Compensation Premium payments are due on the 5th day of each month and pertain to coverage for the particular month of payment.  There are no prepetition obligations owing with respect to the Workers' Compensation Premium payments.

49.    I believe that payment of obligations owing in connection with the Insurance Policies and Premium Finance Agreement and the renewal, revision, extension, supplementation, or change of existing Insurance Policies and entering into new insurance policies as needed in the Debtors' business judgment are necessary to protect and safeguard the Debtors' ongoing operations and ensure compliance with the UST Guidelines.  Also, failure to pay amounts related to the Insurance Policies as and when they come due may harm the Debtors' estates, including because Insurance Companies may terminate coverage.

50.     Therefore, I believe that the relief requested in the Insurance Motion is in the best interest of the estates and should be granted.

**D.     Utilities Motion.**

51.     By the Utilities Motion, the Debtors are requesting entry of interim and final orders (a) prohibiting utilities from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of prepetition invoices, (b) determining that the utilities are adequately assured of future payment, and (c) establishing procedures for determining adequate assurance of payment.

52.     As mentioned above, the Debtors operate two long-term acute care hospital facilities in the Greater Phoenix area and maintain a corporate headquarters in Alpharetta, Georgia (collectively, the "Facilities") that require the continuous provision of utility services, such as electricity, natural gas, oil, water, sewer, telecom, trash collection and/or other services (each, a "Utility Service" and collectively, the "Utility Services") from local and/or regional utilities (each a "Utility Company" and collectively, the "Utility Companies").  The Debtors' average monthly obligations to the Utility Companies total approximately $53,000 in the aggregate.

53.     I believe that uninterrupted utility services are essential to the ongoing operations of Debtors, and therefore, to the successful resolution of these cases.  Any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, including their ability to provide essential health care services to their patients, thereby seriously jeopardizing the Debtors' restructuring efforts and, ultimately, recoveries for their creditors.  It is therefore critical that Utility Services continue uninterrupted during these chapter 11 cases.

54.     The Debtors propose to provide "assurance of payment" to Utility Companies, within twenty (20) days after the Petition Date, by placing a cash deposit (the "Adequate Assurance Deposit") equal to the cost of Utility Services for a period of two weeks, calculated

based on the historical weekly average costs, into a newly created, segregated account (the "Utility Deposit Account") for the benefit of any Utility Company, unless any such Utility Company agrees in writing to a lesser amount, is paid in advance for Utility Services, or already holds a deposit equal to or greater than two weeks of Utility Services.  The Debtors estimate that the total amount of such deposit would be approximately $26,500.  The Debtors submit that the establishment of the Adequate Assurance Deposit, in conjunction with Debtors' ability to pay for future utility services in the ordinary course of business, constitutes adequate assurance of payment to the Utility Providers.

55.    Finally, the Debtors propose to protect the Utility Providers by establishing the Adequate Assurance Procedures provided in the Utilities Motion, whereby any Utility Provider may request additional adequate assurance in the event that it believes there are facts and circumstances with respect to its providing post-petition services to the Debtors that would merit greater protection.

56.    Therefore, I believe that the Utility Providers have adequate assurance of future performance, and the relief sought in the Utility Motion should be granted.

### E.    Cash Management Motion.

57.    By the Cash Management Motion, the Debtors seeks entry of an order (a) approving the Debtors' continued use of their current cash management system and the Debtors' existing bank accounts and business forms, (b) authorizing the Debtors to open and close bank accounts as necessary in the ordinary course of business, (c) granting the Debtors a 60-day extension to either comply with the requirements of section 345(b) of the Bankruptcy Code or file a motion seeking an additional extension or waiver of the requirements of section 345(b) of the Bankruptcy Code, and (d) authorizing all banks participating in the Debtors' cash management system to honor certain transfers and charge back fees and certain other amounts.

58.      In the ordinary course of business, the Debtors maintain nine (9) bank accounts (the "Bank Accounts") with Wells Fargo Bank, N.A. (the "Bank") that operate in connection with a centralized cash management system (the "Cash Management System").  A list of the Bank Accounts is attached to the Cash Management Motion as Exhibit A.  Through the Bank Accounts, the Debtors efficiently collect, transfer and disburse funds generated from their operations on a daily basis.  The Debtors employ various methods to deposit, withdraw, and otherwise transfer funds to, from and between the Bank Accounts, including checks, automated clearing house ("ACH") transactions, direct deposits and electronic funds transfers.

59.      The Debtors maintain (a) four (4) receivables accounts (the "Receivables Accounts") for the receipt of patient and other non-government and government payments, (b) a receivables master account (the "Master Receivables Account"), (c) three (3) operating accounts (the "Operating Accounts"), and (d) a master accounts payable account (the "Master A/P Account").

60.      Restora Mesa and Restora Sun City each maintain two Receivables Accounts—one for government receivables and one for non-government receivables.  Each Receivables Account is a zero-balance account (a "ZBA"), and receivables deposited therein are swept daily into the Master Receivables Account.  Likewise, for payroll and other accounts payable, payments are made from the Operating Accounts, which are ZBAs automatically transferring funds from the Master A/P Account.  On a daily basis, funds from the Master Receivables Account are swept to a segregated account with Citibank N.A., maintained by secured lender HFG.

61.     In addition, in the ordinary course of their businesses, the Debtors use a multitude of checks and other business forms, including electronic forms and paper forms, preprinted letterhead and related documents (collectively, the "Forms").

62.     I believe that by using the existing Cash Management System, Bank Accounts and investment practices, the Debtors will avoid unnecessary expense and delay that would disrupt the ordinary financial affairs and business operations of the Debtors, delay the administration of the Debtors' estates, and increase the costs to the estates.  I believe that the relief requested in the Cash Management Motion will help to ensure the Debtors' orderly entry into chapter 11 protection and will avoid many of the possible disruptions and distractions that could divert Debtors' attention from more pressing matters during the initial days of these chapter 11 cases.  Any disruption in the Debtors' cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates, and altering the Cash Management System may disrupt payments to key vendors and employees, and likewise may disrupt patient care.

63.     I believe that preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial changes to the Cash Management System will (a) facilitate the Debtors' stabilization of their postpetition healthcare operations and (b) assist the Debtors in their efforts to reorganize and preserve value. In addition, allowing the Debtors to continue to use their prepetition Bank Accounts will assist the Debtors in accomplishing a smooth transition to operating in chapter 11 and help avoid any disruption in the Debtors' relationships with critical customers and suppliers and the Debtors' ability to timely receive funds from government payors.

64.     Further, due to the nature and scope of the Debtors' business operations and the

large number of suppliers of goods and services with whom the Debtors deal on a regular basis, I believe it is important that the Debtors be permitted to continue to use the Forms without alteration or change and without the "Debtor in Possession" designation.  Otherwise, the estates will be required to bear a potentially significant expense that I believe is unwarranted.  Note, however, that in compliance with Local Rule 2015-2, once the paper Forms are depleted, the Debtors will then replace them with forms containing the "Debtor in Possession" designation.

65.    I believe that the relief requested in the Cash Management Motion is essential to avoid unnecessary and potentially costly disruptions to the Debtors' operations, is in the best interest of the estates and, therefore, should be granted.

**F.    Claims Agent Application.**

66.    Pursuant to the Claims Agent Application, the Debtors seek authorization to retain Rust Consulting Omni Bankruptcy ("Rust Omni") as their claims and noticing agent ("Agent") in these chapter 11 cases.  Upon information and belief, Rust Omni is an experienced Agent and is frequently used by debtors in large chapter 11 cases, and I believe Rust Omni is well qualified to provide such services, expertise, consultation, and assistance to the Debtors and serve as Agent in these chapter 11 cases.

67.    The Debtors believe that Rust Omni is capable of handling the requisite noticing responsibilities, thereby relieving the Clerk, or in the alternative, the Debtors, of such burden and expense.  The employment of Rust Omni will provide efficient management of the claims and noticing processes in these cases, thereby allowing the Debtors' management and advisors to focus on the Debtors' reorganization efforts for the benefit of the Debtors, their estates their creditors, and other parties in interest, including patients.

**G.    Wage Motion.**

68.    By the Wage Motion, the Debtors are requesting the entry of an order authorizing,

but not directing, the Debtors to pay certain pre-petition wages, salaries, and other compensation, and authorizing and directing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payments requests relating to the foregoing.

69.     As of the Petition Date, the Debtors employ approximately 434 Employees. Approximately 302 of the Employees are employed full-time working 32 hours or more per week.  Approximately 24 of the Employees are employed on a part-time basis.  Approximately 108 of the Employees work on an as-needed basis.

70.     Further, approximately 42 of the Employees are salaried employees and approximately 392 of the Employees are hourly employees.  The Debtors do not directly employ any physicians, but they employ approximately 110 registered nurses.   In addition to their Employees, the Debtors supplement their work force with certain independent contractors (the "Independent Contractors"), including physicians.    The Debtors estimate they have approximately thirty-six (36) Independent Contractors.

71.      The Employees are paid on a bi-weekly basis, and the combined average payroll for the Employees for any pay period, exclusive of payroll taxes, is approximately $585,000 ("Base Compensation").  The Employees are paid every other Friday for a fourteen (14) day period ending 6 days before the Friday pay date.  In the ordinary course of business, the Debtors provide the funds necessary to meet their payroll obligations by noon on Thursday in advance of the Friday pay date.  The Debtors' next scheduled payroll date is February 28, 2014, and such payroll will be for the period ending February 22, 2014.  As a result of adhering to this payroll process, the Debtors will be required to fund a payroll with approximately sixteen (16) days of prepetition obligations owed to their Employees.  The Debtors estimate that, as of the Petition Date, there is an aggregate amount of approximately $655,000 in earned but unpaid salary or

wages, as applicable, owed to the Employees ("Unpaid Base Compensation"). Approximately $19,200 of the Unpaid Base Compensation is owed to officers of the Debtors. Additionally, although the majority of the Employees are paid by direct deposit, approximately forty (40) of the Employees are paid by manually issued checks from the Debtors' payroll account. Therefore, it is likely that some Employees may not have cashed their payroll checks (the "Uncashed Checks") prior to the commencement of the Debtors' chapter 11 cases.

72.     The Independent Contractors are paid pursuant to the terms of their respective contracts. As of the Petition Date, the Independent Contractors are owed in the aggregate approximately $72,000 (the "Unpaid IC Compensation").

73.     As wages are earned by the Employees, the Debtors accrue, in the ordinary course of business, state, local, and federal employment and income taxes, as well as Social Security, state disability, unemployment, Medicare, and other taxes (collectively, the "Payroll Taxes") that must be remitted to the appropriate taxing authorities. These taxes are calculated based on statutorily mandated percentages of earned wages. The Debtors' aggregate payroll taxes, including both the employee and employer portion, for the 2013 calendar year were approximately $2,721,947. The Debtors estimate the amount of accrued and outstanding prepetition obligations with respect to the payroll taxes to be approximately $254,000 (the "Outstanding Payroll Taxes"). Of the aggregate amount of Outstanding Payroll Taxes, approximately $179,000 is outstanding on account of federal and state income taxes, Social Security and Medicare obligations withheld from Employees' wages, and approximately $75,000 is outstanding on account of the Debtors' direct Social Security, Medicare, and state and federal unemployment obligations.

74.     Full-Time Employees may elect to receive a number of benefit programs,

including medical, dental, vision, short-term disability, long-term disability insurance coverage (collectively the "<u>Benefit Programs</u>").  While the Debtors pay a portion of the medical coverage, other benefits are entirely Employee paid.

75.    Health Net Life Insurance Company provides employee medical insurance for the Debtors' Employees.  Employees may select either an HMO plan or one of two PPO options.  Regardless of the plan selected by the Employee, the Debtors contribute a portion of the monthly premium as follows: if the coverage is for the Employee only, the Debtors contribute $229.69 per month; if the coverage is for the Employee and his or her spouse, the Debtors contribute $445.09 per month; if the coverage is for the Employee and a single child, the Debtors contribute $358.77 per month; and if the coverage is for the Employee and his or her family, the Debtors contribute $533.42 per month.

76.    The Debtors are invoiced for their contributions to Employee medical insurance on the first of each month, with payment due by the end of such month.  For the month of February 2014, the Debtors owe or will owe $100,000, in the aggregate, on account of contributions to employee medical insurance premiums.

77.    Dental insurance is provided by SecureCare Dental.  Employees may select one of three available plans (HMO, PPO, or an indemnity option), and 100% of the premiums related to such coverage is paid by the Employee.  The Debtors pay certain administrative fees on account of the dental coverage.  For the month of February 2014, the Debtors owe or will owe an aggregate of $75 on account of such administrative fees.

78.    The Debtors provide $50,000 of life insurance and accidental death and dismemberment coverage to all Employees at no charge.  This coverage is provided by Mutual of Omaha and costs the Debtors $400 per month.  For the month of February 2014, the Debtors owe

or will owe an aggregate of $9,200 in connection with such costs.  In addition, Employees can purchase supplemental life insurance and accidental death and dismemberment coverage for themselves, their spouse or children, at such Employee's own expense.

79.     Additionally, short-term and long-term disability coverage is made available to all Employees through Mutual of Omaha, and the Employee pays 100% of the premiums related to such coverage.  Likewise, the Debtors make vision insurance available to their Employees through Avesis, and the Employee pays 100% of the premiums related to such coverage.

80.     The Debtors began offering a 401(k) plan to Employees in 2013; however, the Debtors do not make matching contributions.

81.     The Debtors provide their Employees with the ability to accrue vacation time based on actual hours paid, with a maximum vacation allotment of 1.5 times each such Employee's annual accrual rate.[4]  Employees who reach their maximum vacation allotment will not earn any additional vacation until they bring their accumulated vacation below the maximum. As of the Petition Date, the Employees have accrued approximately $320,000 in unused vacation time, paid time off and personal days ("PTO").  Some Employees may be entitled under certain circumstances to be paid in cash for their accrued but unused PTO upon the termination of their employment or otherwise.

82.     The Debtors customarily pay for a variety of their Employees' business-related expenses incurred in performing their employment obligations (the "Business Expenses"). Employees may sometimes pay Business Expenses out of their own funds.  All such expenses are incurred with the understanding that they will be reimbursed by the Debtors in accordance with the Debtors' reimbursement policy.  In such cases, Employees are reimbursed upon the

---

[4]     The annual vacation allotment per Employee ranges from three (3) to five (5) weeks.

submission of a claim itemizing the Business Expenses.  Although there is no way to determine the precise amount of outstanding Business Expenses at any moment in time because expenses may not have been submitted, as of the Petition Date, the Debtors estimate that there is an aggregate amount of approximately $67,000 in Business Expenses that have not yet been reimbursed to Employees.

83.    The Debtors also incur costs incident to the Unpaid Base Compensation, Uncashed Checks, Benefits Programs, PTO Payments and Business Expenses, such as processing costs and the employer portion of payroll-related taxes, as well as accrued but unpaid prepetition charges for administration of the various Employee benefit programs (collectively, the "Prepetition Processing Costs").  For instance, the Debtors pay Paytech and Automatic Data Processing certain administrative fees related to the services they provide the Debtors in connection with payroll processing.  The Debtors estimate that the aggregate amount of accrued but unpaid Prepetition Processing Costs, as of the Petition Date, is approximately $34,000.

84.    The Debtors' Employees and Independent Contractors are essential to the orderly and successful reorganization of the Debtors.  The Employees and Independent Contractors have an intimate knowledge of the operation of the Debtors' businesses and any deterioration in employee morale and welfare at this critical time undoubtedly would adversely impact the Debtors, the Debtors' ability to provide proper patient care, the value of the Debtors' assets and businesses, and, ultimately, their ability to reorganize.

85.    In addition, I believe that there are no amounts owed to any single Employee or Independent Contractor of the Debtors for compensation in excess of the $12,475 cap set forth in Bankruptcy Code section 507(a)(4), and all payments to such Employees and Independent Contractors will be within the cap set forth in Bankruptcy Code section 507(a)(4) and (5).

86.     For these reasons, and for the reasons and legal arguments set forth in the Wage Motion, I believe that the relief sought in the Wage Motion should be granted.

### H.     Critical Vendor Motion.

87.     By the Critical Vendor Motion, the Debtors are requesting the entry of an order authorizing, but not directing, the Debtors to pay, as or when they come due, all or a portion of the prepetition claims of certain critical vendors and service providers and authorizing and directing banks and other financial institutions to receive, process, honor, and pay all issued checks and electronic payment requests related to the foregoing.

88.     In the ordinary course of their business, the Debtors rely on certain third parties to provide essential goods and services that are necessary and critical to the Debtors' ongoing operations and to ensure proper patient care.  These vendors and service suppliers (collectively, the "Critical Vendors") have claims for providing essential goods to the Debtors that were received by the Debtors before the Petition Date and/or essential services that were rendered to, or on behalf of, the Debtors before the Petition Date.

89.     Based on their books and records, the Debtors estimate that they have business relationships with over 330 vendors and service providers that hold an aggregate amount of more than $7,300,000 in prepetition claims.  The Debtors estimate that fewer than twelve (12) of these vendors and service providers constitute Critical Vendors, and the Debtors will need to pay an aggregate amount of no more than $600,000 to such Critical Vendors to ensure continued provision of essential goods and services postpetition.  By the Critical Vendor Motion, the Debtors are seeking authorization to pay certain prepetition amounts (collectively, the "Critical Vendor Claims") due to the Critical Vendors in an aggregate amount not to exceed $600,000 (the "Critical Vendor Cap") on a final basis and $300,000 on an interim basis.

90.     To identify Critical Vendors, the Debtors and their advisors spent a significant

amount of time carefully reviewing and analyzing the Debtors' accounts payable and prepetition vendor lists and consulting with management to identify those creditors most essential to the Debtors' health care operations.  The Debtors' analysis included the following:  (a) whether a particular vendor is a "sole source" provider; (b) whether a vendor supplies goods or services that the Debtors require to continue their operations, and whether the cost or time associated with finding a replacement vendor would result in greater losses to the estates than paying such vendor's prepetition claim; (c) whether the Debtors receive advantageous pricing or other terms from a vendor because such vendor provides goods or services on a standardized, system-wide basis; (d) whether certain customizations prevent the Debtors from obtaining the vendor's goods or services from alternative sources within a reasonable timeframe; (e) if a vendor is not a sole source provider, whether the Debtors have sufficient goods in inventory to continue operations while a replacement vendor is secured; (f) whether a vendor must be, and is, approved or accredited by certain regulatory bodies or agencies in order for the Debtors to be eligible for payments from Medicare or insurance companies; (g) whether a vendor provides particular goods or services that must be certified to comply with state or federal laws and regulations; (h) whether a vendor provides particular goods that must undergo a long validation process by the Debtors before they may be utilized in medical procedures, preventing the Debtors from quickly changing a vendor; (i) whether a vendor provides certification and licensure mandatory for performance by the Debtors of certain laboratory testing and medical procedures; (j) whether a vendor is financially dependent on the Debtors, and nonpayment could put the vendor out of business, cutting off any postpetition supply of goods or services to the Debtors; and (k) whether a vendor, meeting any of the above criteria, is likely to refuse to provide goods or services to the Debtors postpetition if its prepetition balances are not paid.

91.     The identified Critical Vendors provide medical supplies, equipment, and other needs that are necessary for proper patient care.  These Critical Vendors, together with the Debtors' employees, are the lifeblood of the Debtors' health care operations, without which the Debtors would not be able to properly, if at all, operate and provide high-quality medical services.  Indeed, I believe that payment of these Critical Vendor Claims is vital to the Debtors' reorganization efforts because, in many instances, the Critical Vendors are the only source from which the Debtors can procure certain goods and services of a required quality, within a timeframe, and at a price that will permit the Debtors to continue their health care operations.  In fact, the Debtors' viability as a health care provider is dependent upon the Debtors' uninterrupted access to the goods and services provided by the Critical Vendors.  Absent payment of the Critical Vendor Claims on the terms and conditions set forth in the Critical Vendor Motion, I believe the Critical Vendors are likely to cease to provide such goods and services to the Debtors postpetition.  Accordingly, I believe it is essential that the Debtors maintain their relationships with these Critical Vendors in order to continue to operate and work toward a smooth and successful sale or other transaction in these chapter 11 cases.

92.     I believe that the relief requested in the Critical Vendor Motion is essential to prevent costly disruptions to the Debtors' operations that may jeopardize the Debtors' reorganization efforts, is in the best interest of the estates and, therefore, should be granted.

**I.      DIP Financing and Cash Collateral Motion.**

93.     By the DIP Financing and Cash Collateral Motion, the Debtors request the entry of the Interim Order and the Final Order, among other things, (a) authorizing the Debtors to (i) enter into a financing arrangement on an interim basis on the terms as set forth in the DIP Term Sheet and on a final basis under a debtor in possession financing agreement containing terms and conditions substantially similar to those set forth in the DIP Term Sheet, and (ii) use

Cash Collateral, (b) granting liens and providing super-priority administrative expense status, (c) granting adequate protection to the Debtors' prepetition secured lender, (d) scheduling a final hearing pursuant to Bankruptcy Rule 4001, and (e) granting related relief.

94.     The proposed financing consists of a revolving credit facility in an amount not to exceed $7,000,000 at any one time outstanding (the "DIP Facility"), substantially on the terms and conditions set forth in the DIP Term Sheet between Restora Mesa and Restora Sun City, as borrowers (the "Borrowers"), Restora Healthcare, as guarantor (the "Guarantor"), Healthcare Finance Group, LLC or an assignee thereof, in its capacity as administrative agent (the "DIP Agent"), and Healthcare Finance Group, LLC  or an assignee thereof, as lender (the "DIP Lender" and, together with the DIP Agent, the "DIP Lender Parties").  The proceeds of the DIP Facility will be used by the Borrowers for the purpose of (a) assuming the Debtors' obligations in connection with the Revolving Commitment provided by the Prepetition Secured Lender which, as of the Petition Date, was outstanding in the aggregate amount of approximately $3,000,000 (the "Existing Revolving Debt"), (b) funding the Debtors' costs and expenses associated with the bankruptcy cases and providing for the Debtors' postpetition operating expenses and general working capital needs during these chapter 11 cases, and (c) paying any fees and expenses of the Debtors incurred in connection with the transactions contemplated by the DIP Facility Documents, all in accordance with a Budget, a form of which is attached to the DIP Financing and Cash Collateral Motion as Exhibit C.  In addition, as part of the DIP Financing, the DIP Lender has agreed to make overadvances in excess of the borrowing base availability in an amount up to (a) $2,300,000 following the entry of the Interim Order and prior to the entry of the Final Order, and (b) $2,600,000 following entry of the Final Order.

95.     In addition, because the Prepetition Secured Lender has a security interest in the

Cash Collateral, including amounts on deposit in the Debtors' deposit accounts and all proceeds of the Collateral realized prepetition or postpetition, the Debtors are requesting authorization to use Cash Collateral and to provide adequate protection to the Prepetition Secured Lender.    The Borrowers are proposing to grant adequate protection liens in the DIP Collateral to the Prepetition Secured Lender to secure any diminution in value of the Existing Term Loan Liens in the Prepetition Collateral, which adequate protection liens shall be senior liens in all DIP Collateral subject only to (a) the Carveout, (b) the liens securing the Debtors' obligations under the DIP Facility and (c) certain Senior Liens.  In addition, as further adequate protection, default interest will accrue on the Existing Term Loan Debt during the course of the Debtors' chapter 11 cases and the Debtors will pay all reasonable out of pocket expenses and professional fees incurred by the Existing Term Lender Parties in connection with the Debtors or these chapter 11 cases.

96.    In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their liquidity needs and operate their long-term acute care (LTAC) hospitals.  In addition, the Debtors require cash on hand to fund these chapter 11 cases while working towards a successful restructuring.  Postpetition financing, in addition to the use of cash collateral, is necessary in order for the Debtors to preserve sufficient liquidity to maintain ongoing day-to-day operations, ensure proper patient care at their hospital facilities, and fund their working capital needs.  Absent postpetition financing and the use of cash collateral, the Debtors will be forced to wind-down their operations due to a lack of funds.

97.    The Debtors and their advisors have solicited proposals from and negotiated with several institutions in an effort to secure debtor in possession financing on the best terms available.  The Debtors have determined that the terms and conditions of the DIP Facility are the

best available under the circumstances and address the Debtors' working capital needs. Postpetition financing is not otherwise available without granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the DIP Collateral pursuant to section 364(c) and (d) of the Bankruptcy Code.

98.     The DIP Facility, if approved, will provide essential working capital that will allow the Debtors to maintain the value of their assets and their ongoing business operations while working towards a successful sale transaction in these chapter 11 cases.  In addition, the DIP Facility will provide the Debtors' various constituencies, including patients, employees, vendors, service providers, and regulatory agencies with confidence in the Debtors' ability to maintain operations while working towards a sale.  If the relief sought in the DIP Financing and Cash Collateral Motion is denied or delayed, the Debtors will experience business disruptions, the Debtors' ability to provide proper patient care will be hindered, and the Debtors' ability to consummate a sale transaction and maximize value for the estates may be irreparably damaged.

99.     In addition, the Debtors' assumption of the Existing Revolving Debt as set forth in the DIP Term Sheet should result in increased availability under the DIP Facility.  Absent assumption of such debt and or a non-consensual use of Cash Collateral, prepetition receivables would need to be applied towards the Existing Revolving Debt, which may not result in any additional availability to the Debtors under the DIP Facility until such Existing Revolving Debt is paid in full.  In addition, the Interim Order preserves the rights of other parties in interest, including any statutory committee of unsecured creditors, to investigate and challenge the validity, enforceability, perfection, and priority of the Existing Revolving Debt and the liens and

security interests granted in connection therewith.

100.    The Interim Order also sets forth certain stipulations and agreements by the Debtors regarding, *inter alia*, (a) the validity and enforceability of the Prepetition Loan Agreement, (b) the validity and enforceability of the Prepetition Loans and the Debtors' obligations under the Prepetition Loan Agreement, and (c) the validity and enforceability of the liens on and security interests in the Debtors' funds and property granted under the Prepetition Loan Agreement and related documents. Each of the stipulations and agreements set forth in the Interim Order are true and correct to the best of my knowledge.

101.    I believe that the relief requested in the DIP Financing and Cash Collateral Motion is in the best interests of the Debtors, their estates and their creditors, and absent such relief, the Debtors will experience immediate and irreparable harm and their reorganization efforts will be jeopardized.

**J.    Motion to Shorten.**

102.    By the Motion to Shorten, the Debtors request entry of an order shortening the applicable notice periods for hearing and response related to the Debtors' motion for entry of an order (the "Bidding Procedures Order") (a) approving certain auction and bidding procedures in connection with the sale of substantially all of the Debtors' assets, (b) authorizing the Debtors to enter into a stalking horse purchase agreement, subject to higher or otherwise better offers, (c) approving procedures relating to the assumption and assignment of executory contracts and unexpired leases, (d) scheduling an auction and sale approval hearing, (e) approving the form and manner of sale notice, and (f) granting certain related relief.

103.    I submit that ample cause exists to grant the Motion to Shorten and conduct a hearing on the Bidding Procedures Order on an expedited basis. As set forth above, the Debtors have experienced significant liquidity issues that have hindered their ability to pay obligations in

the ordinary course of business.  To address the liquidity issues, the Debtors sought to implement a number of restructuring initiatives over the last year.  Although the Debtors have secured a DIP Facility from HFG, this DIP Facility is limited and will provide the Debtors with liquidity sufficient to run a sales process only with the timing anticipated by the Bidding Procedures.  In addition, due to the nature of the Debtors' operations, I believe it is imperative that the Debtors consummate a sale transaction promptly in these cases to ensure that a purchaser with the necessary experience to manage the Debtors' healthcare assets assumes control of such assets and can immediately focus its time and resources solely on caring for and treating patients, without any of the distractions inherent in a bankruptcy case.  I believe that any delay in the sale process will result in a decline in the value of the Debtors' assets.

104.    If the Motion to Shorten is approved and the Bidding Procedures Order is entered on March 12, 2014, the Debtors and their advisors will have forty (40) days from such date to conduct their marketing process in accordance with the Bidding Procedures and facilitate interested parties' diligence efforts before such interested parties will be required to submit competing bids for the Debtors' assets.  I believe that this is an optimal amount of time under the circumstances (including because of the Debtors' liquidity constraints) to run a postpetition marketing process in accordance with the Bidding Procedures.  Such time will be sufficient for the Debtors and their advisors to (a) continue negotiations with parties that expressed an interest in the Debtors' assets prior to the Petition Date and (b) publicize the sale and marketing process and canvas the market for any potentially interest parties with whom the Debtors have not yet engaged in negotiations.

105.    The Debtors and their advisors conducted an extensive prepetition marketing process and, therefore, I submit that an extensive and lengthy sales process would not create

additional value for the Debtors' estates.  Accordingly, I believe that granting the Motion to Shorten will not prejudice any party who may submit a bid for the Debtors' assets, as it is likely that any such party will have already conducted extensive diligence on the Debtors and their assets.

106.    For these reasons, and for the reasons and legal arguments set forth in the Motion to Shorten, I believe that the relief sought in the Motion to Shorten should be granted.

**K.    Conclusion.**

107.    For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Motions. I reserve the right to supplement and/or amend this Declaration with testimony and/or exhibits.

*[Text Continues on the Next Page]*

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and current to the best of my knowledge and belief.

Dated: February 24, 2014

       /s/ George D. Pillari

By:   George D. Pillari

Title: Chief Restructuring Officer