**REVOLVING AND TERM
LOAN AND SECURITY AGREEMENT**

dated as of June 29, 2012

among

Restora Hospital of Mesa, LLC,
Restora Hospital of Sun City, LLC,
and each other Person joined hereto from time to time as a Borrower,

Restora Healthcare Holdings, LLC,
as the Parent,

THE LENDERS FROM TIME TO TIME PARTIES HERETO,

and

HEALTHCARE FINANCE GROUP, LLC,
as the Agent

\39109424

# TABLE OF CONTENTS

ARTICLE 1     DEFINITIONS ...................................................................................1
    1.1    Definitions.............................................................................................1
    1.2    Other Terms; Rules of Construction ....................................................19
    1.3    Accounting Terms.................................................................................19

ARTICLE 2     AMOUNTS AND TERMS OF THE LOANS .....................................20
    2.1    Revolving Advances .............................................................................20
    2.2    [Reserved] ............................................................................................22
    2.3    [Reserved] ............................................................................................22
    2.4    Protective Advances.............................................................................22
    2.5    Term Loan.............................................................................................23
    2.6    Interest and Fees...................................................................................23
    2.7    Computation of Interest; Payment of Fees...........................................24
    2.8    Procedures for Payment .......................................................................24
    2.9    Indemnities...........................................................................................25
    2.10   Maximum Interest ................................................................................26
    2.11   Use of Proceeds of Revolving Loan.....................................................26
    2.12   Use of Proceeds of Term Loan.............................................................27
    2.13   Defaulting Lenders...............................................................................27

ARTICLE 3     PAYMENTS AND PREPAYMENTS ON THE TERM LOAN.............28
    3.1    Scheduled Repayments .........................................................................28
    3.2    Prepayment Upon an Event of Loss......................................................28
    3.3    Mandatory Prepayments.......................................................................29
    3.4    Excess Cash Flow .................................................................................29
    3.5    Voluntary Prepayments.........................................................................29
    3.6    Application of Payments and Collections .............................................29

ARTICLE 4     SECURITY .........................................................................................29
    4.1    Grant of Security Interests....................................................................29
    4.2    Other Collateral....................................................................................30
    4.3    Certain Lien Priorities..........................................................................30

ARTICLE 5     PAYMENT MECHANICS ..................................................................31
    5.1    Payment Mechanics .............................................................................31
    5.2    Misdirected Payments; EOBs...............................................................32
    5.3    No Rights of Withdrawal ......................................................................32

ARTICLE 6     COLLECTION AND DISTRIBUTION................................................32
    6.1    Collections on the Receivables; Distributions......................................32
    6.2    Distribution of Funds to the Revolving Lenders...................................33
    6.3    Distribution of Funds to the Term Lenders ..........................................33
    6.4    Distribution Protocols Between the Agent and the Lenders ..................34
    6.5    Servicing Receivables..........................................................................34
    6.6    Distributions Generally ........................................................................35

ARTICLE 7     CONDITIONS PRECEDENT................................................................36
    7.1    Conditions Precedent to Closing...........................................................36
    7.2    Conditions Precedent to all Funding Dates ..........................................37

ARTICLE 8     REPRESENTATIONS AND WARRANTIES ......................................38

i

| | | |
|---|---|---|
| 8.1 | Organization; Good Standing and Qualification | 38 |
| 8.2 | Authority; No Conflict | 38 |
| 8.3 | Compliance with Certain Material Agreements | 38 |
| 8.4 | Burdensome Agreements | 38 |
| 8.5 | Certain Fees | 38 |
| 8.6 | Valid and Binding Obligation; Enforceability | 38 |
| 8.7 | Permits, Licenses, and Other Approvals | 39 |
| 8.8 | Healthcare Laws | 39 |
| 8.9 | Liability Event | 39 |
| 8.10 | Certain Reports; Claims; Reviews | 39 |
| 8.11 | Rescission and Renewal of Permits, Licenses, and Other Approvals | 39 |
| 8.12 | Subsidiaries; Capitalization | 40 |
| 8.13 | Real Property | 40 |
| 8.14 | Conditions Precedent | 40 |
| 8.15 | Financial Statements and Other Information | 40 |
| 8.16 | Litigation | 40 |
| 8.17 | Ownership of Collateral; Liens | 40 |
| 8.18 | Locations | 41 |
| 8.19 | Notices | 41 |
| 8.20 | Taxes | 41 |
| 8.21 | Solvency | 41 |
| 8.22 | Lockboxes and Lockbox Accounts | 41 |
| 8.23 | ERISA Matters | 41 |
| 8.24 | Patient Consent Forms | 42 |
| 8.25 | Supplements to Schedules | 43 |
| ARTICLE 9 | AFFIRMATIVE COVENANTS | 43 |
| 9.1 | Compliance with Laws | 43 |
| 9.2 | Offices, Records and Books of Account, Names | 43 |
| 9.3 | Performance and Compliance with Contracts and Credit and Collection Policy | 43 |
| 9.4 | Audits; Appraisals | 44 |
| 9.5 | Reporting Requirements | 44 |
| 9.6 | Notice of Proceedings; Overpayments | 46 |
| 9.7 | Taxes | 47 |
| 9.8 | Preservation of Existence | 47 |
| 9.9 | Loan Documents | 47 |
| 9.10 | [Reserved] | 47 |
| 9.11 | Invoices | 47 |
| 9.12 | ERISA Compliance | 47 |
| 9.13 | Equipment | 48 |
| 9.14 | Insurance | 48 |
| 9.15 | Deposit Account Access | 48 |
| ARTICLE 10 | NEGATIVE COVENANTS | 48 |
| 10.1 | Corporate Documentation | 48 |
| 10.2 | Debt | 48 |
| 10.3 | Subordination | 48 |
| 10.4 | Liens | 49 |
| 10.5 | Lease Obligations | 49 |
| 10.6 | Asset Sales; Sale/Leaseback Transaction; Etc | 49 |
| 10.7 | Change in Business | 49 |

ii

\39109424

10.8 Change in Credit and Collection Policy ..................................................49
10.9 Change in Payment Instructions ..........................................................49
10.10 Deviation from Terms of Receivable ....................................................49
10.11 Mergers and Acquisitions; Dissolutions ..............................................50
10.12 No "Instruments" ................................................................................50
10.13 Margin Loan Restrictions ....................................................................50
10.14 Loans or Investments ..........................................................................50
10.15 Transactions with Affiliates ................................................................50
10.16 Distributions ......................................................................................50
10.17 Deviation from Patient Consent Form ................................................51
10.18 Subsidiaries ........................................................................................51

ARTICLE 11        FINANCIAL COVENANTS ..............................................51
11.1 Liquidity ............................................................................................51
11.2 Fixed Charge Coverage Ratio ............................................................51
11.3 Ratio of Senior Funded Debt to EBITDA ..........................................51
11.4 Ratio of Senior Funded Debt to EBITDAR ........................................51

ARTICLE 12        EVENTS OF DEFAULT ..................................................52
12.1 Events of Default ................................................................................52
12.2 Events of Default; Remedies ..............................................................54
12.3 Attorney-in-Fact ................................................................................55

ARTICLE 13        THE AGENT ....................................................................56
13.1 Agency Provisions ............................................................................56
13.2 The Term Loan Agent ........................................................................60
13.3 Replacement of Certain Lenders ........................................................60
13.4 No Third-Party Beneficiaries ............................................................60

ARTICLE 14        MISCELLANEOUS ........................................................60
14.1 Amendments ......................................................................................60
14.2 Notices ................................................................................................62
14.3 Assignments; Participations ..............................................................62
14.4 Further Assurances; Financing Statements ........................................64
14.5 Costs and Expenses; Collection Costs ................................................64
14.6 Confidentiality ....................................................................................65
14.7 Term and Termination; Fees ..............................................................65
14.8 No Liability ........................................................................................66
14.9 Entire Agreement; Severability ..........................................................66
14.10 Governing Law ..................................................................................67
14.11 Waiver of Jury Trial, Jurisdiction, and Venue ..................................67
14.12 Execution in Counterparts ..................................................................67
14.13 No Proceedings ..................................................................................67
14.14 Confidentiality and Notices ................................................................67
14.15 Accounting Information ......................................................................67
14.16 HFG Web Portal; Lender Platform ....................................................67
14.17 USA PATRIOT Act ............................................................................68
14.18 Nature and Extent of Each Loan Party's Liability ............................68
14.19 Inter-Borrower Provision ....................................................................71
14.20 Appointment of Borrower Representative ..........................................72

iii

\39109424

EXHIBITS

Exhibit I                  Eligibility Criteria
Exhibit II                 Form of Borrowing Base Report
Exhibit III                Form of Compliance Certificate
Exhibit IV                 Receivable Information
Exhibit V                  Transmission of Electronic Data Files
Exhibit VI                 Closing Document Checklist
Exhibit VII                Form of Assignment and Assumption

SCHEDULES

Schedule I                 Addresses for Notices
Schedule II                Disclosures
Schedule III               Lockbox Information
Schedule IV                Credit and Collection Policy
Schedule V                 Permitted Debt
Schedule VI                Scheduled Pharmacy Cost Savings

iv

## REVOLVING AND TERM LOAN AND SECURITY AGREEMENT

**REVOLVING AND TERM LOAN AND SECURITY AGREEMENT** (the "**Agreement**") dated as of June 29, 2012, among RESTORA HOSPITAL OF MESA, LLC, a Delaware limited liability company, RESTORA HOSPITAL OF SUN CITY, LLC, a Delaware limited liability company, and each other Person joined hereto from time to time as a borrower (collectively, the "**Borrowers**"), RESTORA HEALTHCARE HOLDINGS, LLC, a Delaware limited liability company (the "**Parent**"), and HEALTHCARE FINANCE GROUP, LLC, a Delaware limited liability company ("**HFG**"), in its capacity as a lender with a Revolving Commitment (together with its successors and permitted assigns in that capacity, the "**Revolving Lenders**"), and its capacity as a lender making the Term Loans (together with its successors and permitted assigns in that capacity, the "**Term Lenders**"; the Revolving Lenders and the Term Lenders, collectively, the "**Lenders**"), and as administrative agent and collateral agent for the Lenders (together with its successors and permitted assigns in those capacities, the "**Agent**").

The Borrowers wish to borrow funds from the Lenders secured by certain assets of the Borrowers, and the Lenders are prepared to make such loans to the Borrowers, on the terms and subject to the conditions set forth herein.

Accordingly, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    **Definitions**. As used in this Agreement (including the Exhibits and Schedules attached hereto), the following definitions apply:

"**Accrued Amounts**" means, as at any date, the aggregate amount of accrued or incurred but unpaid or unreimbursed (whether or not due and payable) (1) interest on the Loans, (2) Non-Utilization Fee, (3) fees set forth in the Agent Fee Letter, (4) the pro rata portion as of such date of the next Term Loan principal installment due and payable, and (5) legal and due diligence costs and expenses.

"**Adjusted Borrowing Limit**" means an amount equal to the result of (1) the Borrowing Limit, minus (2) Accrued Amounts, minus (3) any additional reserves that the Agent might establish and maintain from time to time in accordance with the terms of the Agreement.

"**Adjusted Expected Net Value**" means, with respect to any Eligible Receivable, an amount equal to the Expected Net Value, minus any adjustments and reserves made or established and maintained from time to time by the Agent in accordance with the terms of this Agreement (including the Medicare/Medicaid Reserve, reserves for deferred revenue, unapplied cash, and credit balances and other reserves). The Adjusted Expected Net Value of Eligible Receivables of the Borrowers as of any time is indicated on line VIII of the applicable Borrowing Base Report.

"**Advance Rate Percentage**" means 85%.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person. For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"**Agent**" has the meaning set forth in the preamble to this Agreement.

\39109424

"**Agent Fee Letter**" means that certain letter dated June 29, 2012, between the Agent and the Borrowers, pursuant to which the Borrowers agree to pay certain fees to the Agent from time to time.

"**Asset Sale**" means any sale, lease, conveyance, transfer or other disposition of assets by the Parent or any of its Subsidiaries (including by way of merger or consolidation or sale-leaseback transaction, but not including sales of inventory in the ordinary course of business), whether in one transaction or a series or group of transactions.

"**Assignment and Assumption**" means an assignment and assumption agreement in the form attached hereto as Exhibit VII or otherwise satisfactory to the Agent in its reasonable discretion.

"**Authorized Officer**" means the chief financial officer or President of the Parent and each other Person designated from time to time by the chief financial officer of the Parent in a notice to the Agent, which designation shall continue in force and effect until terminated in a notice to the Agent from the chief financial officer of the Parent.

"**Borrowers**" has the meaning set forth in the preamble to this Agreement.

"**Borrower Account**" means initially account # 4123214868 of the Borrowers at Wells Fargo Bank, NA, ABA # 121000248, or such other bank account designated by the Borrower Representative by notice to the Agent from time to time.

"**Borrower Lockbox**" means each lockbox set forth on Schedule III hereto, established to receive checks and EOBs with respect to Receivables payable by Governmental Entities.

"**Borrower Lockbox Account**" means each account set forth on Schedule III hereto in the name of a Borrower and associated with a Borrower Lockbox established and controlled by that Borrower to deposit collections received in respect of the Receivables, including any such collections received in the Borrower Lockbox and any such collections received by wire transfer directly from Governmental Entities, all as more fully set forth in the applicable Depositary Agreement.

"**Borrower Representative**" means the Parent in its capacity as Borrower Representative pursuant to the provisions of Section 14.20, or any successor Borrower Representative selected by Borrowers and approved by Agent.

"**Borrowing Base**" means, as of any time, an amount equal to the result of (1) the Adjusted Expected Net Value of Eligible Receivables of the Borrowers at such time (as set forth on line VIII of the applicable Borrowing Base Report), multiplied by (2) the Advance Rate Percentage (as set forth on line IX of the applicable Borrowing Base Report).

"**Borrowing Base Deficiency**" means, as of any date, the positive difference, if any, between (1) the sum of the Outstanding Balance of the Revolving Loan, minus (2) an amount equal to the Adjusted Borrowing Limit indicated on the most recent Borrowing Base Report or Monthly Report or as otherwise determined by the Agent.

"**Borrowing Base Report**" means a certificate (which may be sent by Transmission), signed by an Authorized Officer, substantially in the form set forth in Exhibit II hereto, which shall provide the most recently available information with respect to the Eligible Receivables of the Borrowers that is set forth in the aged accounts receivable trial balance and books and records of the Borrowers, in form and substance satisfactory to the Agent.

\39109424

"**Borrowing Limit**" means, as of any date, the lesser of (1) the Total Revolving Commitment and (2) the Borrowing Base as of that date.

"**Business Associate Agreement**" means the business associate agreement, dated the date hereof, between the Agent, for itself and each other "Business Associate" (as defined therein), and each "Covered Entity" (as defined therein), in form and substance satisfactory to the Agent.

"**Business Day**" means any day on which banks are not authorized or required to close in New York City, New York.

"**Capital Expenditures**" means, with respect to any Person for any period, the aggregate of all expenditures (including, without limitation, obligations created under Capital Leases in the year in which created) of such Person in respect of the purchase or other acquisition of fixed or capital assets, as determined in accordance with GAAP.

"**Capital Lease**" means, as applied to any Person, any lease of any Property (whether real, personal or mixed) by that Person as lessee, the obligations of which are required, in accordance with GAAP, to be capitalized on the balance sheet of that Person.

"**Change of Control**" means any of the following: (1) Rod Laughlin shall cease to act as chief executive officer and president of Parent, (2) HCCG shall cease to own or control at least 51% of the voting power of the outstanding securities of the Parent ordinarily having the right to vote in the election of directors; (3) Parent shall cease to own or control at least 80% of the voting power of the outstanding securities of any Borrower ordinarily having the right to vote in the election of directors or such greater percentage as may be necessary to control the operations of any Borrower; (4) the sale, lease or transfer of all or substantially all of the assets of any Borrower or any other Loan Party to any Person or group (as such term is defined in Section 13(d)(3) of the Exchange Act); (5) the liquidation or dissolution of (or the adoption of a plan of liquidation by) any Borrower or any other Loan Party, or the failure of the Parent to own 100% of the issued and outstanding capital stock of any Borrower; (6) the acquisition by any Person or group (as such term is defined in Section 13(d)(3) of the Exchange Act) of (more than 30%) of the voting stock of the Parent by way of merger or consolidation or otherwise; or (7) any change in the composition of the board of directors (or equivalent governing body) of the Parent such that a majority of the members of such board or body were not members thereof on the Closing Date or nominated or elected by the affirmative vote of a majority of the members of such board or body where such majority members were also members thereof on the Closing Date.

"**Claims**" has the meaning set forth in Section 2.9(b).

"**Closing Date**" means the date that all of the conditions set forth in Section 7.1 have been satisfied.

"**CMS**" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services.

"**Coker Broker Fee**" has the meaning set forth in Section 8.5.

"**Collateral**" has the meaning set forth in Section 4.1.

"**Collateral Assignment of Acquisition Agreement**" means that certain Collateral Assignment of Acquisition Agreement, dated as of the Closing Date and relating to the Trillium Acquisition Agreement.

\39109424

"**Collection Account**" means the Agent's account maintained at Citibank, N.A., ABA #021-000-089, DDA Account #36263566, Ref: A&T SF c/o HFG Healthco-4 LLC—Collection Account, or such other bank account designated by the Agent from time to time.

"**Collections**" means all cash collections, wire transfers, electronic funds transfers and other cash proceeds of Receivables deposited in or transferred to the Collection Account. For purposes of the calculation of Net Availability (as set forth on line XXII of the applicable Borrowing Base Report) and the Non-Utilization Fee hereunder, Collections will be applied as of the date of receipt in the Collection Account.

"**Compliance Certificate**" means a certificate of the chief financial officer of the Parent, in the form attached as Exhibit III hereto, that (1) states as of the date of such certificate (A) that no Default or Event of Default has occurred and is continuing (or if any Default or Event of Default then exists, states the nature thereof and describes the steps being taken to address such Default or Event of Default); and (B) that all representations and warranties set forth in this Agreement are true and correct in all material respects (except any representation or warranty that expressly indicates that it is being made only as of a specific date, in which case such representation or warranty shall be true and correct on and as of such date); and (2) details compliance for the applicable fiscal period with all the financial covenants contained in Article 10 of this Agreement (and attaches a schedule showing the calculations thereof).

"**Contracts**" means, collectively, all rights of each Borrower under all leases, contracts and agreements to which such Borrower is now or hereafter a party, including all rights of such Borrower to receive moneys due or to become due thereunder or pursuant thereto, but excluding rights under (but not excluding proceeds of) any lease, contract or agreement (including, without limitation, any license) that by the terms thereof, or under applicable law, cannot be assigned or a security interest granted therein in the manner contemplated by this Agreement unless consent from the relevant party or parties has been obtained and under the terms of which lease, contract or agreement any such assignment or grant of a security interest therein in the absence of such consent would, or could, result in the termination thereof, but only to the extent that (1) those rights are subject to such contractual or legal restriction and (2) that restriction is not, or could not be, rendered ineffective pursuant to the UCC of any relevant jurisdiction or any other applicable law (including the United States Bankruptcy Code) or principles of equity.

"**Control Agreement**" means each deposit account control agreement in favor of the Agent relating to a deposit account of a Borrower or another Loan Party, in form and substance satisfactory to the Agent.

"**Credit and Collection Policy**" means those account receivable credit and collection policies and practices of the Borrowers as in effect on the date of this Agreement and set forth in Schedule IV hereto, as modified from time to time with the consent of the Agent.

"**Cure Amount**" has the meaning set forth in Section 11.5.

"**Cutoff Date**" has the meaning set forth in Section 2.13(g).

"**Debt**" of any Person means (without duplication): (1) all obligations of such Person for borrowed money; (2) all obligations of such Person evidenced by bonds, notes, debentures, or other similar instruments or upon which interest payments are customarily made; (3) all obligations of such Person to pay the deferred purchase price of Property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 90 days after the date such payable was due); (4) all Debt of others directly or indirectly Guaranteed (which term shall not include endorsements in the ordinary course of business) by such Person; (5) all

-4-

obligations created under Capital Leases of such Person; (6) all obligations secured by a Lien on any Property owned by such Person, whether or not the obligations secured thereby have been assumed by such Person or are non-recourse to the credit of such Person (but only to the extent of the value of such Property); (7) the aggregate unfunded pension liabilities pursuant to such Person's pension plans; and (8) the minimum assumed annual funding obligation pursuant to such Person's pension plans.

"**Default**" means an event, act or condition which with the giving of notice or the lapse of time, or both, would constitute an Event of Default.

"**Default Excess**" means, with respect to any Defaulting Lender, an amount equal to (1) such Defaulting Lender's Pro Rata Share of the Revolving Loan (calculated as if all Defaulting Lenders (including such Defaulting Lender) had funded all of their respective payments, including payments not funded by such Lender which resulted in such Lender being a Defaulting Lender), minus (2) the aggregate outstanding principal amount of Revolving Advances of such Defaulting Lender.

"**Default Period**" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates: (1) the date on which all Revolving Commitments are cancelled or terminated or the Lender Debt is declared or becomes immediately due and payable; (2) with respect any Funding Default (other than any such Funding Default arising pursuant to clause (4) of the definition of Defaulting Lender), the date on which (A) the Default Excess with respect to such Defaulting Lender has been reduced to zero (whether by the funding by such Defaulting Lender of all payments resulting in such Funding Default of such Defaulting Lender, the non-pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms of this Agreement, or any combination thereof) and (B) such Defaulting Lender has delivered to the Borrower Representative and the Agent a written reaffirmation of its intention to honor its obligations under this Agreement with respect to its Revolving Commitment; and (3) the date on which the Borrowers, the Agent, and the Required Revolving Lenders waive all Funding Defaults of such Defaulting Lender in writing.

"**Defaulting Lender**" means any Revolving Lender, as determined by the Agent, that (1) fails to make any payment or provide funds to the Agent or any Borrower as required under this Agreement or fails otherwise to perform its obligations under any Loan Document, and such failure is not cured within one Business Day; (2) has notified the Agent or the Borrower Representative in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements in which it commits to extend credit; (3) has failed, within one Business Day after request by the Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund Revolving Advances under this Agreement; or (4) becomes, or has a parent company that becomes, the subject of any Insolvency Proceeding.

"**Deferred Transaction Costs**" means, collectively, deferred fees payable to (i) Cokers Capital Advisors LLC in an amount not to exceed $335,000 and (ii) HealthCap Partners, LLC in an amount not to exceed $300,000.

"**Denied Receivable**" means any Receivable to which any related representations or warranties (including, without limitation, the Eligibility Criteria) have been discovered at any time to have been breached.

"**Depositary Agreement**" means each deposit account agreement, dated the date hereof, among the Borrowers, the Agent, and a Lockbox Bank, in form and substance satisfactory to the Agent.

\39109424

"**Distribution**" means any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Equity Interests in any Loan Party, any return of capital to any Loan Party's equity holders as such, or any action to purchase, retire, defease, redeem or otherwise acquire for value or make any payment in respect of any Equity Interests in any Loan Party or any warrants, rights or options to acquire any such interests, now or hereafter outstanding.

"**Early Termination Fee**" means (1) with respect to any termination, in whole or in part, of a Revolving Commitment, an amount equal to a percentage of such Revolving Commitment (or portion of such Revolving Commitment being terminated), as set forth in the table below; (2) with respect to any prepayment (whether mandatory or otherwise, but excluding any mandatory prepayment made pursuant to Section 3.4) of any of the Term Loan A, an amount equal to a percentage of the principal amount of the Term Loan A being prepaid, as set forth in the table below; and (3) with respect to any prepayment (whether mandatory or otherwise, but excluding any mandatory prepayment made pursuant to Section 3.4) of any of the Term Loan B, an amount equal to a percentage of the principal amount of the Term Loan B being prepaid, as set forth in the table below:

| Date of Termination | Percentage for both Revolving Loan and Term Loan A |
|---|---|
| Within 12 Months of the Scheduled Maturity Date | 0% |
| Within 24 Months of, but more than 12 months prior to, the Scheduled Maturity Date | 0.50% |
| Within 36 Months of, but more than 24 months prior to, the Scheduled Maturity Date | 1.0% |
| Within 48 Months of, but more than 36 months prior to, the Scheduled Maturity Date | 2.0% |
| Within 60 Months of, but more than 48 months prior to, the Scheduled Maturity Date | 3.0% |

| Date of Termination | Percentage for Term Loan B |
|---|---|
| Within 12 Months after the Term Loan B Funding Date | 3.0% |
| Within 24 Months of, but more than 12 months after, the Term Loan B Funding Date | 2.0% |
| Within 36 Months of, but more than 24 months after, the Term Loan B Funding Date | 1.0% |
| More than 36 months after the Term Loan B Funding Date | 0.50% |

"**EBITDA**" of any Person for any period means, the sum of (1) net income (or net loss) of such Person (calculated before extraordinary items) during such period plus (2) the result of the following, in each case (unless otherwise indicated) to the extent included in determining such net income (or net loss): (A) interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) during such period; plus (B) income taxes accruing, paid or payable during such period; plus (C) depreciation and amortization expense; plus (D) Trillium Acquisition Addback in an amount not to exceed $1,160,000 and any other reasonable fees, costs and expenses included in net income of such Person as an expense in connection with the negotiation and execution of this Agreement,

\39109424

the other Loan Documents, the Trillium Acquisition Agreement and the documents related hereto and thereto to the extent incurred on or prior to the date that is 60 days after the Closing Date in an aggregate amount not to exceed $840,000, to the extent not capitalized or included in amortization or interest expense; plus (E) EBITDA Addbacks; minus (F) gains from asset dispositions outside of the normal course of business, in each case determined in each case in accordance with GAAP.  Notwithstanding the foregoing, the aggregate amount of the EBITDA Addbacks for each twelve month period ending on the date identified in the below table shall be deemed to be an amount equal to the percentage of the aggregate EBITDA Addbacks set forth opposite such date:

| Month ending | Percentage of aggregate EBITDA Addbacks |
|---|---|
| June 30, 2012 | 100% |
| July 31, 2012 | 91.6% |
| August 31, 2012 | 83.3% |
| September 30, 2012 | 75% |
| October 31, 2012 | 66.6% |
| November 30, 2012 | 58.3% |
| December 31, 2012 | 50% |
| January 31, 2013 | 41.6% |
| February 28, 2013 | 33.3% |
| March 31, 2013 | 25% |
| April 30, 2013 | 16.6% |
| May 31, 2013 | 8.3% |

"**EBITDA Addbacks**" means, collectively, for the twelve month period ending June 30, 2012 (i) costs relating to employees not rehired after the Trillium Acquisition in the amount of $728,000, (ii) out-of-pocket costs, fees and expenses paid by the Borrowers to Unispecs in the amount of $888,000 and (iii) reasonably expected pharmacy and other savings of the Borrowers in the amount of $750,000; provided, however, that such $750,000 addback for anticipated costs savings described in this clause (iii) will be reduced or eliminated, as applicable, to the extent the execution of new contracts, reductions in staff or lowering of drug costs as described on Schedule VI are not effectuated within 60 days after the Closing Date demonstrating savings of at least $750,000 on an annual basis and as set forth in a report to be delivered by Borrowers to Agent on or before the next schedule delivery of a Compliance Certificate following such 60 day period in form and substance satisfactory to Agent, which report sets forth in reasonable detail such expected savings resulting from the execution of new contracts, reductions of staff or lowering of drug costs.

"**EBITDAR**" of any Person for any period means, the sum of (1) EBITDA of such Person during such period plus (2) rent expense owing to the Mesa Entities (as determined in accordance with GAAP) during such period.

"**Eligible Assignee**" means any Lender, any Affiliate of any Lender, any other financial institution or fund that extends credit or buys loans as one of its businesses including insurance

-7-

companies, mutual funds and lease financing companies, and any trust or special purpose funding vehicle; provided, that neither the Company nor any Affiliate of the Company shall be an Eligible Assignee.

"**Eligibility Criteria**" means the criteria and basis for determining whether a Receivable will be deemed by the Agent to qualify as an Eligible Receivable, all as set forth in Exhibit I hereto, as such Eligibility Criteria may be modified from time to time as determined by the Agent in its good faith discretion upon notice to the Borrower Representative.

"**Eligible Receivables**" means Receivables of each Borrower that satisfy the Eligibility Criteria, as determined by the Agent.

"**Employee Benefit Plan**" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Plan) maintained for employees of the Parent, any Borrower, or any of their respective ERISA Affiliates or any such plan to which any of them is required to contribute on behalf of any of its employees.

"**Environmental Laws**" means any and all applicable federal, state and local laws, statutes, ordinances, rules, regulations, permits, licenses, approvals, interpretations and orders of courts or Governmental Entity, relating to the protection of human health from exposure to hazardous materials or the environment, including, but not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Material Transportation Act (49 U.S.C. § 331 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Safe Drinking Water Act (42 U.S.C. § 300, et seq.), the Environmental Protection Agency's regulations relating to underground storage tanks (40 C.F.R. Parts 280 and 281), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and the rules and regulations thereunder, each as amended or supplemented from time to time. Environmental Laws include but are not limited to requirements pertaining to the manufacture, processing, distribution, use, treatment, storage, disposal, transportation, handling, reporting, licensing, permitting, investigation or remediation of hazardous materials.

"**EOB**" means the explanation of benefit or remittance advice from an Obligor that identifies the services rendered on account of the Receivable specified therein.

"**Equity Interest**" means any share, interest or other equivalent of capital stock of any Person, whether voting or non-voting and whether common or preferred (including any membership interest in a not-for-profit entity), all options, warrants and other rights to acquire, and all securities convertible into, any of the foregoing, all rights to receive interest, income, dividends, distributions, returns of capital and other amounts (whether in cash, securities, property, or a combination thereof), and including, without limitation, all rights to receive amounts due and to become due under or in respect of any investment agreement or upon the termination thereof, and all other rights, powers, privileges, interests, claims and other property in any manner arising out of or relating to any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the guidance issued thereunder.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with the Parent or any Borrower, is treated as a single employer under Section 414(b), (c), (m) or (o) of the IRC or Section 4001 of ERISA.

-8-

"**ERISA Event**" means (1) a Reportable Event; (2) the withdrawal of the Parent, any Borrower, any of their Subsidiaries, or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (3) the complete or partial withdrawal of the Parent, any Borrower, any of their Subsidiaries, or any ERISA Affiliate from any Multiemployer Plan; (4) a notice of reorganization or insolvency of a Multiemployer Plan; (5) the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA; (6) the institution by the PBGC of proceedings to terminate a Plan; (7) the failure to make any required contribution to a Plan or Multiemployer Plan; (8) the imposition of a lien under Section 412 of the IRC or Section 302 of ERISA on the Parent, any Borrower, any of their Subsidiaries, or any ERISA Affiliate; (9) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the IRC or Section 302 of ERISA), whether or not waived; or (10) any event or condition that constitutes grounds under ERISA Section 4042 for the termination of, or the appointment of a trustee to administer, any Plan; (11) the determination that any Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431, and 432 of the IRC or Sections 303, 304, and 305 of ERISA; (12) any event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan; or (13) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA on any Borrower or any ERISA Affiliate.

"**Event of Default**" has the meaning set forth in Section 12.1.

"**Event of Loss**" means the occurrence of any event by which any item of Collateral of any Borrower or any other Loan Party is lost, stolen, destroyed, damaged beyond repair, rendered permanently unfit for use, or seized by a Governmental Entity for any period of time.

"**Excess Cash Flow**" means, for any fiscal year of a Person, the excess, if any, of (1) the sum, without duplication, of (A) EBITDAR for such fiscal year, and (B) decreases in Working Capital for such fiscal year, minus (2) the sum, without duplication, of (A) the aggregate amount actually paid by the Borrowers in cash during such fiscal year on account of Capital Expenditures (excluding the principal amount of Indebtedness incurred in connection with such expenditures and any such expenditures financed with the proceeds of asset dispositions that have not yet been used to pay down the Loans), (B) all optional prepayments of the Term Loan during such fiscal year, and (C) the aggregate amount of all regularly scheduled payments of principal and interest on long-term Indebtedness (including the Term Loan) of the Borrowers made during such fiscal year, (D) increases in Working Capital for such fiscal year, (E) rent expense actually paid in cash to the Mesa Entities during such fiscal year, and (F) any Distributions or dividends paid in cash by any Borrower to Parent during such fiscal year solely to the extent permitted under Section 10.16(a).

"**Exchange Act**" means The Securities Exchange Act of 1934, as amended, and as it may be further amended from time to time.

"**Excluded Claims**" has the meaning set forth in Section 2.9(b).

"**Expected Net Value**" means, with respect to any Eligible Receivable, the gross unpaid amount of such Receivable on the date of creation thereof, times the Net Value Factor.

"**Extraordinary Receipt**" means, the receipt by the Parent or any Borrower or any of their Subsidiaries of cash receipts not in the ordinary course of business (including, without limitation, proceeds of insurance policies).

-9-

"**Fixed Charge Coverage Ratio**" for any period or as of any date, means the ratio of (1) EBITDAR for the applicable period, to (2) the sum (without duplication) of the following, determined in each case in accordance with GAAP: (A) the greater of (i) scheduled principal payments of long term Debt and Capital Leases to be made during such period, and (ii) actual principal payments of long term Debt and Capital Leases made during such period, plus the following items to the extent actually paid in cash during such period: (B) Capital Expenditures (to the extent not funded by permitted purchase money loans or Capital Leases); (C) interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest); (D) taxes based on the Borrowers' income; (E) the aggregate amount of Distributions, and other advances, and loans to officers, Affiliates, and shareholders (other than Distributions by the Borrowers to the Parent solely for the purpose of paying the Trillium Seller Note B or the Deferred Transaction Costs); and (F) rent expense actually paid in cash to the Mesa Entities during such period.

"**Full Payment**" means, with respect to any Lender Debt, the full cash payment thereof, including any interest, fees and other charges accruing during (or that would have accrued but for the commencement of) any bankruptcy or other insolvency proceeding (whether or not allowed or allowable in such proceeding). No Lender Debt will be deemed to have been paid in full until all Lender Debt (other than unasserted contingent indemnification obligations) has been fully paid in cash and all commitments of the Agent and the Lenders under this Agreement have expired or been expressly terminated in writing.

"**Funding Date**" means any Business Day on which a Revolving Advance or a Term Loan is made at the request of the Borrower Representative in accordance with provisions of this Agreement.

"**Funding Default**" means, with respect to any Defaulting Lender, the occurrence of any of the events set forth in the definition of Defaulting Lender.

"**GAAP**" means generally accepted accounting principles in the United States of America.

"**Governmental Entity**" means the United States of America, any state thereof, any political subdivision of a state thereof and any agency or instrumentality of the United States of America or any state or political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to government. Payments from Governmental Entities will be deemed to include payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by CMS.

"**Guarantors**" means Parent and its Subsidiaries (other than the Borrowers) and all other Persons from time to time providing a Guaranty of, or otherwise becoming obligated with respect to, any of the Lender Debt.

"**Guaranty**" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, or to take-or-pay), or (2) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect the obligee of such Debt or other obligation of the payment thereof or to protect the obligee against loss in respect thereof (in whole or in part), provided that the term Guaranty shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guaranty" used as a verb has a corresponding meaning.

-10-

"**HCCG**" means HCCG, LLC, a Texas limited liability company.

"**Healthcare Laws**" means all applicable statutes, laws, ordinances, rules, and regulations of any Governmental Entity with respect to regulatory matters primarily relating to patient healthcare, healthcare providers, and healthcare services (including, without limitation: Section 1128B(b) of the Social Security Act, as amended, 42 U.S.C. § 1320a 7(b) (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute;" HIPAA (as defined in the Business Associate Agreement); and the Social Security Act, as amended, Section 1877, 42 U.S.C. § 1395nn (Prohibition Against Certain Referrals), commonly referred to as "Stark Statute").

"**HFG**" has the meaning set forth in the preamble to this Agreement.

"**HFG Web Portal**" has the meaning set forth in Section 14.16.

"**HFG Web Portal Communications**" means, collectively, any communication, information, document, or other material provided through the HFG Web Portal.

"**Indemnified Party**" has the meaning set forth in Section 2.9(b).

"**Initial Funding Date**" means, (i) with respect to the Revolving Loan, the date of funding of the initial Revolving Advance and (ii) with respect to the Term Loan A, the date of funding of the Term Loan A.

"**Initial Term**" has the meaning set forth in Section 14.7(a).

"**Insolvency Proceeding**" means any case or proceeding commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the United States Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its Property; or (c) an assignment or trust mortgage for the benefit of creditors.

"**Insurer**" means any Person (other than a Governmental Entity) which in the ordinary course of its business or activities agrees to pay for healthcare goods and services received by individuals, including commercial insurance companies, nonprofit insurance companies (such as the Blue Cross, Blue Shield entities), employers or unions which self insure for employee or member health insurance, prepaid health care organizations, preferred provider organizations, health maintenance organizations, commercial hospitals, physicians groups or any other similar Person. "Insurer" includes insurance companies issuing health, personal injury, workers' compensation or other types of insurance but does not include any individual guarantor.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the Closing Date, by and between Agent and Mesa Agent.

"**Interest Period**" means each three-month period (or shorter period ending on the Maturity Date).

"**IRC**" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the guidance thereunder.

\39109424

"**Issuance**" means the issuance by the Parent, any Borrower or any of their respective Subsidiaries of Debt (other than the Loans and Permitted Debt existing on the Closing Date), or the issuance by the Parent, any Borrower or any of their respective Subsidiaries of any Equity Interest; provided, however, that none of the following shall constitute an "Issuance": (1) any Equity Interest in any Subsidiary of the Parent or any Borrower issued to the Parent or such Borrower, as applicable, or any other Subsidiary, and (2) any Equity Interest in the Parent or any Borrower, as applicable, sold to, granted to, or issued upon exercise of any option granted to, any Person who (determined as at the time of the sale or grant) is an employee pursuant to a stock option (or equivalent) plan approved by the Agent.

"**Last Service Date**" means, with respect to any Eligible Receivable, the date set forth on the related invoice or statement as the most recent date on which services, goods or merchandise were provided by the applicable Borrower to the related patient or customer.

"**Lender**" means each lender signatory hereto with a Revolving Commitment, each lender signatory hereto with a Term Loan Commitment, and each of their respective successors and permitted assigns in that capacity.

"**Lender Debt**" means and includes any and all amounts due, whether now existing or hereafter arising, under this Agreement or any other Loan Document in respect of the Loans, including, without limitation, any and all principal, interest, penalties, fees, charges, premiums, indemnities and costs owed or owing to the Agent or any Lender by the Borrowers, or any of them, or any Guarantor or Affiliate of any Borrower (including, without limitation, the Early Termination Fee), in each instance, whether absolute or contingent, direct or indirect, secured or unsecured, due or not due, arising by operation of law or otherwise, and all interest and other charges thereon, including, without limitation, post-petition interest whether or not such interest is an allowable claim in a bankruptcy proceeding.

"**Lender Group**" means (1) the Agent, (2) each Lender, and (3) each of their respective agents and delegates identified from time to time to effectuate this Agreement.

"**Lender Lockbox**" means each lockbox, whether held in the name of the Agent, any Lender, or any Borrower, located at the address set forth on Schedule III, to receive checks and EOBs with respect to Receivables payable by Insurers and other non-Governmental Entities.

"**Lender Lockbox Account**" means each account at a Lockbox Bank as set forth on Schedule III as associated with a Lender Lockbox and established by one or more of the Borrowers to deposit collections in respect of the Receivables, including any such collections received in any Lender Lockbox and any such collections received by wire transfer directly from Insurers and all other Non-Governmental Entities, all as more fully set forth in the applicable Depositary Agreement.

"**Lender Platform**" has the meaning set forth in Section 14.16.

"**Lender Platform Communications**" means, collectively, any notice, demand, communication, information, document, or other material with respect to any Borrower that is provided through the Lender Platform.

"**Liability Event**" means any event, fact, condition, or circumstance or series thereof (1) in or for which any Borrower becomes liable or otherwise responsible for any amount owed or owing to any Medicaid or Medicare program by a provider under common ownership with any Borrower or any provider owned by any Borrower pursuant to any applicable law, ordinance, rule, decree, order, or regulation of any Governmental Entity after the failure of any such provider to pay any such amount when owed or owing; (2) in which Medicaid or Medicare payments to any Borrower can be lawfully set

-12-

off against payments to that or any other Borrower to satisfy any liability of or for any amounts owed or owing to any Medicaid or Medicare program by a provider under common ownership with any other Borrower or any provider owned by any Borrower pursuant to any applicable law, ordinance, rule, decree, order, or regulation of any Governmental Entity; (3) in which any other payments from any Obligor other than a Governmental Entity to any Borrower can be lawfully set off against payments to that or any other Borrower to satisfy any liability of or for any amounts owed or owing to that Obligor by a provider under common ownership with any Borrower or any provider owned by any Borrower; or (4) any of the foregoing under clauses (1) and (2), in each case pursuant to statutory or regulatory provisions that are similar to any applicable law, ordinance, rule, decree, order, or regulation of any Governmental Entity referred to in clauses (1) and (2), or any successor provisions thereto.

"**LIBOR**" for any Interest Period, means a rate per annum equal to the greater of (1) 1.25% and (2) the rate per annum, determined by Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate (rounded upwards, if necessary, to the next 1/16%), to be the rate at which Dollar deposits (for delivery on the first day of an Interest Period) in the amount of $1,000,000 are offered to major banks in the London interbank market on or about 11:00 a.m. (London time) two (2) Business Days prior to the commencement of such Interest Period, which determination shall be conclusive in the absence of manifest error and which determined rate will remain in effect until the next LIBOR Adjustment Date; provided, that so long as available, Agent will obtain such electronic quotation from the USD column on the Bloomberg Screen, code BBAM (Telerate Successor Page 3750) or such other code as may replace code BBAM in such service for the purposes of display of the interest rates in the London interbank market.

"**LIBOR Adjustment Date**" means the date that is two (2) Business Days prior to the first day of each month.

"**Lien**" means any lien, charge, deed of trust, mortgage, security interest, tax lien, pledge, hypothecation, assignment, preference, priority, other charge or encumbrance, or any other type of preferential arrangement of any kind or nature whatsoever by or with any Person (including, without limitation, any conditional sale or title retention agreement), whether arising by contract, operation of law, or otherwise.

"**Loan Documents**" means this Agreement, each promissory note (if any) evidencing any Loan, each Depositary Agreement, each Subordination Agreement, the Intercreditor Agreement, each Borrowing Base Report, each Monthly Report, the Agent Fee Letter, the Parent Guaranty, the Collateral Assignment of Acquisition Agreement, each Control Agreement, the Trillium Sweep Agreement, each Pledge Agreement, and each other document or instrument now or hereafter executed or delivered to the Agent or any Lender pursuant to or in connection herewith or therewith (including, without limitation, each other agreement now existing or hereafter created providing collateral security for the payment or performance of any Lender Debt).

"**Loan Party**" means each Borrower, the Parent, and each Guarantor (other than an individual).

"**Loans**" means, without duplication, the Revolving Loan, the Protective Advances, and the Term Loan, collectively.

"**Lockbox**" refers to each Borrower Lockbox and each Lender Lockbox, as the context requires.

"**Lockbox Account**" refers to each Borrower Lockbox Account and each Lender Lockbox Account, as the context requires.

"**Lockbox Bank**" means the applicable bank set forth on Schedule III hereto.

"**Material Adverse Effect**" means (1) a material adverse effect on the business, Properties, capitalization, assets, liabilities, operations, prospects or condition (financial or other) of the Parent, the Borrowers or any of their Subsidiaries; (2) the material impairment of the ability of any Borrower or any other Loan Party to perform its obligations under this Agreement or any of the other Loan Documents; (3) the material impairment of the validity or enforceability of, or the rights, remedies or benefits available to the Agent or the Lenders under, this Agreement or any other Loan Document; or (4) the material impairment of the validity, perfection or priority of any Lien granted in favor of the Agent pursuant to this Agreement or any other Loan Document.

"**Maturity Date**" means the earliest to occur of (1) the Scheduled Maturity Date, (2) the occurrence of an Event of Default described in clause (9) of Section 12.1, and (3) the declaration by either (A) the Agent or the Required Term Lenders with respect to the Term Loan A or the Term Loan B or (B) the Agent or Required Revolving Lenders with respect to the Revolving Loan, of the Maturity Date in accordance with Section 12.2(a).

"**Maximum Permissible Rate**" has the meaning set forth in Section 2.10.

"**Medicaid**" means the medical assistance program established by Title XIX of the Social Security Act (42 U.S.C. § 1396 et seq.) and any statutes succeeding thereto.

"**Medicare**" means the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. § 1395 et seq.) and any statutes succeeding thereto.

"**Medicare/Medicaid Reserve**" means, as of any date of determination, an amount, which in the Agent's reasonable discretion, is equal to the sum of (1) the amount of retroactive settlements estimated to be due and owing to Governmental Entities and (2) without duplication, 100% of those amounts for which payment plans have been established with the appropriate Governmental Entity.

"**Merrill Lynch**" means Merrill Lynch, Pierce, Fenner & Smith Incorporated

"**Mesa Agent**" means General Electric Capital Corporation.

"**Mesa Entities**" means Mesa City LTAC, LLC and its Subsidiaries.

"**Mesa Mortgage Facility**" means the mortgage loan facility in the original principal amount of provided by Mesa Agent and certain lenders to the Mesa Entities pursuant to that certain Loan Agreement, dated as June 29, 2012, as the same may be amended, restated or replaced from time to time.

"**Minimum Balance**" means an amount equal to $2,000,000.

"**Misdirected Payment**" means any form of payment in respect of a Receivable made by an Obligor in a manner other than as provided in the Notice sent to such Obligor.

"**Monthly Report**" means a report to the Agent (sent by Transmission unless otherwise agreed by the Agent), certified as accurate by the Borrower Representative, containing the following information: (1) the information contained on Exhibit II for the prior month; (2) electronic download of the transaction files for the prior month; and (3) electronic download of the monthly aged final balance for the prior month.

-14-

"**Multiemployer Plan**" means any Employee Benefit Plan of the type described in Section 4001(a)(3) of ERISA to which any Borrower or any ERISA Affiliate makes or is obligated to make contributions or, during the preceding five plan years, has made or been obligated to make contributions.

"**Multiple Employer Plan**" means an Employee Benefit Plan that has two or more contributing sponsors (including any Borrower and any ERISA Affiliate) at least two of whom are not under common control, as such plan is described in Section 4064 of ERISA.

"**Net Proceeds**" means with respect to any Asset Sale, Issuance or Extraordinary Receipt by any Borrower, the aggregate amount of cash proceeds (after a reasonable estimate of taxes payable in connection therewith and payment of associated fees and expenses (including, without limitation, reasonable fees and expenses of counsel, accountants, appraisers, brokers, investment bankers and, with respect to any Issuance, any reasonable underwriter's discount and, with respect to Asset Sales, repayment of any Debt secured specifically by and with a first lien on the asset, the sale or disposition of which gave rise to such Asset Sale) received or receivable by such Person, and cash proceeds paid from time to time to such Person with respect to any promissory note or other instrument or security delivered in connection therewith.

"**Net Value Factors**" means, initially, the percentages reflected in the initial Borrowing Base Report, as such percentages may be adjusted, upwards or downwards, in the reasonable discretion of the Agent, based on actual collection experience.

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

"**Non-Utilization Fee**" has the meaning set forth in Section 2.6(e).

"**Notice**" means a notice letter on the Borrowers' corporate letterhead to an Obligor, in form and substance satisfactory to the Agent.

"**Obligor**" means an Insurer, Governmental Entity, or other Person, as applicable, who is responsible for the payment of all or any portion of a Receivable.

"**Other Taxes**" has the meaning set forth in Section 2.8(b).

"**Outstanding Balance**" means, with respect to any Loan, as of any date of determination, the aggregate outstanding principal balance of such Loan (plus the amount of interest that is due and payable on such Loan that remains unpaid beyond the first Business Day of the month in which such interest was due).

"**Parent**" has the meaning set forth in the preamble to this Agreement.

"**Parent Corporate Expenses**" means the Parent's documented and reasonable operating expenses after the Closing Date.

"**Parent Corporate Expense Debt**" means, collectively, Subordinated Debt incurred by the Parent for the sole purpose of paying the Parent Corporate Expenses, so long as such Subordinated Debt is subject to a Subordination Agreement and subordinated in right of payment to the Lender Debt on terms acceptable to the Agent.

\39109424

"**Parent Guaranty**" means the Parent Guaranty, dated as of the date hereof, executed by Parent in favor of Agent, as administrative agent of the Lenders.

"**Patient Consent Form**" means each type of patient consent form, in form and substance satisfactory to the Agent, to be signed by each patient for which a Receivable will be created on or after the Closing Date, which authorizes certain demographic and medical information with respect to such patient to be disclosed by each Borrower to its servicing agents and by such servicing agents to any third party obligors thereon.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Act**" means the Pension Protection Act of 2006, as amended (or any successor statute thereto), and the guidance issued thereunder.

"**Pension Funding Rules**" means the rules of the IRC and ERISA regarding minimum required contributions (including any installment payment thereof) to Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act Section 412 of the IRC and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Sections 412, 430, 431, 432, and 436 of the IRC and Sections 302, 303, 304, and 305 of ERISA.

"**Permitted Debt**" means:

(1) unsecured Debt in an aggregate amount not to exceed $500,000 outstanding at any one time (without duplication of any Permitted Debt set forth in clauses (2) through (7) of this definition);

(2) the other Debt set forth on Schedule V hereto, and the extension of maturity, refinancing or modification of the terms thereof, so long as (A) such extension, refinancing or modification is pursuant to terms that are not less favorable to the Parent, the Borrowers and their Subsidiaries and the Lenders than the terms of the Debt being extended, refinanced or modified, and (B) after giving effect to such extension, refinancing or modification, the amount of such Debt is not greater than the amount of such Debt outstanding immediately prior to such extension, refinancing or modification plus accrued interest thereon and the fees incurred in connection with the extension, refinancing, or modification;

(3) Debt incurred by any Borrower pursuant to a facility that provides such Borrower financing for equipment, inventory, real property or other asset purchases and other capital expenditures, but solely to the extent such Debt is in an amount, upon such terms and conditions, and subject to documentation in form and substance, reasonably satisfactory to the Agent;

(4) the Lender Debt;

(5) the Trillium Seller Debt;

(6) the Parent Corporate Expense Debt; and

(7) intercompany Debt arising from loans made in accordance with the terms and conditions of Section 10.14 by (i) the Parent to any Borrower or (ii) any Borrower to any other Borrower.

"**Permitted Liens**" means any of the following, but in no event will any Lien against the Receivables or the related contracts, collections in respect of the Receivables, or proceeds thereof constitute or be deemed to be a Permitted Lien:

-16-

(1)     Liens securing the Lender Debt, Liens securing Debt described in clause (3) of the definition of Permitted Debt, and other Liens in existence on the date of this Agreement and set forth on Schedule II, but not the extension of coverage thereof to any other property or assets;

(2)     Liens imposed by law such as Liens of carriers, warehousemen, mechanics, materialmen and landlords, and other similar Liens incurred in the ordinary course of business for sums not constituting borrowed money that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted, and for which adequate reserves have been established in accordance with GAAP (if so required):

    (A)     Liens for taxes, assessments or other governmental charges or statutory obligations that (i) are not delinquent or remain payable without any penalty or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP and (ii) the Borrowers have the financial ability to pay, with all penalties and interest, without resulting in a Material Adverse Effect; and

    (B)     with respect to any real property occupied by any Borrower, all easements, rights of way, licenses and similar encumbrances on title that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or the use of such Property for its intended purposes.

"**Person**" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a Governmental Entity.

"**Plan**" means any employee pension benefit plan (including a Multiemployer Plan and a Multiple Employer Plan) that is maintained or to which any Borrower or any ERISA Affiliate must contribute and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the IRC or Section 302 of ERISA.

"**Pledge Agreements**" means, collectively, (1) the Pledge Agreement, dated as of the date hereof, between the Parent and the Agent, and (2) any other pledge agreements executed after the Closing Date in accordance with the terms of this Agreement.

"**Pro Rata Share**" means (1) with respect to a Revolving Lender, a fraction (expressed as a percentage), the numerator of which is the amount of such Revolving Lender's Revolving Commitment and the denominator of which is the Total Revolving Commitment, or if no Revolving Commitments are in effect, a fraction (expressed as a percentage), the numerator of which is the amount of Lender Debt owed to such Revolving Lender and the denominator of which is the aggregate amount of the Lender Debt owed to the Revolving Lenders, and (2) with respect to a Term Lender, a fraction (expressed as a percentage), the numerator of which is the amount of Lender Debt owed to such Term Lender and the denominator of which is the aggregate amount of the Lender Debt owed to the Term Lenders.

"**Property**" means property of all kinds, movable, immovable, corporeal, incorporeal, real, personal or mixed, tangible or intangible (including, without limitation, all rights relating thereto), whether owned or acquired on or after the date of this Agreement.

"**Protective Advance**" has the meaning set forth in Section 2.4(a).

\39109424

"**Qualified Refinancing**" shall mean any refinancing from any source (other than Healthcare Finance Group) that is obtained by the Parent and/or its subsidiaries, the proceeds of which refinancing facility are intended to, and are sufficient to, pay in full the Trillium Seller Debt and cause the Full Payment of the Lender Debt.

"**Receivable Information**" means the information listed on Exhibit IV hereto (together with any other information relating to the Receivables provided by any Borrower to the Agent from time to time) as such Exhibit may be modified by the Agent in consultation with the Borrowers from time to time.

"**Receivables**" means all accounts, instruments, general intangibles and health-care-insurance receivables, all other obligations for the payment of money and goodwill, whether now existing or hereafter arising, including, without limitation, all payments due from any Receivables including those based on a cost report settlement or expected settlement, and all proceeds of any of the foregoing, in each case, including rights of payment arising out of the rendition of medical, surgical, diagnostic or other professional medical services or the sale of medical products by each Borrower in the ordinary course of its business, including all third-party reimbursable portions or third-party directly payable portions of health-care-insurance receivables or general intangibles owing (or in the case of Unbilled Receivables, to be owing) by an Obligor, including all rights to reimbursement under any agreements with and payments from Obligors, patients or other Persons, together with all books, records, ledger cards, data processing records, computer software, and other property at any time used or useful in connection with, evidencing, embodying, referring to, or relating to any of the foregoing.

"**Records**" means all of the Borrowers' present and future books of account of every kind or nature, service and management agreements, invoices, ledger cards, statements, correspondence, memoranda, credit files and other data relating to the Receivables and the other Collateral or any account debtor or Obligor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of the Borrowers with respect to the foregoing maintained with or by any other Person).

"**Related Person**" means any incorporator, equityholder (or immediate family member of an equityholder), Affiliate (other than the Agent), agent, attorney, officer, director, member, manager, employee or partner of any Lender or its members or its equityholders.

"**Renewal Term**" has the meaning set forth in Section 14.7(a).

"**Repayment Date**" has the meaning set forth in Section 3.1.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"**Required Revolving Lenders**" means, at any time, Revolving Lenders holding Revolving Commitments representing at least 66–2/3% of the Total Revolving Commitment or, if the Revolving Commitments shall have been terminated, holding at least 66–2/3% of the outstanding Revolving Loans; provided, however, that (1) the Revolving Commitments of, and the portion of the Total Revolving Commitment held or deemed held by, any Defaulting Lender will be excluded for purposes of making a determination of Required Revolving Lenders, (2) if there are only two Revolving Lenders, Required Revolving Lenders will mean both Revolving Lenders. For purposes of determining the number of Revolving Lenders, Revolving Lenders that are Affiliates will be counted as a single Revolving Lender.

"**Required Term Lenders**" means, at any time, Term Lenders holding at least 66–2/3% of the outstanding Term Loans; provided, however, that if there are only two Term Lenders, Required Term

Lenders will mean both Term Lenders. For purposes of determining the number of Term Lenders, Term Lenders that are Affiliates will be counted as a single Term Lender.

"**Revolving Advance**" has the meaning set forth in Section 2.1(a) and includes any Protective Advance.

"**Revolving Commitment**" means the commitment of each Revolving Lender to make Revolving Advances up to the amount set forth below the signature of such Revolving Lender on the signature page of this Agreement or as set forth in the applicable Assignment and Assumption.

"**Revolving Exposure**" means, as to any Lender at any time, the aggregate principal amount at such time of its outstanding Revolving Advances.

"**Revolving Lender Debt**" means all Lender Debt owing to the Revolving Lenders and all Lender Debt owing to the Agent in respect of the Revolving Loans.

"**Revolving Lender Group**" means (1) the Agent, (2) each Revolving Lender, and (3) each of their respective agents and delegates identified from time to time to effectuate this Agreement.

"**Revolving Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Revolving Loan**" has the meaning set forth in Section 2.1(a).

"**Revolving Loan Senior Collateral**" means all Collateral other than the Term Loan Senior Collateral and all proceeds thereof.

"**Scheduled Maturity Date**" means June 29, 2017, as such date may be extended thereafter with respect to the Revolving Loan and Revolving Commitments in accordance with Section 14.7(a).

"**Senior Funded Debt**" means, at any date of determination, the aggregate outstanding amount of all Debt of such Person, other than Subordinated Debt.

"**Specified Financial Covenants**" has the meaning set forth in Section 11.5.

"**Subordinated Debt**" means (1) the Trillium Seller Debt, (2) the Parent Corporate Expense Debt and (3) any other unsecured Debt subordinated in right of payment to the Lender Debt on terms acceptable to the Agent.

"**Subordination Agreement**" means (1) the Trillium Subordination Agreement and (2) any other subordination agreements or similar agreements among the Loan Parties, the Agent and the holders of Subordinated Debt, in form and substance satisfactory to the Agent, together with all modifications, amendments and restatements of any of the foregoing.

"**Subsidiary**" means any corporation or entity of which at least a majority of the outstanding shares of stock or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors (or Persons performing similar functions) of such corporation or entity (irrespective of whether or not at the time, in the case of a corporation, stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the Parent or any Borrower.

"**Taxes**" has the meaning set forth in Section 2.8(a).

\39109424

"**Term**" means the Initial Term and any Renewal Term agreed to by the Agent, the Lenders, and the Borrowers.

"**Term Lender Debt**" means all Lender Debt owing to the Term Lenders and all Lender Debt owing to the Agent in respect of the Term Loans.

"**Term Lender Group**" means (1) each Term Lender and the Agent, and (2) each of their respective agents and delegates identified from time to time to effectuate this Agreement.

"**Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Term Loan A**" has the meaning set forth in Section 2.5(a).

"**Term Loan A Commitment**" means with respect to the Term Loan A, the commitment of each Term Lender to lend up to the amount set forth below the signature of such Term Lender on the signature page of this Agreement or as set forth in the applicable Assignment and Assumption.

"**Term Loan Agent**" has the meaning set forth in Section 13.2.

"**Term Loan B**" has the meaning set forth in Section 2.5(b).

"**Term Loan B Commitment**" means with respect to the Term Loan B, the commitment of each Term Lender to lend up to the amount set forth below the signature of such Term Lender on the signature page of this Agreement or as set forth in the applicable Assignment and Assumption.

"**Term Loan B Commitment Termination Date**" means the earliest to occur of (1) December 31, 2013, (2) the occurrence of an Event of Default described in clause (9) of Section 12.1, (3) the termination of the Term Loan B Commitments in accordance with Section 12.2(a) and (4) the Term Loan B Funding Date.

"**Term Loan B Funding Date**" means the date of the funding of the Term Loan B.

"**Term Loan B Non-Utilization Fee**" has the meaning set forth in Section 2.4(b).

"**Term Loans**" means the Term Loan A and the Term Loan B, collectively.

"**Term Loan Senior Collateral**" means the Collateral referred to in clauses (5) through (11) of Section 4.1, together with all proceeds thereof.

"**Transfer**" has the meaning set forth in Section 2.4(b).

"**Transfer Date**" has the meaning set forth in Section 2.4(b).

"**Total Revolving Commitment**" means $7,000,000.

"**Transmission**" means, upon establishment of a computer interface between the Borrowers and the Agent or an FTP site, in each case in accordance with the specifications established by the Agent, the transmission of Receivable Information through such computer interface or FTP site or e-mail communication to the Agent in a manner satisfactory to the Agent.

"**TRICARE/CHAMPUS**" means the Civilian Health and Medical Program of the Uniformed Service, a program of medical benefits covering former and active members of the uniformed services

\39109424

and certain of their dependents, financed and administered by the United States Departments of Defense, Health and Human Services and Transportation and established pursuant to 10 USC §§ 1071-1106, and all regulations promulgated thereunder including without limitation (1) all federal statutes (whether set forth in 10 USC §§ 1071-1106 or elsewhere) affecting TRICARE/CHAMPUS; and (2) all rules, regulations (including 32 CFR 199), manuals, orders and administrative, reimbursement, and other guidelines of all Governmental Entities (including, without limitation, the Department of Health and Human Services, the Department of Defense, the Department of Transportation, the Assistant Secretary of Defense (Health Affairs), and the Office of TRICARE/CHAMPUS, or any Person or entity succeeding to the functions of any of the foregoing) promulgated pursuant to or in connection with any of the foregoing (whether or not having the force of law) in each case as may be amended, supplemented or otherwise modified from time to time.

"**Trillium Acquisition**" means (1) the acquisition by Parent of certain assets of the Trillium Sellers pursuant to the term and conditions of the Trillium Acquisition Agreement, and (2) the contribution of the assets acquired by Parent under clause (1) above to each of the Borrowers.

"**Trillium Acquisition Agreement**" means that certain Operations Transfer Agreement dated as of April 16, 2012, by and among Parent and the Trillium Sellers.

"**Trillium Acquisition Addback**" means, collectively, the Coker Broker Fee and that certain fee payable by the Parent to HealthCap Partners, LLC in an amount not to exceed $400,000.

"**Trillium Seller Account**" means deposit account number 412-07031 owned by the Trillium Sellers and maintained with Merrill Lynch, which account is not being sold pursuant to the Trillium Acquisition but which account will continue to receive proceeds of assets sold pursuant to the Trillium Acquisition for a period of time after the Closing Date as specified in Section 5.5. For the avoidance of doubt, the Trillium Seller Account is not, and shall not be deemed to be, a deposit account of any Loan Party.

"**Trillium Seller Debt**" means, collectively, (i) the unsecured subordinated Debt owing by Parent to the Trillium Sellers in the original principal amount of $2,000,000, which Debt is evidenced by the Trillium Seller Note A, (ii) the unsecured subordinated Debt owing by Parent to the Trillium Sellers in the original principal amount of $1,500,000, which Debt is evidenced by the Trillium Seller Note B and (iii) in each case, Subordinated Debt issued by Parent to refinance such Debt, so long as such refinancing Subordinated Debt is on terms substantively similar to the terms and conditions of such Debt being refinanced and such terms and conditions are no less favorable to the Parent, Borrowers, the Agent or the Lenders than such Debt being refinanced (other than such amendments and other modifications acceptable to the Agent). The Trillium Seller Debt shall be subordinated to the Lender Debt pursuant to the Trillium Subordination Agreement.

"**Trillium Seller Note A**" means that certain Subordinate Promissory Note [First Promissory Note] in the original principal amount of $2,000,000, dated as of June 29, 2012, made by Parent in favor of the Trillium Sellers.

"**Trillium Seller Note B**" means that certain Subordinate Promissory Note [Second Promissory Note] in the original principal amount of $1,500,000, dated as of June 29, 2012, made by Parent in favor of the Trillium Sellers.

"**Trillium Sellers**" means, collectively, Hearthstone Hospital – Sun City, LLC and Hearthstone Hospital – Mesa, LLC.

\39109424

"**Trillium Subordination Agreement**" means that certain Subordination and Intercreditor Agreement dated as of June 29, 2012, by and among Parent, the Agent and the holders of the Trillium Seller Debt.

"**Trillium Sweep Agreement**" has the meaning given such term in Section 5.5.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in effect in the specified or applicable jurisdiction.

"**Unbilled Receivable**" means a Receivable in respect of which the goods have been shipped, or the services rendered, to the relevant customer or patient, rights to payment thereon have accrued, but the invoice has not been rendered to the applicable Obligor.

"**Withdrawal Liability**" means, with respect to the Parent, any Borrower and its ERISA Affiliates at any time, the aggregate liability incurred (whether or not assessed) with respect to all Multiemployer Plans pursuant to Section 4201 of ERISA and with respect to all increases in contributions required to be made pursuant to Section 4243 of ERISA.

"**Working Capital**" means, for any Person, at any date of determination, an amount equal to the aggregate amount of all current assets other than cash, cash equivalents of such Person minus the aggregate amount of all current liabilities excluding any short term Debt and current maturities of long term Debt of such Person, as determined in accordance with GAAP.

1.2    **Other Terms; Rules of Construction.** All terms used in Article 9 of the UCC in the State of New York, and not specifically defined herein, are used herein as defined in such Article 9. Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. For avoidance of doubt, a Default or Event of Default will be deemed to exist and be continuing at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to the terms of this Agreement or, in the case of a Default, is cured within the period of cure, if any, expressly provided for in this Agreement. Unless the context otherwise provides to the contrary, the term "month" means a calendar month. The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph, subdivision, or clause. Any pronoun used shall be deemed to cover all genders. In the computation of periods of time from a specified date to a later specified date, "from" means "from and including,", "through" means "through and including," and "to" and "until" each mean "to but excluding,". The terms "including" and "include" shall mean "including" and, for purposes of each Loan Document, the parties agree that the rule of *ejusdem generis* shall not be applicable to limit any provision. Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document. All references to (a) laws or statutes include all related rules, regulations, interpretations, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, waivers and other modifications, extensions or renewals (to the extent permitted by the Loan Documents); (c) any Section or Article mean, unless the context otherwise requires, a Section or Article of this Agreement; (d) any Exhibits mean, unless the context otherwise requires, Exhibits attached hereto, and any Schedules mean, unless the context otherwise requires, the Schedules attached hereto, all of which are hereby incorporated by reference; and (e) unless otherwise specified, discretion of the Agent or any Lender mean the sole and absolute discretion of such Person. The Borrowers shall have the burden of establishing any alleged negligence, misconduct, or lack of good faith by the Agent or any Lender under any Loan Documents. No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision. Whenever the phrase "to the best of the Borrowers' knowledge", or words of similar import are used in any Loan Documents, it means actual

knowledge of an officer of the applicable Borrowers, or knowledge that an officer of the applicable Borrowers would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter to which such phrase relates.

1.3    **Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP. Defined terms and calculations in connection with the covenants and other provisions of this Agreement, including Article 11, shall be based upon and utilize GAAP applied in a manner consistent with that used in preparing the financial statements referred to in Section 8.15. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in this Agreement, and the Borrowers shall so request, the Agent and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; provided that, until so amended, (1) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (2) the Borrowers shall provide to the Agent financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

## ARTICLE 2
## AMOUNTS AND TERMS OF THE LOANS

2.1    **Revolving Advances**. (a) The Revolving Lenders agree to lend to the Borrowers, on a joint and several basis,, from time to time during the Term, subject to and upon the terms and conditions herein set forth, on any Funding Date, such amounts as in accordance with the terms hereof may be requested by the Borrowers from time to time (each such borrowing, a "**Revolving Advance**" and the aggregate outstanding principal balance of all Revolving Advances from time to time, the "**Revolving Loan**").

(b)    The aggregate outstanding principal amount of Revolving Advances made by any Revolving Lender shall not at any time exceed the amount of such Revolving Lender's Revolving Commitment. The sum of the principal amount of the Revolving Loan outstanding at any time shall not exceed the Adjusted Borrowing Limit.  Notwithstanding any provision in this Agreement to the contrary, the aggregate outstanding principal amount of the Revolving Loans shall not exceed (and the Lenders shall have no obligation to advance Revolving Loans in an aggregate amount in excess of) $2,500,000, until the earliest of the date on which (a) the Trillium Seller Account shall become subject to a Depository Agreement by and among the Trillium Sellers, Merrill Lynch and the Agent, on terms and conditions satisfactory to Agent, (b) the Trillium Seller Account shall become subject to a Control Agreement by and among the Trillium Sellers, Merrill Lynch and the Agent, to the extent permitted by applicable law, or (c) the Trillium Seller Account is closed and all Obligors have commenced making all payments with respect to Receivables to the applicable Lockbox Accounts pursuant to Section 5.1.

(c)    Subject to the limitations herein (including, without limitation, the conditions to funding Loans set forth in Article 7 hereof), the Borrowers may borrow, repay (without premium or penalty, except as expressly set forth in this Agreement) and reborrow Revolving Advances under each Revolving Lender's Revolving Commitment. The Revolving Loan shall not exceed, and the Revolving Lenders will not have any obligation to make any Revolving Advance which would result in the Revolving Loan being in excess of, the Adjusted Borrowing Limit. If at any time the Revolving Loan exceeds the Adjusted Borrowing Limit, the Borrowers shall immediately eliminate such excess by repaying the Revolving Loan in an amount equal to such excess.

\39109424

(d)     Each Revolving Lender, at its option, may make any Revolving Advance by causing any domestic or foreign branch or Affiliate of such Revolving Lender to make such Revolving Advance; provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Revolving Advance in accordance with the terms of this Agreement.

(e)     Whenever the Borrowers desire a Revolving Advance be made, the Borrower Representative shall, not later than 2:00 p.m. (New York City time) one Business Day prior to the proposed Funding Date of the Revolving Advance, provide the Agent irrevocable notice of that borrowing request, which notice may be given by telephone or other means acceptable to the Agent, in each case by an Authorized Officer. Each such notice must specify the amount of the requested Revolving Advance (which must not be less than $100,000) and the requested Funding Date. Each such notice must be confirmed promptly by delivery to the Agent of a Borrowing Base Report with the amount of the requested advance in line XX of that Borrowing Base Report, which must be signed by an Authorized Officer. Promptly following receipt of such request for a Revolving Advance and such related Borrowing Base Report, the Agent shall advise each Revolving Lender of the details thereof and of the amount of such Revolving Lender's Pro Rata Share of the requested Revolving Advance. In the event that one or more payments in respect of any Lender Debt shall become due and payable, the Borrowers will be deemed to have made an irrevocable request for Revolving Advances in an aggregate amount equal to such payments, and the proceeds of such Revolving Advances shall be applied by the Agent directly to make such payments; provided, however, that if any conditions contained herein to the funding of the aggregate amount of such Revolving Advances shall not have been satisfied, such Revolving Advances shall be made only to the extent that the Required Revolving Lenders have consented thereto.

(f)     Each Revolving Lender shall make each Revolving Advance to be made by it hereunder on the proposed Funding Date thereof by wire transfer of immediately available funds by noon (New York City time) to the account of the Agent most recently designated by it for such purpose by notice to the Revolving Lenders. The Agent will make such Revolving Advances available to the Borrowers by promptly transferring the amount so received, in like funds, to the Borrower Account. The Revolving Advances made by the Revolving Lenders on any Funding Date shall be made by the Revolving Lenders ratably in accordance with their respective Revolving Commitments. The failure of any Revolving Lender to make any Revolving Advance or portion thereof required to be made by it shall not relieve any other Revolving Lender of its obligations hereunder; provided that the Revolving Commitments of the Revolving Lenders are several and no Revolving Lender shall be responsible for any other Revolving Lender's failure to make Revolving Advances as required.

(g)     Unless the Agent has received notice from a Revolving Lender prior to the proposed Funding Date of any Revolving Advance to be made by such Revolving Lender that such Revolving Lender will not make immediately available funds available to the Agent for such Revolving Advance in accordance with Section 2.1(f), which notice shall be provided by a Revolving Lender to Agent immediately upon Revolving Lender's receipt of notice of such Revolving Advance, then the Agent may assume that such Revolving Lender has made such immediately available funds available on such Funding Date in accordance with Section 2.1(f) and may, in its sole discretion and in reliance upon such assumption, make available to the Borrowers a corresponding amount. In such event, if a Revolving Lender has not in fact made immediately available funds available to the Agent for such Revolving Advance, then the applicable Revolving Lender and the Borrowers severally agree to pay to the Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Agent, at (1) in the case of a payment to be made by such Revolving Lender, the rate determined by the Agent in accordance with banking industry rules on interbank compensation, and (2) in the case of a payment to be made by the Borrowers, the interest rate applicable to the Revolving Loan. If the Borrowers and such Revolving Lender pay such interest to the Agent for the same or an overlapping

\39109424

period, then the Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Revolving Lender pays the amount of the applicable Revolving Advance to the Agent, then the amount so paid will constitute such Revolving Lender's Revolving Advance. Any payment by the Borrowers will be without prejudice to any claim any Borrower might have against a Revolving Lender that has failed to make such payment to the Agent.

(h)     On the Maturity Date, each Revolving Lender's Revolving Commitment shall terminate automatically. Upon such termination, the Revolving Loan (together with all other Revolving Lender Debt) shall become, without further action by any Person, immediately due and payable together with all accrued interest thereon plus any fees, premiums, charges or costs provided for hereunder with respect thereto, and, if applicable, the Early Termination Fee.

(i)     **[Reserved]**.

(j)     Following payment in full of the Term Loans and upon ten days' prior notice (which shall be irrevocable) to the Agent, the Borrowers may elect to terminate the Revolving Commitment. On the effective date of such termination, the Borrowers shall pay to the Agent, for the account of the Revolving Lenders, (1) the outstanding principal amount of the Revolving Loan, if any, in excess of the Adjusted Borrowing Limit (after giving effect to the decrease in the Total Revolving Commitment), together with all accrued interest thereon, which payment shall be distributed by the Agent in accordance with the terms of this Agreement or the relevant provisions of the other Loan Documents, and (2) the Early Termination Fee.

(k)     The Borrowers may in addition to any reduction by application of the Collections in accordance with Section 6.2 on any Business Day reduce the outstanding principal amount of the Revolving Loan; provided, however, that the Borrowers shall provide the Agent with at least two weeks' prior notice to the extent such reduction shall be more than $1,000,000 of the then outstanding principal amount of the Revolving Loan.

(l)     The Revolving Loan may but need not be evidenced by one or more promissory notes, but in no event will the manner in which the Revolving Loan is evidenced limit or otherwise affect the obligation of the Borrowers to repay the Revolving Loan or any other Lender Debt, and that obligation, howsoever evidenced, is and will remain a continuing obligation of the Borrowers under this Agreement. Each Revolving Advance and each payment by the Borrowers thereon will be evidenced by the account or accounts maintained by each Revolving Lender pursuant to Section 2.8(e) and the register maintained by the Agent pursuant to Section 2.8(f).

2.2     **[Reserved]**.

2.3     **[Reserved]**.

2.4     **Protective Advances.** (a) Subject to the limitations set forth below, the Agent is authorized by the Borrowers and the Revolving Lenders to make (but has absolutely no obligation to make), from time to time in the Agent's sole discretion, Loans to the Borrowers on behalf of all Lenders that the Agent, in its sole discretion, deems necessary or desirable (1) to preserve or protect the Collateral or any portion thereof and (2) to the extent an Event of Default has occurred and is continuing, (i) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Lender Debt, or (ii) to pay any other amount chargeable to or required to be paid by the Borrowers pursuant to the terms of this Agreement, including payments of principal, interest, fees, premiums, reimbursable expenses (including costs, fees, and expenses as described in Section 14.5) and other sums payable under the Loan Documents (any of such Loans are herein referred to as "**Protective Advances**"). No Protective Advance

-25-

may be made that would cause the aggregate principal balance of the Revolving Loan and Protective Advances to exceed the aggregate amount of the Revolving Commitments then in effect, and the aggregate amount of Protective Advances outstanding at any time pursuant to clauses (1) and (2) above may not exceed $2,000,000. Protective Advances may be made during the existence of a Default or Event of Default and regardless of whether the applicable conditions precedent set forth in Section 7.2 have then been satisfied. Each Protective Advance will be secured by the Liens in favor of the Agent in and to the Collateral and will constitute Lender Debt hereunder. The Agent shall endeavor to provide the Borrower Representative with prior notice of the nature and amount of any contemplated Protective Advance. The Agent's authorization to make Protective Advances may be revoked at any time by the Required Revolving Lenders. Any such revocation must be in writing and will become effective prospectively upon the Agent's receipt thereof. At any time that there is sufficient Net Availability and the conditions precedent set forth in Section 7.2 have been satisfied, the Agent may request the Revolving Lenders to make Revolving Advances to repay a Protective Advance. At any other time the Agent may require the Revolving Lenders to fund their risk participations as described in Section 2.4(b).

(b)    Upon the making of a Protective Advance by the Agent, whether before or after the occurrence of a Default or Event of Default and without any further action on the part of the Agent or any Lender, the Agent will be deemed to have granted to each Revolving Lender, and each Revolving Lender will be deemed to have acquired from the Agent, without recourse or warranty, a participation in such Protective Advance equal to such Revolving Lender's Pro Rata Share of such Protective Advance. Each Revolving Lender shall transfer (each such transfer, a "**Transfer**") the amount of such Revolving Lender's Pro Rata Share of the outstanding principal amount of the applicable Protective Advance with respect to such acquired interest and participation promptly when requested to the Agent, to such account of the Agent as the Agent may designate, but in any case not later than 3:00 p.m. (New York City time), on the Business Day requested (if notice is provided by the Agent prior to noon (New York City time) on such Business Day) or otherwise on the immediately following Business Day (each such transfer date, as to the applicable Transfer, a "**Transfer Date**"). Transfers may occur during the existence of a Default or Event of Default and regardless of whether the applicable conditions precedent set forth in Section 7.2 have then been satisfied. Such amounts transferred to the Agent will be applied against the amount of the Protective Advance and, together with each Revolving Lender's Pro Rata Share of such Protective Advance, will constitute Revolving Advances of such Revolving Lenders, respectively. If any such amount is not transferred to the Agent by any Revolving Lender on the applicable Transfer Date, then the Agent may recover such amount on demand from such Revolving Lender together with interest thereon as specified in Section 2.1(g). From and after the date, if any, on which any Revolving Lender is required to fund, and funds, its participation in any Protective Advance purchased hereunder, the Agent shall promptly distribute to such Revolving Lender such Revolving Lender's Pro Rata Share of all payments of principal and interest and all proceeds of Collateral received by the Agent in respect of such Protective Advance in accordance with this Agreement.

2.5    **Term Loans.**

(a)    Each Term Lender with a Term Loan A Commitment agrees to lend to the Borrowers, on a joint and several basis, on the Initial Funding Date, subject to and upon the terms and conditions herein set forth, the amount indicated below such Term Lender's name on the signature page hereto, as a single loan in the aggregate initial principal amount equal to $3,000,000 (the "**Term Loan A**").

(b)    Each Term Lender with a Term Loan B Commitment agrees to lend to the Borrowers, on a joint and several basis, on the Term Loan B Funding Date, subject to and upon the terms and conditions herein set forth, the amount indicated below such Term Lender's name on the signature

-26-

page hereto, as a single loan in the aggregate initial principal amount equal to $2,000,000 (the "**Term Loan B**").

(c)       The Term Loans made by each Term Lender may but need not be evidenced by one or more promissory notes, but in no event will the manner in which such Term Loan is evidenced limit or otherwise affect the obligation of the Borrowers to repay such Term Loan or any other Lender Debt, and that obligation, howsoever evidenced, is and will remain a continuing obligation of the Borrowers under this Agreement. The Term Loans and each payment by the Borrowers thereon will be evidenced by the account or accounts maintained by each applicable Term Lender pursuant to Section 2.8(e) and the register maintained by the Agent pursuant to Section 2.8(f).

2.6    **Interest and Fees**. (a) The Borrowers shall pay (1) interest on the average daily Outstanding Balance of the Revolving Loan (including each Protective Advance) during the prior month on the first Business Day of each month, and (2) all accrued and unpaid interest on the Outstanding Balance of the Revolving Loan on the Maturity Date (whether by acceleration or otherwise), in each case, at an interest rate per annum equal to LIBOR plus 4.25%. If the average daily Outstanding Balance of the Revolving Loan during any month is less than the Minimum Balance, then the Borrowers shall pay to the Agent, for the account of each Revolving Lender, on the earlier of the first Business Day of the following month and the Maturity Date, a fee in an amount equal to the interest rate per annum stated in the immediately preceding sentence multiplied by the amount by which the Minimum Balance exceeded the average daily Outstanding Balance of the Revolving Loan during that prior month.

(b)       **[Reserved]**

(c)       The Borrowers shall pay (1) interest on the average daily Outstanding Balance of the Term Loans during the prior month on the first Business Day of each month, and (2) all accrued and unpaid interest on the Outstanding Balance of the Term Loans on the Maturity Date (whether by acceleration or otherwise), in each case, at an interest rate per annum equal to LIBOR plus 6.0%.

(d)       Notwithstanding anything to the contrary contained herein, at all times following the occurrence of any Default or Event of Default, without notice to the Borrowers, interest on each Loan shall accrue, at the Agent's discretion, at a rate per annum equal to 4.00% in excess of the rate then otherwise applicable to such Loan. Interest accrued pursuant to this Section 2.6(d) shall be payable on the earlier of (1) the next date for payment of interest pursuant to Sections 2.6(a) and 2.6(c) above, as applicable, and (2) the date on which Agent makes demand therefor.

(e)       The Borrowers shall pay to the Agent, for the account of each Revolving Lender, in arrears, on the first Business Day of each month and the Maturity Date, a fee (the "**Non-Utilization Fee**") equal to 0.50% per annum on the average amount, calculated on a daily basis, by which the Revolving Commitment of such Revolving Lender exceeded the greater of (1) the aggregate amount of Revolving Advances made by such Revolving Lender that were outstanding during the prior month and (2) the Minimum Balance.

(f)       During the period from the Closing Date through the Term Loan B Commitment Termination Date, the Borrowers shall pay to the Agent, for the account of each Term Lender with a Term Loan B Commitment, in arrears, on the first Business Day of each month and the Term Loan B Commitment Termination Date, a fee (the "**Term Loan B Non-Utilization Fee**") equal to 0.50% per annum on the amount of the Term Loan B Commitment of such Term Lender.

(g)       The Borrowers shall pay to the Agent, for its own account, the fees set forth in the Agent Fee Letter.

\39109424

2.7    **Computation of Interest; Payment of Fees**. (a) Interest on the Loans and fees and other amounts calculated on the basis of a rate per annum shall be computed on the basis of actual days elapsed over a 360-day year.

(b)    Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due and payable on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in computing interest on such payment.

(c)    All fees owed by the Borrowers under this Agreement are, and will be deemed hereunder for all purposes to be, fully earned and non-refundable on the due date thereof.

2.8    **Procedures for Payment**. (a) Each payment hereunder and under the other Loan Documents shall be made not later than noon (New York City time) on the day when due in lawful money of the United States of America without counterclaim, defense, offset, claim or recoupment of any kind and free and clear of, and without deduction for, any present or future withholding or other taxes, duties, levies, imposts, deductions, charges or other liabilities of any nature imposed on such payments or prepayments by or on behalf of any Governmental Entity, except for taxes upon or determined by reference to a Lender's net income imposed by the jurisdiction in which such Lender is organized or has its principal or registered lending office (all such nonexcluded taxes, levies, imposts, deductions, charges, withholdings and liabilities hereinafter referred to as "**Taxes**"). If any such Taxes are so levied or imposed on any payment to any Lender, the Borrowers will make additional payments in such amounts as may be necessary so that the net amount received by such Lender, after withholding or deduction for or on account of all Taxes, including deductions applicable to additional sums payable under this Section 2.8, will be equal to the amount provided for herein or in the other Loan Documents. Whenever any Taxes are payable by the Borrowers with respect to any payments hereunder, the Borrowers shall furnish promptly to the Agent information, including certified copies of official receipts (to the extent that the relevant governmental authority delivers such receipts), evidencing payment of any such Taxes so withheld or deducted. If the Borrowers fail to pay any such Taxes when due to the appropriate taxing authority or fails to remit to the Agent the required information evidencing payment of any such Taxes so withheld or deducted, the Borrowers shall indemnify the Agent and each Lender for any incremental Taxes, interest or penalties that may become payable by the Agent or such Lender as a result of any such failure.

(b)    Notwithstanding anything to the contrary contained in this Agreement, the Borrowers shall pay any present or future stamp or documentary taxes, any intangibles tax or any other sales, excise or property taxes, charges or similar levies now or hereafter assessed that arise from and are attributable to any payment made hereunder or from the execution, delivery or performance of, or otherwise with respect to, this Agreement or any other Loan Documents and any and all recording fees relating to any Loan Documents securing any Lender Debt ("**Other Taxes**").

(c)    The Borrowers shall indemnify the Agent and each Lender for the full amount of any and all Taxes and Other Taxes (including, without limitation, any Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.8) paid or payable by the Agent or such Lender (whether or not such Taxes or Other Taxes were correctly or legally asserted) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto. Indemnification payments due to the Agent or any Lender under this Section 2.8 shall be made within 10 days from the date the Agent or such Lender makes written demand therefor.

(d)    Without prejudice to the survival of any other agreement of the Borrowers hereunder, the agreements and obligations of the Borrowers contained in this Section 2.8 shall survive the

-28-

Full Payment of all Lender Debt hereunder and any termination of the Revolving Commitments or the Term Commitment.

(e)        Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Term Loan or Revolving Advance owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder. In furtherance thereof, each Lender agrees that before disposing of any promissory note evidencing any Loan held by it (if applicable), or any part thereof (other than by granting participations therein), such Lender will make a notation thereon of all Revolving Advances (with respect to Revolving Notes), principal payments previously made thereon, and of the date to which interest thereon has been paid; provided that the failure to make (or any error in the making of) any notation under any such promissory note shall not limit or otherwise affect the obligations of the Borrowers hereunder or under any such promissory note with respect to the unpaid portion of the Lender Debt.

(f)        The register maintained by the Agent with respect to the Revolving Advances and the Term Loans shall include accounts for each Lender, in which accounts (taken together) shall be recorded (1) the rate and amount of each Revolving Advance made hereunder, (2) the amount of each Revolving Lender's Revolving Commitment and the terms of each Assignment and Assumption delivered to and accepted by it, (3) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder, and (4) the amount of any sum received by the Agent from the Borrowers hereunder and each Lender's share thereof. The parties hereto acknowledge and agree that the entries made by the Agent as provided in this Section 2.8(f) shall be conclusive and binding for all purposes, absent manifest error.

2.9        **Indemnities.** (a) The Borrowers hereby agree to indemnify the Agent and each Lender on demand against any loss or expense which the Agent or such Lender or a branch or an Affiliate of such Person may sustain or incur as a consequence of any of the following: (1) any default in payment or prepayment of the principal amount of any Loan or any portion thereof or interest accrued thereon, as and when due and payable (at the due date thereof, by irrevocable notice of payment or prepayment, or otherwise); (2) the effect of the occurrence of any Default or Event of Default upon any Loan or any portion thereof; or (3) the failure by the Borrowers to accept a Loan or any portion thereof after the Borrowers have requested such borrowing; in each case including, but not limited to, any loss or expense sustained or incurred in liquidating or employing deposits from third parties acquired to effect or maintain the Revolving Loan or any portion thereof. The Agent or Lender, as applicable, shall provide to the Borrowers a statement, supported when applicable by documentary evidence, explaining the amount of any such loss or expense it incurs, which statement shall be conclusive absent manifest error.

(b)        The Borrowers hereby agree to indemnify and hold harmless the Agent, the Lenders, and each of their respective Affiliates, directors, officers, agents, representatives, counsel and employees and each other Person, if any, controlling them or any of their respective Affiliates within the meaning of either Section 15 of the Securities Act of 1933, as amended, or Section 20(a) of the Exchange Act (each, an **"Indemnified Party"**), from and against any and all losses, claims, damages, costs and expenses (including reasonable counsel fees and disbursements) and liabilities which may be incurred by or asserted against such Indemnified Party with respect to or arising out of the Revolving Commitments hereunder, the Revolving Loan or the Term Loans contemplated hereby, the Loan Documents, the Collateral (including, without limitation, the use thereof by any of such Persons or any other Person, the exercise by any Indemnified Party of rights and remedies or any power of attorney with respect thereto, and any action or inaction of any Indemnified Party under and in accordance with any Loan Documents), the use of proceeds of any financial accommodations provided hereunder, any investigation, litigation or other proceeding (pending or threatened) relating thereto, or the role of any such Person or Persons in

-29-

connection with the foregoing whether or not they or any other Indemnified Party is named as a party to any legal action or proceeding ("**Claims**"). The Borrowers will not, however, be responsible to any Indemnified Party hereunder for any Claims to the extent that a court having jurisdiction shall have determined by a final nonappealable judgment that any such Claim shall have arisen out of or resulted solely from (1) actions taken or omitted to be taken by such Indemnified Party by reason of its bad faith, willful misconduct or gross negligence, or (2) a successful claim by the Borrowers, or any of them, against such Indemnified Party ("**Excluded Claims**"). Further, should any employee of an Indemnified Party, in connection with such employee's employment by such Indemnified Party, be involved in any legal action or proceeding in connection with the transactions contemplated hereby (other than relating to an Excluded Claim), the Borrowers hereby agree to pay to such Indemnified Party such reasonable per diem compensation as such Indemnified Party shall request for each employee for each day or portion thereof that such employee is involved in preparation and testimony pertaining to any such legal action or proceeding. Each Indemnified Party shall give the Borrowers prompt notice of any Claim with respect to which such Indemnified Party is seeking indemnification hereunder, setting forth a description of those elements of the Claim of which such Indemnified Party has knowledge. The Indemnified Party shall be permitted hereunder to select counsel to defend such Claim at the expense of the Borrowers. The Indemnified Parties and the Borrowers and their respective counsel shall cooperate with each other in all reasonable respects in any investigation, trial, and defense of any such Claim and any appeal arising therefrom.

2.10     **Maximum Interest**. No provision of this Agreement shall require the payment to any Lender or permit the collection by any Lender of interest in excess of the maximum rate of interest from time to time permitted (after taking into account all consideration which constitutes interest) by laws applicable to the Lender Debt and binding on such Lender (such maximum rate being such Lender's "**Maximum Permissible Rate**"). If the amount of interest (computed without giving effect to this Section 2.10) payable to any Lender in respect of any interest computation period would exceed the amount of interest computed in respect of such period at such Lender's Maximum Permissible Rate, the amount of interest payable to such Lender in respect of such period shall be computed at such Lender's Maximum Permissible Rate and any excess shall be applied to reduce any Lender Debt (other than interest) then owing to such Lender in such order as it shall determine.

2.11     **Use of Proceeds of Revolving Loan**. The Borrowers shall use the proceeds of the Revolving Loan (i) on the Closing Date, solely to distribute all of such proceeds to the Parent in consideration for the contribution by Parent to the Borrowers of the assets acquired by Parent in the Trillium Acquisition, and the Parent shall use such distributed proceeds solely to pay a portion of the purchase price under the Trillium Acquisition Agreement, as well as certain transaction costs with respect thereto and (ii) after the Closing Date, for working capital and general corporate purposes.

2.12     **Use of Proceeds of Term Loans**. The Borrowers shall use the proceeds of (i) the Term Loan A solely to distribute, on the Closing Date, all of such proceeds to the Parent in consideration for the contribution by Parent to the Borrowers of the assets acquired by Parent in the Trillium Acquisition, and the Parent shall use such distributed proceeds solely to pay a portion of the purchase price under the Trillium Acquisition Agreement, as well as certain transaction costs with respect thereto and (ii) the Term Loan B solely to distribute, on the Term Loan B Funding Date, all of such proceeds (a) first, on behalf of the Parent for the purpose of, and the Parent shall cause such distributed proceeds to be disbursed directly to Trillium Sellers for the purpose of, payment in full satisfaction of the Trillium Seller Note B, and (b) next, in payment of certain transaction costs with respect thereto (including, without limitation, Deferred Transaction Costs).

2.13     **Defaulting Lenders**. Notwithstanding anything to the contrary contained in this Agreement, if any Revolving Lender becomes a Defaulting Lender, then the provisions of this

-30-

Section 2.13 will apply until such time as such Revolving Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)    Each such Defaulting Lender's right to approve or disapprove any amendment, waiver, or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Revolving Lenders.

(b)    Until such time as the Default Excess of any such Defaulting Lender has been reduced to zero, (1) any voluntary prepayment of the Revolving Loan will be applied to the Revolving Advances of the Non-Defaulting Lenders in accordance with Article 6 as if each Defaulting Lender (including such Defaulting Lender) had no Revolving Advances outstanding, and (2) any mandatory prepayment of the Revolving Loan under this Agreement will be applied to the Revolving Advances of the Non-Defaulting Lenders in accordance with Article 6 as if each Defaulting Lender (including such Defaulting Lender) had funded all Revolving Advances that it failed to fund.

(c)    The amount of each such Defaulting Lender's Revolving Commitment and Revolving Advances will be excluded for purposes of calculating the Non-Utilization Fee payable to the Revolving Lenders for any day during any Default Period relating to such Defaulting Lender, and each such Defaulting Lender will not be entitled to receive any Non-Utilization Fee in connection with such Defaulting Lender's Revolving Commitment for any Default Period relating to such Defaulting Lender.

(d)    **[Reserved]**

(e)    **[Reserved]**

(f)    If each of the Agent and each Borrower agree that a Defaulting Lender has adequately remedied prior to the Cutoff Date all matters that caused such Revolving Lender to be a Defaulting Lender, then the Revolving Loan of the Revolving Lenders will be readjusted to reflect the inclusion of such Revolving Lender's Revolving Commitment and on such date such Revolving Lender shall purchase at par so much of the Revolving Advances of the other Revolving Lenders or take such other actions as the Agent determines to be necessary to cause the Revolving Advances to be held by the Revolving Lenders in accordance with their respective Revolving Commitments and Pro Rata Shares, whereupon such Revolving Lender will cease to be a Defaulting Lender.

(g)    Following a Cutoff Date, the Defaulting Lender shall have no right to remedy under this Agreement the matters that caused such Revolving Lender to be a Defaulting Lender. For purposes of this Agreement, "**Cutoff Date**" means the date on which the Agent sends written notice to a Defaulting Lender (no earlier than 10 Business Days following the determination that a Revolving Lender has been classified as a Defaulting Lender), stating that the Agent has placed additional Revolving Commitments hereunder in an amount at least equal to the Revolving Commitment of such Defaulting Lender. In connection therewith, the Agent shall first offer each other existing Revolving Lender its Pro Rata Share of such Defaulting Lender's Revolving Commitment prior to allocating such additional Revolving Commitment to any other Revolving Lender or potential new Revolving Lender.

(h)    No amount of the Revolving Commitment of any Revolving Lender will be increased or otherwise affected by, and, except as otherwise expressly provided in this Section 2.13, performance by the Borrowers of their obligations under this Agreement and the other Loan Documents will not be excused or otherwise modified as a result of, any Funding Default or the operation of this Section 2.13. The rights and remedies against a Defaulting Lender under this Section 2.13 are in addition to other rights and remedies that the Borrowers may have against such Defaulting Lender with respect to

\39109424

any Funding Default and that the Agent or any Revolving Lender may have against such Defaulting Lender with respect to any Funding Default.

# ARTICLE 3
# PAYMENTS AND PREPAYMENTS ON THE TERM LOAN

3.1    **Scheduled Repayments**.

(a)    The aggregate principal amount of the Term Loan A shall be payable in consecutive monthly installments on the first Business Day of each month (each, a "**Repayment Date**"), commencing on the first Business Day of the month following the Initial Funding Date, each such installment to be in an amount as set forth in the table below:

| Payment Date | Monthly Payment Amount |
|---|---|
| From July 1, 2012 through June 1, 2013 | $15,000.00 |
| From July 1, 2013 through June 1, 2014 | $30,000.00 |
| From July 1, 2014 through June 1, 2015 | $35,000.00 |
| From July 1, 2015 through June 1, 2016 | $35,000.00 |
| From July 1, 2016 through June 1, 2017 | $35,000.00 |
| Maturity Date | The aggregate outstanding principal balance of the Term Loan A |

(b)    The aggregate principal amount of the Term Loan B shall be payable in consecutive monthly installments on each Repayment Date, commencing on the first Business Day of the month following the Term Loan B Funding Date, each such installment to be in the amount of $29,000.00.

(c)    To the extent not previously paid, the Term Loans shall be due and payable in full on the Maturity Date. All principal payments in respect of the Term Loans or any portion thereof shall be accompanied by accrued interest on the principal amount being repaid to the date of payment. No scheduled payment of principal in respect of the Term Loans shall be made to the extent that a lesser principal payment would result in the payment in full of the outstanding amount of the Term Loans, and such lesser amount is paid.

3.2    **Prepayment Upon an Event of Loss**. (a) Subject to the other terms of this Section 3.2, if any equipment, inventory, real property or other assets included in the Collateral is subject to an Event of Loss, then the Term Loans shall be repaid (1) with the insurance proceeds received with respect thereto (to the extent such proceeds are received by any Borrower, the Borrowers shall immediately, and in any event, within 3 days of receipt, turn such proceeds over to the Agent on behalf of the Term Lenders), and (2) from any award paid by the seizing Governmental Entity (to the extent such award is received by any Borrower, the Borrowers shall immediately, and in any event, within 3 days of receipt, turn such award over to the Agent on behalf of Term Lenders).

-32-

(b)    Subject to the approval of the Agent (which approval the Agent may not unreasonably withhold), the Agent will release, and the Borrowers may utilize all or a portion of any such insurance proceeds to replace the assets subject to an Event of Loss with substantially similar assets with a fair market value at least equal to the assets subject to that Event of Loss, subject also to satisfaction of the following conditions: (1) that no Event of Default is continuing; (2) that within 30 days of that Event of Loss, the Borrower Representative provides the Agent with notice that the Borrowers intend to replace the assets subject to that Event of Loss with qualified replacement assets; (3) that those replacement assets are subject to the first-priority Lien of the Agent; (4) that those replacement assets are delivered and in full working order at the Borrowers within 120 days of the date of that Event of Loss; and (5) that the Borrowers presents to the Agent invoices from third party non-Affiliates of the Borrowers equaling the amount of proceeds requested to be released by the Agent to the Borrowers under this Section 3.2.

3.3    **Mandatory Prepayments**. Concurrently with the receipt of Net Proceeds with respect to each Asset Sale, Issuance or Extraordinary Receipt by the Parent or any of its Subsidiaries, the Borrowers shall make a prepayment in respect of the Term Loans equal to 100% of the Net Proceeds of such Asset Sale, Issuance or Extraordinary Receipt, such prepayment to be applied in the manner set forth in Section 3.6. Notwithstanding anything contained in this Section 3.3 to the contrary, neither the Parent nor the Borrowers shall be required to make any mandatory prepayments pursuant to this Section 3.3 with respect to (a) any proceeds of an issuance of Equity Interests or Subordinated Debt, as applicable, used to repay the Trillium Seller Debt pursuant to the terms and conditions of Section 10.3, (b) any Cure Amounts received pursuant to the terms and conditions of Section 11.5 (which Cure Amounts shall be deposited into the Collection Account and used to reduce the Outstanding Balance of the Revolving Loan), (c) any proceeds of Parent Corporate Expense Debt, or (d) any other proceeds of an issuance of Equity Interests of the Parent, so long as no Event of Default is in existence at the time such proceeds are received.

3.4    **Excess Cash Flow**. Concurrently with each delivery of annual financial statements pursuant to clause (2) of Section 9.5, commencing with the delivery of such annual financial statements for the fiscal year ending December 31, 2013, the Borrowers shall make a prepayment in respect of the Term Loans equal to 50% of Excess Cash Flow of the Borrowers and their respective Subsidiaries for the immediately preceding fiscal year, calculated on a consolidated basis in accordance with GAAP, such prepayment to be applied in the manner set forth in Section 3.6.

3.5    **Voluntary Prepayments**. The Borrowers may prepay the outstanding principal amount of the Term Loans in whole or in part at any time and from time to time upon at least two weeks prior notice to the Agent, subject to payment of any fees required under Section 3.6.

3.6    **Application of Payments and Collections**. All mandatory and voluntary prepayments of the Term Loans under this Article 3 shall be applied to the unpaid principal installments with respect to the Term Loans (on a pro rata basis among all advances of the Term Loan A and the Term Loan B) in inverse order of maturity, and shall be accompanied by all accrued and unpaid interest on the portion of the Term Loan being prepaid to the date of prepayment, all costs associated with such prepayment, and, with respect to any prepayment made resulting from an Asset Sale pursuant to Section 3.3 or any prepayment made pursuant to Section 3.5, by the Early Termination Fee.

## ARTICLE 4
## SECURITY

4.1    **Grant of Security Interests**. As collateral security for (i) the Borrowers' obligations to pay the Lender Debt when due and payable and their indemnification obligations to the Lender Group hereunder and (ii) Parent's obligations pay the Guaranteed Obligations (as defined in the Parent

-33-

Guaranty) when due and payable and its indemnification obligations to the Lender Group hereunder, each Borrower and Parent hereby grant to the Agent for the benefit of the Lender Group a first-priority Lien (subject only to Permitted Liens) on and security interest in and right of set-off against all of the rights, title and interest of such Borrower (or Parent, as applicable) in and to all assets of such Borrower (or Parent, as applicable) whether now existing or hereafter acquired, and wherever located, including without limitation all of the following (together with all other collateral provided by the Loan Parties under the other Loan Documents as security for the Lender Debt, the "**Collateral**"):

    (1)    all Receivables, whether now owned or hereafter acquired;

    (2)    to the maximum extent permitted by law, all deposit accounts of the Parent or such Borrower, including, without limitation, each Lockbox and each Lockbox Account, and amounts held therein;

    (3)    all money and cash;

    (4)    all Records relating to items (1) through (3) above;

    (5)    all general intangibles (other than Receivables and rights under Contracts), including franchise rights, licenses, patents, patent applications, trade names and trademarks and Federal, state and local tax refund claims of all kinds;

    (6)    all goods, including without limitation all machinery, equipment, fixtures and all other tangible personal property, as well as all of such types of property leased and all rights and interests with respect thereto under such leases (including, without limitation, options to purchase), together with all present and future additions and accessions thereto, replacements therefor, component and auxiliary parts and supplies used or to be used in connection therewith, and all substitutes for any of the foregoing, and all manuals, drawings, instructions, warranties and rights with respect thereto;

    (7)    all inventory and documents of title relating thereto;

    (8)    all Contracts, to the extent not included in the definition of Receivables;

    (9)    all instruments, investment property, securities, security entitlements and securities accounts;

    (10)    all Equity Interests held by each Borrower and the Parent;

    (11)    all Records relating to items (5) through (10) above; and

    (12)    all proceeds of any kind or nature of the foregoing.

This Agreement will be deemed to be a security agreement within the meaning of the UCC.

    4.2    **Other Collateral**. In addition, the Borrowers' obligations to pay the Lender Debt when due and payable and their indemnification obligations to the Lender Group hereunder are also secured by each Pledge Agreement, the Parent Guaranty and the Parent's security interest grant in its Collateral as set forth above.

\39109424

4.3    **Certain Lien Priorities**. (a) Each Borrower, Parent, the Agent and each Lender acknowledges and agrees that the rights of the Revolving Lenders in the Revolving Loan Senior Collateral shall be senior to the rights of the Term Lenders therein and the rights of the Term Lenders in the Term Loan Senior Collateral shall be senior to the rights of the Revolving Lenders therein, as provided herein. Accordingly, each Borrower, Parent and each Lender acknowledges and agrees that because of, among other things, the Lenders' differing rights in the Collateral, the Revolving Lender Debt is fundamentally different from the Term Lender Debt and must be separately classified in any plan of reorganization proposed or adopted in any proceeding of the type described in clause (9) of Section 12.1.

(b)    Notwithstanding the date, order, or time of attachment, or the order, time, or manner of perfection, or the order or time of filing, registration, publication, or recordation of any document or instrument, or other method of perfecting a Lien in the Collateral, and notwithstanding any conflicting terms or conditions contained in any of the Loan Documents or any provisions of any applicable law, the Liens of Agent for the Revolving Lenders in the Revolving Loan Senior Collateral shall be deemed to be first, prior, and senior to the Liens of Agent for the benefit of the Term Lenders therein and the Liens of the Agent for the benefit of the Term Lenders in the Term Loan Senior Collateral shall be deemed to be first, prior, and senior to the Liens of the Agent for the benefit of the Revolving Lenders therein. Each Revolving Lender hereby subordinates the Liens for its benefit with respect to the Term Loan Senior Collateral to the Liens for the benefit of the Term Lenders therein, and each Term Lender hereby subordinates the Liens for its benefit with respect to the Revolving Loan Senior Collateral to the Liens for the benefit of the Revolving Lenders therein.

(c)    Each Revolving Lender hereby agrees that it shall not challenge, contest, or seek to avoid the rights possessed of or purported to be possessed of any Term Lender (or of the Agent for the benefit of any Term Lender) under this Agreement or any other Loan Document, including, without limitation, the Liens of the Agent for the benefit of the Term Lenders in the Term Loan Senior Collateral. Each Term Lender hereby agrees that it shall not challenge, contest, or seek to avoid the rights possessed of or purported to be possessed of any Revolving Lender (or of the Agent for the benefit of any Revolving Lender) under this Agreement or any other Loan Document, including, without limitation, the Liens of the Agent for the benefit of the Revolving Lenders in the Revolving Loan Senior Collateral.

(d)    The priorities of the Liens provided in this Section 4.3 or in Article 6 shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement, replacement, or refinancing of the Term Lender Debt or the Revolving Lender Debt or by any action or inaction that Agent or any Lender takes or fails to take in respect of the Collateral.

(e)    Each Term Loan Lender and Revolving Lender hereby: (1) agrees not to challenge the validity or amount of any claim or valuations submitted by any other Person party hereto in good faith in any Insolvency Proceeding; and (2) agrees not to vote in favor of any plan of reorganization whose confirmation would have the effect of modifying or abrogating any of the rights and interests of the Revolving Lenders in the Revolving Loan Senior Collateral or of the Term Lenders in the Term Loan Senior Collateral, as applicable, arising under this Agreement.

## ARTICLE 5
## PAYMENT MECHANICS

5.1    **Payment Mechanics**. (a) On or prior to the Closing Date, the Borrowers, the Agent, and each Lockbox Bank shall have entered into a Depositary Agreement and shall have caused the Lockbox Banks to establish the Lockboxes and the Lockbox Accounts.

\39109424

(b)    The Borrowers shall prepare, execute and deliver to (or, in the case of Notice to an Insurer, provide to the Agent for delivery to) each Obligor (or, in the case of a Governmental Entity, its fiscal intermediary) who is proposed to be a payor of Receivables, with copies to the Agent, on or prior to the Closing Date, a Notice, which Notice shall state the following: (1) in the case of any Notice to an Insurer, that all checks and EOBs from such Insurer on account of Receivables shall be sent to a designated Lender Lockbox and all wire transfers from such Insurer on account of Receivables shall be wired directly into a designated Lender Lockbox Account; and (2) in the case of any Notice to a Governmental Entity, that all checks and EOBs from such Governmental Entity on account of Receivables shall be sent to the applicable Borrower Lockbox and all wire transfers on account of Receivables shall be wired directly into the applicable Borrower Lockbox Account.

(c)    Each Borrower covenants and agrees that, on and after the Closing Date, all invoices (and, if provided by the Borrowers, return envelopes) to be sent to Obligors shall set forth the following: (1) in the case of Insurers, only the address of a designated Lender Lockbox as a return address for payment of Receivables by check and delivery of EOBs, and only a Lender Lockbox Account with respect to wire transfers for payment of Receivables; and (2) in the case of Governmental Entities, only the address of the designated Borrower Lockbox as a return address for payment of Receivables and delivery of EOBs, and only the designated Borrower Lockbox Account with respect to wire transfers for payment of Receivables. Each Borrower hereby further covenants and agrees to instruct and notify each of the members of its accounting and collections staff to provide identical information in communications with Obligors with respect to payment of Receivables, wire transfers and EOBs.

(d)    Each Borrower shall maintain each of its Borrower Lockbox Accounts solely and exclusively for the receipt of payments on account of Receivables from Governmental Entities. The Borrowers shall take all actions necessary to ensure that no payments from any Person other than a Governmental Entity are deposited in the Borrower Lockbox Accounts.

5.2    **Misdirected Payments; EOBs**. (a) In the event that any Borrower receives an EOB or a Misdirected Payment in the form of a check, such Borrower shall immediately send such EOB or check to the appropriate Lender Lockbox or Borrower Lockbox, as the case may be. In the event that any Borrower receives a Misdirected Payment in the form of cash or wire transfer, such Borrower shall immediately wire transfer the amount of such Misdirected Payment directly into the appropriate Lender Lockbox Account. All Misdirected Payments shall be sent promptly upon receipt thereof and in no event later than the close of business on the first Business Day after receipt thereof.

(b)    Each Borrower shall take such actions as are reasonably necessary or as are reasonably requested by the Agent to ensure that future payments from any Obligor of a Misdirected Payment shall be made in accordance with any Notice previously delivered to such Obligor or, in the case of any Person which is an Insurer and has not previously been sent a Notice, to a designated Lender Lockbox, in the case of checks and EOBs, or a designated Lender Lockbox Account, in the case of wire transfers, including, without limitation, (1) delivering to such Obligor a new Notice in form and substance satisfactory to the Agent, and (2) contacting such Obligor by telephone to convey new directions for payment or to confirm the instructions previously set forth in any Notice to such Obligor. If such Borrower does not promptly (and in any event, within two Business Days from the Agent's request) take such actions or such similar actions as the Agent may request, then the Agent, its assigns or designees, or any member of the Lender Group, may, to the maximum extent permitted by law, execute and deliver such Notices, contact such Obligors to convey such instructions or directions, or take such similar actions as the Agent, its assigns or designees or any member of the Lender Group may, in its discretion, deem appropriate.

\39109424

5.3     **No Rights of Withdrawal**. No Borrower shall have any rights of direction or withdrawal with respect to amounts held in the Lender Lockbox Accounts.

5.4     **Other Deposit Accounts**.  All deposit accounts of each Loan Party shall be subject to a Control Agreement, other than any Lockbox Account which shall be subject to an applicable Depositary Agreement pursuant to Section 5.1.

5.5     **Trillium Seller Account**.  The Loan Parties shall cause the Trillium Sellers to sweep from the Trillium Seller Account into a Lockbox Account on each Business Day after the Closing Date all amounts on deposit in the Trillium Seller Account, in accordance with the terms and conditions of a sweep agreement executed on or before the Closing Date among Merrill Lynch and the Trillium Sellers in form and substance satisfactory to Agent (the "**Trillium Sweep Agreement**").  The Loan Parties shall cause all Obligors of the Trillium Sellers that pay into the Trillium Seller Account to pay into a Lockbox Account on or before December 31, 2012.

## ARTICLE 6
## COLLECTION AND DISTRIBUTION

6.1     **Collections on the Receivables; Distributions**.  The Agent, for the account of the Lenders, may (1) receive and hold as collateral all Receivables, deposits, and all Collections on Receivables in accordance with the terms of the Depositary Agreements; and (2) have and exercise any and all rights, to the extent permitted by, and in a manner consistent with, all applicable laws and regulations, to collect, record, track and, during the continuance of an Event of Default, take all actions to obtain Collections with respect to all Receivables. Each Borrower hereby consents to the distribution by the Agent of all Collections and proceeds of Collateral in accordance with this Article 6 and hereby authorizes and directs the Agent to distribute all Collections and proceeds of Collateral in accordance with this Article 6.

6.2     **Distribution of Funds to the Revolving Lenders**.  On each Business Day (provided, with respect to distributions made prior to the Maturity Date and so long as no Event of Default exists, that the Borrowers shall have successfully sent by Transmission to the Agent all Receivable Information required with respect to the Receivables), the Agent shall distribute any and all cash Collections in the Collection Account (provided, with respect to distributions made prior to the Maturity Date and so long as no Event of Default exists, that such Collections were deposited in the Collection Account prior to noon (New York City time) on the immediately preceding Business Day), and all other proceeds or other amounts with respect to the Revolving Loan Senior Collateral, including amounts distributed by the Term Lenders to the Agent pursuant to the turnover provision of Section 6.4 with respect to the Revolving Loan Senior Collateral and item SIXTH of Section 6.3 (subject in full to the absolute, senior and prior rights of the Term Lenders with respect to the Term Loan Senior Collateral, the proceeds of which the Agent hereby agrees to first turnover to the Term Lenders for distribution against the Term Loan Debt in accordance with Section 6.4), as follows:

(1)     FIRST, to the Agent, an amount in cash equal to expenses incurred with respect to the administration, service and maintenance of the Agent's Lien on the Revolving Loan Senior Collateral and all fees and collection costs that are due and payable, if any, as set forth in Sections 2.9 and 14.5, until such amounts have been paid in full;

(2)     SECOND, to the Agent, an amount in cash equal to the principal amount of the Protective Advances then outstanding, if any, until such amount has been paid in full;

(3)    THIRD, to the Agent, for the account of the Revolving Lenders, an amount in cash equal to fees, interest and expenses that are due and payable to the Revolving Lenders as of such Business Day and have not otherwise been paid in full by the Borrowers, if any, until such amounts have been paid in full;

(4)    FOURTH, to the Agent, for the account of the Revolving Lenders, an amount in cash equal to the principal amount of the Revolving Loan, until such amount has been paid in full;

(5)    FIFTH, to the Agent, for the account of the Agent or any applicable Revolving Lenders, an amount in cash equal to the aggregate amount of any other Revolving Lender Debt due and payable on such Business Day, if any, until such amount has been paid in full;

(6)    SIXTH, to the Agent to be applied to any Term Lender Debt then due and payable, in accordance with Section 6.3; and

(7)    SEVENTH, to the Borrowers, all remaining amounts of Collections, as requested.

6.3    **Distribution of Funds to the Term Lenders**. Subject to the other provisions of this Article 6, on each Business Day, all proceeds, payments and other amounts received by the Term Lenders hereunder, including with respect to the Term Loan Senior Collateral, including amounts distributed by the Agent pursuant to the turnover provision of Section 6.4 with respect to the Term Loan Senior Collateral and item SIXTH of Section 6.2 (subject in full to the absolute, senior and prior rights of the Revolving Lenders with respect to the Revolving Loan Senior Collateral, the proceeds of which the Term Lenders hereby agree to first turnover to the Agent for distribution against the Revolving Lender Debt in accordance with Section 6.2), shall be applied as follows (on a pro rata basis among all advances of the Term Loan A and the Term Loan B):

(1)    FIRST, to the Agent, an amount in cash equal to expenses incurred with respect to the administration, service and maintenance of the Lien in the Term Loan Senior Collateral and all accrued fees and collection costs, if any, as set forth in Sections 2.9 and 14.5, until such amounts have been paid in full;

(2)    SECOND, to the Agent, an amount in cash equal to the principal amount of the Protective Advances then outstanding, if any, until such amount has been paid in full;

(3)    THIRD, to the Term Lenders, an amount in cash equal to fees, interest and expenses that are due and payable to the Term Lenders as of such Business Day and have not otherwise been paid in full by the Borrowers, if any, until such amounts have been paid in full;

(4)    FOURTH, to the Term Lenders, an amount in cash equal to the principal amount of the Term Loans due and payable on such Business Day, if any, until such amount has been paid in full;

(5)    FIFTH, to the Term Lenders, an amount in cash equal to the aggregate amount of any other Term Lender Debt due and payable on such Business Day, if any, until such amount has been paid in full;

(6)    SIXTH, to the Agent to be applied to any Revolving Lender Debt then outstanding, in accordance with Section 6.2; and

(7)    SEVENTH, to the Borrowers, all remaining amounts.

\39109424

6.4    **Distribution Protocols Between the Agent and the Lenders**. The Borrowers, Parent, the Agent and the Lenders intend the distribution provisions set forth in this Article 6 to be consistent in all respects with the priorities and other terms set forth in Section 4.3. If any term of this Article 6 is inconsistent with any term of Section 4.3, the terms of Section 4.3 shall prevail. In furtherance thereof, the parties hereto agree that:

(1)    funds that the Term Lenders receive that are clearly identified as Collections or proceeds with respect to Revolving Loan Senior Collateral shall not be distributed in accordance with the provisions of Section 6.3 and shall promptly be turned over to the Agent for distribution in accordance with the provisions of Section 6.2; and

(2)    funds that the Agent or any Revolving Lender receives that are clearly identified as proceeds with respect to Term Loan Senior Collateral shall not be distributed in accordance with the provisions of Sections 6.2 and shall promptly be turned over to the Term Lenders for distribution in accordance with the provisions of Section 6.3.

6.5    **Servicing Receivables**. (a) Subject to the review and authority of the Agent, the Borrowers shall administer and service the Receivables (1) in compliance in all material respects at all times with all legal requirements and the terms and conditions of this Agreement, (2) in accordance with industry standards for servicing receivables of the type included in the Collateral to the extent that such standards do not conflict with the terms and conditions of this Agreement, (3) in a manner consistent in all respects with the Credit and Collection Policy, and (4) until such time as a successor servicer shall be designated and shall accept appointment pursuant to this Section. The Borrowers shall establish and maintain electronic data processing services for monitoring, administering, and collecting the Receivables in accordance with the foregoing standards and shall, within three Business Days of the deposit of any checks, other forms of cash deposits, EOBs, or other written matter into a Lockbox, post such information to its electronic data processing services.

(b)    The Borrowers shall not change in any material respect their existing policies and procedures with respect to the administration and servicing of accounts receivable (including, without limitation, the amount and timing of write-offs) without the prior written consent of the Agent.

(c)    If the Borrowers determine that a payment with respect to a Receivable has been received directly by a patient or any other Person, the Borrowers shall promptly advise the Agent, and demand that such patient or other Person remit and return such funds. If such funds are not promptly received by the Borrowers, the Borrowers shall take all reasonable steps to obtain such funds.

(d)    Upon the occurrence and during the continuance of an Event of Default, (1) the Agent may terminate the Borrowers' performance of servicing responsibilities with respect to the Receivables and appoint another Person to succeed the Borrowers in the performance of such servicing responsibilities (which replacement may be effectuated through the outplacement to a third-party collection firm obligated to use commercially reasonable efforts to maximize collections in accordance with the provisions of Article 9 of the UCC), in which event the Borrowers shall immediately transfer to any successor servicer designated by the Agent all records, computer access and other information as shall be necessary or desirable, in the judgment of any such successor servicer, to perform such responsibilities; and (2) at the Required Revolving Lenders' request, all enforcement and collection proceedings with respect to the Receivables shall, unless prohibited by applicable law, be instituted and prosecuted in the name of the Agent. The Borrowers shall otherwise cooperate fully with such successor servicer.

\39109424

(e)    The members of the Lender Group and the Borrowers shall comply with the requirements of the Business Associate Agreement.

6.6    **Distributions Generally.** (a) All remaining amounts of the Collections pursuant to Article 6 as requested by Borrowers shall be deposited in the Borrower Account.

(b)    Distributions to Lenders under this Article 6 shall be made in accordance with their respective Pro Rata Shares, subject to Section 6.6(c) below.

(c)    Notwithstanding anything to the contrary contained herein but subject to the other provisions of this Section 6.6(c), each Lender agrees that any amount of principal, interest, fees, or other amounts received by the Agent for the account of a Defaulting Lender shall be applied by the Agent as follows:

(1)    FIRST, to the payment of any amounts owing by such Defaulting Lender to the Agent hereunder;

(2)    SECOND, as the Borrower Representative may request (so long as no Default or Event of Default exists), to the funding of any Revolving Advance in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Agent;

(3)    THIRD, if so determined by the Agent and the Borrower Representative, to be held in a deposit account and released in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Advances under this Agreement;

(4)    FOURTH, to the payment of any amounts owing to the Revolving Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Revolving Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement;

(5)    FIFTH, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and

(6)    SIXTH, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction.

If (x) any such payment is a payment of the principal amount of any Revolving Advances in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Revolving Advances were made at a time when the conditions set forth in Section 7.2 were satisfied or waived, such payment shall be applied solely to pay the Revolving Advances of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Revolving Advances of such Defaulting Lender until such time as all Revolving Advances are held by the Revolving Lenders in accordance with their Pro Rata Shares. Any payments, prepayments, or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

## ARTICLE 7
## CONDITIONS PRECEDENT

7.1    **Conditions Precedent to Closing**. The obligation of each Lender to make the initial Revolving Advance and the Term Loan A on the Initial Funding Date is subject to satisfaction of the following conditions precedent:

(1)    that the Agent has received (A) payment of the fees due and payable to the Agent under the Agent Fee Letter and (B) payment of closing costs and expenses, including attorneys' fees;

(2)    that the Agent has received evidence satisfactory to the Agent (A) that no material litigation has been initiated or is ongoing involving any Loan Party or any of its Subsidiaries or shareholders, whether relating to this Agreement or the transactions contemplated hereby or otherwise, and (B) that no judgment, order, injunction, or other similar restraint prohibiting any of the transactions contemplated hereby has been issued or is in effect;

(3)    that the Agent has received evidence satisfactory to the Agent that the Parent, each Borrower and each of their Subsidiaries is in compliance with all applicable laws and regulations, and has obtained all licenses, consents and approvals necessary to operate its respective business and shall have obtained all material and appropriate approvals pertaining to all applicable governmental, ERISA, retiree health benefits, workers' compensation, and other requirements, regulations, and laws, including without limitation Environmental Laws;

(4)    that the Agent has received executed originals of this Agreement and the other Loan Documents, and originals or copies (as specified by the Agent) of all of the other documents listed on the Closing Document Checklist attached hereto as Exhibit VI;

(5)    **[Reserved]**;

(6)    that the Agent has received file-stamped copies of UCC financing statements filed in each jurisdiction as may be necessary or appropriate or, in the opinion of the Agent, desirable to perfect the Liens created, or purported to be created, by this Agreement;

(7)    that the Agent shall have received evidence satisfactory to it that Parent shall have completed (or concurrently with the initial credit extension hereunder will complete) the Trillium Acquisition pursuant to the terms and conditions of the Trillium Acquisition Agreement, which agreement and all schedules, ancillary agreements and documents related thereto or executed in connection therewith (including without limitation a transitional services agreement for billing and collection services) shall be in form and substance satisfactory to Agent in its reasonable discretion;

(8)    that the Agent has received evidence satisfactory to the Agent that the ratio of Senior Funded Debt to EBITDA as of April 30, 2012 (calculated on a trailing twelve month basis) of the Parent and its Subsidiaries, on a consolidated basis, does not exceed 1.75 to 1.0;

(9)    that the Agent has received evidence satisfactory to the Agent that the EBITDAR (less the EBITDA Addbacks) as of April 30, 2012 (calculated on a trailing twelve month basis) of the Parent and its Subsidiaries, on a consolidated basis, shall not be less than $3,500,000;

(10)    that the Agent has received evidence satisfactory to the Agent that (a) the Net Availability (as set forth in a Borrowing Base Report or as otherwise determined by the Agent) is no less than $2,000,000 on the Borrowing Base on the Closing Date, and (b) the aggregate amount of cash on

-41-

hand in operating deposit accounts of the Loan Parties, plus the positive difference, if any, between (i) the Adjusted Borrowing Limit and (ii) the sum of the then Outstanding Balance of the Revolving Loan, shall not be less than $2,500,000; and

(11)    that the Agent has received on-line and real-time access to the operating deposit accounts of the Loan Parties and the Trillium Seller Account.

7.2    **Conditions Precedent to all Funding Dates**. The making of (i) a Revolving Advance on a Funding Date (including the initial Revolving Advance on the Initial Funding Date), (ii) the Term Loan A on the Initial Funding Date and (iii) the Term Loan B on the Term Loan B Funding Date, in each case, will be subject to satisfaction of the following conditions precedent:

(1)    that, with respect to Revolving Advances only, at least one Business Day prior to the applicable Funding Date, the Borrowers shall have delivered to the Agent a Borrowing Base Report and such other information as requested by the Agent, in form and substance satisfactory to the Agent; and

(2)    that on that Funding Date the following statements are true and correct (and acceptance of the proceeds of the applicable Revolving Advance, the advance of the Term Loan A or the advance of the Term Loan B, as applicable, will be deemed a representation and warranty by each Borrower that those statements are then true and correct):

(A)    that the representations and warranties contained in Article 8 hereof and Exhibit I hereto are true and correct in all material respects on and as of the date of such Revolving Advance, Term Loan A advance or Term Loan B advance, as applicable, as though made on and as of such date (except any representation or warranty that (i) expressly indicates that it is being made as of a specified date, in which case each such representation or warranty is true and correct as of that specified date and (ii) contains a materiality qualifier, in which case such representation or warranty is true and correct in all respects);

(B)    that no event has occurred and is continuing, or would result from such Revolving Advance, Term Loan A advance or Term Loan B advance, as applicable, or any actions connected therewith, that constitutes a Default or an Event of Default; and

(C)    that after giving effect to the making of any such Revolving Advance, Term Loan A advance or Term Loan B advance, as applicable, on such Funding Date, the sum of (i) the aggregate amount of cash on hand in operating deposit accounts of the Borrowers that are being monitored by the Agent on-line and in real-time, plus (ii) the positive difference, if any, between (A) the Adjusted Borrowing Limit and (B) the sum of the then Outstanding Balance of the Revolving Loan, is not less than the amount set forth in Section 11.1 and the ratio of the Borrowers' Senior Funded Debt to EBITDA shall not exceed the ratio set forth in Section 11.3 for the most recent month end.

7.3    **Conditions Precedent to the Term Loan B**. In addition to the satisfaction of the conditions precedent in Section 7.2 above, the making of the Term Loan B on the Term Loan B Funding Date, will be subject to satisfaction of the following conditions precedent:

(1)    that on the Term Loan B Funding Date and after giving effect to the making of the Term Loan B, the Loan Parties have delivered evidence satisfactory to the Agent demonstrating that each of the

-42-

following statements are true and correct (and the advance of the Term Loan B will be deemed a representation and warranty by each Borrower that those statements are then true and correct):

(A)    the sum of (1) the aggregate amount of cash on hand in operating deposit accounts of the Borrowers and the Parent that are being monitored by the Agent on-line and in real-time, plus (2) the positive difference, if any, between (A) the Adjusted Borrowing Limit and (B) the sum of the then Outstanding Balance of the Revolving Loan, shall not be less than $2,500,000;

(B)    the ratio of Senior Funded Debt to EBITDA (but not including any EBITDA Addbacks) of the Borrowers and their Subsidiaries, on a consolidated basis, and calculated on a trailing twelve month basis (or on an annualized basis, if less than 12 consecutive Monthly Reports have been delivered since the Closing Date in accordance with Section 9.5(a)) shall not exceed 2.25:1.00, provided that no more than 4 of such Monthly Reports may reflect internal unaudited results; and

(C)    the Loan Parties shall be in compliance on a pro forma basis with the financial covenants set forth in Sections 11.2 and 11.4.

(2)    The Agent shall have received such other approvals, opinions or documents as it may reasonably request.

# ARTICLE 8
## REPRESENTATIONS AND WARRANTIES

Parent and each Borrower hereby makes, and will be deemed to have made, on the Closing Date (and after giving effect to the consummation of the Trillium Acquisition), on the Initial Funding Date, on each subsequent Funding Date, and upon delivery of each Borrowing Base Report, the following representations and warranties to the Agent and each Lender:

8.1    **Organization; Good Standing and Qualification**. Each Loan Party is duly formed and organized, validly existing and in good standing under the laws of the state of its organization (as indicated on Schedule II hereto) and is duly qualified to do business, and is in good standing, in every jurisdiction where the nature of its business requires it to be so qualified, except where such failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect.

8.2    **Authority; No Conflict**. The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party and any other documents to be delivered by it thereunder (1) are within its corporate powers; (2) have been duly authorized by all necessary corporate, limited liability company or partnership action, as applicable; (3) do not contravene (A) its organizational documents, (B) any law, rule, or regulation applicable to it in any material respect (including, without limitation, laws, rules and regulations relating to usury, truth in lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices, licensing, and privacy), (C) any contractual restriction binding on or affecting it or its Property, or (D) any order, writ, judgment, award, injunction or decree binding on or affecting it or its Property; (4) do not result in or require the creation of any Lien upon or with respect to any of its Properties, other than the security interests created by this Agreement and the other Loan Documents; and (5) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or non-renewal of any permit, license, authorization or approval applicable to its operations or any of its Properties.

-43-

8.3    **Compliance with Certain Material Agreements.** No Loan Party is in violation of any material term of any material agreement or instrument binding on or otherwise affecting it or any of its Properties.

8.4    **Burdensome Agreements.** No Loan Party (1) is a party or subject to any contract, agreement, or restriction under its organizational documents that could reasonably be expected to have a Material Adverse Effect or (2) is a party or subject to any contract or agreement (other than this Agreement and the other Loan Documents and its organizational documents) that conditions or restricts the right of that Loan Party to incur or repay Debt, to grant Liens on any assets, to declare or make Distributions, or to modify, extend, or renew any agreement evidencing any Debt.

8.5    **Certain Fees.** Except for the fee that will be payable to Cokers Capital Advisors LLC in an amount not to exceed $760,000 (the "Coker Broker Fee"), no investment banking, brokerage, finders' or similar fees are payable to any Person (other than to the Agent under the Loan Documents in connection with the execution, delivery and performance of this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby).

8.6    **Valid and Binding Obligation; Enforceability.** Each of the Loan Documents to which any Loan Party is a party constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as limited by bankruptcy, insolvency, moratorium, fraudulent conveyance or other laws relating to the enforcement of creditors' rights generally and general principles of equity (regardless of whether enforcement is sought at equity or law);

8.7    **Permits, Licenses, and Other Approvals.** Each Loan Party has all power and authority, and has all permits, licenses, accreditations, certifications, authorizations, approvals, consents and agreements of all Obligors, Governmental Entities, accreditation agencies and other Persons (including, without limitation, (1) accreditation by the appropriate Governmental Entities and industry accreditation agencies, (2) accreditation and certifications as a provider of healthcare services eligible to receive payment and compensation and to participate under Medicare, Medicaid, TRICARE/CHAMPUS, Blue Cross/Blue Shield and other equivalent programs, and (3) valid provider identification numbers and licenses to generate the Receivables) necessary or required for it (A) to own the assets (including Receivables) that it now owns, (B) to carry on its business as now conducted, (C) to execute, deliver and perform the Loan Documents to which it is a party, and (D) if applicable, to receive payments from the Obligors in the manner contemplated in this Agreement and the other Loan Documents.

8.8    **Healthcare Laws.** Each Loan Party has maintained all records required to be maintained by the Joint Commission on Accreditation of Healthcare Organizations, the Food and Drug Administration, the Drug Enforcement Agency, the State Boards of Pharmacy, and the federal and state Medicare and Medicaid programs as required by Healthcare Laws, and that, to the best knowledge of each Loan Party, there are no presently existing circumstances which likely would result in material violations of any Healthcare Laws.

8.9    **Liability Event.** There is no Liability Event.

8.10    **Certain Reports; Claims; Reviews.** Without limiting or being limited by any other provision of any Loan Document, each Loan Party has timely filed or caused to be filed all material cost and other reports of every kind required by law, agreement or otherwise. There are no material claims, actions or appeals pending before any commission, board or agency or other Governmental Entity, including, without limitation, any intermediary or carrier, the Provider Reimbursement Review Board, or the administrator of CMS, with respect to any material state or federal Medicare or Medicaid cost reports or material claims filed by any Loan Party (and, as of the Closing Date, any Trillium Seller), or any

-44-

disallowance by any commission, board or agency or other Governmental Entity in connection with any audit of such cost reports. No validation review or program integrity review related to any Loan Party, the consummation of the transactions contemplated by this Agreement or the Trillium Acquisition Agreement, or the Collateral have been conducted by any commission, board, or agency or other Governmental Entity in connection with the Medicare or Medicaid programs, and, to the knowledge of each Loan Party, no such reviews are scheduled, pending, or threatened against or affecting any of the providers, any of the Collateral or the consummation of the transactions contemplated by this Agreement.

8.11    **Rescission and Renewal of Permits, Licenses, and Other Approvals**. Except as disclosed on Schedule II hereto, no Loan Party (and, as of the Closing Date, no Trillium Seller) has been notified by any Governmental Entity, accreditation agency or any other Person, during the immediately preceding 24-month period, that such Person has rescinded or not renewed, or is reasonably likely to rescind or not renew, any permit, license, accreditation, certification, authorization, approval, consent or agreement granted to it or to which it is a party and no other condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non renewal of any permit, license, authorization, approval, entitlement or accreditation, and to the best of each Borrower's knowledge, there is no claim that any thereof is not in full force and effect.

8.12    **Subsidiaries; Capitalization**. Schedule II sets forth the full and complete organizational structure of Parent, each Borrower and their Subsidiaries as of the Closing Date, including the names of all equityholders, the nature and terms of each equity interest, and the capital account or number of shares of each equityholder. All of the issued and outstanding Equity Interests in Parent, each Borrower and each of their Subsidiaries have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights, except as set forth in its organizational documents as in existence on the Closing Date. Except as indicated on Schedule II, all such Equity Interests are owned by the holder thereof free and clear of all Liens other than Permitted Liens. Except as set forth on Schedule II, there are no outstanding Debt or equity securities of Parent, any Borrower or any of their Subsidiaries and no outstanding obligations of Parent, any Borrower or any of their Subsidiaries convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from Parent, any Borrower or any of their Subsidiaries, or other obligations of Parent, any Borrower or any of their Subsidiaries to issue, directly or indirectly, any Equity Interests. The Parent and Borrowers have no Subsidiaries, other than as listed on Schedule II hereto.

8.13    **Real Property**. Schedule II contains a correct and complete list (indicating the location of such real property by street address and state) of all real property owned or leased by each Loan Party.

8.14    **Conditions Precedent**. As of the Closing Date, all conditions precedent set forth in Article 7 have been fulfilled or waived in writing by the Agent, and as of each Funding Date, all conditions precedent set forth in Section 7.2 shall have been fulfilled or waived in writing by the Agent.

8.15    **Financial Statements and Other Information**. All of the financial statements of the Trillium Sellers and the Parent and its Subsidiaries which have been furnished to the Agent, fairly present the consolidated and consolidating financial condition of the Trillium Sellers or the Parent and its Subsidiaries, as applicable, as of the dates referred to therein and the results of the operations of the Trillium Sellers or the Parent and its Subsidiaries, as applicable, for the periods ended on such dates, all in accordance with GAAP, and since December 31, 2011, there has been no change which has had or resulted in, or is reasonably likely to have or result in, a Material Adverse Effect. All information provided in the application for the financing effectuated by this Agreement, and each other document, report and Transmission provided by or on behalf of any Loan Party to the Lender Group is or shall be true and accurate in all material respects as of its date and as of the date so furnished; provided that, with

-45-

respect to projected financial information, each Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time. Each Loan Party has disclosed to the Agent all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect, and, as of the Closing Date, there exists no contingent liability or other fact or circumstance that could reasonably be expected to have or result in a Material Adverse Effect which has not been set forth on Schedule II hereto.

8.16    **Litigation**. Except as disclosed on Schedule II hereto, there is no pending or, to its knowledge, threatened action or proceeding or investigation, injunction, writ or order affecting any Loan Party (and, as of the Closing Date, any Trillium Seller) before or by any court, Governmental Entity or arbitrator which could reasonably be expected to having or result in a Material Adverse Effect or which purports to affect the legality, validity or enforceability of this Agreement or any other Loan Document, and none of the Parent, the Borrowers nor any of their Subsidiaries is currently the subject of, nor does any of such Persons have any present intention of commencing or filing, an insolvency proceeding or petition in bankruptcy.

8.17    **Ownership of Collateral; Liens**. Each Loan Party is the legal and beneficial owner of the Collateral and upon the execution of the Loan Documents and the filing of the UCC financing statements with respect thereto the Agent will hold a valid, perfected and continuing first-priority Lien in the Collateral as security for the Lender Debt, free and clear of any Lien (including any Lien in favor of the Internal Revenue Service, any Employee Benefit Plan, any Multiemployer Plan or the PBGC) other than Permitted Liens. No effective financing statement or other instrument similar in effect covering the Receivables is on file in any recording office other than those in favor of the Agent relating to this Agreement, and no competing notice or notice inconsistent with the transactions contemplated in this Agreement has been sent to any Obligor.

8.18    **Locations**. Each Borrower's exact name, principal place of business and chief executive office, and the office where it keeps its data, books, and records concerning the Receivables and other Collateral, and where Receivables and payments thereon are processed, are located at the addresses referred to on Schedule I hereto and, as of the Closing Date, except as disclosed on Schedule II hereto, there have been no other such locations for the four immediately prior months. Except as disclosed on Schedule II hereto, it has not changed its principal place of business or chief executive office in the last five years. Except as disclosed on Schedule II hereto, it has not used and does not now use any fictitious or trade name during the five years immediately prior to the date of this Agreement and, as of the Closing Date, it has not changed its name in the last 24 months.

8.19    **Notices**. All required Notices have been prepared and delivered to each of the Borrowers' Obligors, and all invoices now bear only the appropriate remittance instructions for payment direction to the Lockboxes or the Lockbox Accounts, as the case may be.

8.20    **Taxes**. The Parent and Borrowers have filed on a timely basis all tax returns (federal, state, and local) required to be filed and has paid, or made adequate provision for payment of, all taxes, assessments and other governmental charges due from it. No tax Lien has been filed and is now effective against it or any of their respective Properties except any Lien in respect of taxes and other charges not yet due or contested in good faith by appropriate proceedings. To its best knowledge, and except as disclosed on Schedule II hereto, there is no pending investigation by any taxing authority or any pending but unassessed tax liability relating to it.

8.21    **Solvency**. Both before and after giving effect to the transactions contemplated by this Agreement, each Loan Party (1) was and is solvent; (2) had not and has not incurred debts or liabilities

\39109424

beyond its ability to pay; and (3) had and will have an adequate amount of capital to conduct its business in the foreseeable future; the transactions contemplated hereunder and under the other Loan Documents, including the granting of Liens on the Collateral, are made by each Loan Party in good faith and without intent to hinder, delay or defraud any of its present or future creditors.

8.22    **Lockboxes and Lockbox Accounts**. Each Borrower maintains only the Borrower Lockboxes and only the Borrower Lockbox Accounts described on Schedule III hereto for Receivables the Obligors with respect to which are Governmental Entities. The Lender Lockbox is the only post office box and the Lender Lockbox Account is the only lockbox account maintained for Receivables, the Obligors with respect to which are not Governmental Entities. No direction is in effect directing Obligors to remit payments on Receivables other than to the applicable Lockbox and Lockbox Account, each as described on Schedule III.

8.23    **ERISA Matters**. (a) With respect to each of the Employee Benefit Plans, and, to the knowledge of the Loan Parties, each of the Multiemployer Plans, each Employee Benefit Plan and each Multiemployer Plan has complied with and been administered in accordance with its terms and is in compliance in all material respects with all applicable laws including ERISA and the IRC, except for such non-compliances as could not reasonably be expected to result in a Material Adverse Effect. No Loan Party nor any ERISA Affiliate has been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or has been terminated, within the meaning of Title IV of ERISA; and no Loan Party nor any ERISA Affiliate has any material unpaid liability for any Employee Benefit Plan or Multiemployer Plan. Schedule II separately identifies as of the date hereof (1) all Plans, all Multiemployer Plans and all Employee Benefit Plans and (2) all material consulting agreements, executive employment agreements, executive compensation plans, deferred compensation agreements, employee stock purchase and stock option plans and severance plans of each Loan Party.

(b)    Each Plan that is intended to be a qualified plan under Section 401(1) of the IRC has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(1) of the IRC and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(1) of the IRC, or an application for such a letter is currently being processed by the Internal Revenue Service. To the best knowledge of the Parent, each Borrower, and each ERISA Affiliate nothing has occurred that would prevent or cause the loss of such tax-qualified status. Except to the extent set forth on Schedule II, no Loan Party or ERISA Affiliate would have any Withdrawal Liability as a result of a complete withdrawal as of the date hereof from any Multiemployer Plan.

(c)    No ERISA Event has occurred, and none of the Parent, the Borrowers, and the ERISA Affiliates is aware of any fact, event, or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Plan. The Parent, the Borrowers, and each ERISA Affiliate have met all applicable requirements under the Pension Funding Rules with respect to each Plan, and no waiver under the Pension Funding Rules has been applied for or obtained. As of the most recent valuation date for each Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the IRC) is 60% or higher, and none of the Parent, the Borrowers, and the ERISA Affiliates knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage of any such Plan to drop below 60% as of the most recent valuation date. None of the Parent, the Borrowers, and the ERISA Affiliates has incurred any liability to the PBGC other than for the payment of premiums, and there are no premiums that have become due that are unpaid. None of the Parent, the Borrowers, and the ERISA Affiliates has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA. No Plan has been terminated by the administrator thereof or by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan.

-47-

(d)　　There are no pending actions, claims or lawsuits that have been asserted or instituted against any of the Employee Benefit Plans, the assets of any of the trusts under such plans, the plan sponsor, the plan administrator or any fiduciary of any such plan (other than routine benefit claims), and, to the knowledge of each Loan Party and all ERISA Affiliates, there are no facts which could form the basis for any such action, claim or lawsuit. There are no investigations or audits by any Governmental Entity of any of the Employee Benefit Plans, any trusts under such plans, the plan sponsor, the plan administrator or any fiduciary of any such plan that have been instituted or threatened, and, to the knowledge of each Loan Party and all ERISA Affiliates, there are no facts that could form the basis for any such investigation or audit.

(e)　　None of the Parent, the Borrowers, and the ERISA Affiliates maintains or contributes to, or has any unsatisfied obligation to contribute to, or liability under, any active or terminated Plan.

8.24　**Patient Consent Forms**. Only patient consent forms for which favorable opinions of counsel have been received and in compliance with all applicable laws, rules and regulations are being obtained from each patient and customer receiving services or products.

8.25　**Supplements to Schedules**. Should any of the information or disclosures provided on any of the Schedules originally attached hereto become outdated or incorrect in any material respect, the Borrower Representative shall deliver to Agent within thirty (30) days after the end of the month in which such change occurs, along with a compliance certificate, such revisions or updates to such Schedule(s) as may be necessary or appropriate to update or correct such Schedule(s); provided that no such revisions or updates to any Schedule(s) shall be deemed to have cured any breach of warranty or representation resulting from the inaccuracy or incompleteness of any such Schedule(s), unless and until Agent, in the exercise of its reasonable discretion, shall have accepted in writing such revisions or updates to such Schedule(s).

## ARTICLE 9
## AFFIRMATIVE COVENANTS

Until the Full Payment of all Lender Debt and the termination of the Total Revolving Commitment hereunder, the Parent and each Borrower agrees to perform and cause each of the other Loan Parties to perform all covenants in this Article 9.

9.1　**Compliance with Laws**. The Parent, each Borrower and each of their Subsidiaries shall comply in all material respects with all applicable laws (including, without limitation, all applicable Healthcare Laws and Environmental Laws), rules, regulations and orders. The Parent and each Borrower shall obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations which are necessary or useful in the proper conduct of its business. Each Borrower shall timely file all Medicaid and Medicare cost reports.

9.2　**Offices, Records and Books of Account, Names**. Each Loan Party shall keep its principal place of business and chief executive office and the offices where it keeps its records concerning the Collateral at its address set forth on Schedule I or, upon 30 days' prior notice to the Agent, at any other locations in jurisdictions where all actions reasonably requested by the Agent or otherwise necessary to protect, maintain and perfect the Agent's Lien on the Collateral have been taken and completed. Each Loan Party shall maintain proper books and accounts in which full, true and correct entries in conformity with GAAP are made of all dealings and transactions in relation to its business and activities and shall not make any notation on its books and records, including any computer files, that is

-48-

inconsistent with the assignment of the Collateral to the Agent as collateral security. Each Loan Party shall maintain and implement administrative and operating procedures (including, without limitation, an ability to recreate records evidencing Receivables and related contracts and pertinent documentation with respect to all other Collateral in the event of the destruction of the originals thereof), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for collecting all Receivables (including, without limitation, records adequate to permit the daily identification of each Receivable and all Collections of and adjustments to each existing Receivable) and for providing the Receivable Information. Each Loan Party shall keep its exact legal name as set forth on Schedule I hereto and will not change its name without providing 30 days' prior notice to the Agent and taking and completing all actions reasonably requested by the Agent or otherwise necessary to protect, maintain and perfect the Agent's Lien on the Collateral.

9.3     **Performance and Compliance with Contracts and Credit and Collection Policy**. Each Loan Party shall, at its expense, timely and fully perform and comply with all material provisions, covenants and other promises required to be observed by it under all contracts related to the Receivables and other Collateral. Each Loan Party shall timely and fully comply in all material respects with the Credit and Collection Policy in regard to the Collateral, including each Receivable and the related contract, and it shall maintain, at its expense, in full operation each of the bank accounts and lockboxes required to be maintained under this Agreement. Each Loan Party shall do nothing, nor suffer or permit any other Person, to impede or interfere with the collection by the Agent, or any other Person designated by the Agent or on its behalf, of the Collateral, including the Receivables. Parent will ensure that all material contracts or agreements relating to the operation of the Borrowers permit the Borrowers to perform the obligations and exercise the rights under such contracts or agreements; provided, however, that the Parent may enter into such contracts or agreements that do not satisfy such requirements on and after the date on which the Agent obtains a Pledge Agreement from the shareholder(s) of the Parent pledging 100% of the Equity Interests of the Parent.

9.4     **Audits; Appraisals**. Each Loan Party shall, at any time and from time to time during regular business hours as requested by the Agent, permit the Agent (who may be accompanied by any members of the Lender Group) or its representatives, upon reasonable notice or during the continuance of any Event of Default without notice, and subject to compliance with applicable law in the case of review of patient/customer information, to do any of the following: (1) on a confidential basis, examine and make copies of and abstracts from all books, records and documents (including, without limitation, computer tapes and disks) in such Loan Party's possession or under its control relating to the Collateral and the financial condition and operations of the Borrowers, including, without limitation, the related contracts; (2) visit such Loan Party's offices and properties for the purpose of discussing financial condition, performance and operations of the Borrowers, and examining and auditing such materials described in clause (1) above; and (3) discuss accounting, operational, performance, financial and general business matters relating to the Borrowers, matters relating to the Collateral or Contracts relating to the Collateral, or matters relating to such Loan Party's performance under the Loan Documents with any of such Loan Party's officers or employees having knowledge of such matters. The Borrowers shall, at its expense and upon the Agent's request, provide the Agent with appraisals or updates thereof of any or all of its equipment, inventory, scripts, real property and other assets, prepared on a basis and in form and substance satisfactory to the Agent, such appraisals and updates to include, without limitation, information required by applicable law and regulation and by the internal policies of the Agent.

9.5     **Reporting Requirements**. The Borrowers shall provide and shall cause each Loan Party to provide to the Agent (in multiple copies, if requested by the Agent) the following:

(1)     (A) on or prior to the 15th day of each month, by Transmission (unless otherwise agreed by the Agent), the Monthly Report for the prior month, and (B) on or prior to the 30th day of each

\39109424

month, for the prior month, a Borrowing Base Report based on reconciliations and adjustments reflected in the Monthly Report described in (A) above, certified by the chief financial officer of the Borrowers;

(2)     as soon as available and in any event within 120 days after the end of each fiscal year of the Parent, the following:

   (A)     a copy of the audited consolidated and consolidating financial statements (together with explanatory notes thereon) and the auditor's unqualified report letter for such year for the Parent and its Subsidiaries, containing financial statements for such year audited by independent certified public accountants of recognized standing acceptable to the Agent and a copy of any management letter or written report submitted to the Parent by independent certified public accountants with respect to the business, condition (financial or otherwise), operations, prospects, or Properties of the Parent and its Subsidiaries;

   (B)     a Compliance Certificate; and

   (C)     a report satisfactory in form to the Agent, listing all material insurance coverage maintained as of the date of such report by the Parent and its Subsidiaries and all material insurance planned to be maintained by the Parent and its Subsidiaries in the subsequent fiscal year.

(3)     as soon as available and in any event no later than 30 days after the end of each month, the following:

   (A)     consolidated and consolidating balance sheets, income statements and statements of changes in cash flow of the Parent and its Subsidiaries as of the end of such month or quarter, as the case may be, and for the period commencing at the beginning of the current fiscal year and ending with the end of such month or quarter, as the case may be, certified by the chief financial officer of the Parent;

   (B)     a Compliance Certificate;

   (C)     a statistical report, including occupancy and average length of stay statistics and such other information as may be requested by the Agent; and

   (D)     if adjusted from the prior month's value, internally prepared cost report settlement estimates with respect to Governmental Entities.

(4)     prior to the commencement of each fiscal year of the Parent, a consolidated and consolidating operating plan (together with a complete statement of the assumptions on which such plan is based) of the Parent and its Subsidiaries approved by the applicable Boards of Directors (or equivalent governing bodies) which shall include budgeted monthly balance sheets, profit and loss statements, and cash flow projections for the prospective year together with personnel, capital expenditures and facilities plans in reasonable detail acceptable to the Agent;

(5)     the Parent shall promptly (and in no event later than one Business Day following its obtaining actual knowledge thereof) notify the Agent of the following: (A) any breach by the Parent, any Borrower or any of their Subsidiaries of any covenants or representations and warranties hereunder or under any other Loan Document, including, without limitation, upon discovery of a breach of the Eligibility Criteria; and (B) the occurrence of any Default or any Event of Default,

\39109424

such notice to be accompanied by a statement of the chief financial officer of the Parent setting forth details of such Default or Event of Default, and the action that the applicable Loan Party has taken or proposes to take with respect thereto;

(6)    (A) promptly and in any event within 10 days after any Loan Party or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred or that a request for a minimum funding waiver under Section 412 of the IRC has been filed with respect to any Plan or Multiemployer Plan, a written statement of an Authorized Officer of the applicable Loan Party describing such ERISA Event or waiver request and the action, if any, the applicable Loan Party, its Subsidiaries, and its ERISA Affiliates propose to take with respect thereto and a copy of any notice filed with the PBGC or the IRS pertaining thereto and (B) simultaneously with the date that any Loan Party or any ERISA Affiliate files a notice of intent to terminate any Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, copies of each such notice.

(7)    immediately (and in no event later than one Business Day after actual knowledge or notice thereof is obtained or received), notice in reasonable detail, of the following: (A) any Lien asserted or claim made against a Receivable or any Lien asserted or claim made against any other Collateral other than a Permitted Lien; and (B) the occurrence of any other event which could reasonably be expected to adversely affect the value of any equipment, inventory, real property or other assets of any Loan Party, the other Collateral or the interest of the Agent therein;

(8)    immediately (and in no event later than one Business Day after actual knowledge or notice thereof is obtained or received), notice in reasonable detail, of any notice of any investigations or audits (including cost reports or similar audits regarding the valuation of receivables payments) of the Parent, any Borrower or any of their Subsidiaries being conducted by any federal, state or county Governmental Entity or its agents or designees, and the results thereof;

(9)    promptly, and in any event within two Business Days after becoming aware of the occurrence thereof, notice in reasonable detail of (A) any material reduction to any rate for reimbursement under any agreement with any Obligor, (B) any material system charge master change that would affect the Expected Net Value of Eligible Receivables of any Obligor, or (C) any matter that could reasonably be expected to have an effect on (i) any Borrower's rights to reimbursement under any agreement with, and the amount of any related payments from, any Obligor or (ii) the Expected Net Value of Eligible Receivables of any Borrower;

(10)    promptly, and in any event within two Business Days after becoming aware of the occurrence thereof, notice of any matter that could reasonably be expected to have or result in a Material Adverse Effect;

(11)    as soon as available, (A) copies of each financial statement, report, notice or proxy statement sent by any Loan Party to its stockholders generally, (B) copies of each press release or other statement made available by any Loan Party to the public concerning developments in the business of the such Loan Party and (C) copies of any statement or report furnished by any Loan Party to any other party pursuant to the terms of any indenture, loan, or credit or similar agreement and not otherwise required to be furnished to the Agent or any Lender pursuant to this Agreement;

(12)    on each Funding Date, and more frequently if requested by the Agent, estimates of amounts of Receivables which are subject to offset by any Governmental Entity; and

-51-

(13)    such other information respecting the Receivables, the equipment, inventory, real property or other assets of each Loan Party, the other Collateral or the condition or operations, financial or otherwise, of the Parent, any Borrower and their Subsidiaries as the Agent or any of the Lenders may from time to time reasonably request.

9.6    **Notice of Proceedings; Overpayments**. The Borrowers shall promptly notify the Agent (and modify the next Borrowing Base Report to be delivered hereunder to reflect same) in the event of any action, suit, proceeding, dispute, set-off, deduction, defense or counterclaim that is asserted by an Obligor with respect to any of the Receivables. The Borrowers shall make all payments to the Obligors necessary to prevent the Obligors from offsetting any earlier overpayment by the Obligors against any amounts the Obligors owe on any Receivables.

9.7    **Taxes**. (a) Each Loan Party shall, and shall cause each of its Subsidiaries to do the following: (1) file when due all federal, national and state income and other tax returns and other reports which it is required to file; and (2) subject to the other terms of this Section 9.7, pay, or provide for the payment, when due, of all taxes (including, without limitation, sales taxes), fees, assessments and other governmental charges against it or upon its Property, income or franchises, including taxes relating to the transactions contemplated under this Agreement, make all required withholding and other tax deposits, and establish adequate reserves for the payment of all such items, and provide to the Agent, upon request, satisfactory evidence of its timely compliance with the foregoing.

(b)    So long as the Borrowers have notified the Agent in writing, the applicable Loan Party or any of its Subsidiaries will not be required under this Section 9.7 to pay an amount referred to in clause (2) of Section 9.7(a) if (1) the applicable Loan Party is contesting that amount in good faith by appropriate proceedings diligently pursued; (2) the applicable Loan Party has established proper reserves as provided in GAAP with respect to that amount; and (3) no Lien (other than a Permitted Lien) results from non-payment of that amount.

(c)    Except pursuant to any tax sharing agreement disclosed in Schedule II hereto, no Loan Party shall have any obligation under any tax sharing agreement.

9.8    **Preservation of Existence**. Each Loan Party shall preserve and maintain its existence, rights, franchises and privileges in the jurisdiction of its organization, and qualify and remain qualified in good standing as a foreign corporation in each jurisdiction where the failure to maintain such qualification would have or result in a Material Adverse Effect.

9.9    **Loan Documents**. Each Loan Party shall, at its sole expense, timely and fully perform and comply with all provisions, covenants and other promises required to be observed by it under the Loan Documents, maintain the Loan Documents in full force and effect, enforce each Loan Document in accordance with its terms, take all such action to such end as may be from time to time reasonably requested by the Agent or any Term Lenders and make upon any party to the Loan Documents such demands and requests for information and reports or for action as such Loan Party is entitled to make thereunder and as may be from time to time reasonably requested by the Agent or such Term Lender. Each Loan Party shall not permit any waiver, modification, or amendment of any Loan Document, except as may be requested by the Agent or Lenders.

9.10    **[Reserved]**.

9.11    **Invoices**. Each Borrower shall take all reasonable steps to ensure that all invoices rendered or dispatched on or after the Closing Date contain only the remittance instructions required under Article 5 of this Agreement.

-52-

9.12   **ERISA Compliance**. Each Loan Party shall, and shall cause its ERISA Affiliates to, make all required contributions to each Plan and shall not, nor shall it permit any ERISA Affiliate to, cause or permit to occur: (1) an event that could result in the imposition of a lien under Section 412 of the IRC or Section 302 or 4068 of ERISA, (2) an ERISA Event that would have a Material Adverse Effect in the aggregate, (3) the adoption of a new Plan or the amendment of an existing Plan, or an agreement to contribute to any Multiemployer Plan if the increase in its obligations as a result thereof could reasonably be expected to have a Material Adverse Effect in the aggregate.

9.13   **Equipment**. Each Loan Party shall, in accordance with sound business practices, maintain all equipment and other Properties used by it in its business (other than obsolete or worn-out equipment) in good repair, working order and condition (normal wear and tear and immaterial impairments of value and damage by the elements excepted) and make all necessary repairs, renewals, replacements and improvements thereof so that the value and operating efficiency thereof shall at all times be maintained and preserved.

9.14   **Insurance**. Each Loan Party shall keep insured by financially sound and reputable insurers all Property of a character usually insured by corporations engaged in the same or similar business similarly situated, including without limitation, all Collateral, against loss or damage of the kinds and in the amounts customarily insured against by such corporations and carry such other insurance as is usually carried by such corporations conducting a similar business in similar locales. Each policy referred to in this Section 9.14 shall provide that it will not be canceled, amended, or reduced except after not less than 30 days' prior notice to the Agent and shall also provide that the Agent (or its designees and assigns) shall be named as loss (or co-loss) payee and additional insured, as applicable and as its interests may appear, and such interests shall not be invalidated by any act or negligence of any Loan Party. The Borrowers shall advise the Agent promptly of any policy cancellation, reduction, or amendment. Each insurance policy for property, casualty, liability and business interruption coverage for any Loan Party shall name the Agent (and the Term Loan Agent, if any) as lender loss payee (as its interests may appear) or an additional insured, as appropriate

9.15   **Deposit Account Access**. The Loan Parties shall provide and maintain for the Agent on-line and real-time access to the deposit accounts of the Loan Parties and, until the Trillium Seller Account is closed, the Trillium Seller Account.

## ARTICLE 10
## NEGATIVE COVENANTS

Until the Full Payment of all Lender Debt, the termination of the Total Revolving Commitment hereunder, the Parent and each Borrower agrees to perform and cause each of the other Loan Parties to perform all covenants in this Article 10.

10.1   **Corporate Documentation**. No Loan Party shall modify, amend, or alter its organizational documents in any manner that is adverse to the interests of the Agent or any Lender or in any other material manner.

10.2   **Debt**. No Loan Party shall incur or assume any Debt following the Closing Date other than Permitted Debt.

10.3   **Subordination**. Except in connection with a Qualified Refinancing, no Loan Party shall, directly or indirectly (1) at any time pay any amount of principal or prepay, defease, purchase or redeem any Debt (other than the Debt evidenced by this Agreement and the other Loan Documents), during the continuance of an Event of Default, or (2) pay any amount of principal or cash interest on any

-53-

Subordinated Debt (including, without limitation, the Trillium Seller Debt), but nothing in this Section 10.3 prohibits payment of non-cash interest "in-kind" thereunder; provided however that: (A) to the extent permitted pursuant to the terms and conditions of Section 10.16, the Borrowers may make Distributions to Parent and the Parent may use such distributed amounts to make payments not more than once per six (6) month period on the Parent Corporate Expense Debt and (B) to the extent permitted pursuant to the terms and conditions of Section 10.16, the Borrowers may make distributions to Parent in an amount equal to, and the Parent may pay such distributed amounts to the Trillium Sellers to make, (a) scheduled payments of interest on the Trillium Seller Debt, (b) a single payment of the outstanding principal amount of the Trillium Seller Note A on or after January 1, 2016 and (c) a single payment of the outstanding principal amount of the Trillium Seller Note B on or after June 30, 2013 from the proceeds of the Term Loan B (if made) or from the proceeds of an Issuance of Equity Interests of the Parent or the issuance of Subordinated Debt by the Parent, provided that, in the case of each of the foregoing clauses (A) and (B) only if each of the following conditions are satisfied both prior to and after giving effect to any such payment: (i) no Default or Event of Default exists, (ii) the sum of (x) the aggregate amount of cash on hand in operating deposit accounts of the Borrowers and the Parent that are being monitored by the Agent on-line and in real-time, and (y) the positive difference, if any, between the Adjusted Borrowing Limit and the sum of the then Outstanding Balance of the Revolving Loan, shall not be less than $2,500,000 (provided that the condition specified in this clause (ii) shall not be required to be satisfied in order to permit the payment of scheduled interest payments as described in clause (B)(a) above), and (iii) the Borrowers shall have delivered to Agent evidence that the Loan Parties shall be in compliance on a pro forma basis with the financial covenants set forth in Article 11 (without giving any effect to any Cure Amounts applied pursuant to Section 11.5). For the avoidance of doubt, other than as expressly provided in the immediately preceding sentence, no payments on the Trillium Seller Debt or the Parent Corporate Expense Debt may be made until the date that is at least 180 days after the Full Payment of all Lender Debt.

10.4    **Liens**. No Loan Party shall create or suffer to exist any Liens upon or with respect to any of its Properties (including, without limitation, any Collateral) or assign any right to receive income in respect thereof, except Permitted Liens.

10.5    **Lease Obligations.** No Loan Party shall enter into, or suffer to exist, any lease of real or personal Property as lessee or sublessee (including, but not limited to, a Capital Lease and such Loan Parties' operating leases in existence on the Closing Date and listed on Schedule II hereto), if, after giving effect thereto, the aggregate amount of Rentals for the Loan Parties on an aggregate basis in any fiscal year in respect of such lease and all other such leases would exceed $7,000,000. The term "Rentals" means all payments due from the lessee or sublessee under a lease, including, without limitation, basic rent, percentage rent, property taxes, utility or maintenance costs, and insurance premiums.

10.6    **Asset Sales; Sale/Leaseback Transaction; Etc**. No Loan Party shall sell, assign (by operation of law or otherwise), transfer, lease, sublease, liquidate or otherwise dispose of (including, without limitation, pursuant to any sale/leaseback transaction) any of its Properties (including, without limitation, any Collateral), or assign any right to receive income in respect thereof, other than:

(1)    sales of inventory in the ordinary course of its business; and

(2)    replacement and disposition of worn out and obsolete equipment in the ordinary course of business.

10.7    **Change in Business**. No Loan Party shall engage in any business other than the business engaged in by it on the Closing Date.

\39109424

10.8    **Change in Credit and Collection Policy**. No Borrower shall make any material change in the Credit and Collection Policy without the prior written consent of the Agent.

10.9    **Change in Payment Instructions**. No Borrower shall terminate, or suffer or permit the termination of, any of the Lockboxes or the Lockbox Accounts, or make any change or replacement (1) in the instructions contained in any Notice or otherwise, (2) regarding payments with respect to Receivables to be made to the Lockboxes or the Lockbox Accounts, (3) in the Standing Revocable Instruction referred to in the Depositary Agreements or otherwise, or (4) regarding payments to be made to the Agent, except upon the prior and express written direction of the Agent.

10.10    **Deviation from Terms of Receivable**. Except in accordance with the Credit and Collection Policy, no Borrower shall, without the prior written consent of the Agent:

(1)    compromise, adjust, extend, satisfy, subordinate, rescind, set off, waive, amend, or otherwise modify, or permit or agree to any deviation from, the terms and conditions of any Receivable or materially or adversely modify or waive any term or condition of any contract related thereto;

(2)    (A) amend, modify, supplement or delete in any way or to any extent any provision for uncollectible accounts and free care applicable to any Receivable, or (B) amend, modify or supplement in any way or to any extent any financial category or change in any way or to any extent the manner in which any financial category is treated or reflected in its records;

(3)    alter or modify its claims processing system or its third-party billing system, as applicable (except for technical changes of an immaterial nature); provided, however that any such alteration or modification requiring prior written consent of the Agent shall not be unreasonably withheld; or

(4)    change, modify, or rescind any direction contained in any invoice or previously delivered Notice.

10.11    **Mergers and Acquisitions; Dissolutions**. Neither the Parent, any Borrower nor any of their Subsidiaries shall consummate or enter into any transaction or agreement which results or is intended to result in a merger, acquisition, dissolution or wind-up.

10.12    **No "Instruments"**. No Borrower shall take any action which would allow, result in, or cause any Eligible Receivable to be evidenced by an "instrument" within the meaning of the UCC of the applicable jurisdiction.

10.13    **Margin Loan Restrictions**. No portion of the proceeds of any borrowing hereunder shall be used in any manner that might cause the borrowing or the application of such proceeds to violate Regulation U, T, or X of the Board of Governors of the Federal Reserve System or any other regulation of such .

10.14    **Loans or Investments**. Except with respect to loans and investments set forth on Schedule II, no Loan Party shall make, and no Loan Party shall enter into an agreement to make, any loans to or investments in any Person, other than (i) loans and advances to physicians for reasonable travel, relocation and business expenses in the ordinary course of business, so long as (1) all such loans and advances comply with all applicable laws and regulations (including, without limitation, the Sarbanes Oxley Act of 2002 and any successor laws or regulations, as amended from time to time) and (2) the aggregate outstanding amount of all such loans and advances does not exceed $250,000 at any time outstanding during the term of this Agreement, and (ii) loans and advances made by the Parent to any Borrower or by any Borrower to any other Borrower, so long as such loans or advances are (1) unsecured, (2) subordinated in right of payment to the Lender Debt on terms acceptable to the Agent and (3)

-55-

evidenced by a demand note in form and substance satisfactory to the Agent and such demand note is pledged and delivered to the Agent as additional Collateral.

10.15    **Transactions with Affiliates.** No Loan Party shall sell, transfer, distribute, or pay any money or property, including, but not limited to, any fees or expenses of any nature (including, but not limited to, any fees or expenses for management services), to any Affiliate, or lend or advance money or property to any Affiliate, or invest in (by capital contribution or otherwise) or purchase or repurchase any equity interest or indebtedness, or any Property, of any Affiliate, or become liable under any Guaranty for the obligations of any Affiliate. Notwithstanding the foregoing, the Loan Parties may engage in transactions with Affiliates in the ordinary course of business, in amounts and upon terms fully disclosed to the Agent, and no less favorable to the Loan Parties than would be obtained in a comparable arm's-length transaction with a third party who is not an Affiliate.

10.16    **Distributions.** (a) Subject to the other terms of this Section 10.16, no Loan Party shall make, or enter into any agreement to make, or enter into any transaction or agreement which results or is intended to result in, any dividends or other Distributions in cash or cash equivalents being paid to any Person; provided, however, that (1) to the extent permitted pursuant to the terms and conditions of Section 10.3, the Borrowers may make dividends in cash to Parent in an amount equal to the payments on Subordinated Debt that may be made under such section, (2) the Borrowers may make dividends in cash to Parent in an amount equal to the Parent Corporate Expenses, and (3) the Borrowers may make dividends in cash to Parent to pay the Parent Corporate Expense Debt, in each case, if each of the following conditions are satisfied: (i) in the cases of clauses (1) and (2), such dividends are limited to no more than one per each calendar month and, in the case of clause (3), such dividends are limited to no more than once per six (6) month period, (ii) prior to and after giving effect to any such dividend, no Default or Event of Default exists, (iii) prior to and after giving effect to any such dividend, the Borrowers demonstrate compliance on a pro forma basis with the financial covenants set forth in Article 11 and (iv) any cash dividends made by the Borrowers to the Parent shall be used by the Parent to pay Parent Corporate Expenses as described in clause (2) prior to making payments on the Parent Corporate Expense Debt.

(b)    For any taxable year, the Borrowers may pay cash dividends to their respective members in an aggregate amount equal to the actual federal and state income tax liability of those members for that taxable year (or portion thereof) attributable to the Borrowers' income, subject to satisfaction of the following conditions: (1) that no Default or Event of Default is continuing; (2) that the Borrowers have delivered to the Agent a letter from their independent certified public accountants, in form and substance satisfactory to the Agent, detailing the amount necessary to be applied to such tax liabilities of such members, which letter may relate to the estimated tax payments for the next succeeding four quarters; (3) that each such payment or distribution is limited to the amounts specified in the applicable letter; and (4) that after any redetermination of the Borrowers' income for any such period, the Borrowers receive from their members a repayment of the aggregate amount (if any) by which any such payment or distribution exceeded the allocable amount of the actual income of the Borrowers.

(c)    Notwithstanding anything to the contrary in this Section 10.16, the Loan Parties may make the following Distributions:

(1)    on or after the date that is at least 365 days after the date on which any Cure Amount is received by the Borrowers in connection with an exercise of the cure rights set forth in Section 11.5, the Borrowers may pay a dividend to Parent, and Parent may pay a dividend to the holders of its Equity Interests, in an amount not to exceed such Cure Amount, provided that each of the following conditions are satisfied prior to and after giving effect to such payment: (i) no Default or Event of Default exists, (ii) the sum of (x) the aggregate amount of cash on hand in operating

\39109424

deposit accounts of the Borrowers and the Parent that are being monitored by the Agent on-line and in real-time, and (y) the positive difference, if any, between the Adjusted Borrowing Limit and the sum of the then Outstanding Balance of the Revolving Loan, shall not be less than $2,500,000 and (iii) the Borrowers shall have delivered to Agent evidence that the Loan Parties shall be in compliance on a pro forma basis with the financial covenants set forth in Article 11 (without giving any effect to any Cure Amounts applied pursuant to Section 11.5); and

(2)    on or after the date of the Full Payment of the Term Loans, the Borrowers may pay dividends to Parent, and Parent may pay dividends to the holders of its Equity Interests, provided that each of the following conditions are satisfied prior to and after giving effect to such payment: (i) such dividends are limited to no more than one per each calendar quarter (ii) no Default or Event of Default exists, (iii) the sum of (x) the aggregate amount of cash on hand in operating deposit accounts of the Borrowers and the Parent that are being monitored by the Agent on-line and in real-time, and (y) the positive difference, if any, between the Adjusted Borrowing Limit and the sum of the then Outstanding Balance of the Revolving Loan, shall not be less than $2,500,000, and (iv) the Borrowers shall have delivered to Agent evidence that the Loan Parties shall be in compliance on a pro forma basis with the financial covenants set forth in Article 11 (after giving to such dividends to the Parent).

10.17    **Deviation from Patient Consent Form**. No Borrower shall, without the prior written consent of the Agent, substitute, alter, modify, or change in any way the Patient Consent Form.

10.18    **Subsidiaries**. No Loan Party shall maintain, suffer to exist, create or acquire any Subsidiaries other than those listed on Schedule II.

## ARTICLE 11
## FINANCIAL COVENANTS

Until the Full Payment of all Lender Debt, the termination of the Total Revolving Commitment hereunder, the Parent and each Borrower agrees to perform and cause each of the other Loan Parties to perform all covenants in this Article 11.

11.1    **Liquidity**. The sum of (1) the aggregate amount of cash on hand in operating deposit accounts of the Borrowers that are being monitored by the Agent on-line and in real-time, plus (2) the positive difference, if any, between (A) the Adjusted Borrowing Limit and (B) the sum of the then Outstanding Balance of the Revolving Loan, shall at no time be less than $2,000,000.

11.2    **Fixed Charge Coverage Ratio**. The Fixed Charge Coverage Ratio maintained by the Borrowers and their respective Subsidiaries, on a consolidated basis and calculated on a trailing twelve month basis, calculated as of the last day of each calendar month, shall not be less than 1.30 to 1.00.

11.3    **Ratio of Senior Funded Debt to EBITDA**. The ratio of Senior Funded Debt to EBITDA and calculated on a trailing twelve month basis of the Borrowers and their respective Subsidiaries, on a consolidated basis, calculated as of the last day of each calendar month, shall not exceed 2.40:1.00.

11.4    **Ratio of Senior Funded Debt to EBITDAR**. The ratio of (a) the sum of (1) Senior Funded Debt plus (2) the amount equal to six (6) times the trailing twelve-month rent expense of the Borrowers, to (b) EBITDAR and calculated on a trailing twelve month basis of the Borrowers and their respective Subsidiaries, on a consolidated basis, calculated as of the last day of each calendar month, shall not exceed 4.00:1.00.

-57-

11.5    **Cure Right**. Notwithstanding anything to the contrary contained in this Agreement, in the event that the Borrowers and their respective Subsidiaries, on a consolidated basis, fail to comply with any of the Financial Covenants set forth in Section 11.1, 11.2, 11.3 or 11.4 (the "Specified Financial Covenants"), then until the fifth day after the date on which the Agent shall have received the documents required to be delivered to the Agent pursuant to Section 9.5(2) and Section 9.5(3), a holder of any Equity Interest in the Borrowers or the Parent may irrevocably commit, by giving written notice to the Agent, to purchase no later than five (5) days after such notice is given additional Equity Interests of the Borrowers or the Parent, as applicable, for cash or make a loan to the Borrowers or the Parent in the form of Subordinated Debt (such cash proceeds, the "Cure Amount"), and if such Cure Amount is directly deposited into the Collection Account for application to the Revolving Loan pursuant to Section 6.2, then the applicable Specified Financial Covenant(s) shall be recalculated giving effect to the following pro forma adjustments:

(a)    the Cure Amount shall immediately reduce the Outstanding Balance of the Revolving Loan for the purpose of determining compliance with the Specified Financial Covenant(s); and

(b)    if after giving effect to the foregoing recalculations the Borrowers and their respective Subsidiaries, on a consolidated basis, would have satisfied such Specified Financial Covenant(s), then the Borrowers and their respective Subsidiaries shall then be deemed to have complied with such Specified Financial Covenant(s) as to the relevant date of determination.

Notwithstanding anything to the contrary set forth in this Section 11.5, (i) the Specified Financial Covenants shall not be recalculated more than twice during any 12-month period pursuant to the cure right in this Section 11.5 and (ii) the cure right in this Section 11.5 shall not be permitted if after giving pro forma effect to thereto a Change of Control would occur. For the avoidance of doubt, no Lender shall be under any obligation to make any Loans or other extensions of credit during the period between the date on which such holder of an Equity Interest in the Borrower provides notice of its intention to exercise the cure right provided for in this Section 11.5 and the date on which the Agent receives cash in the amount of the Cure Amount.

## ARTICLE 12
## EVENTS OF DEFAULT

12.1    **Events of Default**. Each of the following will constitute an "**Event of Default**":

(1)    Any Borrower fails to pay any principal or interest hereunder or under any of the other Loan Documents, when and as the same shall become due and payable, whether at maturity, by acceleration or otherwise.

(2)    Any Borrower shall default in the due and punctual payment of any other payment, fee or expense owing to the Agent or any Lender pursuant to any of the Loan Documents, when and such amount of payment, fee or expense shall become due and payable, and such default shall continue unremedied for five Business Days.

(3)    Any provision of this Agreement or any other Loan Document shall at any time fail for any reason to be in full force and effect, or this Agreement or any other Loan Document shall terminate, be terminated or become void or unenforceable by the Agent or any Lender party thereto for any reason whatsoever without the prior written consent of the Agent.

\39109424

(4)     This Agreement shall for any reason fail or cease to create or fail or cease to be a valid and perfected security interest in favor of the Agent in the Receivables, the collections with respect thereto and the other Collateral, free and clear of all Liens other than Permitted Liens.

(5)     Any Borrower shall default in the performance or observance of any covenant, agreement or provision contained in (A) Section 9.5, 9.6, 9.7, 9.8, 9.9 or Article 5, 6, 10, or 11; or (B) any other Section or Article of this Agreement or any other Loan Document or in any other instrument or document evidencing or creating any obligation, guaranty or Lien in favor of the Agent in connection with or pursuant to this Agreement or any Lender Debt, and, in the case of any default referred to in this clause (B), that default continues for a period of 20 days after the earlier of (i) the date on which notice of such default is sent to the Borrower Representative by the Agent or any Lender, and (ii) the date on which any Borrower discovers such default.

(6)     A Revocation Order (as defined in the Depositary Agreement) shall have been sent or any change or replacement shall have been made in the Standing Revocable Instruction (as defined in each of the Depositary Agreements) or any bank (including the Lockbox Bank) at which any deposit account, blocked account, or lockbox account (including the Lockbox Accounts) is maintained shall fail to comply with any of the terms of any deposit account, blocked account, lockbox account or similar agreement (including any Depositary Agreement) to which such bank is a party.

(7)     Any representation or warranty made or deemed made by any Loan Party (other than with respect to the eligibility of Receivables as Eligible Receivables hereunder) under or in connection with this Agreement or any other Loan Document or any information or report delivered by any Loan Party pursuant to this Agreement or any other Loan Document shall prove to have been incorrect or untrue in any material respect when made or deemed made or delivered.

(8)     Any Loan Party shall fail to pay any principal of or premium or interest on any of its Debt which is outstanding in an aggregate principal amount of at least $250,000 when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt; or any such Debt shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to repay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof.

(9)     Any Loan Party shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Loan Party seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its Property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of 60 days, or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief, or the appointment of a receiver, trustee, custodian or other similar

\39109424

official for it or for any substantial part of its Property) shall occur; or any Loan Party shall take any action to institute, initiate or authorize any of the actions set forth above in this clause (9).

(10)   As of any date of determination, any Borrower is found to have been overpaid by Governmental Entities during any period covered by an audit conducted by CMS or any State entity and such overpayment is not repaid within 30 days of its due date or reserved for in a manner reasonably acceptable to the Agent.

(11)   There shall have occurred any event, or any condition shall exist, which has had or resulted in, or could reasonably be expected to have or result in, a Material Adverse Effect.

(12)   The Parent, any Borrower or any of their Subsidiaries shall have entered into any transaction or agreement which could reasonably be expected to result in a Change of Control; or a Change of Control shall have occurred.

(13)   Judgments or orders for payment of money (other than judgments or orders in respect of which adequate insurance is maintained for the full payment thereof) in excess of $100,000 in the aggregate against one or more Loan Parties remain unpaid, unstayed on appeal, undischarged, unbonded, or undismissed for a period of 30 days or more.

(14)   Any of the following occurs: (A) any Loan Party is enjoined, restrained or in any way prevented by the order of any court or any Governmental Entity from conducting all or any material part of its business; (B) any Loan Party suffers the loss, revocation or termination of any material license, permit, lease or agreement necessary to its business; (C) the average inpatient length of stay for any Borrower is 25 days or less as set forth in the annual cost report filed with CMS, or any Borrower otherwise fails to qualify as a "long term acute care hospital" under Medicare, (D) there is a cessation of any material part of the business of any Loan Party; or (E) any Governmental Entity (including, without limitation, the Internal Revenue Service or the PBGC) files a notice of a Lien against any assets of any Loan Party.

(15)   Any Loan Party shall fail to discharge within a period of 30 days after the commencement thereof any attachment, sequestration, forfeiture, or similar proceeding or proceedings against any of its Properties.

(16)   Any Loan Party shall fail to pay or discharge at or before maturity or before becoming delinquent all lawful claims for labor, material, and supplies, which, if unpaid, might become a Lien upon any of its Property.

(17)   An ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to have or result in liability in the aggregate in excess of $250,000, or the Parent, any Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to any Withdrawal Liability in an aggregate amount in excess of $250,000.

(18)   Any provision in any Subordination Agreement shall cease to be in full force and effect, or any Borrower, any other Loan Party or any other Person (including the holder of any applicable Subordinated Debt) shall contest in any manner the validity, binding nature or enforceability of any such provision.

(19)   Any Borrower is unable to maintain the Transmission interface described in Exhibit V to the commercially reasonable satisfaction of the Agent, or the electronic information servicing

-60-

capabilities of any Borrower is not functioning, in either case, for a period of more than three consecutive Business Days.

(20)    Any Borrower shall fail to pay any rental expense to any Mesa Entity under any lease between such Borrower and such Mesa Entity which is outstanding when the same becomes due and payable (whether by scheduled payment, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the applicable lease; or any other event shall occur or condition shall exist under any such lease and shall continue after the applicable grace period, if any, specified in such lease, if the effect of such event or condition is the termination of such lease or the option of such Mesa Entity to terminate such lease.

(21)    Any Mesa Entity shall fail to pay any principal of or premium or interest on any Debt under the Mesa Mortgage Facility when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to Mesa Mortgage Facility; or any other event shall occur or condition shall exist under any agreement or instrument relating to the Mesa Mortgage Facility and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of the Debt under the Mesa Mortgage Facility; or any Debt under the Mesa Mortgage Facility shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to repay, redeem, purchase or defease the Debt under the Mesa Mortgage Facility shall be required to be made, in each case prior to the stated maturity thereof.

(22)    On or before December 31, 2015, the Mesa Mortgage Facility shall not have been extended to have a final maturity date on or after June 30, 2017.

(23)    Any Borrower has sent multiple Transmissions to the Agent in a manner that is not in compliance with the specifications set forth in Exhibit V hereto.

(24)    The Trillium Sellers shall fail on any Business Day to sweep from the Trillium Seller Account into a Lockbox Account all amounts on deposit in the Trillium Seller Account, or the Trillium Sellers and Merrill Lynch shall otherwise fail to comply with their obligations under the Trillium Sweep Agreement, or the Loan Parties shall fail to cause all Obligors of the Trillium Sellers that pay into the Trillium Seller Account to pay into a Lockbox Account on or before December 31, 2012.

    12.2    **Events of Default; Remedies.** (a) If any Event of Default shall occur and be continuing, the Agent may, and at the request of the Required Term Lenders with respect to the Term Loans and at the request of the Required Revolving Lenders with respect to the Revolving Loan, shall, by notice to the Borrower Representative, take any of the following actions: (1) declare the Maturity Date to have occurred with respect to Term Loans, the Revolving Loan or all Loans, as the case may be, and all Lender Debt related thereto, shall become immediately due and payable in full; (2) terminate all commitments and obligations of the Term Lenders hereunder; and (3) with respect to the declaration of an Event of Default relating to the Revolving Loan, (A) terminate all commitments and obligations of the Revolving Lenders hereunder, and (B) without limiting any rights hereunder and subject to applicable law, replace the Borrowers in their performance of any or all of its Receivables servicing responsibilities. If an Event of Default under clause (9) of Section 12.1 occurs, the Maturity Date will be deemed to have occurred automatically and without notice and all Lender Debt shall automatically become immediately due and payable and all commitments and obligations of the Revolving Lenders shall be terminated without any

-61-

notice or demand of any kind. Upon any such declaration or designation, the Agent and the Lenders shall have, in addition to the rights and remedies which it may have under this Agreement, all other rights and remedies provided after default under the UCC and under other applicable law, which rights and remedies shall be cumulative. Each Lender agrees that it will not have any right individually to enforce or seek to enforce this Agreement or any other Loan Document or to realize upon any Collateral for the Lender Debt, it being understood and agreed that such rights and remedies may be exercised only by the Agent in its discretion granted hereunder or at the direction of the applicable Lenders as set forth hereunder.

(b)        Each Term Lender acknowledges that the Revolving Lenders may elect, in their sole discretion, to continue to fund Revolving Advances following the occurrence of an Event of Default, including, without limitation, following the declaration that the Maturity Date has occurred pursuant to Section 12.2(a). Notwithstanding that the Revolving Lenders may, in their sole discretion, continue to fund Revolving Advances after the Maturity Date, as provided herein, all Lender Debt (including, without limitation, any Early Termination Fee) in existence on the Maturity Date shall be due and payable on the Maturity Date, as provided in this Agreement, and all Lender Debt arising after the Maturity Date shall be due and payable on demand.

(c)        Each Revolving Lender acknowledges that the Term Lenders may elect, in their sole discretion, to accelerate the Term Loan or terminate their commitments with respect to the Term Loan B following the occurrence of an Event of Default and exercise remedies in connection therewith, notwithstanding the determination of the Revolving Lenders to continue to fund Revolving Advances.

(d)        Each Borrower hereby irrevocably authorizes and instructs the Agent and each Lender during the continuance of an Event of Default to set-off the full amount of any Lender Debt due and payable against any Collections, any other proceeds of Collateral, or the principal amount of any Revolving Advance requested on or after such due date. No further notification, act or consent of any nature whatsoever is required prior to the exercise by the Agent or any Lender of such right of set off.

12.3    **Attorney-in-Fact**. Each Borrower hereby irrevocably designates and appoints the Agent, for the benefit of the Lenders, to the extent permitted by applicable law and regulation, as such Borrower's attorney-in-fact, which irrevocable power of attorney is coupled with an interest, with authority, during the continuance of an Event of Default (and to the extent not prohibited under applicable law and regulations) to do any of the following: (1) endorse or sign such Borrower's name to remittances, invoices, assignments, checks (other than, absent a court order, payments from Governmental Entities), drafts or other instruments or documents in respect of the Receivables; (2) notify Insurers to make payments on the Receivables directly to the Agent; and (3) bring suit in such Borrower's name and settle or compromise such Receivables as the Agent or Required Revolving Lenders may, in their discretion, deem appropriate.

## ARTICLE 13
## THE AGENT

13.1    **Agency Provisions**. (a) Each of the Lenders hereby irrevocably appoints HFG as its administrative and collateral agent and authorizes the Agent to take such actions on behalf of such Lender and to exercise such powers as are delegated to the Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.

(b)        Each Lender authorizes and directs the Agent to enter into this Agreement and the other Loan Documents, for the benefit and obligation (subject to this Agreement and Section 4.3) of the Agent and the Lenders. Each Lender agrees that any action taken by the Agent in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Agent of its powers set

-62-

forth herein or therein, together with such other powers that are reasonably incidental thereto, shall be authorized by and binding upon all of the Lenders. Without limiting the generality of the foregoing, the Agent shall have the sole and exclusive authority to (1) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents; (2) execute and deliver as Agent each Loan Document, including any intercreditor or subordination agreement, and accept delivery of each Loan Document from any Loan Party or other Person; (3) act as collateral agent for the Lender Group for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein; (4) manage, supervise or otherwise deal with Collateral; and (5) exercise any rights or remedies with respect to any Collateral under the Loan Documents, applicable law or otherwise. Agent alone shall be authorized to determine whether any Receivables constitute Eligible Receivables, or whether to impose or release any reserve, and to exercise its discretion in connection therewith, which determinations and exercise of discretion, if exercised in good faith, shall exonerate the Agent from liability to any Lender or other Person for any error in judgment.

(c)     Each Person serving as an agent hereunder or under the other Loan Documents shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an agent and each such Person and its respective Affiliates may accept deposits from, lend money to and generally engage in any kind of business with any Borrower or any Guarantor or other Affiliate thereof as if it were not an agent hereunder or under the other Loan Documents.

(d)     The duties of the Agent shall be ministerial and administrative in nature, and the Agent shall not have any duties or obligations except those expressly set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, (1) the Agent will not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (2) the Agent will not be required to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or thereby that the Agent is required to exercise pursuant to written instructions by the Required Revolving Lenders or the Required Term Lenders (or such other number or percentage as shall be necessary under the circumstances as provided in Section 14.1), and (3) except as expressly set forth herein, the Agent will not be required to disclose, and will not be liable for any failure to disclose, any information relating to any Borrower or any of the Guarantors that is communicated to or obtained by any of them serving as an agent or any of their respective Affiliates in any capacity.

(e)     The Agent will not be liable for any action taken or not taken by it (1) with respect to the Revolving Loan, with the consent or at the request of the Required Revolving Lenders (or such other number or percentage of the Revolving Lenders as shall be necessary under the circumstances as provided in Section 14.1); (2) with respect to the Term Loans, with the consent or at the request of the Required Term Lenders (or such other number or percentage of the Term Lenders as shall be necessary under the circumstances as provided in Section 14.1); or (3) in the absence of its own gross negligence or willful misconduct. The Agent may request instructions from the Required Revolving Lenders or Required Term Lenders with respect to any act (including the failure to act) in connection with any Loan Documents, and may seek assurances to its satisfaction from Lenders of their indemnification obligations under Section 13.1(o) against all Claims that could be incurred by any Agent Indemnitees (as defined below) in connection with any act. Agent shall be entitled to refrain from any act until it has received such instructions or assurances, and Agent shall not incur liability to any Person by reason of so refraining. In no event shall the Agent be required to take any action that, in its opinion, is contrary to applicable law or any Loan Documents or could subject any Agent Indemnitee to personal liability.

\39109424

(f)     The Agent shall not be liable to Lenders for any action taken or omitted to be taken under the Loan Documents, except for losses directly and solely caused by the Agent's gross negligence or willful misconduct. The Agent does not assume any responsibility for any failure or delay in performance or any breach by any Loan Party or Lender of any obligations under the Loan Documents. The Agent will not be deemed to have knowledge of any Default unless and until notice thereof is given to the Agent by the Borrowers or a Lender, and the Agent will not be responsible for, or be required to ascertain or inquire into, any of the following: (1) any statement, warranty or representation made in or in connection with this Agreement; (2) the contents of any certificate, report or other document delivered hereunder or in connection herewith; (3) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein; (4) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document; (5) the genuineness, enforceability, collectibility, value, sufficiency, location or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; (6) the validity, enforceability or collectibility of any Lender Debt; (7) the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Loan Party or Obligor; or (8) the satisfaction of any condition set forth in Article 7 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

(g)     The Agent may rely upon, and will not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document, or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone or other means and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Agent may consult with legal counsel (who may be counsel for the Borrowers), accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or other professionals or experts. The Agent shall not be responsible for the negligence or misconduct of any such professionals or experts selected by it with reasonable care.

(h)     The Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub agents appointed by the Agent. The Agent and any such sub agent may perform any and all its duties and exercise its rights and powers through its respective Related Persons. The exculpatory provisions of the preceding paragraphs shall apply to any such sub agent and to the Related Persons of the Agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.

(i)     With respect to the release of Collateral, the Lenders hereby irrevocably authorize the Agent to release any Lien granted to or held by it upon any Property covered by this Agreement or the other Loan Documents (1) upon termination or expiration of the Total Revolving Commitment and the Full Payment of all Lender Debt; (2) if any such Property constitutes Property being sold or disposed of in compliance with the provisions of the Loan Documents (and the Agent may rely in good faith conclusively on any certificate stating that the Property is being sold or disposed of in compliance with the provisions of the Loan Documents, without further inquiry); (3) that does not constitute a material part of the Collateral; or (4) with the written consent of all Lenders. The Lenders authorize the Agent to subordinate its Liens to any purchase money Lien permitted hereunder. The Agent will not be required to execute any release on terms which, in the Agent's opinion, would expose the Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty. No release of Collateral authorized under this Section 13.1(i) will in any manner discharge, affect, or impair any Liens upon all interests retained, all of which will continue to constitute part of the Property covered by the Loan Documents. The Agent shall have no obligation to

-64-

assure that any Collateral exists or is owned by a Borrower, or is cared for, protected or insured, nor to assure that the Agent's Liens have been properly created, perfected or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any Collateral.

(j)     With respect to perfecting security interests in Collateral which, in accordance with Article 9 of the UCC or any comparable provision of any Lien perfection statute in any applicable jurisdiction, can be perfected only by possession, each Lender hereby appoints each other Lender and the Agent as its agent for the purpose of perfecting such interest. Should any Lender obtain possession of any such Collateral, such Lender shall notify the Agent, and, promptly upon the Agent's request, shall deliver such Collateral to the Agent or in accordance with the Agent's instructions.

(k)     The Agent may forward to each Lender, when complete, copies of any field audit, examination or appraisal report prepared by or for the Agent with respect to any Loan Party or Collateral. Each Lender agrees (a) that neither HFG nor the Agent makes any representation or warranty as to the accuracy or completeness of any Report, and shall not be liable for any information contained in or omitted from any such report; (b) that such reports are not intended to be comprehensive audits or examinations, and that the Agent or any other Person performing any audit or examination will inspect only specific information regarding Lender Debt or the Collateral and will rely significantly upon the Loan Parties' books and records as well as upon representations of the Loan Parties' officers and employees; and (c) to keep all such reports confidential and strictly for such Lender's internal use, and not to distribute any such report (or the contents thereof) to any Person (except to such Lender's participants, attorneys and accountants) or use any Report in any manner other than administration of the Loans and other Lender Debt. Each Lender agrees to indemnify and hold harmless the Agent and any other Person preparing a report from any action such Lender may take as a result of or any conclusion it may draw from any report, as well as from any Claims arising as a direct or indirect result of the Agent furnishing a report to such Lender.

(l)     In the event that a petition seeking relief under Title 11 of the United States Code or any other federal, state or foreign bankruptcy, insolvency, liquidation or similar law is filed by or against the Borrowers, or any of them, any Guarantor, or any other Person obligated under any Loan Document, the Agent is authorized, to the fullest extent permitted by applicable law, to file proofs of claim on behalf of itself and the Lenders in such proceeding for the total amount of obligations owed by the Borrowers, or any of them, any Guarantor, or any other Person under any Loan Document. With respect to any such proof of claim which the Agent may file, each Lender acknowledges that without reliance on such proof of claim, such Lender shall make its own evaluation as to whether an individual proof of claim must be filed in respect of such obligations owed to such Lender and, if so, take the steps necessary to prepare and timely file such individual claim.

(m)     Each Lender agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Agent and the Required Revolving Lenders and Required Term Lenders, it will not take any action to enforce any Lender Debt or Loan Documents or to realize upon any Collateral (whether by judicial action, self-help, notification of Obligors, exercise of setoff or recoupment, or otherwise), accelerate any Lender Debt, or exercise any right that it might otherwise have under applicable law to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral.

(n)     If any Lender shall obtain any payment or reduction of any Lender Debt, whether through set-off or otherwise, in excess of its Pro Rata Share, such Lender shall (1) immediately notify the Agent of such fact and (2) immediately purchase (for cash at face value) from the other Lenders such participations in the affected Lender Debt as are necessary to cause the purchasing Lender to share the excess payment or reduction on a pro rata basis. If any of such payment or reduction is thereafter

\39109424

recovered from the purchasing Lender, the purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(o)    EACH LENDER SHALL INDEMNIFY AND HOLD HARMLESS THE AGENT AND ITS AFFILIATES, DIRECTORS, OFFICERS, AGENTS, REPRESENTATIVES, COUNSEL AND EMPLOYEES AND EACH OTHER PERSON, IF ANY, CONTROLLING THEM OR ANY OF THEIR RESPECTIVE AFFILIATES WITHIN THE MEANING OF EITHER SECTION 15 OF THE SECURITIES ACT OF 1933, AS AMENDED, OR SECTION 20(A) OF THE EXCHANGE ACT (COLLECETIVELY, "**AGENT INDEMNITEES**"), TO THE EXTENT NOT REIMBURSED BY LOAN PARTIES (BUT WITHOUT LIMITING THE INDEMNIFICATION OBLIGATIONS OF THE LOAN PARTIES UNDER ANY DOCUMENTS), ON A PRO RATA BASIS, AGAINST ALL CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY AGENT INDEMNITEE, PROVIDED THE CLAIM RELATES TO OR ARISES FROM AN AGENT INDEMNITEE ACTING AS OR FOR AGENT (IN ITS CAPACITY AS AGENT). In the Agent's discretion, it may reserve for any such Claims made against an Agent Indemnitee, and may satisfy any judgment, order, or settlement relating thereto, from proceeds of Collateral prior to making any distribution of Collateral proceeds to Lenders. If the Agent is sued by any receiver, bankruptcy trustee, debtor-in-possession or other Person for any alleged preference or fraudulent transfer, then any monies paid by the Agent in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to the Agent by each Lender to the extent of its Pro Rata Share.

(p)    Subject to the appointment and acceptance of a successor agent as provided in this Section 13.1(p), the Agent may resign at any time by notifying the Lenders and the Borrower Representative, but unless that resignation is accepted by the Lenders, that resignation will not become effective until the appointment of a successor Agent pursuant to the terms of this Section 13.1(p). Upon any such notice of resignation, the Required Revolving Lenders and the Required Term Lenders shall have the right to appoint a successor for the Agent. If no successor shall have been so appointed by the Required Revolving Lenders and the Required Term Lenders and shall have accepted such appointment within 30 days after the Agent gives notice of its resignation, then the Agent may, on behalf of the Lenders, appoint a successor Agent. Upon the acceptance of its appointment as the Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges, and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed in writing between the Borrowers and such successor. After any Agent's resignation hereunder, the provisions of this Article 13 and Sections 2.9, 13.1(o), and 14.5 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Agent Indemnitees in respect of any actions taken or omitted to be taken by any of them while it was acting as the Agent. Any successor to HFG by merger or acquisition shall continue to be the Agent hereunder without further act on the part of the parties hereto, unless such successor resigns as provided above.

(q)    Each Lender acknowledges that it has, independently and without reliance upon the Agent or any Related Party thereof or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender further acknowledges and agrees that the other Lenders and the Agent have made no representations or warranties concerning any Loan Party, any Collateral, or the legality, validity, sufficiency or enforceability of any Loan Documents or Lender Debt. Each Lender also acknowledges that it will, independently and without reliance upon the Agent, or any Related Party thereof or any other Lender, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

-66-

13.2    **The Term Loan Agent**. At any time and from time to time, the Required Term Lenders may request that the Agent appoint a co-agent designated by the Required Term Lenders (the "**Term Loan Agent**"), which Term Loan Agent shall have all of the powers, responsibilities and duties of the Agent hereunder but only with respect to the Term Lenders and the Term Loans. In connection therewith, the Term Loan Agent may request, and the Agent shall cooperate, in the transfer and sharing of rights and privileges in favor and for the benefit of the Term Lenders hereunder, granting of Liens in favor of the Term Loan Senior Collateral to the Term Loan Agent, with all the rights, powers and privileges in favor of the Term Lenders as contemplated hereunder and under Section 4.3. The terms and conditions of the service, designation, replacement, limitations and other terms of the Term Loan Agent shall be identical to the provisions set forth with respect to the Agent in Section 13.1. The Lenders, the Agent, and the Term Loan Agent agree to enter into such amendments and execute such additional documents as may be reasonably requested by the Required Term Lenders and Term Loan Agent to effectuate the purposes and intent of this Section 13.2.

13.3    **Replacement of Certain Lenders.** If a Lender (1) is a Defaulting Lender, or (2) fails to give its consent to any amendment, waiver or action for which consent of (A) all Revolving Lenders was required and Required Revolving Lenders consented or (B) all Term Lenders was required and Required Term Lenders consented, then, in addition to any other rights and remedies that any Person may have, the Agent may, by notice to such Lender within 120 days after such event, require such Lender to assign all of its rights and obligations under the Loan Documents to one or more Eligible Assignees specified by the Agent, pursuant to appropriate Assignment and Assumption(s) and within 20 days after Agent's notice. Agent is irrevocably appointed as attorney-in-fact to execute any such Assignment and Assumption if the Lender fails to execute same. Such Lender shall be entitled to receive, in cash, concurrently with such assignment, all amounts owed to it under the Loan Documents, including all principal, interest and fees through the date of assignment (but excluding any prepayment charge).

13.4    **No Third-Party Beneficiaries.** This Article 13 is an agreement solely among the Lenders and the Agent, and shall survive Full Payment of the Lender Debt. This Article 13 does not confer any rights or benefits upon the Borrowers or any other Person. As between the Borrowers and the Agent, any action that the Agent may take under any Loan Documents or with respect to any Lender Debt shall be conclusively presumed to have been authorized and directed by the Lenders.

## ARTICLE 14
## MISCELLANEOUS

14.1    **Amendments**. (a) Subject to the other terms of this Section 14.1, no amendment or waiver of any provision of this Agreement or consent to any departure therefrom by a party hereto will be effective unless in a writing signed by the Agent, the Required Revolving Lenders, the Required Term Lenders, the Parent, and the Borrowers, and then such amendment, waiver, or consent will be effective only in the specific instance and for the specific purpose for which given. In addition, the following provisions apply to the effectiveness of any amendment, waiver, or consent with respect to this Agreement:

(1)    Any amendment, waiver, or consent with respect to this Agreement that does not affect the Term Loans or the Term Loan Senior Collateral (including, without limitation, any amendment or waiver to Section 2.1, Article 5, and Sections 6.1, 6.2, and 6.3) will not require the consent of any Term Lender.

(2)    Any amendment, waiver, or consent with respect to this Agreement that does not affect the Revolving Loan or the Revolving Loan Senior Collateral (including, without limitation, any

\39109424

amendment or waiver to Section 2.5 and Article 3) will not require the consent of any Revolving Lender.

(3)     No amendment will be effective to increase the Revolving Commitment of any Revolving Lender without the written consent of that Revolving Lender, and no amendment will be effective to increase the commitment of any Term Lender without the written consent of such Term Lender.

(4)     No amendment will be effective to reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly affected thereby.

(5)     No amendment will be effective to postpone the Maturity Date of any Loan without the written consent of each Lender affected thereby.

(6)     No amendment will be effective (A) to increase any percentage contained in the definition of Borrowing Base (other than the Net Value Factors), (B) to increase the Advance Rate, or (C) to modify any of the Eligibility Criteria, in any such case without the written consent of each Required Revolving Lender.

(7)     No amendment will be effective to release all or a material portion of the Revolving Loan Senior Collateral without the consent of the Agent and each Revolving Lender. No amendment will be effective to release all or a material portion of the Term Loan Senior Collateral without the consent of the Agent and each Term Lender.

(8)     No amendment will be effective to release any Guaranty (other than in accordance with its terms) of any Loan without the written consent of each Lender affected thereby.

(9)     No amendment will be effective to change any of the provisions of this Section 14.1 or the definition of "Required Revolving Lenders" or any other provisions hereof specifying the number or percentage of Revolving Lenders required to waive, amend, or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Revolving Lender affected thereby.

(10)    No amendment will be effective to change any of the provisions of this Section or the definition of "Required Term Lenders" or any other provisions hereof specifying the number or percentage of Term Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Term Lender affected thereby.

(11)    No agreement will be effective to amend, modify, or otherwise affect the rights or duties of the Agent hereunder without the prior written consent of the Agent.

        (b)     No failure on the part of the Agent or any Lender or the Borrowers to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

        (c)     The parties hereto agree to make any change, modification or amendment to this Agreement as may be requested by Fitch, Inc., Moody's Investors Service Inc., or any other rating agency then rating the receivables financing program of any Revolving Lender, so long as any such change, modification or amendment does not materially adversely affect the parties hereto.

\39109424

(d)        Subject to the terms of this Section 14.1, each Revolving Lender agrees that any action taken by the Required Revolving Lenders, in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Required Revolving Lenders of their respective powers set forth herein or therein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Revolving Lenders, and each Term Lender agrees that any action taken by the Required Term Lenders, in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Required Term Lenders of their respective powers set forth herein or therein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Term Lenders.

(e)        Notwithstanding anything to the contrary contained herein, no Defaulting Lender shall have any right to approve or vote on any amendment, waiver, or consent hereunder, except that the Revolving Commitment of such Defaulting Lender shall not be increased or extended without the consent of such Defaulting Lender.

14.2    **Notices**. All notices and other communications hereunder shall, unless otherwise stated herein, be in writing (which may include email, facsimile and telephone calls followed by hard copy or facsimile communication and notices and other communications submitted through the HFG Web Portal) and shall be delivered to each applicable party, at the address set forth under its name on Schedule I hereto (or in the case of a Lender, as set forth in the Assignment and Assumption pursuant to which it became a party hereto) or at such other address as shall be designated by such party in a notice to the other parties hereto. All notices by the Borrowers to the Agent shall be delivered by an Authorized Officer. Notices and communications submitted through the HFG Web Portal or sent by email and facsimile shall be effective when sent (and shall be immediately followed by hard copy sent by regular mail), and notices and communications sent by other means shall be effective when received. Without in any way limiting the Borrowers' obligation to confirm in writing any telephonic notice of a borrowing or any notice of a borrowing submitted through the HFG Web Portal, the Agent may act without liability upon the basis of telephonic notice or any notice or other communication submitted through the HFG Web Portal believed by the Agent in good faith to be from an Authorized Officer of the Borrowers prior to receipt of separate written confirmation.

14.3    **Assignments; Participations**. (a) This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns; provided, that no Loan Party may assign any of its rights or obligations hereunder or any interest herein without the prior written consent of the Agent and Lenders.

(b)        Subject to the conditions set forth in Section 14.3(c), each Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its commitments and the advances or loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of the Agent, provided that no consent of the Agent shall be required for an assignment to an assignee that is a Lender immediately prior to giving effect to such assignment or to any Affiliate or branch of any Lender, or to any trust or special purpose funding vehicle, whether or not the Agent maintains any interest in such trust or special purpose funding vehicle. The Agent shall notify the Borrower Representative of any such assignment; provided, however, that failure to so notify the Borrower Representative shall not affect the validity of such assignment. In the event that, as a result of one or more assignments pursuant to this Section 14.3(b), there shall be more than one Revolving Lender and/or Term Lender hereunder, then the commitment of each Revolving Lender and/or Term Lender, as the case may be, to make Revolving Loans and Term Loans, respectively, hereunder shall be several and not joint.

-69-

(c)    Assignments (other than assignments of any Loan to any Affiliate of HFG) shall be subject to the following additional conditions:

(1)    the assignee shall be an Eligible Assignee with the financial ability to perform as a Lender under this Agreement;

(2)    with respect to assignments of the Revolving Commitments, except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire amount of the assigning Revolving Lender's Revolving Commitment or Revolving Advances, the amount of the Revolving Commitment or Revolving Advances of the assigning Revolving Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent) shall not be less than $1,000,000 unless the Agent otherwise consents; and

(3)    the parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; provided that such fee shall not apply to an assignment to another Lender or an Affiliate of the assigning Lender.

(d)    Subject to acceptance by the Agent, as the case may be, pursuant to Section 14.3(e) with respect to assignments of any portion of the Loans, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and shall be bound by the terms of each of the other Loan Documents, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement and the other Loan Documents (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.9 and 14.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 14.3 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 14.3(f).

(e)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee and the processing and recordation fee referred to in clause (3) of Section 14.3(c), if applicable, and any written consent to such assignment required by Section 14.3(b), the Agent shall accept such Assignment and Assumption.

(f)    Any Lender may, without the consent of the Borrowers, any other Lender or the Agent, sell participations to one or more banks or other entities (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including, if applicable, all or a portion of its commitments and the loans and advances owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrowers, the other Lenders and the Agent shall continue to deal solely and directly with such Lender in connection with all of such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement, except that any such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 14.1(a) that affects such Participant. Each Borrower agrees, to the fullest extent permitted under applicable law, that each Participant shall be entitled to the benefits of Section 2.9 to the same extent as if it were a Lender

-70-

and had acquired its interest by assignment pursuant to Section 14.3(c). A Participant shall not be entitled to receive any greater payment under Section 2.9 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent.

(g)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights (and subject to the consent of the Agent, the Collateral) under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 14.3 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

14.4    **Further Assurances; Financing Statements**. Each Loan Party shall, and shall cause its Subsidiaries to, at such Loan Party's expense, promptly execute and deliver all further instruments and documents, and take all further action that the Agent or any Lender may request, from time to time, as may be necessary or proper in the reasonable opinion of the Agent or such Lender to carry out more effectively the provisions and purposes of this Agreement and the other Loan Documents, in order to perfect, protect or more fully evidence the assignment as security of the Receivables and the other Collateral, or to enable the Agent and Lenders to exercise or enforce their respective rights hereunder and under the other Loan Documents. Without limiting the generality of the foregoing, each Loan Party shall, upon the request of the Agent, execute and file such UCC financing or continuation statements, or amendments thereto or assignments thereof, and such other documents or notices, as may be, in the opinion of the Agent, necessary or appropriate. Each Borrower hereby authorizes the Agent to file one or more financing or continuation statements and amendments thereto and assignments thereof, relative to all or any of the Collateral now existing or hereafter arising without such Borrower's signature where permitted by law. If any Loan Party or any of its Subsidiaries fails to perform any of its agreements or obligations under this Agreement, the Agent may (but shall not be required to) itself perform, or cause performance of, such agreement or obligation, and the expenses of the Agent incurred in connection therewith shall be payable by the Borrowers.

14.5    **Costs and Expenses; Collection Costs**. (a) Each Borrower agrees to pay on demand (1) all reasonable non-legal costs and expenses of the Agent and each Lender in connection with the syndication of the Loans and in connection with the preparation, execution, delivery and administration of this Agreement and the Loan Documents; (2) the reasonable fees and expenses of counsel for each member of the Lender Group in connection with this Agreement and the transactions contemplated hereby; (3) all reasonable costs and out-of-pocket expenses, if any (including reasonable counsel fees and expenses), of the Agent and the Lenders in connection with any waiver, modification, supplement, or amendment hereto, or any action to collect, enforce, protect, maintain, preserve or foreclose its interests with respect to any Loan Document or Collateral and (4) any and all wire fees for each wire initiated by Agent or any Lender to or for the benefit of any Borrower.

(b)    Each Borrower further agrees to pay on the Closing Date and thereafter on demand (1) all reasonable costs and expenses incurred by the Agent or any Lender in connection with periodic audits of the Collateral (including the Receivables, books and records, accounting, financial and general business matters of each Loan Party; (2) all reasonable costs and expenses incurred by the Agent to accommodate any significant coding or data system changes made by any Borrower that would affect the transmission or interpretation of data received through the interface; and (3) all reasonable costs and expenses incurred by the Agent resulting from a lack of either cooperation or responsiveness of any Borrower to agreed-upon protocol and schedules; provided, that such Borrower has been informed of the alleged lack of cooperation or responsiveness and has been provided the opportunity to correct such problems; and (4) all successor and substitute servicing costs.

\39109424

(c)     Without limiting the generality of the foregoing, the expenses, costs, charges and fees referred to in this Section 14.5 may include the following: recording costs, appraisal costs, paralegal fees, costs and expenses; accountants' fees, costs and expenses; court costs and expenses; photocopying and duplicating expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram charges; telecopier charges; secretarial overtime charges; and expenses for travel, lodging and food.

(d)     Any and all expenses that Borrowers may be responsible for pursuant to this Section 14.5 on the Closing Date shall first be offset against the $105,000 non-refundable deposit made by Borrowers (or their affiliate) to the Agent (or its affiliate) in accordance with that certain letter agreement from Healthcare Finance Group, LLC to the Agent.

(e)     Absent the occurrence and continuance of an Event of Default, (1) the Loan Parties shall only be obligated to reimburse the Agent for up to $45,000 plus out-of-pocket costs and expenses incurred in connection with examinations, visits and discussions conducted pursuant to Section 9.4 during any calendar year, and (2) the Borrowers shall only be obligated to reimburse the Agent for one appraisal conducted pursuant to Section 9.4 during each calendar year.

14.6    **Confidentiality**. Each of the parties hereto hereby acknowledges that this Agreement and the other Loan Documents (including, without limitation, any information relating to the Borrowers or any member of the Lender Group) contain confidential and proprietary information. Unless otherwise required by applicable law, each of the parties hereto hereby agrees to maintain the confidentiality of this Agreement (and all drafts, memos and other documents delivered in connection herewith including, without limitation, any information relating to the Borrowers or any member of the Lender Group delivered hereunder) in communications with third parties and otherwise and to take all reasonable actions to prevent the unauthorized use or disclosure of and to protect the confidentiality of such confidential information, except that such confidential information may be disclosed (in accordance with applicable laws) to (1) the Borrowers' legal counsel, accountants and investors; (2) each member of the Lender Group, investors in and creditors of any Lender, or the Agent, appropriate rating agencies with respect to such Persons, and each of their respective legal counsel and auditors; (3) any assignee or Participant or potential assignee or Participant that has agreed to comply with this Section 14.6 (and any such assignee or Participant or potential assignee or Participant may disclose such information to Persons employed or engaged by them as described in clause (2) above); (4) in connection with the syndication of any Loan, any prospective Lender that has agreed to comply with this Section 14.6 (and any such prospective Lender may disclose such information to Persons employed or engaged by them as described in clause (2) above); (5) any Person, if such information otherwise becomes available to such Person or publicly available through no fault of any party governed by this Section 14.6; (6) any Governmental Entity requesting such information; and (7) any other Person with the written consent of each affected party, which consent shall not be unreasonably withheld, and provided further that no Borrower shall disclose such confidential information to any financial adviser, except with the consent of the Agent or the applicable Lender. Each member of the Lender Group hereby agrees to, and shall take reasonable steps to cause each other member of the Lender Group to, comply with all applicable laws (including the provisions set forth in the Business Associate Agreement) regarding confidential patient information, if any, it receives in connection with the transactions described in this Agreement.

14.7    **Term and Termination; Fees**. (a) This Agreement shall have an initial term commencing on the Closing Date and expiring on the Scheduled Maturity Date (the "**Initial Term**"). Thereafter, the term of this Agreement with respect to the Revolving Loan and Revolving Commitments shall be automatically extended for annual successive terms (each, a "**Renewal Term**") commencing on the first day following the Initial Term or a Renewal Term, as the case may be, and expiring on the date twelve months thereafter, unless the Agent, any Revolving Lender, or the Borrowers provide notice not

-72-

less than 90 days prior to the expiration of the Initial Term or a Renewal Term, as the case may be, that such Person does not intend to extend the term of this Agreement.

(b)    The obligations of the Lenders under this Agreement shall continue in full force and effect from the Closing Date until the Maturity Date.

(c)    If the Total Revolving Commitment is reduced or terminated or the Revolving Loan becomes due and payable prior to the scheduled end of the Term (including by reason of an Event of Default), the Borrowers shall pay to the Agent for the account of the Revolving Lenders the Early Termination Fee, if any.

(d)    The termination of this Agreement shall not affect any rights of the Agent or any Lender or any obligations of the Borrowers arising on or prior to the effective date of such termination, and the Borrowers' duties and obligations hereunder shall continue to be fully operative until Full Payment of all Lender Debt (including, without limitation, all Lender Debt incurred on or prior to such termination).

(e)    The Liens and rights granted to the Agent hereunder for the benefit of the Lenders shall continue in full force and effect, notwithstanding the termination of this Agreement, until the Full Payment of all Lender Debt. Upon the termination of all commitments and obligations of the Lenders and the Full Payment of all Lender Debt in cash, the Agent shall, at the Borrowers' sole cost and expense, execute and deliver such documents as the Borrower Representative shall reasonably request to evidence such termination.

(f)    All indemnities of the Parent and each Borrower contained herein shall survive termination hereof unless otherwise provided. In furtherance and not in limitation of the foregoing, if after receipt of any payment of all or any part of the Lender Debt, the Agent or any Lender is for any reason compelled to surrender such payment to any Person or entity because such payment is determined to be void or voidable as a preference, an impermissible setoff, a diversion of trust funds or for any other reason, this Agreement shall continue in full force (except that the Revolving Commitment shall have been terminated), and each Borrower shall be liable to, and shall indemnify and hold the Agent and each Lender harmless for the amount of such payment surrendered until the applicable Lenders and the Agent shall have been finally and irrevocably paid in full in cash. The provisions of the foregoing sentence shall be and remain effective notwithstanding any contrary action which may have been taken by the Agent or any Lender in reliance upon such payment, and any such contrary action so taken shall be without prejudice to the Agent's and Lenders' rights under this Agreement and will be deemed to have been conditioned upon such payment having become final and irrevocable.

14.8    **No Liability**. Neither this Agreement nor any document executed in connection herewith shall constitute an assumption by the Agent or any Lender of any obligation to any Obligor or any patient or customer of any Borrower. Notwithstanding any other provision herein, no recourse under any obligation, covenant, agreement or instrument of the Agent or any Lender contained herein or with respect hereto shall be had against any Related Person whether arising by breach of contract, or otherwise at law or in equity (including any claim in tort), whether express or implied, it being understood that the agreements and other obligations of the Agent and each Lender herein and with respect hereto are solely its corporate obligations; provided, however, nothing herein shall operate as a release of any liability which may arise as a result of such Related Person's gross negligence or willful misconduct.

14.9    **Entire Agreement; Severability**. This Agreement, including all exhibits and schedules hereto and the other Loan Documents, embody the entire agreement and understanding of the parties concerning the subject matter contained herein. This Agreement supersedes any and all prior agreements

-73-

and understandings between the parties, whether written or oral. If any provision of this Agreement shall be declared invalid or unenforceable, the parties hereto agree that the remaining provisions of this Agreement shall continue in full force and effect.

14.10  **Governing Law.** THIS AGREEMENT, AND ALL MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT, SHALL, IN ACCORDANCE WITH SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAWS PRINCIPLES THEREOF THAT WOULD CALL FOR THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION, EXCEPT TO THE EXTENT THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTERESTS GRANTED HEREUNDER, OR REMEDIES RELATED THERETO, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

14.11  **Waiver of Jury Trial, Jurisdiction, and Venue.** EACH OF THE PARTIES HERETO HEREBY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN THE EVENT OF ANY LITIGATION WITH RESPECT TO ANY MATTER RELATED TO THIS AGREEMENT, AND HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN NEW YORK CITY, NEW YORK COUNTY, NEW YORK, IN CONNECTION WITH ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. IN ANY SUCH LITIGATION, EACH OF THE PARTIES HERETO WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS AND AGREES THAT SERVICE THEREOF MAY BE MADE BY CERTIFIED OR REGISTERED MAIL DIRECTED TO THE PARTIES HERETO AT THEIR ADDRESSES SET FORTH ON SCHEDULE I HERETO.

14.12  **Execution in Counterparts.** This Agreement may be executed in counterparts, each of which when so executed will be deemed to be an original and all of which when taken together will constitute one and the same agreement.

14.13  **No Proceedings.** Each of the Parent and each Borrower hereby agrees that it will not institute against any Lender any proceeding of the type referred to in clause (9) of Section 12.1 so long as any senior indebtedness issued by such Lender shall be outstanding or there shall not have elapsed one year plus one day since the last day on which any such senior indebtedness shall have been outstanding.

14.14  **Confidentiality and Notices.** Each Borrower hereby grants the Agent the right to place one or more advertisements in newspapers and journals, on its website and in its other materials (all, at its own expense) that recites the transaction hereunder, the amount of such transaction and utilizes the corporate logo of the Borrowers.

14.15  **Accounting Information.** Each Borrower hereby authorizes the Agent and the Lenders to discuss the financial condition of the Borrowers, or any of them, with their independent public accountants and agrees that such discussion or communication shall be without liability to such Person or the independent public accountants.

14.16  **HFG Web Portal; Lender Platform.** (a) The Agent may, but will not be required to, establish and make available to the Borrowers, and each Borrower hereby authorizes the Agent to establish make available to the Borrowers, a secure website, FTP site, or other Internet interface accessible only by the Agent and the Borrowers (and separate from the computer interface or FTP site used for Transmissions) through which the Borrowers may access certain account information relating to the Loans and this Agreement (that secure website, FTP site, or other Internet interface, the "HFG Web Portal"). The HFG Web Portal, if established and made available to any Borrower, will be provided "as

-74-

is" and "as available." The Agent does not warrant the adequacy of the HFG Web Portal for any particular purpose and expressly disclaims liability for errors or omissions in any information provided through the HFG Web Portal. No warranty of any kind, express, implied, or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights, or freedom from viruses or other code defects, is made by the Agent in connection with the HFG Web Portal. In no event will the Agent or any of its Related Persons have any liability to the Borrowers or any other Person for damages of any kind, including, without limitation, direct or indirect, special, incidental, or consequential damages, losses, or expenses (whether in tort, contract, or otherwise) arising out of the Agent's establishing the HFG Web Portal or making the HFG Web Portal available to the Borrowers or out of any Borrower's use of the HFG Web Portal. All information provided through the HFG Web Portal, including, without limitation, all HFG Web Portal Communications, shall remain subject in all respects to the terms and conditions of this Agreement.

(b)      The Agent may, but will not be required to, make the Lender Platform Communications available to the Lenders by posting the Lender Platform Communications on Debt Domain, Intralinks, Syndtrak, or a substantially similar electronic transmission system (the "**Lender Platform**"). The Lender Platform is provided "as is" and "as available." The Agent does not warrant the adequacy of the Lender Platform and expressly disclaim liability for errors or omissions in the Lender Platform Communications. No warranty of any kind, express, implied, or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights, or freedom from viruses or other code defects, is made by the Agent in connection with the Lender Platform Communications or the Lender Platform. In no event will the Agent or any of its Related Persons have any liability to any Borrower, any Lender, or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental, or consequential damages, losses, or expenses (whether in tort, contract, or otherwise) arising out of any Borrower's or the Agent's transmission of communications through the Lender Platform. All information provided through the Lender Platform, including, without limitation, all Lender Platform Communications, shall remain subject in all respects to the terms and conditions of this Agreement.

14.17   **USA PATRIOT Act**. Each Borrower acknowledges and consents that, in accordance with the reporting requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), the Lenders may require, obtain, verify and record information that identifies such Borrower, which information includes the name and addresses of such Borrower and its principals, as well as any other information that will allow the Agent and the Lenders to identify such Borrower and its principals in accordance with, and otherwise comply with the requirements of, the Act.

14.18   **Nature and Extent of Each Loan Party's Liability**.

(a)      *Joint and Several Liability*. Each Loan Party agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to the Agent and the Lenders the prompt Full Payment of all Lender Debt and the prompt performance of all agreements under the Loan Documents. Each Loan Party agrees that its obligations hereunder constitute continuing obligations, that such obligations shall not be discharged until the Full Payment of all Lender Debt, and that such obligations are absolute and unconditional, irrespective of, and will not be discharged, impaired, or affected by: (i) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Lender Debt or Loan Document, or any other document, instrument or agreement to which any Loan Party is or may become a party or be bound, or the power or authority or lack thereof of any other Loan Party to incur its obligations; (ii) the absence of any action to enforce this Agreement (including this Section 14.18) or any other Loan Document, or any waiver, consent or indulgence of any kind by the Agent or any Lender with respect thereto; (iii) the existence, value or condition of, or failure to perfect a Lien or to preserve rights against, any security or guaranty for the Lender Debt or any action,

or the absence of any action, by the Agent or any Lender in respect thereof (including the release of any security or guaranty); (iv) the insolvency of any Loan Party; (v) the payment in full of all of the Lender Debt at any time or from time to time, except the Full Payment of all Lender Debt; (vi) the existence or non-existence of any Loan Party as a legal entity; (vii) any transfer by any Loan Party of all or any part of any Collateral; (viii) any statute of limitations affecting the liability of any other Loan Party hereunder or under any of the other Loan Documents or the ability of the Agent or the Lenders to enforce this Agreement, this Section 14.18, or any other provision of any Loan Document; (ix) any right of offset, counterclaim or defense of any Loan Party, including those that have been waived by the Loan Parties pursuant to this Section 14.18; (x) any election by the Agent or any Lender in a bankruptcy proceeding for the application of Section 1111(b)(2) of Title 11 of the United States Code; (xi) any borrowing or grant of a Lien by any other Loan Party, as debtor-in-possession under Section 364 of Title 11 of the United States Code or otherwise; (xii) the disallowance of any claims of the Agent or any Lender against any Loan Party for the repayment of any Lender Debt under Section 502 of Title 11 of the United States Code or otherwise; or (xiii) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except Full Payment of all Lender Debt.

(b)     *Permitted Actions.* Except as otherwise expressly provided by this Agreement, the Agent and Lenders may from time to time, in their sole discretion and without notice to any Loan Party, take any or all of the following actions: (i) retain or obtain a Lien in any asset of any Loan Party or any other Person to secure any of the Lender Debt; (ii) retain or obtain the primary or secondary obligation of any obligor or obligors, in addition to the Loan Parties, with respect to any of the Lender Debt; (iii) extend or renew for one or more periods (whether or not longer than the original period), or, with the agreement of the Borrowers, alter or exchange any of the Lender Debt; (iv) waive, ignore, or forbear from taking action or otherwise exercising any of its default rights or remedies with respect to any default by the Loan Parties under the Loan Documents; (v) release, waive, or compromise any obligation of the Loan Parties hereunder or any obligation of any nature of any other obligor primarily or secondarily obligated with respect to any of the Lender Debt; (vi) release Agent's Liens in, or surrender, release or permit any substitution or exchange for, all or any part of the Collateral now or hereafter securing any of the Lender Debt or any obligation hereunder, or extend or renew for one or more periods (whether or not longer than the original period) or release, waive, compromise, alter or exchange any obligations of any nature of any Loan Party with respect to any such property; and (vii) demand payment or performance of any of the Lender Debt from any Loan Party at any time or from time to time, whether or not the Agent or any Lender has exercised any of its rights or remedies with respect to any property securing any of the Lender Debt or any obligation hereunder or proceeded against any other Loan Party or other Person primarily or secondarily liable for payment or performance of any of the Lender Debt.

(c)     *Waivers.*

(i)     Each Loan Party expressly waives, to the extent not prohibited by applicable law, and except to the extent otherwise expressly required pursuant to this Agreement: (1) in the case of a Guarantor, all rights to revoke its guaranty pursuant to this Section 14.18 at any time; (2) notice of the acceptance by the Agent and the Lenders; (3) notice of the existence, creation, payment, nonpayment, performance or nonperformance of all or any of the Lender Debt; (4) presentment, demand, notice of dishonor, protest, notice of protest and all other notices whatsoever with respect to the payment or performance of the Lender Debt or the amount thereof or any payment or performance by the Loan Parties hereunder; (5) all diligence in collection or protection of or realization upon the Lender Debt or any thereof, any obligation hereunder or any security for or guaranty of any of the foregoing; (6) any right to direct or affect the manner or timing of the Agent's enforcement of its rights or remedies; (7) any and all defenses that would otherwise arise upon the occurrence of any event or contingency described in Sections 14.18(a) or 14.18(b) or upon the taking of any action by the Agent or Lenders permitted hereunder; and (8) all other principles or provisions of law, if any, that conflict with the terms of this

-76-

\39109424

Section 14.18, including the effect of any circumstances that may or might constitute a legal or equitable discharge of a guarantor or surety;

(ii)    Each Loan Party expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel the Agent or Lenders to marshal assets or to proceed against any Loan Party, other Person or security for the payment or performance of any Lender Debt before, or as a condition to, proceeding against such Loan Party.

(iii)    The Agent and Lenders may, in their discretion, pursue such rights and remedies hereunder, under the other Loan Documents and under applicable law as they deem appropriate, including realization upon Collateral by judicial foreclosure or non-judicial sale or enforcement, without affecting any rights and remedies under this Section 14.18. If, in the exercise of any rights or remedies, the Agent or any Lender forfeits any of its rights or remedies, including its right to enter a deficiency judgment against any Loan Party or any other Person, whether because of any applicable laws pertaining to "election of remedies" or otherwise, each Loan Party consents to such action by the Agent or such Lender and waives any claim based upon such action, even if the action may result in loss of any rights of subrogation that any Loan Party might otherwise have had but for such action.

(iv)    If the Agent bids at any foreclosure or trustee's sale or at any private sale, the Agent may bid all or a portion of the Lender Debt and the amount of such bid need not be paid by the Agent but shall be credited against the Lender Debt. The amount of the successful bid at any such sale, whether the Agent or any other Person is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral, and the difference between such bid amount and the remaining balance of the Lender Debt shall be conclusively deemed to be the amount of the Lender Debt guaranteed under this Section 14.18, notwithstanding that any present or future law or court decision may have the effect of reducing the amount of any deficiency claim to which the Agent or any Lender might otherwise be entitled but for such bidding at any such sale.

(v)    It is agreed among each Loan Party, the Agent, and the Lenders that the provisions of this Section 14.18 are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, the Agent and each Lender would decline to make the Loans. Each Loan Party acknowledges that its waivers pursuant to this Section 14.18 are necessary to the conduct and promotion of its business, and can be expected to benefit such business.

(d)    *Extent of Liability*. Notwithstanding any provision herein contained to the contrary, each Loan Parties' liability under this Section 14.18 shall be limited to an amount not to exceed as of any date of determination the greater of:

(i)    the net amount of all proceeds of the Loans directly or indirectly loaned or otherwise transferred to, or incurred for the benefit of, such Loan Party (including, without limitation, the net amount of all proceeds of the Revolving Advances directly or indirectly re-loaned or otherwise transferred to, or incurred for the benefit of, such Loan Party), *plus* interest and fees thereon at the applicable rate specified in this Agreement; or

(ii)    the amount that could be claimed by the Agent and the Lenders from such Loan Party under this Section 14.18 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of Title 11 of the United States Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, such Loan Parties' right of contribution and indemnification from each other Loan Party hereunder.

\39109424

(e)    *Rights of Contribution.* To the extent that any Loan Party shall make a payment under this Section 14.18 of all or any of the Lender Debt (each a "**Loan Party Payment**") which, taking into account all other Loan Party Payments then previously or concurrently made by the other Loan Parties, exceeds the amount which such Loan Party would otherwise have paid if each Loan Party had paid the aggregate guaranteed Lender Debt satisfied by such Loan Party Payment in the same proportion that such Loan Parties' "Allocable Amount" (as defined below) (in effect immediately prior to such Loan Party Payment) bore to the aggregate Allocable Amounts of all of Loan Parties in effect immediately prior to the making of such Loan Party Payment, then, following the Full Payment of all Lender Debt, such Loan Party shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each of the other Loan Parties for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Loan Party Payment. As of any date of determination, the "**Allocable Amount**" of any Loan Party shall be equal to the maximum amount of the claim that could then be recovered from such Loan Party under this Section 14.18 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of Title 11 of the United States Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law. This Section 14.18(e) is intended only to define the relative rights of the Loan Parties and nothing set forth in this Section 14.18 is intended to or shall impair the obligations of Loan Parties, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Section 14.18. The rights of the parties under this Section 14.18(e) shall only be exercisable upon the Full Payment of all Lender Debt. The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of any Loan Party to which such contribution and indemnification is owing.

(f)    *Joint Enterprise.* Each Loan Party has requested that the Agent and Lenders make this credit facility available to the Loan Parties on a combined basis, in order to finance the Loan Parties' business most efficiently and economically. The Loan Parties' business is a mutual and collective enterprise.

(g)    *Subordination.* Each Loan Party hereby irrevocably subordinates any claims, including any rights at law or in equity to payment, subrogation, reimbursement, exoneration, contribution, indemnification or set off, that it may have at any time against any other Loan Party, howsoever arising, to the Full Payment of all Lender Debt.

(h)    *Subrogation.* No Loan Party will exercise any rights that such Loan Party may acquire by way of subrogation under this Section 14.18, by any payment hereunder or otherwise, until Full Payment of all Lender Debt and the Agent and Lenders shall have no further obligations to the Loan Party under the Loan Documents or otherwise. If any amount shall be paid to any Loan Party on account of such subrogation rights at any other time, such amount shall be held in trust for the benefit of the Agent and Lenders and shall be forthwith paid to the Agent to be credited and applied to the Lender Debt, whether matured or unmatured, in such manner as the Agent shall determine.

14.19    **Inter-Borrower Provision.** Each Borrower acknowledges that it will enjoy significant benefits from the business conducted by the other Borrowers (regardless of whether or not such Borrower actually receives any of the proceeds of the Loans) because of, inter alia, their combined ability to bargain with other Persons including, without limitation, their ability to receive the credit facility on favorable terms granted by this Agreement and the other Loan Documents which would not have been available to an individual Borrower acting alone. Each Borrower has determined that it is in its best interest to procure the credit facility which each Borrower may utilize directly and which received the credit support of the other Borrower as contemplated by this Agreement and the other Loan Documents.

\39109424

14.20 **Appointment of Borrower Representative**. (a) Each Borrower hereby designates Borrower Representative as its representative and agent on its behalf for the purposes of issuing Borrowing Base Reports, and giving instructions with respect to the disbursement of the proceeds of the Revolving Advances, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or Borrowers under the Loan Documents. Borrower Representative hereby accepts such appointment. Notwithstanding anything to the contrary contained in this Agreement, no Borrower other than Borrower Representative shall be entitled to take any of the foregoing actions. The proceeds of each Revolving Advance made hereunder shall be advanced to or at the direction of Borrower Representative; provided, however, at no time shall Borrower Representative or any other Borrower permit the outstanding Revolving Advances actually advanced to a Borrower and used in its business exceed the Eligible Receivables of such Borrower.

(b) Agent and each Lender may regard any notice or other communication pursuant to any Loan Document from Borrower Representative as a notice or communication from all Borrowers, and may give any notice or communication required or permitted to be given to any Borrower or all Borrowers hereunder to Borrower Representative on behalf of such Borrower or all Borrowers. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative will be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

\39109424

The parties are signing this Revolving and Term Loan and Security Agreement as of the date stated in the preamble.

BORROWERS:

RESTORA HOSPITAL OF MESA, LLC

By: _____
Name:  Rod Laughlin
Title:  Manager

RESTORA HOSPITAL OF SUN CITY, LLC

By: _____
Name:  Rod Laughlin
Title:  Manager

PARENT:

RESTORA HEALTHCARE HOLDINGS, LLC

By: _____
Name:  Rod Laughlin
Title:  President & CEO

*Signature page to*
*Revolving and Term Loan and Security Agreement*

The parties are signing this Revolving and Term Loan and Security Agreement as of the date stated in the preamble.

AGENT:

HEALTHCARE FINANCE GROUP, LLC,
as the Agent

By: _____

Name: Alan Regdos

Title: Senior Vice President

LENDERS:

HEALTHCARE FINANCE GROUP, LLC,
as a Revolving Lender and a Term Lender

By: _____

Name: Alan Regdos

Title: Senior Vice President

Revolving Commitment:        $7,000,000
Term Loan A Amount:          $3,000,000
Term Loan B Amount:          $2,000,000

Address for Notices:

Healthcare Finance Group, LLC
199 Water Street, 31st Floor
New York, New York 10038
Attention:   National Portfolio Manager
       cc:   Chief Credit Officer
             General Counsel
Tel: (212) 785-8500
Fax: (212) 785-8501

*Signature page to*
*Revolving and Term Loan and Security Agreement*

EXHIBIT I
ELIGIBILITY CRITERIA

The following shall constitute the eligibility criteria for acceptance of Receivables for financing and inclusion in the Borrowing Base under the Agreement (the "**Eligibility Criteria**"):

(1)     The information provided by any Borrower with respect to each such Receivable is complete and correct and all documents, attestations, and agreements relating thereto that have been delivered to the Agent are true and correct.

(2)     All information set forth in the bill and supporting claim documents with respect to such Receivable is true, complete and correct; if additional information is requested by the Obligor, the Borrowers have or will promptly provide the same, and if any error has been made with respect to such information, the Borrowers will promptly correct the same and, if necessary, rebill such Receivable.

(3)     Except with respect to Unbilled Receivables, a Borrower has billed the applicable Obligor within 30 days after the Last Service Date and has delivered to such Obligor all requested supporting claim documents with respect to such Receivable and no amounts with respect to such Receivable have been paid as of the date and time of the inclusion of such Receivable in the Borrowing Base. The Borrowers have, or have the right to use, valid identification numbers and licenses to generate valid Receivables.

(4)     The Borrowers' Medicare and Medicaid cost reports with respect to such Receivable for all cost reporting periods ending on or before the date of the last audited cost report have been examined and audited by (A) as to Medicaid, the applicable state agency or other CMS designated agent or agents of such state agency, charged with such responsibility, or (B) as to Medicare, the Medicare intermediary or other CMS designated agents charged with such responsibility; and there is no basis for any Governmental Entity to assert an offset with respect to such Receivable against any Borrower.

(5)     Each such Receivable (A) is payable in an amount not less than its Expected Net Value, by the Obligor or Obligors identified by a Borrower in its records as being obligated to do so, (B) is based on an actual and bona fide rendition of services or sale of goods to the patient by a Borrower in the ordinary course of business, (C) is denominated and payable only in U.S. dollars in the United States, (D) is an account or general intangible within the meaning of the UCC of the state in which such Borrower is incorporated or formed, and is not evidenced by any instrument or chattel paper, (E) shall be subject to a patient consent form approved by the Agent and executed by the applicable patient, (F) is net of any contractual allowances, deductible limitations, commissions, fees, or other discounts, (G) does not cover any treatment for alcohol, drug or substance abuse, workers' compensation claims or personal injury claims and (H) satisfies all applicable requirements of, and was originated and processed in accordance with, the billing and collection requirements of the applicable Obligor. There are no payors other than the Obligor or Obligors identified in the Borrowers' records as the payors primarily liable on such Receivable.

(6)     Each such Receivable (A) is not the subject of any action, suit, proceeding or dispute (pending or threatened), setoff, counterclaim, defense, abatement, suspension, deferment, deductible, reduction or termination by the Obligor thereof (except for statutory rights of Governmental Entities that are not pending or threatened), (B) is not within 45 days of the statutory limit for collection applicable to the Obligor thereof and is not aged more than 150 days from its Last

Service Date, (C) with respect to Unbilled Receivables, was not aged more than 30 days (or, with respect only to Unbilled Receivables arising from the provision of long term acute care goods and services under Medicare, 60 days) after the Last Service Date, and (D) with respect to Unbilled Receivables in respect of patients who have been discharged, the Receivable has not remained unbilled for 30 or more days since the Last Service Date.

(7)     Each such Receivable is not due from any Governmental Entity based on any cost report settlement or expected settlement.

(8)     No Borrower has any Guaranty of, letter of credit providing credit support for, or collateral security for, such Receivable, other than any such guaranty, letter of credit or collateral security as has been assigned to the Agent, and any such guaranty, letter of credit or collateral security is not subject to any Lien in favor of any other Person.

(9)     The goods and services constituting the basis for such Receivable were medically necessary for the customer or patient, and the customer or patient has received such goods and services.

(10)    The fees charged for the goods and services constituting the basis for such Receivable are consistent with the usual, customary, and reasonable fees charged by other similar medical providers for the same or similar goods in the Borrowers' community and in the community in which the patient resides.

(11)    The Obligor with respect to each such Receivable (A) is not currently the subject of any bankruptcy, insolvency or receivership proceeding, nor is it unable to make payments on its obligations when due, (B) is located in the United States of America, (C) is not a subsidiary, parent or other Person that is an Affiliate of any Borrower, (D) is not the Obligor of any Receivable that was a Defaulted Receivable in the past 12 months, and (E) is an Insurer with a credit quality acceptable to the Agent or a Governmental Entity. For purposes hereof, "**Defaulted Receivable**" means a Receivable as to which the Obligor thereof or any other Person obligated thereon has taken any action, or suffered any event to occur, of the type described in clause (9) of Section 12.1.

(12)    The financing of such Receivables hereunder is made in good faith and without actual intent to hinder, delay or defraud present or future creditors of any Borrower.

(13)    Any insurance policy, contract or other instrument obligating an Obligor to make payment with respect to such Receivable (A) does not contain any provision prohibiting the grant of a Lien in such payment obligation from the patient to the Borrowers, or from the Borrowers to the Agent, (B) has been duly authorized and, together with such Receivable, constitutes the legal, valid and binding obligation of the Obligor in accordance with its terms, (C) together with such Receivable, does not contravene in any material respect any requirement of law applicable thereto, and (D) was in full force and effect and applicable to the customer or patient at the time the goods or services constituting the basis for such Receivable were sold or performed.

(14)    The insurance policy, contract or other instrument obligating a Governmental Entity to make payment with respect to such Receivable (A) has been duly authorized and, together with the applicable Receivable, constitutes the legal, valid and binding obligation of the Governmental Entity in accordance with its terms, (B) together with the applicable Receivable, does not contravene in any material respect any requirement of law applicable thereto, and (C) was in full force and effect and applicable to the customer or patient at the time the goods or services constituting the basis for such Receivable were sold or performed.

(15)    No consents by any third party to the grant of a security interest in such Receivable are required other than consents previously obtained in writing by the Borrowers, a copy of each such consent having been provided to the Agent.

(16)    The inclusion of such Receivable in the Borrowing Base would not increase the total aggregate gross value of all Receivables in the Borrowing Base for any Obligor (or group of Obligors) listed below, as a percentage of the total aggregate gross value of Receivables of all Obligors in the Borrowing Base, above the corresponding percentages listed below

| Obligor | Maximum Eligibility |
| --- | --- |
| Medicare | 90% |
| Medicaid | 50% |
| Blue Cross/Blue Shield | 30% |
| All Commercial Insurance Obligors, HMOs, and PPOs | 50% |
| any single AAA rated (non-governmental) Obligor | 15% |
| any single AA rated (non-governmental) Obligor | 10% |
| any single A rated (non-governmental) Obligor | 5% |
| any single BBB rated (non-governmental) Obligor | 5% |
| any single unrated (non-governmental) Obligor | 2% |

(17)    Unless specifically verified by the Borrowers and accepted by the Agent, the Expected Net Value of each Eligible Receivable is in an amount not in excess of $250,000.

(18)    If the percentage of Eligible Receivables (other than Unbilled Receivables) aged over 120 days at any point in time is greater than 10% of the total Eligible Receivables, the dollar amount of Eligible Receivables over the aforementioned percentage will not be considered Eligible Receivables.

(19)    If the percentage of Eligible Receivables which are Medicare Receivables constituting Unbilled Receivables aged from their respective Initial Service Dates over 60 days at any point in time is greater than 20% of the total Eligible Receivables, the dollar amount of such Eligible Receivables over the aforementioned percentage will not be considered Eligible Receivables.

(20)    No Lien which is still in effect on the applicable Funding Date has been made with respect to or granted in any such Receivable except for the Lien in favor of the Agent.

(21)    Each such Receivable, regardless of whether otherwise eligible, is not due from an Obligor if 50% or more of the total amount of Receivables due from such Obligor are not Eligible Receivables.

EXHIBIT II
FORM OF BORROWING BASE REPORT


HEALTHCARE FINANCE GROUP, LLC
BORROWING BASE REPORT

Report submission date: [*]
As of date: [*]

| | | |
|---|---|---|
| I. | Gross Receivables Balance as of: [*] | |
| | | |
| II. | Deductions to Gross Receivables:<br>Ineligible Receivables<br>Cross-aged Balances<br>Other Ineligibles<br>Total Ineligible A/R | |
| | | |
| III. | Gross Eligible Receivables as of: [*] | |
| | | |
| IV. | Net Value Factor | % |
| | | |
| V. | Expected Net Value | |
| | | |
| VI. | Additions to Expected Net Value<br>Expected Net Value of New Receivables<br>Adjustments | |
| | | |
| VII. | Deductions to Expected Net Value<br>Collections<br>Aged Claims<br>Deferred Revenue<br>Unapplied Cash<br>Credit Balances<br>Medicare/Medicaid Reserve<br>Other Adjustments/Reserves | |
| | | |
| VIII. | Adjusted Expected Net Value | |
| | | |
| IX. | Advance Rate | % |
| | | |
| X. | Borrowing Base | |
| | | |
| XI. | Revolving Commitment | |
| | | |
| XII. | Borrowing Limit (Lesser of Revolving Commitment and Borrowing Base) | |
| | | |
| XIII. | Less: Accrued Amounts | |

Ex. II–1

| | | |
|---|---|---|
| XIV. | **[Reserved]** | |
| XV. | **[Reserved]** | |
| XVI. | Adjusted Borrowing Limit | |
| XVII. | Outstanding Revolving Loan Balance Prior Report | |
| XVIII. | Less: Collections | |
| XIX. | Total Interest, Fees, Charges, and Expenses | |
| XX. | Revolving Advances Request This Report | |
| XXI. | Revolving Loan Balance This Report | |
| XXII. | Net Availability | |
| XXIII. | Protective Advances | |

The undersigned desires to make a borrowing of a Revolving Advance on [*], 20[*], in the amount of $[*].

The undersigned represents and warrants that the foregoing information is true, complete and correct and that the collateral reflected herein complies with and conforms to the Eligibility Criteria set forth in Exhibit I to the Revolving and Term Loan and Security Agreement between the Borrowers and Healthcare Finance Group, LLC, a Delaware limited liability company ("**HFG**"), and any supplements and amendments, if any, thereto (the "**Agreement**"; capitalized terms used herein and not otherwise defined are as defined in the Agreement). The undersigned, on behalf of the Borrowers, promises to pay to HFG the new loan balances reflected above, plus interest, as set forth in the Agreement.

The undersigned represents and warrants as follows: (1) that as of the date hereof, (A) each Borrower is in compliance with each of the terms, covenants, and conditions set forth in the Agreement and that no Default or Event of Default exists or is continuing under the Agreement, (B) all scheduled monthly payments of rental expense of the Borrowers to the Mesa Entities since the date of the most recent Compliance Certificate delivered to the Agent have been timely paid in full, (C) all scheduled monthly payments of amounts due and payable by the Mesa Entities under their mortgage loan documents since the date of the most recent Compliance Certificate delivered to the Agent have been timely paid in full and (D) if this Borrowing Base is being delivered in connection with a request for a Revolving Advance, the representations, warranties and covenants contained in Articles 8, 9, 10, and 11 of the Agreement are and will be true, correct, and in compliance in all material respects both before and after giving effect to the Revolving Advance requested herein and to the application of the proceeds thereof, as though made on and as of such date (it being understood and agreed that any representation or warranty which by its terms (i) is made on a specified date shall be required to be true and correct only as of such specified date or (ii) contains a materiality qualifier shall be required to be true and correct in all respects); (2) that within 90 days preceding and through the date hereof, no Borrower is aware of receiving any notice from any state or federal regulatory or law enforcement agency citing specific deficiencies that (x) pose immediate jeopardy to the health or safety of the patients in any of any Borrower's facilities; or (y) would otherwise threaten any Borrower's continued participation in the Medicare, Medicaid, and/or any other applicable government program; (3) that within 90 days preceding

Ex. II–2

and through the date hereof, no Borrower is aware of being subject to any investigatory visits by or received any correspondence from any state or federal agency alleging possible improper billing or claims activity, (4) the Liquidity is at least the level set forth in Section 11.1, (5) the ratio of Senior Funded Debt to EBITDA does not exceed the ratio set forth in Section 11.3 for the most recent month ended and (6) that the aggregate amount of cost report settlement liability owing to Medicare/Medicaid is $[_____].

As of the date hereof, no Borrower has diverted or permitted to be diverted any such payments on Receivables from the Lockbox Accounts or issued any Revocation Order (as defined in the Depositary Agreements).

[BORROWER REPRESENTATIVE]

By:      _____
Name:  _____
Title:   _____

Date:   _____

EXHIBIT III
FORM OF COMPLIANCE CERTIFICATE

**COMPLIANCE CERTIFICATE**

_____, 201__

This Compliance Certificate is given by the chief financial officer of RESTORA HEALTHCARE HOLDINGS, LLC, a Delaware limited liability company ("**Parent**"), pursuant to that certain Revolving and Term Loan and Security Agreement, dated as of June 29, 2012 (as the same may have been amended, modified, or supplemented from time to time, the "**Loan Agreement**"), by and among Parent, RESTORA HOSPITAL OF SUN CITY, LLC, a Delaware limited liability company, and RESTORA HOSPITAL OF MESA, LLC, a Delaware limited liability company (collectively, the "**Borrowers**"), and HEALTHCARE FINANCE GROUP, LLC, a Delaware limited liability company ("**HFG**"), in its capacity as a lender with a Revolving Commitment (together with its successors and permitted assigns in that capacity, the "**Revolving Lenders**"), and its capacity as a lender with a Term Loan Commitment (together with its successors and permitted assigns in that capacity, the "**Term Lenders**"; the Revolving Lenders and the Term Lenders, collectively, the "**Lenders**"), and as administrative agent and collateral agent for the Lenders (together with its successors and permitted assigns in those capacities, the "**Agent**"). Capitalized terms used without definition herein shall have the meaning given such terms in the Loan Agreement.

The undersigned hereby certifies to Agent and Lenders that:

1. No Default or Event of Default has occurred and is continuing **[or if any Default or Event of Default then exists, state the nature thereof and describe the steps being taken to address such Default or Event of Default]**.

2. The representations and warranties set forth in the Loan Agreement are true and correct in all material respects (except any representation or warranty that (i) expressly indicates that it is being made as of a specified date, in which case each such representation or warranty is true and correct as of that specified date and (ii) contains a materiality qualifier, in which case such representation or warranty is true and correct in all respects) **[or if any representation or warranty is not then true and correct, state the nature thereof]**.

3. The Borrowers are in compliance with the covenants contained in Article 11 of the Loan Agreement, as demonstrated by the calculation of such covenants on the attached schedule **[, except as set forth below]**. Such calculations and the certifications contained therein are true, correct, and complete.

4. All scheduled monthly payments of rental expense of the Borrowers to the Mesa Entities since the date of the immediately preceding Compliance Certificate delivered to the Agent have been timely paid in full.

5. All scheduled monthly payments of amounts due and payable by the Mesa Entities under their mortgage loan documents since the date of the immediately preceding Compliance Certificate delivered to the Agent have been timely paid in full.

6. The foregoing certifications and computations are made as of _____, _____ (end of month or fiscal year) and delivered this _____ day of _____, 201__.

[Signature page follows.]

Sincerely,

**RESTORA HEALTHCARE HOLDINGS, LLC,**
as Parent

By:      _____
Name: _____
Title:   _____

Schedule

**[Borrowers to provide calculation.]**

| | | | |
|---|---|---|---|
| **Restora Hosptial of Mesa, LLC** | | | |
| **Restora Hosptial of Sun City, LLC** | | | |
| **Compliance Certificate Supporting Schedule** | | | |
| **For Period Ending:** | | | |
| | | | |
| | | | |
| | | | |
| **ARTICLE 11** | | | |
| **FINANCIAL COVENANTS** | | | |
| | | | |
| **DEFINED TERMS USED IN FINANCIAL COVENANTS** | | | |
| | | | |
| | **EBITDA:** | | |
| (1) | net income (or net loss) of Person (calculated before extraordinary items) during such period; plus | | |
| (2) (A) | interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) during such period; plus | | |
| (2) (B) | income taxes accruing, paid or payable during such period; plus | | |
| (2) (C) | depreciation and amortization; plus | | |
| (2) (D) | Trillium Acquisition Addback in an amount not to exceed $1,160,000 and any other reasonable fees, costs and expenses included in net income of such Person as an expense in connection with the negotiation and execution of this Agreement, the other Loan Documents, the Trillium Acquisition Agreement (Scheduled per the Loan Agreement) and the documents related hereto and thereto to the extent incurred on or prior to the date that is 60 days after the Closing Date in an aggregate amount not to exceed $840,000, to the extent not capitalized or included in amortization or interest expense; plus | | |
| (2) (E) | EBITDA Addbacks (Scheduled per the Loan Agreement); minus | | |
| (2) (F) | gains from asset dispositions outside of the normal course of business. | | |

Ex. III

| | | | | |
|---|---|---|---|---|
| | | **EBITDA for the applicable period** | | |
| | | | | |
| | | **EBITDAR:** | | |
| | (1) | EBITDA of such Person during such period; plus | | |
| | (2) | rent expense owing to the Mesa Entities (as determined in accordance with GAAP) | | |
| | | **EBITDAR for the applicable period** | | |
| | | | | |
| **11.1. Liquidity** | | | | |
| Sum of: | | | | |
| | (1) | the aggregate amount of cash on hand in operating deposit accounts of the Borrowers that are being monitored by the Agent on-line and in real-time, plus | | |
| | (2) | the positive difference, if any, between (A) the Adjusted Borrowing Limit and (B) the sum of the | | |
| | | then Outstanding Balance of the Revolving Loan. | | |
| | | **Total Liquidity Covenant** | | |
| | | | | |
| | | **Requirement** | $2,000,000 | |
| | | | | |
| | | **Status** | | |
| | | | | |
| **11.2.  Fixed Charge Coverage Ratio** | | | | |
| Ratio of EBITDAR for the trailing twelve month period | | | | |
| | | | | |
| | (1) | EBITDAR for the applicable period, to | | *(x)* |
| | (2) | the sum (without duplication) of the following, determined in each case in accordance with GAAP | | |
| | (2) (A) | the greater of (i) scheduled principal payments of long term Debt and Capital Leases to be made during such period, and (ii) actual principal payments of long term Debt and Capital Leases made during such period, | | |
| | | plus the following items to the extent actually paid in cash during such period: | | |
| | (2) (B) | Capital Expenditures (to the extent not funded by permitted purchase money loans or Capital Leases); | | |

| | | | | |
|---|---|---|---|---|
| (2) (C) | interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest); | | | |
| (2) (D) | taxes based on the Borrowers' income; | | | |
| (2) (E) | the aggregate amount of Distributions, and other advances, and loans to officers, Affiliates, and shareholders (other than Distributions by the Borrowers to the Parent solely for the purpose of paying the Trillium Seller Note B or the Deferred Transaction Costs) | | | |
| (2) (F) | rent expense actually paid in cash to the Mesa Entities during such period | | | |
| | Total Fixed Charges | | | *(y)* |
| | | | | |
| | **Fixed Charge Coverage Ratio Covenant** | | | *(x)/(y)* |
| | | | | |
| | **Requirement** | | **1.30x** | |
| | | | | |
| | **Status** | | | |
| | | | | |
| **11.3.  Ratio of Senior Funded Debt to EBITDA** | | | | |
| | | | | |
| (1) | Outstanding Balance of the Revolving Loan | | | |
| (2) | Outstanding Balance of the Term Loan | | | |
| (3) | Aggregate amount of all other Debt, other than Subordinated Debt | | | |
| | Total Senior Funded Debt | | | *(a)* |
| | | | | |
| | EBITDA | | | *(b)* |
| | | | | |
| | **Ratio of Senior Debt to EBITDA Covenant** | | | *(a)/(b)* |
| | | | | |
| | **Requirement:** | | **2.40x** | |
| | | | | |
| | **Status** | | | |
| | | | | |

Ex. III

| | | | |
|---|---|---|---|
| **11.4.  Ratio of Senior Funded Debt to EBITDAR** | | | |
| | | | . |
| (1) | Senior Funded Debt plus the amount equal to six (6) times the trailing twelve-month rent expense of the Borrowers | | |
| | (Total Rent Adjusted Senior Funded Debt) | | *(c)* |
| | | | |
| (2) | EBITDAR | ｜ | *(d)* |
| | | | |
| | **Ratio of Senior Debt to EBITDA Covenant** | | *(c)/(d)* |
| | | | |
| | **Requirement:** | 4.00x | |
| | | | |
| | **Status** | | |

Ex. III

EXHIBIT IV
RECEIVABLE INFORMATION

Subject to compliance with and the limitations of applicable law in effect from time to time, including, without limitation, patient confidentiality restrictions which may limit or otherwise proscribe the providing of requested medical information, the following information shall, as appropriate, be provided by the Borrowers to the Agent with respect to the Receivables, together with such other information and in such form as may reasonably be requested from time to time by the Agent (the "**Receivable Information**"):

- customer/patient information;

- insured party and other policy-related information;

- services and products classification information (i.e., D.R.G. and other like information established by the Borrowers from time to time to classify services rendered by the Borrowers or goods sold at or by the Borrowers' institutions);

- Obligor required information (i.e., information provided in the ordinary course of business to any specified Obligor or any other information required to be provided to an Obligor pursuant to any agreement, contract or other arrangement with such Obligor); and

- billing information (i.e., all information provided by the Borrowers on invoices to Obligors and any other information required to be provided pursuant to the Credit and Collection Policy and, to the extent the Transmission will not be via computer interface, including a copy of the admitting face sheet, CMS Form and a detailed copy of the bill).

Ex. IV

EXHIBIT V
TRANSMISSION OF ELECTRONIC DATA FILES

(1)     The Agent will convey appropriate data requirements and guidelines to the Borrowers in order for the Borrowers to provide the necessary data files from their accounts receivable systems. The Agent will require data files of a format reasonably acceptable to the lender that contains the Borrowers' accounts receivable information and summary reports. This will include, but not be limited to, detailed charges, payments, adjustments, write offs, aging summary information, insurance master detail and control totals. The above mentioned data files will be provided to the Agent via secure electronic transfer through the Agent's secure FTP site. These files will be provided on an on-going basis according to an established schedule.

(1)     The Borrowers shall give the Agent at least ten Business Days' notice of any coding changes or electronic data processing system modifications made by the Borrowers which could affect the Agent's processing or interpretation of the data received.

(2)     The Agent shall have no responsibility to return to the Borrowers any information which the Borrowers provide via e-mails or through the secure FTP site.

(3)     The Borrowers will create the necessary data files for each of the eligible sites. The data files will contain all detail transactions posted to the accounts receivable system for the specified period (and will indicate the site and total dollars on each transaction report for control purposes). The data files will contain balances that reflect the transactions posted on the Borrowers' systems through the end of business of the specified period.

(4)     The Borrowers will prepare detail accounts receivable data files of all transaction types for all of its sites that are included in the program. The weekly or monthly cutoff, as applicable, will occur at a predetermined time in each such period, and such cutoff date for all of the sites must occur at exactly the same time. The cutoff date that will be selected will be at the end of business for a specific day of the week or month, as applicable, or in other words, at the end of the Borrowers' transaction posting process for that day. The Borrowers will temporarily maintain a copy of the accounts data files in the event that the data is degraded or corrupted during transmission, and needs to be re-transmitted.

(5)     The Borrowers will transmit the data files to the Agent according to the established schedule. The Borrowers should, again, maintain the backup of each of these data files in the event that a re-transmission is necessary.

(6)     The Agent's data analyst will receive the receivables data files, and confirm that the files have been passed without degradation or corruption of data by balancing the detailed items to the control totals that accompany the files. Any problems in this process will be reported to the Borrowers so that the receivables data file can be re-transmitted, if necessary.

(7)     The Agent will compare the updated accounts balances on the Agent's system to the corresponding account balances reflected on the applicable receivable data file. The Agent expects that the balances for the funded receivables will be congruent, and any discrepancies will be immediately examined and resolved through the cooperative effort of the Agent and the Borrowers. The Agent will produce discrepancy reports (e.g., "Roll-Forward" or "Out of Balance" reports) and the Borrowers shall respond promptly to such reports.

(8)     Once the reconciliation process has been completed and any discrepancies between the Agent's and the Borrowers' receivable data files resolved through the discrepancy report process described in clause (8) above, the Agent will then process the receivables file and advise the Lenders that they may make additional Revolving Advances with respect to any new receivable that has satisfied the Eligibility Criteria.  The Agent will then proceed through exactly the same process described in clause (10) below..

(9)      The Agent will analyze the transaction files and update the balances.  The agent will perform analysis to determine which receivables meet the Eligibility Criteria. Upon completion of the posting process, the Agent will generate summary reports of the posting process that the Agent will use to complete various funding activities.

(10)    The Agent will use commercially reasonable efforts subject to Section 5.4 of the Agreement to comply with, and to cause the members of the Lender Group to comply with, all laws and regulations applicable to its duties hereunder, including patient confidentiality laws and regulations, including as set forth under HIPPA (as defined in the Business Associate Agreement).

EXHIBIT VI
CLOSING DOCUMENT CHECKLIST


HEALTHCARE FINANCE GROUP, LLC
SENIOR SECURED REVOLVING CREDIT FACILITY
SENIOR SECURED TERM LOANS


Closing Checklist

Abbreviations Used:

| | |
|---|---|
| Borrowers | Restora Hospital of Sun City, LLC and Restora Hospital of Mesa, LLC |
| Parent | Restora Healthcare Holdings, LLC |
| HFG | Healthcare Finance Group, LLC, as Agent and Lender |
| H&P | Hallett & Perrin, P.C., counsel to Borrowers |
| MW | McGuireWoods, LLP, counsel to Lender and Agent |

| A. TRANSACTION DOCUMENTS | | | | |
|---|---|---|---|---|
| Item | Document | Responsible Party | Status | Completion Date |
| (22) | Revolving and Term Loan and Security Agreement ("**LSA**") | MW | | |
| (23) | EXHIBITS TO THE LSA | | | |
| | Exhibit I – Eligibility Criteria | MW | | |
| | Exhibit II – Form of Borrowing Base Report | MW | | |
| | Exhibit III – Form of Compliance Certificate | MW | | |
| | Exhibit IV – Receivable Information | MW | | |
| | Exhibit V – Transmission of Electronic Data Files | MW | | |
| | Exhibit VI – Closing Document Checklist | MW | | |
| | Exhibit VII – Form of Assignment and Assumption | MW | | |
| | | | | |
| (24) | SCHEDULES TO LSA | | | |
| | Schedule I – Addresses for Notices | HFG/Borrowers | | |
| | Schedule II – Disclosures | Borrowers | | |
| | Schedule III – Lockbox Information | Borrowers | | |
| | Schedule IV – Credit and Collection Policy | Borrowers | | |
| | Schedule V – Permitted Debt | HFG/Borrowers | | |

| (25) | Lockbox Agreements with Wells Fargo Bank<br>(a) Government Receivables<br>(b) Non-government Receivables (Access Restricted Immediately) | Wells Fargo / Borrowers | | |
| (26) | Springing Deposit Account Control Agreement for operating accounts of each Borrower and Parent | Wells Fargo / Borrowers | | |
| (27) | Merrill Lynch Lockbox Agreement | Merrill Lynch | | |
| (28) | Business Associate Agreement | MW | | |
| (29) | Subordination Agreements -<br>(a) Holder of Seller Notes<br>(b) Management Company | MW | | |
| (30) | Guaranty Agreement executed by Parent | MW | | |
| (31) | Pledge Agreement executed by Parent | MW | | |
| (32) | Post-Closing Obligations Letter | MW | | |
| (33) | Delivery of original Stock Certificates of each Borrower being pledged | Borrowers | | |
| (34) | Delivery of Stock Power with respect to each Stock Certificate | Borrowers | | |
| (35) | Collateral Assignment of Acquisition Documents | MW | | |
| (36) | Collateral Assignment Leases/SNDAs<br>(i) Mesa<br>(ii) Sun city | MW | | |
| (37) | **Seller Debt Documents:**<br>(a) Loan/Note Purchase Agreement<br>(b) Seller Notes | Borrowers | | |
| (38) | UCC Authorization Letter (UCC-1 Financing Statement/Fixture Filings) | MW | | |
| (39) | Copy of executed real property lease with each landlord | Borrowers | | |
| (40) | Intercreditor with mortgage lender | MW | | |
| (41) | Limited Agency Agreement | MW | | |
| (42) | SNDAs with mortgage lender | Borrowers | | |

Ex. VI–2

| (43) | Management Agreement | Borrowers | | |
|------|----------------------|-----------|---|---|
| (44) | Landlord Waivers for each location of each Borrower | Borrowers | | |
| B.   NOTICES AND CORPORATE DOCUMENTS OBLIGORS | | | | |
| (45) | Notice to Obligors re: Lockbox Arrangements | Borrowers MW to provide form | | |
| (46) | Form of each Invoice showing proper Lender Lockbox as remittance address | Borrowers | | |
| (47) | Good Standing of each Borrower and each Guarantor | Borrowers | | |
| (48) | Secretary's Certificate of each Loan Party: (a) Certified articles of incorporation/certificate of formation (b) By-laws/operating agreement (c)Resolutions (d) Any documents evidencing governmental approvals (if applicable) (e)Authorized Signatures and Incumbency | Borrowers | | |
| (49) | Copies of the audited balance sheets of the Loan Parties and their subsidiaries and the related statements of income and expense and retained earnings of the Loan Parties and their subsidiaries for the fiscal year then ended. | Borrowers | | |
| (50) | Unaudited balance sheets for the fiscal quarters and the related statements of income and expense and retained earnings of the Loan Parties and their subsidiaries for such fiscal quarter then ended | Borrowers | | |
| (51) | Initial Borrowing Base Report (based on Exhibit II to the LSA) | HFG/Borrowers | | |
| (52) | Officer's Certificate | MW | | |
| (53) | Delivery of copies of certified copies of insurance coverage required along with lender loss payee or other endorsements | Borrowers | | |
| (54) | Insurance Broker Opinion | Borrowers/ Insurance Broker | | |

| | | | | |
|---|---|---|---|---|
| (55) | Certificate from HFG that all computer linkups and interfaces necessary or desirable, in the judgment of the Program Manager, to effectuate Transmissions are fully operational | HFG | | |
| (56) | Certificate by the CFO (with required financials attached) | Borrowers | | |
| (57) | Officer's Certificate regarding Regulatory Matters | MW/HFG | | |
| (58) | Acquisition Documents   a. Operations Transfer Agreement (with Schedules)   b. Property Purchase Agreement | Borrowers | | |
| C.      CONSENTS, APPROVALS, AND FILINGS | | | | |
| (59) | UCC Lien Search Results | MW/Borrowers | | |
| (60) | UCC pre-filing authorization letter | MW | | |
| (61) | UCC-1 Financing Statements/Fixture Filings | MW | | |
| (62) | UCC-3 Termination Statements (if any) a. HSM Property, LLC (Prudential and Secretary U.S. Dept. Housing) | Borrowers | | |
| (63) | Payoff Letter/Consent for HSM Property, LLC (Prudential and Secretary U.S. Dept. Housing) | Borrowers | | |
| (64) | Certified Forms of Patient Consents | Borrowers | | |
| (65) | Copies of all permits, licenses, etc. necessary to conduct business of each Borrower | Borrowers | | |
| D.      OPINIONS OF COUNSEL | | | | |
| (66) | Corporate Opinion of HC | HC | | |
| (67) | Patient Confidentiality Opinion | HC | | |
| (68) | Opinion of the counsel to Seller in connection with the Acquisition on which HFG shall be entitled to rely | Seller's counsel | | |
| E.      FEES AND DISBURSEMENTS | | | | |
| (69) | Closing Instruction Letter to Title Company | MW | | |

| (70) | Disbursement Letter/ Funds Flow memorandum | MW | | |
|------|---------------------------------------------|-----------|--|--|
| (71) | Fee Letter | MW | | |
| (72) | Proof of payment of all fees and other disbursements | Borrowers | | |
| (73) | Payment of all Facility Fees and all other expenses owing to HFG | Borrowers | | |

EXHIBIT VII
FORM OF ASSIGNMENT AND ASSUMPTION

ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into by and between the Assignor identified in item 1 below (the "**Assignor**") and the Assignee identified in item 2 below (the "**Assignee**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Revolving and Term Loan and Security Agreement identified below (as amended, the "**Loan Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Loan Agreement, as of the Effective Date inserted by the Agent as contemplated below (1) all of the Assignor's rights and obligations in its capacity as a Lender under the Loan Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including without limitation any letters of credit, guarantees, and swingline loans included in such facilities), and (2) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Loan Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (1) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (1) and (2) above being referred to herein collectively as the "**Assigned Interest**"). Each such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.   Assignor:        _____
                      **[Assignor [is][is not] a Defaulting Lender]**

2.   Assignee:        _____
                      **[Assignee is an Affiliate of [identify Lender]]**

3.   Borrowers:       Restora Hospital of Sun City, LLC, a Delaware limited liability
                      company, and Restora Hospital of Mesa, LLC, a Delaware limited
                      liability company

4.   Agent:           Healthcare Finance Group, LLC,
                      as Agent under the Loan Agreement

5.   Loan Agreement:  Revolving and Term Loan and Security Agreement dated as of June 29,
                      2012, between Borrowers, Restora Healthcare Holdings, LLC, a
                      Delaware limited liability company (the "**Parent**"), the Lenders parties
                      thereto, and Agent

Ex. VII

6.    Assigned Interest:

| Assignor | Assignee | Facility Assigned[1] | Aggregate Amount of Commitment or Loans | Amount of Commitment or Loans Assigned | Percentage Assigned of Commitment or Loan[2] |
|---|---|---|---|---|---|
| | | | $_____ | $_____ | _____% |

[Remainder of page intentionally left blank]

---

[1] Fill in the appropriate terminology for the types of facilities under the Loan Agreement that are being assigned under this Assignment and Assumption (e.g., "Revolving Commitment," "Term Loan A," "Term Loan B," etc.)

[2] Set forth, to at least nine decimal places, as a percentage of the Commitment or Loans of all Lenders.

Ex. VII

Effective Date: _____ ___, 20___ [3]

The terms set forth in this Assignment and Assumption are hereby agreed to:

[_____],
as the Assignor

By: _____
Name: _____
Title: _____


[_____],
as the Assignee

By: _____
Name: _____
Title: _____


**[Consented to and]**[4] Accepted:

HEALTHCARE FINANCE GROUP, LLC,
as the Agent

By: _____
Name: _____
Title: _____

---

[3] To be inserted by the Agent. The Effective Date will be the effective date of recordation of transfer in the register therefor.
[4] To be added only if the Agent's consent is required by the terms of the Loan Agreement.

Ex. VII

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.      **Representations and Warranties.**

1.1      **Assignor.** The Assignor (a) represents and warrants (1) that it is the legal and beneficial owner of the Assigned Interest; (2) that the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim; (3) that it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (4) that it is **[not]** a Defaulting Lender; and (b) assumes no responsibility with respect to (1) any statements, warranties, or representations made in or in connection with the Loan Agreement or any other Loan Document ; (2) the execution, legality, validity, enforceability, genuineness, sufficiency, or value of the Loan Documents or any collateral thereunder; (3) the financial condition of the Borrowers, any of their respective Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document; or (4) the performance or observance by the Borrowers, any of their respective Subsidiaries, or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2      **Assignee.** The Assignee (a) represents and warrants (1) that it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Loan Agreement; (2) that it meets all the requirements to be an assignee under the Loan Agreement (subject to such consents, if any, as may be required under the Loan Agreement); (3) that from and after the Effective Date, it shall be bound by the provisions of the Loan Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder; (4) that it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type; (5) that it has received a copy of the Loan Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to the Loan Agreement, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest; (6) that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest; and (7) attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Loan Agreement, duly completed and executed by the Assignee; and (b) agrees (1) that it will, independently and without reliance on the Agent, the Assignor, or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; and (2) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      **Payments.** From and after the Effective Date, the Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to the Assignee.

3.      **General Provisions**. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

SCHEDULE I
ADDRESSES FOR NOTICE

If to the Agent:                    Healthcare Finance Group, LLC
                                    199 Water Street, 31st Floor
                                    New York, New York 10038
                                    Attention:    National Portfolio Manager
                                         cc:      Chief Credit Officer
                                                  General Counsel
                                    Tel:    (212) 785-8500
                                    Fax:    (212) 785-8501


If to a Lender:                    To the address set forth on the signature page of such Lender


If to Parent:                      Restora Healthcare Holdings, LLC
                                    6120 Windward Parkway, Suite 165
                                    Alpharetta, Georgia  30005
                                    Attention: Rod Laughlin, Manager
                                    Tel: _____
                                    Fax: _____


If to the Borrowers:               Restora Hospital of Mesa, LLC
                                    215 S. Power Road
                                    Mesa, Arizona  85206
                                    Attention: _____
                                    Tel: _____
                                    Fax: _____


                                    Restora Hospital of Sun City, LLC
                                    13818 N. Thunderbird Boulevard
                                    Sun City, Arizona  85351
                                    Attention: _____
                                    Tel: _____
                                    Fax: _____

SCHEDULE II
DISCLOSURES

1.1    **Definitions.  "Permitted Liens"**

None.

**8.1**   **Organization; Good Standing and Qualification**.

<u>Restora Hospital of Mesa, LLC</u>

Duly formed and organized, validly existing and in good standing under the laws of the state of Delaware. Qualified to do business in Arizona.

<u>Restora Hospital of Sun City, LLC</u>

Duly formed and organized, validly existing and in good standing under the laws of the state of Delaware. Qualified to do business in Arizona.

<u>Restora Healthcare Holdings, LLC</u>

Duly formed and organized, validly existing and in good standing under the laws of the state of Delaware. Qualified to do business in Arizona.

8.11     **Rescission and Renewal of Permits, Licenses, and Other Approvals.**

None.

8.12    **Subsidiaries; Capitalization**.



<u>Restora Healthcare Holdings, LLC Capital Contributions</u>:

HCCG, LLC - $8,000,000.00
Rod Laughlin - $979,168.00
Greg Sassman - $562,500.00
George W. Dunaway - $158,332.00
John Watkins - $100,000
Restora Employee Fund, LLC - $100.00

8.13    **Real Property**.

Restora Hospital of Mesa, LLC

| Description of Property | Term of Lease | | Renewal Option | Monthly Rental |
|---|---|---|---|---|
| | From | To | | |
| Trillium Specialty Hospital – East Valley<br>215 S. Power Road<br>Mesa, Arizona  85206 | 1/1/2003 | 12/31/2013 | 10 Years | $137,500.00 |

Restora Hospital of Sun City, LLC

| Description of Property | Term of Lease | | Renewal Option | Monthly Rental |
|---|---|---|---|---|
| | From | To | | |
| Trillium Specialty Hospital – West Valley<br>13818 N. Thunderbird Boulevard<br>Sun City, Arizona  85351 | 1/1/2003 | 12/31/2013 | 10 Years | $137,500.00 |

8.15    **Financial Statements and Other Information**.

None.

8.16    **Litigation**.

None.

8.18    **Locations**.

None.

8.20    **Taxes**.

None.

8.23    **ERISA Matters**.

(a)(1)   Health insurance plans to be provided to employees on an ongoing basis.

(a)(2)   Employment Agreement, dated as of even date herewith, between Restora Healthcare Holdings, LLC and Rod Laughlin.

Employment Agreement, dated as of even date herewith, between Restora Healthcare Holdings, LLC and Greg Sassman.

Employment Agreement, dated as of even date herewith, between Restora Healthcare Holdings, LLC and George W. Dunaway.

Employment Agreement, dated as of even date herewith, between Restora Healthcare Holdings, LLC and John Watkins.

Certain management employees will receive profits interests pursuant to (i) that certain Limited Liability Company Agreement of Restora Healthcare Holdings, LLC dated as of May 24, 2012; and (ii) that certain Limited Liability Company Agreement of Restora Employee Fund, LLC dated as of even date herewith.

(b)      None.

9.7    **Taxes**.

(c)    None.

10.3    **Lease Obligations**.

<u>Real Property Leases</u>

Reference is made to Schedule 8.13.

<u>Personal Property Leases</u>

**Restora Hospital of Mesa, LLC:**

| Description of Property | Term of Lease | | Purchase Options | Renewal Options | Monthly Rental |
|---|---|---|---|---|---|
| | From | To | | | |
| Canon Copiers (11) | 4/10/2009 | 4/10/2014 | FMV | None | $1,098.00 |
| Canon Copiers/Fax (3) | 4/22/2011 | 4/22/2014 | FMV | None | $254.00 |
| Med One Capital Funding #1- Med Dispense | 10/15/2007 | 9/15/2012 | | 1 Year | $5,025.00 |
| Med One Capital Funding #3- Tele Monitor | 06/08 | 05/11 | | 1 Year | $3,165.00 |
| Med One Capital Funding #5 - Bronchoscope | 08/08 | 07/11 | | 1 Year | $1,525.00 |
| Pitney Bowes - Postage Meter | 4/1/2011 | 6/30/2015 | FMV | 1 Year | $106.00 |
| Everbank_Inifinity Imaging Systems - 3 copiers (20009668) | 4/28/2006 | 4/28/2011 | FMV | Monthly | $257.87 |
| Puritan Bennett | 10/11 | 12/11 | | Monthly | $3,600.00 |

**Restora Hospital of Sun City, LLC:**

| Description of Property | Term of Lease | | Purchase Options | Renewal Options | Monthly Rental |
|---|---|---|---|---|---|
| | From | To | | | |
| Everbank Inifinity Imaging Systems - 4 copiers (20009670) | 05/06 | 04/11 | FMV | Monthly | $136.44 |
| Med One Capital Funding #2 - Med Dispense | 10/07 | 09/12 | | 1 Year | $5,025.00 |
| Med One Capital Funding #4 - Tele Monitor | 05/08 | 04/11 | | 1 Year | $3,085.00 |
| Med One Capital Funding #6 - Bronchoscope | 08/08 | 07/11 | | 1 Year | $1,545.00 |
| Pitney Bowes - Postage Meter | | | FMV | 1 Year | $51.75 |
| Puritan Bennett | 09/11 | 11/11 | | Monthly | $3,600.00 |

Capital Leases

**Restora Hospital of Mesa, LLC:**

| Description of Property | Term of Lease | | Purchase Options | Monthly Rental |
|---|---|---|---|---|
| | From | To | | |
| Med One Capital Funding #10- Healthland Software | 1/08 | 10/13 | $1 | $1,645.00 |
| Med One Capital Funding #11 - Computer Equipment | 09/08 | 08/13 | $1 | $1,962.00 |

**Restora Hospital of Sun City, LLC:**

| Description of Property | Term of Lease | | Purchase Options | Monthly Rental |
|---|---|---|---|---|
| | From | To | | |
| Med One Capital Funding #8 - Computer Equip | 09/08 | 08/13 | $1 | $1,882.00 |
| Med One Capital Funding #9 - Healthland | 11/08 | 10/13 | $1 | $1,645.00 |
| Med One Capital Funding #12 - Copiers/Printers | 08/10 | 07/15 | $1 | $1,053.00 |

10.14    **Loans or Investments.**

None.

10.18  **Subsidiaries**.

Reference is made to Schedule 3.12.

SCHEDULE III
LOCKBOX INFORMATION

Restora Healthcare Bank Accounts
Wells Fargo Bank
Borrower Lockbox Accounts

| Restora Hospital of Mesa, LLC (80-0808773) | Account # |
|---|---|
| Government Receivables Account | 4123214793 |
| Non-Government Receivables Account | 4123214801 |

| Restora Hospital of Sun City, LLC (37-1691028) | |
|---|---|
| Government Receivables Account | 4123214835 |
| Non-Government Receivables Account | 4123214843 |

SCHEDULE IV
CREDIT AND COLLECTION POLICY

| Trillium Specialty Hospital | | Campus | □ East | □ West | X Both |
| | | Care Level | □ ACU | X TCU | □ Both |
| **Policy & Procedure** | | | | | |
| **Title:** | **In House Patient Self Pay Collections** | | **Policy #:** | **AR100** | |
| **Department:** | **Finance** | | **Origin Date:** | **04/01/2012** | |
| **Manual/s** | | | **Date Revised:** | | |

## Purpose:

This policy is applicable to all Patients receiving services at Trillium Specialty Hospital who are considered self-pay (as defined in this policy).  The guidelines below are for the purposes of scheduling collections processes.

## Policy:

A self-pay account is defined as one that is not covered by any medical insurance or other indemnity, in whole or in part (co-payment, co-insurance, deductible, share of cost, etc.), and for which the Patient/Guarantor is liable for payment.

Trillium Specialty Hospital will comply with Fair Debt Collection Practices Act regarding the patient/guarantor communication.

Attempt will be made to collect all self pay balances prior to discharge. The Procedure below outlines the process for collecting account balances at the time services are rendered.

## Procedure:

1. Admitting Representative will promptly forward a copy of the signed Statement of Financial Responsibility and Insurance Assignment form to Business Office.

2. Accounts Receivables Specialist will contact Patient/Guarantor to arrange for payment of Patient liability on the day the co-payment is due, according to Insurance guidelines. If patient is unable to pay the balance due make reasonable attempts to offer solutions to collect estimated balance prior to discharge. If payment plan is approved supply the patient with Approved Payment Plan Doc 2012 and attempt to collect the first payment prior to discharge (see attached Approved Payment Plan Doc 2012).

**Approved Payment Plan**

If an acceptable payment agreement is established, send the patient / responsible party the Approved Payment Plan Doc 2012 letter outlining the details of the payment agreement. If the patient / responsible party fails to comply with the agreed upon payment plan send Failure to Pay Installment Agreement doc 2012 and start normal collection action as defined the steps 1-6 (see Approved Payment Plan doc 2012 and Failure to Pay Installment Agreement doc 2012).

**Settlement Requests**

The Accounts Receivables Specialists has the authority to offer a one- time settlement on the account for a 20% discount. If the patient / responsible party is agreeable to a settlement, send Settlement Offer Doc 2012 (see attached Settlement Offer Doc 2012). Give the patient / responsible party no more than 30 days to satisfy the settlement offer. In the event the patient / responsible party fails to comply with the terms of the agreement send Failure to Pay Installment Agreement doc 2012 (see attached Failure to Pay Installment Agreement Doc 2012).

**Share of Cost Collections**

See Policy AR300 for special Medicaid Collection Instructions.

**SPECIAL CIRCUMSTANCES**

Risk Management Accounts - The Risk Management Department must approve any activity on accounts that have outstanding risk management issues.

**RESPONSIBILITIES**

<u>**Admitting Representative**</u>
Admitting Representative will promptly forward a copy of the signed Statement of Financial Responsibility and Insurance Assignment form to Business Office.

<u>**Financial Services Representative**</u>
Contact Patient/Guarantor to arrange for payment of Patient liability on the day the co-payment is due, according to Insurance guidelines. Document all conversations and actions in the financial system. Financial Services will make reasonable attempts to offer solutions to collect estimated balance prior to discharge.

<u>**Controller / Financial Services Manager**</u>
Monitor In-House collections activity and intervene if necessary. Consult with patient's case manager for solutions if patient is unable to meet financial obligations (i.e. ALTCS Application, Social Security enrollment or assistance with discharge options).

# Reference(s):

Approved Payment Plan Doc 2012
Settlement Offer Doc 2012
Statement of Financial Responsibility and Insurance Assignment Form

| Trillium Specialty Hospital | | Campus    ☐ East    ☐ West    X Both<br>Care Level  ☐ ACU    X TCU    ☐ Both |
|---|---|---|
| **Policy & Procedure** | | |
| **Title:** | Collections Policy / Self Pay Balances | **Policy #:** | AR200 |
| **Department:** | Finance | **Origin Date:** | 04/01/2012 |
| **Manual/s** | | **Date Revised:** | |

## Purpose:

This policy is applicable to all Patients receiving services at Trillium Specialty Hospital who are considered self-pay (as defined in this policy). The guidelines below are for the purposes of scheduling collections processes.

## Policy:

A self-pay account is defined as one that is not covered by any medical insurance or other indemnity, in whole or in part (co-payment, co-insurance, deductible, share of cost, etc.), and for which the Patient/Guarantor is liable for payment.

Trillium Specialty Hospital will comply with Fair Debt Collection Practices Act regarding the patient/guarantor communication.

Attempt will be made to collect all self pay balances prior to discharge. The Procedure below outlines the process for collecting account balances post discharge.

## Procedure:

1. Submit Patient Portion Statement for charges due on the account monthly, this is to include all Private Pay Charges for Room and Board, and ancillary services in the event that the Patient does not have insurance that will be covering the stay. Also this is to include all Co-Payments, Share of Cost, Co-Insurance, and Deductible amounts due by the client.

2. Within 15 days of sending the first statement, if payment is not received or acceptable payment arrangements have not been made, start making phone calls to the patient / responsible party. Send Collection Letter 1 doc no later than day 15 (see attached Collection Letter 1 doc 2012).

Sch. IV–4

3. Between sending the initial statement and the first collection letter, at least one phone call attempt should be made. Continue to send statements on a monthly basis. Add "Past Due Sticker" to subsequent statements and continue to reach patient by phone.

4. By day 45, there should be a minimum of 2 phone call attempts made and Collection Letter 1 sent. If the balance has not been collected or acceptable payment arrangements made by this time, send Collection Letter 2 doc (see attached Collection Letter 2 doc 2012).

5. On day 60, there should be a minimum of 3 phone call attempts made and Collection Letters 1 & 2 have been sent. If acceptable payment arrangements have not been made, send Collection Letter 3 Final doc (see attached Collection Letter 3 Final doc 2012).

6. By day 75, if the patient has not contacted the Business Office to pay in full or make acceptable payment arrangements, the Accounts Receivables Specialist should consult with the Business Office Manager. At that time, the Business Office Manager will attempt to contact the patient / responsible party by phone to collect the balance owed. If payment or payment arrangements are not obtained the Business Office Manager will assess the account for Collection Agency assignment or Legal Review with Collection Attorney.

**Approved Payment Plan**

If an acceptable payment agreement is established, send the patient / responsible party the Approved Payment Plan Doc 2012 letter outlining the details of the payment agreement. If the patient / responsible party fails to comply with the agreed upon payment plan send Failure to Pay Installment Agreement doc 2012 and start normal collection action as defined the steps 1-6 (see Approved Payment Plan doc 2012 and Failure to Pay Installment Agreement doc 2012).

**Collection Agency Assignment**

If the Business Office Manager assigns the account to the Collection Agency, and intake form must be completed, signed off by the Business Office Manager and sent to Collection Agency. A complete copy must be given to the Business Office Manager to complete the Bad Debt Write Off Process (see Karbec Intake Form 2012 attachment) .

**Settlement Requests**

The Accounts Receivables Specialists has the authority to offer a one- time settlement on the account for a 20% discount. If the patient / responsible party is agreeable to a settlement, send Settlement Offer Doc 2012 (see attached Settlement Offer Doc 2012). Give the patient / responsible party no more than 30 days to satisfy the settlement offer. In the event the patient / responsible party fails to comply with the terms of the agreement send Failure to Pay Installment Agreement doc 2012 (see attached Failure to Pay Installment Agreement Doc 2012).

**Share of Cost Collections**

See Policy AR300 for special Medicaid Collection Instructions.


**SPECIAL CIRCUMSTANCES**

Estate Claims - Claims will be filed against estates within six (6) months after the patient expires whenever there is an outstanding balance of over $250 on the account. Consult with Business Office Manager for further instructions.

Risk Management Accounts - The Risk Management Department must approve any activity on accounts that have outstanding risk management issues.

Bankruptcy Accounts – Forward any and all Bankruptcy notifications to the Controller or CFO. Cease all collections efforts and withdraw or recall any account sent to Collection Agency immediately.


## RESPONSIBILITIES

### Financial Services Representative
Contact Patient/Guarantor to arrange for payment of Patient liability and send letters to Patient/Guarantor to expedite payment. Document all conversations and actions in the financial system.  Recommend uncollectible accounts for bad debt write-off and placement with an external agency.

### Controller / Financial Services Manager
Monitor bad debt write-offs recommended by Financial Services Representatives. Analyze productivity, and evaluate collection agency performance.
Assist in resolving difficult accounts and approve initiation of legal action by external collection agents.  Meet with other departments to develop and coordinate efforts to reduce bad debt.


## Reference(s):

Collection Letters –
Approved Payment Plan Doc 2012
Failure to Pay Installment Agreement Doc 2012
Settlement Offer Doc 2012
Collection Letter 1 Doc 2012
Collection Letter 2 Doc 2012
Collection Letter 3 Final Doc 2012
Karbec Intake Form 2012

| Trillium Specialty Hospital | Campus | ☐ East | ☐ West | X Both |
| | Care Level | ☐ ACU | X TCU | ☐ Both |
| **Policy & Procedure** | | | | |

| Title: | Share of Cost Collections | | Policy #: | AR300 |
| Department: | Finance | | Origin Date: | 04/01/2012 |
| Manual/s | | | Date Revised: | |

## Purpose:

This policy is applicable to all Patients receiving services at Trillium Specialty Hospital who are eligible for and enrolled in Arizona Long Term Care Services (ALTCS) Program according to ARS 36-2934. The guidelines below are for the purposes of collections procedures.

## Policy:

Arizona Long Term Care Services (ALTCS) determines, upon eligibility or when notified of income changes when one of their members is required to pay a "Share of Cost" amount. The Share of Cost is based on income less a personal needs allowance. All Share of Cost payments are due no later than the 5th of the month, for the month in which they receive the income.

## Procedure:

**For new ALTCS admissions**

1. Upon admission, the Admissions Department will run an AHCCCS Benefit Verification and determine the Health Plan that the patient elected as well as the Share of Cost amount that should be collected.

2. Once the data is obtained, Admitting will document the Share of Cost amount on the Statement of Financial Responsibility and Insurance Assignment form and go over the financial responsibility with the patient.

3. Admitting will attach the AHCCCS Benefit Verification form to the Statement of Financial Responsibility and Insurance Assignment form and provide a copy to the Finance Department.

**For In-House payer changes**

1. If the patient admitted to Trillium under a Medicare, Medicare Advantage or Commercial Insurance Payer and no longer meets skilled criteria or has exhausted their Primary Medical Benefit, the Case Manager will notify the Admitting and Finance Department that the patient will now be covered under an ALTCS plan.

2. Admitting will process the payer change in Healthland, run a new AHCCCS Verfication and submit a copy of the payer change form and AHCCCS Verification to the Finance Office.

3. If the AHCCCS Verification form indicates a Share of Cost is due, the Finance Department will bill the patient for the Share of Cost that is due for that month.

4. Financial Department will screen every new admission in the event that the ALTCS plan is a Secondary Payer (for co-pay, coinsurance or deductible amounts) and will collect any necessary Share of Cost amounts at that time.

## FRAUD AND ABUSE

**Procedure for Collecting Past Due Share of Cost:**

1. According to ARS 36-2918.01,

## RESPONSIBILITIES

**Financial Services Representative**
Contact Patient/Guarantor to arrange for payment of Patient liability and send letters to Patient/Guarantor to expedite payment. Document all conversations and actions in the financial system.  Recommend uncollectible accounts for bad debt write-off and placement with an external agency.

**Controller / Financial Services Manager**
Monitor bad debt write-offs recommended by Financial Services Representatives.
Analyze productivity, and evaluate collection agency performance.
Assist in resolving difficult accounts and approve initiation of legal action by external collection agents.  Meet with other departments to develop and coordinate efforts to reduce bad debt.

## Reference(s):

AHCCCS Benefit Verification  (Example)

Statement of Financial Responsibility and Insurance Assignment form

Sch. IV–8

(Label)

**Statement of Financial Responsibility and Insurance Assignment**

Trillium Specialty Hospital ("Hospital") appreciates the confidence you have shown in choosing us to provide for your healthcare needs. The services you will receive create a financial responsibility on your part. This responsibility obligates you to ensure payment in full for services rendered. As a courtesy, we will verify your insurance coverage and bill your insurance carrier on your behalf. However, you are ultimately responsible for the payment of your bill.

At the time of your admission we have verified your insurance as _____. Your insurance provider has estimated the following dollar amounts that you may be financially responsible for:

**Co-Pay:** _____    **Co-Insurance:** _____    **Deductible:** _____
**Due on day(s):** _____    **Due on day(s):** _____    **Due on day(s):**_____

**Share of Cost (ALTCS Members):** _____    **Due on the 5th of the month**

**Transportation Benefits (your insurance may cover):**

Non Emergent Ambulance Transport: **Y** or **N**

 Medically Necessary Ambulance Transport: **Y** or **N**

Non Emergent Wheelchair / Stretcher: **Y** or **N**
*(Private Pay transportation rates are available on the back of this form)*

**Insurance Assignment**
I hereby assign to and authorize the Hospital and physician involved in care during this period of illness or treatment, or their duly authorized assignees, to take all necessary steps, without limitations, to ensure that any insurance benefits otherwise payable to me or my estate are paid directly to the Hospital or physicians and I hereby assign my rights to all such benefits to the Hospital or physicians. This assignment of insurance benefits includes but is not limited to billing insurance, filing petitions, filing suit in my name or on behalf of the Hospital or physicians, filing proofs of claim, filing probate claims, and filing grievances and all other similar procedures, as may be amended from time to time with the Arizona Department of

Insurance. I also agree to provide and sign any other documents that may be reasonably necessary to accomplish any of the other purposes.

## Exhaustion of Benefits

In some cases your physician may determine that your care could require you to stay at the Hospital longer than what your insurance coverage allows. In the event you become private pay due to exhaustion of benefits or a denial from your insurance company, you will be subject to the Private Pay rates (see Private Rates on the back of this form).

## Members Enrolled in Arizona Long Term Care Services (ALTCS)

For members enrolled in Arizona Long Term Care Services (ALTCS), your eligibility worker may determine that you will owe a "Share of Cost" based on your income and other eligibility requirements. It is your responsibility or the responsibility of your designated "Payee" to make your monthly Share of Cost Payment to the Hospital. In the event you become delinquent in making your monthly Share of Cost payment, the Hospital may apply to become your designated Representative Payee with the Social Security Administration, as well as take such other action as the Hospital deems necessary to ensure payment of your monthly share of cost assessment.

## About Your Bill

I have read the above policy regarding my financial responsibility to the Hospital for services rendered in the below named patient or myself. I certify that the information provided is, to the best of my knowledge, true and accurate. I authorize my insurer to pay any benefits directly to the Hospital. I agree to pay the full and entire amount of all bills incurred by me or the above named patient, if applicable, including any amount due after payment has been made by my insurance carrier within ten (10) days from the date of the bill. I understand and agree that the Hospital is not obligated to await payment from my insurance carrier and will attempt to collect all co-pays, co-insurance or deductible amounts due according to my insurance company prior to discharge. If my account is sent to a collection agency or attorney for collection, I agree to pay all collection expenses and reasonable Attorney's fees, plus interest on the unpaid account balance at the rate of 18% per annum from the date payment was due.


_____          _____

**Patient / Legal Representative's Signature**          **Date**


_____          _____

**Witness**          **Date**


**(Original – Financial File**          **Copy to Patient**          **Copy to Billing Office)**

Sch. IV–10

## Trillium Specialty Hospital East Valley - Private Pay Rates

**Room and Board Transitional Care Unit (TCU)**
A-1 $400.00 per day        A-2 $450.00 per day        A-3 $500.00 per day

**Room and Board Hospital Unit**
B1 - $1,300.00 per day    B2 - $1,550.00 per day    B3 - $1,700.00 per day

**Ancillaries**
Cost + 150% includes: Medical Supplies, Respiratory Supplies, Oxygen, Wound Care Supplies, Medications, Durable Medical Equipment (DME), Personal Care Supplies and any other supply item as prescribed by your physician.

**Rehabilitation**
Speech Evaluation - $464.94, Dysphasia / Oral Function $159.40, Audiological Evaluation $147.13, Swallow Evaluation / 75 minutes $660.95, Speech Assessments $294.28
Physical Therapy Evaluation - $77.32, PT Activities $273.26 per 15 min treatment, PT Exercise $233.55 per 15 min treatment, Gait Training $147.13 per 15 min treatment
Occupational Therapy Evaluation - $77.32, OT Therapeutic Activities $77.32 per 15 min treatment, OT Range of Motion $147.12 per 15 min treatment, OT Multi Disc $147.13 per 15 min treatment, OT Funct Capacity $147.13 per 15 min treatment, OT Therapeutic Massage $242.89 per 15 min treatment

**Non Emergent Transportation (One-way)**
Ambulatory / Wheelchair – Base Rate $30.00, Mileage $3.00 per mile, Wait Time $15.00 per 15 minute block, No Show $30.00 and Bariatric $60.00 Base Rate
Stretcher – Base Rate $60.00, Mileage $3.00 per mile, Wait Time $15.00 per 15 minute block, No Show $30.00 and Bariatric $60.00 Base Rate
Oxygen – Base Rate $50.00, Mileage $3.00 per mile, Wait Time $15.00 per 15 minute block, No Show $30.00 and Bariatric $60.00 Base Rate
Wait and Return – $1.00 per minute AFTER first 15 minutes (included)

**Dialysis**
2 to 1 Patient to Staff ratio up to 4 hours - $660.21 per treatment
1 to 1 Patient to Staff ratio up to 4 hours - $702.16 per treatment
Declotting Fee- $60.01    Wait Time - $160.70
Weekend / Holiday Fee - $100.03

March 30, 2012

Mr. Jones                                    Admit #: 1234
12345 MISC St.                                Balance due: $1,500
Anywhere, AZ. 85000

RE: Past Due Account Balance

Dear Mr. Jones,

On March 1, 2012 our office sent you an invoice for $1,500.00. According to your insurance company, this is the amount that you owe after receiving your insurance payment. Please remit payment in full within 10 days of this letter or contact our office to discuss payment options.

If you have already sent your payment, please disregard this notice and accept our thanks for your payment.

Sincerely,

Lindsay Guarnero
Accounts Receivables Specialist

This is an attempt to collect a debt. Any information obtained about you will be used to assist in the collection of that debt.

Sch. IV–12

March 30, 2012

Mr. Jones                                    Admit #: 1234
12345 MISC St.                               Balance due: $1,500
Anywhere, AZ. 85000

RE: Past Due Account Balance


Dear Mr. Jones,

As you may recall, upon admission, you or your authorized representative signed a Statement of Financial Responsibility and Insurance Assignment. This instructs you on your estimated financial liability for your stay at Trillium Specialty Hospital.

At this time we have tried, unsuccessfully, to obtain payment in full for your portion of the balance owed according to your insurance company. We are willing to consider other payment arrangements but you must contact our office immediately.

Failure to satisfy your obligation may result in further collection action taken against you. Your response will determine what course of action is taken. Please take advantage of this opportunity while we are able to offer it to you.



Sincerely,


Lindsay Guarnero
Accounts Receivables Specialist


This is an attempt to collect a debt. Any information obtained about you will be used to assist in the collection of that debt.

Sch. IV–13

March 30, 2012

Mr. Jones                              Admit #: 1234
12345 MISC St.                         Balance due: $1,500
Anywhere, AZ. 85000

RE: Past Due Account Balance

Dear Mr. Jones,

It is unfortunate that we have been unable to negotiate repayment of the outstanding balance on your account with Trillium Specialty Hospital. It has become necessary to take further action on your account.

Demand is hereby made upon you for full payment of this debt within ten (10) days of this letter.

In the event that payment is not received within that time, we shall have no alternative but to proceed with all remedies legally available to us.

Please give this matter your immediate attention.


Sincerely,


Lindsay Guarnero
Accounts Receivables Specialist



This is an attempt to collect a debt. Any information obtained about you will be used to assist in the collection of that debt.

Sch. IV–14

March 30, 2012

Mr. Jones                                    Admit #: 1234
12345 MISC St.                               Balance due: $1,500
Anywhere, AZ. 85000

RE: Failure to pay as agreed

Dear Mr. Jones,

You promised that payment in the amount of $500.00 would be received by 4/5/12. Your commitment was accepted in good faith, but the payment has not been received. Please contact our office within 10 days of this letter to remain on the payment plan.

Failure to comply with these arrangements will result in continued collection activity. If payment is not received or arrangements are not made within 10 days of this letter, the balance in full is due and the payment plan will be terminated.

Sincerely,

Lindsay Guarnero
Accounts Receivables Specialist

This is an attempt to collect a debt. Any information obtained about you will be used to assist in the collection of that debt.

Sch. IV–15

March 30, 2012

Mr. Jones                                  Admit #: 1234
12345 MISC St.                             Balance due: $1,500
Anywhere, AZ. 85000

RE: Settlement Offer

Dear Mr. Jones,

Trillium Specialty Hospital is willing to settle your account for $1,200.00 which is 80% of the balance referenced above.

This offer will only be available for 10 days from the date of this letter, so we urge you to respond immediately.

If you fail to do so by the date stated above, this settlement offer will be void and we will take whatever actions we deem necessary to collect the balance in full.


Sincerely,



Lindsay Guarnero
Accounts Receivables Specialist



This is an attempt to collect a debt. Any information obtained about you will be used to assist in the collection of that debt.

Sch. IV–16

SCHEDULE V
PERMITTED DEBT

None.

SCHEDULE VI
SCHEDULED PHARMACY COST SAVINGS

## PHARMACY CONTRACT LABOR

**ANNUALIZED SAVINGS**

**PERCENT SAVINGS**

| Current Contract Labor | Staff | Cost |
|---|---|---|
| Directors of Pharmacy | 2 | 308,607 |
| Full Time Pharmacists | 3 | 420,900 |
| Pharmacy Techs | 7 | 285,490 |
| Total | 12 | 1,014,997 |
| | | |
| **Future Contract Labor** | | |
| Directors of Pharmacy | 2 | 308,607 |
| | | |
| **Future Employees** | | |
| Full Time Pharmacists | 2 | 280,600 |
| Pharmacy Techs | 4 | 163,137 |
| Total Employees | 6 | 443,737 |
| | | |
| Total Future | 8 | 752,344 |
| | | |
| Total Savings | 4 | 262,653 |

**Action Plan:**

Sch. VI–1

The pharmacy staff is currently contracted out to Pharmacare.  Rather than immediately terminating the Pharmacare agreement, we have reached a verbal agreement to hire a
portion of their pharmacists and pharmacy techs while continuing to use the Directors of Pharmacy on a contract basis.

The hours of operation of the the pharmacy will be reduced, enabling the reduction of one pharmacist and three pharmacy techs. The cost savings from the reduced staff will be $262,653.

In the near term, we will continue to pay Pharmacare a monthly management fee of $4,500 per facility.

Within the first year, we will hire our own Directors of Pharmacy and will be able to eliminate the management fee and save an additional $108,000 annually.

## PHARMACY MARKET BASKET ASSESSMENT RESULTS - EAST VALLEY

## LINE ITEM SUMMARY

| ANNUALIZED SAVINGS | $169,947 |
|---|---|
| PERCENT SAVINGS | 9.9% |
| NUMBER OF ITEMS | 94 |

| CATEGORY OF ITEMS | NUMBER OF ITEMS | SUBMITTED EXTENSION | PROVISTA EXTENSION | PROVISTA SAVINGS | % SAVINGS | SUBMITTED EXTENSION AS % OF ANALYZED |
|---|---|---|---|---|---|---|
| ITEMS PRICED: | | | | | | |
| MATCH | 74 | $593,631 | $576,184 | $17,447 | 2.9% | 58.8% |
| SUBSTITUTE | 20 | $82,445 | $69,394 | $13,051 | 15.8% | 8.2% |
| TOTAL ITEMS PRICED | 94 | $676,076 | $645,577 | $30,498 | 4.5% | 66.9% |
| | | | | | | |
| TOTAL ITEMS NOT PRICED | 22 | $334,038 | | | | |
| | | | | | | |
| TOTAL ITEMS ANALYZED | 116 | $1,010,114 | | | | 100.0% |

| | | | | | |
|---|---|---|---|---|---|
| Drug Costs | | $1,616,835 | | $72,937 | 4.5% |
| 6% Markup | | $97,010 | | $97,010 | 100.0% |
| Total Savings | | $1,713,846 | | $169,947 | 9.9% |

Action Plan:
Drugs are currently purchased through Pharmacare at cost plus 6%. Pharmacare purchases the drugs through Amerinet GPO. Immediately following closing, we will terminate the existing agreement with Pharmacare and sign an agreement to purchase drugs directly from ProVista-Novation. A comparison of pricing between Amerinet GPO and Provista-Novation for 94 drugs representing 42% of the total drug costs resulted in savings of 4.5%. Applied to the full annual drug expense, the annual savings from the cost of drugs will be $72,937. In addition, we will no longer pay the 6% markup to Pharmacare, resulting in an additional $97,010 of annual savings.

There will be additional savings from therapeutic substitutions and a revised formulary, but the additional impact has not been quantified.

Sch. VI-1

## PHARMACY MARKET BASKET ASSESSMENT RESULTS - WEST VALLEY

## LINE ITEM SUMMARY

| | |
|---|---|
| ANNUALIZED SAVINGS | $103,679 |
| PERCENT SAVINGS | 8.7% |
| NUMBER OF ITEMS | 83 |

| CATEGORY OF ITEMS | NUMBER OF ITEMS | SUBMITTED EXTENSION | PROVISTA EXTENSION | PROVISTA SAVINGS | % SAVINGS | SUBMITTED EXTENSION AS % OF ANALYZED |
|---|---|---|---|---|---|---|
| ITEMS PRICED: | | | | | | |
| MATCH | 57 | $409,429 | $414,979 | -$5,550 | -1.4% | 54.0% |
| SUBSTITUTE | 26 | $99,343 | $77,344 | $21,999 | 22.1% | 13.1% |
| TOTAL ITEMS PRICED | 83 | $508,772 | $492,324 | $16,449 | 3.2% | 67.1% |
| | | | | | | |
| TOTAL ITEMS NOT PRICED | 26 | $249,307 | | | | |
| | | | | | | |
| TOTAL ITEMS ANALYZED | 109 | $758,080 | | | | 100.0% |
| | | | | | | |
| Drug Costs | | $1,122,913 | | $36,304 | 3.2% | |
| 6% Markup | | $67,375 | | $67,375 | 100.0% | |
| Total Savings | | $1,190,288 | | $103,679 | 8.7% | |

Action Plan:
Drugs are currently purchased through Pharmacare at cost plus 6%. Pharmacare purchases the drugs through Amerinet GPO. Immediately following closing, we will terminate the existing agreement with Pharmacare and sign an agreement to purchase drugs directly from ProVista-Novation. A comparison of pricing between Amerinet GPO and Provista-Novation for 94 drugs representing 42% of the total drug costs resulted in savings of 3.2%. Applied to the full annual drug expense, the annual savings from the cost of drugs will be $36,304. In addition, we will no longer pay the 6% markup to Pharmacare, resulting in an additional $67,375 of annual savings.

There will be additional savings from therapeutic substitutions and a revised formulary, but the additional impact has not been quantified.

## MEDICAL SUPPLIES MARKET BASKET ASSESSMENT RESULTS

## LINE ITEM SUMMARY

| ANNUALIZED SAVINGS | $292,285 |
|---|---|
| PERCENT SAVINGS | 15.7% |

| CATEGORY OF ITEMS | NUMBER OF ITEMS | SUBMITTED EXTENSION | MEDASSETS EXTENSION | MEDASSETS SAVINGS | PERCENT SAVINGS |
|---|---|---|---|---|---|
| ITEMS PRICED: | | | | | |
| MATCH | 133 | $774,979 | $653,312 | $121,667 | 15.7% |
| | | | | | |
| Medline Costs | | $1,861,764 | | $292,285 | 15.7% |

**Action Plan:**
Medical Supplies are currently purchased through the Amerinet GPO and distributed by Medline.
Immediately following closing, we will contract with a new GPO, MedAssets.
A pricing comparison between MedAssets and Amerinet for 40% of the currently purchased
items results in a 15.7% cost savings.  Applying this savings to the annual spend with Amerinet GPO
through Medline results in an annualized savings of $292,285.

An additional $725,058 of medical supplies were purchased outside of Medline.
There will be savings on these supplies as well, but the savings have not been quantified at this time.
If the same 15.7% savings applies to these other vendors, an additional $133,384 will be realized.

Further savings will be achieved from product substitution and standardization, but these savings have not been quantified.

Sch. VI–1

## PROVISTA GPO PARTICIPATION AGREEMENT

This Provista GPO Participation Agreement (this "Agreement") is made this _____day of _____, 2012 (the "Effective Date"), by and between Provista, LLC ™ ("Provista"), a Delaware limited liability company, and _____[insert Customer name] ("Customer").

WHEREAS, Provista is a group purchasing organization ("GPO") that, among other things, negotiates, directly and through its affiliate, Novation, LLC ("Novation") and/or third party agents, vendor and distribution agreements on behalf of participating organizations.

WHEREAS, Customer is an organization that desires to obtain access to the Provista Supplier Agreements (as defined herein) under the terms of this Agreement.

NOW, THEREFORE, in consideration of the covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

I.  Definitions.  For purposes of this Agreement, the following terms have the following meanings:

    A.  "Confidential Information" is defined in Section V.

    B.  "Covered Items" means goods, services or intangible rights.

    C.  "Provista Supplier Agreement" means an agreement between Provista (or one of its agents, such as Novation) and a Supplier, pursuant to which the Supplier makes goods, services and/or intangible rights available for purchase by Provista customers.

    D.  "Supplier" means a vendor or distributor of Covered Items.

II.  Provista Supplier Agreements

    A.  Authorization.  Customer hereby authorizes Provista, and its agents, to act as its non-exclusive group purchasing agent for purposes of negotiating and entering into Provista Supplier Agreements.  Notwithstanding the foregoing, this authorization shall be contingent upon Customer's proper and timely completion of any necessary enrollment forms or declaration documents.  Nothing in any Provista Supplier Agreement shall, in any way, obligate Customer to purchase, license or lease any Covered Item thereunder.

    B.  Supplier Agreement Terms.  Customer acknowledges and agrees that before it may purchase through Provista Supplier Agreements, Provista may need to ensure that its Suppliers are willing to do business with Customer.  Customer further acknowledges and agrees that, in the event that Customer purchases Covered Items pursuant to Provista Supplier Agreement, Customer shall comply with any and all applicable terms and conditions set forth in such Provista Supplier Agreement.

C.     Own Use; Not For Resale.  If Customer is a nonprofit organization, Customer represents and warrants that all goods purchased through Provista Supplier Agreements will be for Customer's "own use," within the meaning of the Nonprofit Institutions Act as interpreted by the U.S. Supreme Court in Abbott Laboratories v. Portland Retail Druggist Association Inc., 425 U.S. 1 (1976), and following cases.  Notwithstanding, in no event shall Customer sell, resell, lease or otherwise transfer goods purchased through Provista Supplier Agreements to a third party unless expressly permitted by the terms of the applicable Provista Supplier Agreement.  Any breach of the foregoing representation and warranty may result in immediate termination of this Agreement.

III.   Supplier Fees and Disclosure Reports

A.     In General.  Customer acknowledges and agrees that, pursuant to the terms of Provista Supplier Agreements, Provista may receive fees from Suppliers ("Supplier Fees") for Provista's provision of certain services to Suppliers.  Except as noted below, each Provista Supplier Agreement provides for Supplier Fees that are fixed at three percent or less of the purchase price of the Covered Items in the Provista Supplier Agreement.

B.     Fee Database.  With respect to Provista Supplier Agreements providing for Supplier Fees that are not fixed at three percent or less of the purchase price of the Covered Items, Customer (or its authorized agent or designee) has been given access to a secure, electronic web-based database that lists all such Supplier Fees, which shall be updated by Provista or Novation, as applicable, from time to time, as necessary.

C.     Contact for Questions.  If Customer has any questions concerning Supplier Fees in general or the Supplier Fee provisions of any Provista Supplier Agreement in particular, Customer may contact Provista.

D.     Disclosure Report.  Provista shall provide Customer (or its authorized agent or designee) with, or provide Customer with access to, an annual report listing Customer's purchases under Provista Supplier Agreements and the associated Supplier Fees received by Provista based on such purchases.

IV.    Term and Termination

A.     Term.  The initial term of this Agreement shall commence as of the Effective Date and continue for three (3) years (the "Initial Term").  The Initial Term shall renew automatically from year to year, unless earlier terminated as set forth herein (each, a "Renewal Term").  The Initial Term and any Renewal Terms are referred to herein collectively as the "Term."

B.     Termination Without Cause.  Either party may terminate this Agreement at will and without cause at any time upon one hundred eighty (180) days' prior written notice to the other party.

C.    <u>Termination For Cause</u>.  Either party may serve written notice of material breach of this Agreement to the other party, which notice shall specify the nature of the breach.  If such material breach is not cured within thirty (30) days of the notice, or such additional time as is reasonably required and agreed to by both parties to cure such material breach, the notifying party may terminate this Agreement upon ten (10) days written notice thereafter.

D.    <u>Bankruptcy</u>.  If there is filed by or against a party a petition for its adjudication as bankrupt or insolvent or for its reorganization under the United States Bankruptcy Code or for the appointment pursuant to any local, state or federal bankruptcy or insolvency law of a receiver or trustee of such party's property, or an assignment by such party for the benefit of its creditors or the taking of possession of the property of such party by any local, state or federal government officer or agency or court-appointed official for the dissolution, liquidation, supervision or receivership of such party or for the operating, either temporarily or permanently, of such party's business, then this Agreement may be terminated by the other party upon thirty (30) days' prior written notice; provided, however, that if such action is commenced against such party, the action will not cause a termination of this Agreement if such party causes the action to be dismissed within thirty (30) days after the filing or commencement of such action.

E.    <u>Effect of Expiration or Termination</u>.  Upon any expiration or termination of this Agreement, Sections V.A., V.D., V.E., V.G., V.H., V.I., V.K., V.L., V.M., and V.N. shall survive.

V.    <u>Miscellaneous</u>

A.    <u>Confidentiality</u>

1.    <u>General</u>.  Except as provided below, neither party shall, during the term of this Agreement and for a period of three (3) years after the expiration or termination thereof, disclose to any third party, other than its employees or agents with a need to know who have been advised of the confidentiality restrictions contained in this Agreement, or use for any purpose other than compliance with this Agreement, any of the Confidential Information of the other party.

2.    <u>Exclusions</u>.  The obligation of confidentiality described in this Section V.A. shall not apply to information that is:

a)    publicly available through no fault of the receiving party;

b)    received from a third party who is not under an obligation of confidentiality to the disclosing party;

c)    known by the receiving party prior to disclosure by owner;

d)    developed by the receiving party  independently from the Confidential Information of the owner; or

e) required to be disclosed by law or legal process, as determined by the receiving party based on the advice of legal counsel, so long as the party uses reasonable efforts to notify the disclosing party prior to such disclosure.

3. <u>Provista Disclosures</u>.  Notwithstanding anything in this Agreement to the contrary, Provista shall have the right to disclose the terms and conditions of this Agreement to Channel Partner, Suppliers with whom Provista has Provista Supplier Agreements, and federal, state, and local governmental regulatory entities.

4. <u>Definition</u>.  For purposes of this Agreement, the term "Confidential Information" includes:

a) any information which refers or relates to this Agreement, any agreements between Provista and its customers, and any Provista Supplier Agreement, including but not limited to any information relating to Supplier pricing, customer data, customer lists, financial analyses, benchmarking, and comparative reports of any kind prepared by the other party;

b) any information that a party marks as "Confidential," "Proprietary" or with a similar legend prior to disclosure;

c) any information which is orally identified as confidential at the time of disclosure and confirmed as confidential in writing within three (3) business days following such disclosure; and

d) all information generated by a party that contains, reflects, or is derived from Confidential Information.

5. <u>Sanctions</u>.  The parties agree that money damages will not be a sufficient remedy for any breach of the confidentiality provisions of this Agreement. The non-breaching party shall be entitled to seek specific performance and/or injunctive relief, in addition to any other remedies available at law or in equity, upon the breach or threatened breach of this Section V.A. of the Agreement without posting bond and without proof of actual damages.

B. <u>Assignment</u>.  This Agreement may not be transferred or assigned without the prior written consent of the non-assigning party; provided, however, that Provista may, without the consent of Customer, assign this Agreement to a parent, affiliate or subsidiary or to the successor in interest in the event of a merger or sale of substantially all of its assets.  Any attempt to assign this Agreement without the required consent shall be void.

C. <u>Binding Agreement</u>.  This Agreement will inure to the benefit of and be binding on the parties and their permitted successors and assigns.

D. <u>Reporting Price Reductions; Compliance with Law</u>.  Customer represents, warrants and guarantees that at all times during the Term of this Agreement,

Customer shall comply with all applicable federal, state and local laws. To the extent Customer receives discounts, rebates or any other price reductions as a result of purchases under a Provista Supplier Agreement, or any other remuneration under this Agreement or any Provista Supplier Agreement, Customer may have an obligation under federal or state law to disclose such price reductions or remuneration to federal or state health care programs or other payors, and Customer agrees to comply with all such laws.

E.    Att orneys' Fees and Cost s . In the event that either party resorts to legal action to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover the costs and expenses of such action so incurred, including, without limitation, reasonable attorneys' fees.

F.    Exclusion. Each party represents and warrants that it has never been, and shall never be, during the term of this Agreement, excluded from participation in any federal health care program (as such term is defined in 42 U.S.C. § 1320a-7b(f)) ("Federal Health Care Program"), or been debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded by any federal department or agency. Each party represents and warrants that it has not been the subject of an actual, pending or threatened formal adverse action, as that term is defined in 42 U.S.C. § 1320a-7e(g). Each party agrees that it will notify the other party immediately in the event it is excluded from any Federal Health Care Program, or debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded by any federal department or agency, during the term of this Agreement.

G.    Indemnification. Each party (the "indemnifying party") shall hold harmless and indemnify the other party, its shareholders, directors, officers and assigns (collectively, the "indemnified party"), from and against any and all claims, actions, causes of action, verdicts, demands, orders, judgments, settlements, liabilities, losses, costs, obligations, damages, expenses, offsets, deductions, refunds, recoupments, or penalties (including court costs and attorney and other consultancy fees) incurred by or assessed against the indemnified party that in any way arise or result from, directly or indirectly, breach of this Agreement by, or any act or omission of, the indemnifying party. The indemnification obligations set forth herein are subject to the indemnifying party being promptly notified of any and all threats, claims and proceedings related thereto and given reasonable assistance and the opportunity to assume sole control over the defense and all negotiations for a settlement or compromise.

H.    Limitation of Liability. Neither party shall be liable for special, incidental or consequential damages under this Agreement, even if advised of the possibility thereof. All remedies available to an aggrieved party herein under this Agreement, at law, or in equity, are cumulative and not mutually exclusive. Provista and its parent, subsidiaries, affiliates, directors, officers, agents and employees shall not be liable to Customer for any act, or failure to act, in connection with any Provista Supplier Agreement (or Provista program), including, but not limited to, any failure of a Supplier to furnish the Covered Items that the Supplier has agreed to furnish under any Provista Supplier Agreement. Without limiting the generality of the foregoing, Provista hereby disclaims and

excludes any express or implied representation or warranty regarding any Covered Items under any Provista Supplier Agreement (or Provista program).

I.  Entire Agreement.  This Agreement constitutes the entire agreement of the parties with respect to the transactions contemplated hereby. This Agreement supersedes all written or oral prior agreements or understandings with respect to the subject matter hereof. This Agreement may not be amended or modified, and no provision of this Agreement may be discharged or waived, except by a writing signed by Provista and Customer. A waiver of any particular provision will not be deemed a waiver of any other provision, nor will a waiver given on one occasion be deemed to apply to any other occasion.

J.  Severability.  In the event any provision of this Agreement is for any reason deemed to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other term or provision of this Agreement, and this Agreement will be construed by limiting or invalidating such provision to the minimum extent necessary to make such provision valid, legal and enforceable.

K.  Notice.  Any notice required by this Agreement will be deemed to be properly given if sent by (1) certified or registered mail, return receipt requested, or (2) national courier service, such as federal express, at the addresses set forth below or at any other address of which notice has been properly given pursuant to the provisions of this Section V.K.:

If to Provista:          Provista, LLC
                         220 E. Las Colinas Blvd.
                         Irving, TX 75039
                         Attn: Legal Counsel

If to Customer:          _____
                         _____
                         _____
                         Attn: _____

L.  Governing Law.  This Agreement will be construed under and governed by the laws of the State of Texas.

M.  Independent Contractors.  The parties to this Agreement are independent contractors and are solely responsible for the conduct of their respective employees, agents, and representative in connection with the performance of their obligations under this Agreement. Neither party will, by entering into this Agreement, become liable for any of the existing or future obligations, liabilities or debts of the other party. Nothing in this Agreement will be construed as creating a partnership or joint venture between Provista and Customer.

N.  Audit Rights.  At any time during the Term of this Agreement and for a period of one (1) year following termination or expiration of the Agreement, Provista and Customer or its authorized representatives will have the right, upon reasonable written notice and during regular business hours, to inspect and audit all such

books, records and accounts of the other party as is necessary to establish and verify the other's compliance with this Agreement

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed and delivered by their respective authorized representatives.

**PROVISTA, LLC**

By: _____

Name:

Title:

Date:

**CUSTOMER**

By: _____

Name:

Title:

Date:

**Tax Status**.  Customer has checked the number below that correctly reflects Customer's organizational legal structure and tax status, and agrees to provide Provista with written notice of any changes during the term of this Agreement.  **Please attach a completed Form W-9.**

☐   1.  Federal tax-exempt entity
☐   2.  Federal taxable entity

*Tax ID
Number: _____
 * Tax ID Number is required for enrollment



## CUSTOMER ENROLLMENT FORM

**CUSTOMER INFORMATION:**

CUSTOMER NAME                                                                    CHANNEL PARTNER NAME

CUSTOMER ADDRESS (PO Box Address Not Valid)          CITY                              STATE                ZIP CODE

CUSTOMER TELEPHONE NUMBER          CUSTOMER FAX NUMBER          FEDERAL TAX ID NUMBER

AHA ID NUMBER *+          ADJUSTED PATIENT DAYS *+          LICENSED BED COUNT *+          OPERATING BED COUNT *+

\* Per American Hospital Association (AHA) Guide

+ *Please provide information if membership class of trade equals "Acute"*

CUSTOMER ELIGIBILITY: The Customer identified above will be eligible to participate in PROVISTA Contracts and Programs (where no commitment document is required) within 45 days after announcement to the appropriate Supply Partner(s). Some Supply Partners require completion of specific commitment or participation forms prior to contract access. Upon receipt of these completed commitment forms, the customer identified above will be eligible to participate in that specific agreement within 45 days after notification to the Supply Partner. All completed AD and commitment forms will be posted on PROVISTA Forms Manager within 24 business hours.

**CUSTOMER TYPE:** (Please select **one** Customer Type)

☐ **STAND ALONE:** An independent facility with no affiliates or satellites
☒ **SYSTEM:** A facility that owns, leases, and/or manages affiliates/satellites
☐ **SATELLITE:** A facility owned, leased, or managed by another *PROVISTA Customer.* Enter System Name or MID#: _____

**CUSTOMER CLASS OF TRADE and PRIMARY DESCRIPTION:**

| HEALTHCARE | |
|---|---|
| ☒ **Acute Care** | ☐ Acute Medical School   ☐ Cardiac Hospital   ☐ General Medical & Surgical   ☒ Long Term Care Acute Hospital   ☐ Psychiatric Hospital   ☐ Rehabilitation Hospital   ☐ Surgical Hospital |
| ☐ **Ambulatory Care** | ☐ Ambulatory Surgery Center   ☐ Dialysis   ☐ Imaging Center   ☐ Urgent Care Center |
| ☐ **Clinic/Phys. Practice** | ☐ Ambulance Service/EMT   ☐ Clinic/Medical Group   ☐ Laboratory   ☐ Student Health Clinic   ☐ Other: _____ |
| ☐ **HMO – Closed** | ☐ Group Model HMO   ☐ Managed Care Plan |
| ☐ **Home Health** | ☐ Durable Medical Equipment   ☐ Home Health Services   ☐ Home Infusion Center   ☐ Hospice   ☐ Specialty Pharmacy |
| ☐ **Long Term Care** | ☐ Assisted Living   ☐ Long Term Care   ☐ Rehabilitation |
| ☐ **Retail Pharmacy** | ☐ Pharmacy |

| EDUCATION | |
|---|---|
| ☐ **University, College or School** | ☐ College or University   ☐ Community College   ☐ K- 12   ☐ Early Learning |

| CORPORATE/MUNICIPALITIES | |
|---|---|
| ☐ **Corporate and Municipalities** | ☐ Corporations and Businesses   ☐ Correctional Facilities   ☐ Faith Based Organization   ☐ State & Local Government |

**PRIMARY *CUSTOMER* CONTACT INFORMATION:** (Required to process enrollment)

CONTACT NAME (PRINT)          CONTACT TITLE          CONTACT E-MAIL ADDRESS          PHONE#

PROVISTA Sales Rep Initials: _____

**FAX TO PROVISTA MEMBER SERVICES: (972) 910-6604**

*Revised February 2011*

**Pharmacy Program Participation Agreement** | Submit Form Online | PROVISTA.

AGREEMENT, made and entered into as of the date of signature between Novation, LLC, a Delaware limited liability company ("Novation"), and _Restora Healthcare, LLC_ located in _Alpharetta GA._ a Member or Affiliate of Provista and its successor company, Provista, LLC (the "HCO").**WITNESSETH:**

WHEREAS, the HCO desires to purchase pharmaceuticals, over-the-counter drugs, health and beauty aids, medicines, drugs, and goods related to the use thereof (collectively "Pharmaceuticals") through Novation's Pharmacy Program for its own use, as detailed in Section 6, in connection with its operations;

WHEREAS, the HCO desires that Novation negotiate certain agreements on behalf of the HCO regarding, among other things, the ordering, purchasing, and storage of Pharmaceuticals,

NOW, THEREFORE, in consideration of the premises and mutual covenants, conditions, and agreements hereinafter contained, the parties hereto agree as follows;

1. Distribution Agreement. The HCO hereby authorizes Novation to negotiate and enter into, on behalf of and for the benefit of the HCO, distribution agreements which provide for the storage and delivery of Pharmaceuticals to the HCO, with such changes, amendments, modifications, replacements, and/or substitutions thereto as Novation from time to time prior to and after the execution thereof at its discretion shall deem necessary, proper, or advisable for the HCO. Novation shall deliver a copy of such Agreement, or a summary thereof, to the HCO promptly after its execution.

2. Pharmaceutical Agreements. The HCO hereby authorizes Novation, on behalf of and for the benefit of the HCO to negotiate and enter into, and from time to time prior to and after the execution thereof, to modify, amend or change, agreements (the "Pharmaceutical Agreements") with manufacturers of Pharmaceuticals (the "Manufacturers"), under which the HCO may purchase, at its discretion, Pharmaceuticals at prices specified in such agreements. Upon request, Novation shall deliver a summary of each Pharmaceutical Agreement to the HCO promptly after its execution.

3. Pharmacy Services and Support Agreements. Novation, on behalf of and for the benefit of the HCO will negotiate and enter into, and from time to time prior to and after the execution thereof, modify, amend or change, agreements to support operation and infrastructure of pharmacy related operations ("Pharmacy Services and Support Agreements") with providers of such products or services, under which the HCO may obtain, at its discretion, products or services under terms and prices as specified in such agreements. Upon request, Novation shall deliver a summary of such agreement to the HCO promptly after its execution.

4. Term and Termination. This Agreement shall continue in full force and effect for twelve months effective the date of signature of the HCO, and shall be renewed automatically thereafter from year to year; provided, that this Agreement shall terminate automatically and be of no further force or effect with respect to the HCO upon the date such HCO ceases to be a Member or Affiliate of "Provista", except for rights and obligations of such HCO arising pursuant to this Agreement prior to such date (which rights and obligations shall continue in full force and effect).

5. Liability. The HCO for itself, its successors and assigns, hereby forever waives, releases, and relinquishes all claims, demands, suits, and causes of action of every kind and nature, in law or in equity, which it has now or claims to have or which it may have in the future against "Provista", Novation, or any of their subsidiaries or affiliates, or any of their respective directors, officers, employees, or agents, or any of them, in connection with the Pharmacy Distribution Agreement, the Pharmacy Services and Support Agreements, or any Pharmaceutical Agreement.

6. Own Use. HCO represents and warrants that all Pharmaceuticals purchased under the Pharmaceutical Agreements will be for the HCO's "own use" within the meaning of the Nonprofit Institutions act as interpreted by the U.S. Supreme Court in Abbott Laboratories v. Portland Retail Druggist Association, Inc., 425 U.S. 1 (1976), and following cases, Federal Trade Commission Advisory Opinion Letters which apply to Abbott, and that HCO will observe and comply with all applicable laws.

7. Covered Products. HCO hereby elects to participate in the Novation Pharmacy Program and will, to the extent it purchases and products covered by the Pharmaceutical, or Pharmacy Product or Support Agreements, purchase all such products through the Novation Pharmacy Program, available from the Novation pharmacy distributor, and pursuant to the applicable agreement. HCO hereby authorizes all Manufacturers to delete HCO from any other Group Purchasing Organizations (GPO) lists with respect to products covered by the agreements.

8. Enrollment into the Novation Pharmacy Program does not guarantee the customer will meet the individual supplier requirements to receive pricing under the Novation Agreements. Customer pricing eligibility for products included in the Novation Pharmacy Program is determined by the participating suppliers based on the customer class of trade. Each has supplier determined how pricing will be assigned to each class of trade in order for that company to meet federal pricing requirements.

## Pharmacy Program Participation Agreement



IN WITNESS THEREOF, Novation and HCO have executed this Agreement as of the date of signature of the HCO.

For Novation, LLC                    For HCO

Signature:_____    Signature:_____

Printed:_____    Printed:_____

Title:_____    Title:_____

Email:_____    Email:_____

Date:_____    Date:_____

| Submitted By: | _____ | Phone No.: | _____ |
|---|---|---|---|
| Member ID No.: | _____ | Date: | _____ |

| Submit form online in upper right hand corner of page one. | Or print, SIGN, copy and fax to: Provista Member Services (972) 910-6604 |
|---|---|
| | *Problems? Contact us at (888) 538-4662 or ProvistaCustService@provistaco.com* |

Pharmacy Program Participation Agreement


**PROVISTA**

**Pharmacy Program Participation:**

**Health Care Organization Profile**

Facility Name: _____

Address: _____

City, Sate, Zip: _____

Phone: _____ Fax: _____

Internet Address: _____ DEA Number: _____

Pharmacy Retail License, if applicable: _____

Director of Pharmacy: _____ Phone: _____

Sponsoring Organization, if applicable: _____


Signature: _____

Printed: _____

Title: _____

Email: _____

Date: _____



## Pharmacy Program Participation Agreement



**Pharmacy Program Participation:**

**Health Care Organization Profile**

Facility Name: _____

Address: _____

City, Sate, Zip: _____

Phone: [_____]    Fax: [_____] _____

Internet Address: [_____]    DEA Number: _____

Pharmacy Retail License, if applicable: [_____] ___

Director of Pharmacy: [_____]    Phone: [_____]

Sponsoring Organization, if applicable: [_____]


Signature: _____

Printed: [_____]

Title: [_____]

Email: _____

Date: _____

## PROVISTA GPO PARTICIPATION AGREEMENT

This Provista GPO Participation Agreement (this "Agreement") is made this _____day of _____, 2012 (the "Effective Date"), by and between Provista, LLC ™ ("Provista"), a Delaware limited liability company, and $\text{Restora Hea Hhcare}$ [insert Customer name] $\text{LLC}$ ("Customer").

WHEREAS, Provista is a group purchasing organization ("GPO") that, among other things, negotiates, directly and through its affiliate, Novation, LLC ("Novation") and/or third party agents, vendor and distribution agreements on behalf of participating organizations.

WHEREAS, Customer is an organization that desires to obtain access to the Provista Supplier Agreements (as defined herein) under the terms of this Agreement.

NOW, THEREFORE, in consideration of the covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

I.  Definitions. For purposes of this Agreement, the following terms have the following meanings:

    A.  "Confidential Information" is defined in Section V.

    B.  "Covered Items" means goods, services or intangible rights.

    C.  "Provista Supplier Agreement" means an agreement between Provista (or one of its agents, such as Novation) and a Supplier, pursuant to which the Supplier makes goods, services and/or intangible rights available for purchase by Provista customers.

    D.  "Supplier" means a vendor or distributor of Covered Items.

II. Provista Supplier Agreements

    A.  Authorization. Customer hereby authorizes Provista, and its agents, to act as its non-exclusive group purchasing agent for purposes of negotiating and entering into Provista Supplier Agreements. Notwithstanding the foregoing, this authorization shall be contingent upon Customer's proper and timely completion of any necessary enrollment forms or declaration documents. Nothing in any Provista Supplier Agreement shall, in any way, obligate Customer to purchase, license or lease any Covered Item thereunder.

    B.  Supplier Agreement Terms. Customer acknowledges and agrees that before it may purchase through Provista Supplier Agreements, Provista may need to ensure that its Suppliers are willing to do business with Customer. Customer further acknowledges and agrees that, in the event that Customer purchases Covered Items pursuant to Provista Supplier Agreement, Customer shall comply with any and all applicable terms and conditions set forth in such Provista Supplier Agreement.

C.  Own Use; Not For Resale.  If Customer is a nonprofit organization, Customer represents and warrants that all goods purchased through Provista Supplier Agreements will be for Customer's "own use," within the meaning of the Nonprofit Institutions Act as interpreted by the U.S. Supreme Court in Abbott Laboratories v. Portland Retail Druggist Association Inc., 425 U.S. 1 (1976), and following cases.  Notwithstanding, in no event shall Customer sell, resell, lease or otherwise transfer goods purchased through Provista Supplier Agreements to a third party unless expressly permitted by the terms of the applicable Provista Supplier Agreement.  Any breach of the foregoing representation and warranty may result in immediate termination of this Agreement.

III.  Supplier Fees and Disclosure Reports

A.  In General.  Customer acknowledges and agrees that, pursuant to the terms of Provista Supplier Agreements, Provista may receive fees from Suppliers ("Supplier Fees") for Provista's provision of certain services to Suppliers.  Except as noted below, each Provista Supplier Agreement provides for Supplier Fees that are fixed at three percent or less of the purchase price of the Covered Items in the Provista Supplier Agreement.

B.  Fee Database.  With respect to Provista Supplier Agreements providing for Supplier Fees that are not fixed at three percent or less of the purchase price of the Covered Items, Customer (or its authorized agent or designee) has been given access to a secure, electronic web-based database that lists all such Supplier Fees, which shall be updated by Provista or Novation, as applicable, from time to time, as necessary.

C.  Contact for Questions.  If Customer has any questions concerning Supplier Fees in general or the Supplier Fee provisions of any Provista Supplier Agreement in particular, Customer may contact Provista.

D.  Disclosure Report.  Provista shall provide Customer (or its authorized agent or designee) with, or provide Customer with access to, an annual report listing Customer's purchases under Provista Supplier Agreements and the associated Supplier Fees received by Provista based on such purchases.

IV.  Term and Termination

A.  Term.  The initial term of this Agreement shall commence as of the Effective Date and continue for three (3) years (the "Initial Term").  ~~The Initial Term shall renew automatically from year to year, unless earlier terminated as set forth herein (each, a "Renewal Term").  The Initial Term and any Renewal Terms are referred to herein collectively as the "Term."~~

B.  Termination Without Cause.  Either party may terminate this Agreement at will and without cause at any time upon one hundred eighty ~~(180)~~ days' prior written notice to the other party.   *60*

C.  Termination For Cause. Either party may serve written notice of material breach of this Agreement to the other party, which notice shall specify the nature of the breach. If such material breach is not cured within thirty (30) days of the notice, or such additional time as is reasonably required and agreed to by both parties to cure such material breach, the notifying party may terminate this Agreement upon ten (10) days written notice thereafter.

D.  Bankruptcy. If there is filed by or against a party a petition for its adjudication as bankrupt or insolvent or for its reorganization under the United States Bankruptcy Code or for the appointment pursuant to any local, state or federal bankruptcy or insolvency law of a receiver or trustee of such party's property, or an assignment by such party for the benefit of its creditors or the taking of possession of the property of such party by any local, state or federal government officer or agency or court-appointed official for the dissolution, liquidation, supervision or receivership of such party or for the operating, either temporarily or permanently, of such party's business, then this Agreement may be terminated by the other party upon thirty (30) days' prior written notice; provided, however, that if such action is commenced against such party, the action will not cause a termination of this Agreement if such party causes the action to be dismissed within thirty (30) days after the filing or commencement of such action.

E.  Effect of Expiration or Termination. Upon any expiration or termination of this Agreement, Sections V.A., V.D., V.E., V.G., V.H., V.I., V.K., V.L., V.M., and V.N. shall survive.

V.  Miscellaneous

A.  Confidentiality

1.  General. Except as provided below, neither party shall, during the term of this Agreement and for a period of three (3) years after the expiration or termination thereof, disclose to any third party, other than its employees or agents with a need to know who have been advised of the confidentiality restrictions contained in this Agreement, or use for any purpose other than compliance with this Agreement, any of the Confidential Information of the other party.

2.  Exclusions. The obligation of confidentiality described in this Section V.A. shall not apply to information that is:

a)  publicly available through no fault of the receiving party;

b)  received from a third party who is not under an obligation of confidentiality to the disclosing party;

c)  known by the receiving party prior to disclosure by owner;

d)  developed by the receiving party independently from the Confidential Information of the owner; or

e)   required to be disclosed by law or legal process, as determined by the receiving party based on the advice of legal counsel, so long as the party uses reasonable efforts to notify the disclosing party prior to such disclosure.

3.   <u>Provista Disclosures</u>. Notwithstanding anything in this Agreement to the contrary, Provista shall have the right to disclose the terms and conditions of this Agreement to Channel Partner, Suppliers with whom Provista has Provista Supplier Agreements, and federal, state, and local governmental regulatory entities.

4.   <u>Definition</u>. For purposes of this Agreement, the term "Confidential Information" includes:

a)   any information which refers or relates to this Agreement, any agreements between Provista and its customers, and any Provista Supplier Agreement, including but not limited to any information relating to Supplier pricing, customer data, customer lists, financial analyses, benchmarking, and comparative reports of any kind prepared by the other party;

b)   any information that a party marks as "Confidential," "Proprietary" or with a similar legend prior to disclosure;

c)   any information which is orally identified as confidential at the time of disclosure and confirmed as confidential in writing within three (3) business days following such disclosure; and

d)   all information generated by a party that contains, reflects, or is derived from Confidential Information.

5.   <u>Sanctions</u>. The parties agree that money damages will not be a sufficient remedy for any breach of the confidentiality provisions of this Agreement. The non-breaching party shall be entitled to seek specific performance and/or injunctive relief, in addition to any other remedies available at law or in equity, upon the breach or threatened breach of this Section V.A. of the Agreement without posting bond and without proof of actual damages.

B.   <u>Assignment</u>. This Agreement may not be transferred or assigned without the prior written consent of the non-assigning party; provided, however, that Provista may, without the consent of Customer, assign this Agreement to a parent, affiliate or subsidiary or to the successor in interest in the event of a merger or sale of substantially all of its assets. Any attempt to assign this Agreement without the required consent shall be void.

C.   <u>Binding Agreement</u>. This Agreement will inure to the benefit of and be binding on the parties and their permitted successors and assigns.

D.   <u>Reporting Price Reductions; Compliance with Law</u>. Customer represents, warrants and guarantees that at all times during the Term of this Agreement,

Provista GPO Participation Agreement
Template June 2012

Customer shall comply with all applicable federal, state and local laws. To the extent Customer receives discounts, rebates or any other price reductions as a result of purchases under a Provista Supplier Agreement, or any other remuneration under this Agreement or any Provista Supplier Agreement, Customer may have an obligation under federal or state law to disclose such price reductions or remuneration to federal or state health care programs or other payors, and Customer agrees to comply with all such laws.

E.   <u>Attorneys' Fees and Costs</u>.  In the event that either party resorts to legal action to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover the costs and expenses of such action so incurred, including, without limitation, reasonable attorneys' fees.

F.   <u>Exclusion</u>.  Each party represents and warrants that it has never been, and shall never be, during the term of this Agreement, excluded from participation in any federal health care program (as such term is defined in 42 U.S.C. § 1320a-7b(f)) ("Federal Health Care Program"), or been debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded by any federal department or agency.  Each party represents and warrants that it has not been the subject of an actual, pending or threatened formal adverse action, as that term is defined in 42 U.S.C. § 1320a-7e(g).  Each party agrees that it will notify the other party immediately in the event it is excluded from any Federal Health Care Program, or debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded by any federal department or agency, during the term of this Agreement.

G.   <u>Indemnification</u>.  Each party (the "indemnifying party") shall hold harmless and indemnify the other party, its shareholders, directors, officers and assigns (collectively, the "indemnified party"), from and against any and all claims, actions, causes of action, verdicts, demands, orders, judgments, settlements, liabilities, losses, costs, obligations, damages, expenses, offsets, deductions, refunds, recoupments, or penalties (including court costs and attorney and other consultancy fees) incurred by or assessed against the indemnified party that in any way arise or result from, directly or indirectly, breach of this Agreement by, or any act or omission of, the indemnifying party.  The indemnification obligations set forth herein are subject to the indemnifying party being promptly notified of any and all threats, claims and proceedings related thereto and given reasonable assistance and the opportunity to assume sole control over the defense and all negotiations for a settlement or compromise.

H.   <u>Limitation of Liability</u>.  Neither party shall be liable for special, incidental or consequential damages under this Agreement, even if advised of the possibility thereof.  All remedies available to an aggrieved party herein under this Agreement, at law, or in equity, are cumulative and not mutually exclusive. Provista and its parent, subsidiaries, affiliates, directors, officers, agents and employees shall not be liable to Customer for any act, or failure to act, in connection with any Provista Supplier Agreement (or Provista program), including, but not limited to, any failure of a Supplier to furnish the Covered Items that the Supplier has agreed to furnish under any Provista Supplier Agreement. Without limiting the generality of the foregoing, Provista hereby disclaims and

excludes any express or implied representation or warranty regarding any Covered Items under any Provista Supplier Agreement (or Provista program).

I.  Entire Agreement. This Agreement constitutes the entire agreement of the parties with respect to the transactions contemplated hereby. This Agreement supersedes all written or oral prior agreements or understandings with respect to the subject matter hereof. This Agreement may not be amended or modified, and no provision of this Agreement may be discharged or waived, except by a writing signed by Provista and Customer. A waiver of any particular provision will not be deemed a waiver of any other provision, nor will a waiver given on one occasion be deemed to apply to any other occasion.

J.  Severability. In the event any provision of this Agreement is for any reason deemed to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other term or provision of this Agreement, and this Agreement will be construed by limiting or invalidating such provision to the minimum extent necessary to make such provision valid, legal and enforceable.

K.  Notice. Any notice required by this Agreement will be deemed to be properly given if sent by (1) certified or registered mail, return receipt requested, or (2) national courier service, such as federal express, at the addresses set forth below or at any other address of which notice has been properly given pursuant to the provisions of this Section V.K.:

If to Provista:              Provista, LLC
                             220 E. Las Colinas Blvd.
                             Irving, TX 75039
                             Attn: Legal Counsel

If to Customer:              _____
                             _____
                             _____
                             Attn: _____

L.  Governing Law. This Agreement will be construed under and governed by the laws of the State of Texas.

M.  Independent Contractors. The parties to this Agreement are independent contractors and are solely responsible for the conduct of their respective employees, agents, and representative in connection with the performance of their obligations under this Agreement. Neither party will, by entering into this Agreement, become liable for any of the existing or future obligations, liabilities or debts of the other party. Nothing in this Agreement will be construed as creating a partnership or joint venture between Provista and Customer.

N.  Audit Rights. At any time during the Term of this Agreement and for a period of one (1) year following termination or expiration of the Agreement, Provista and Customer or its authorized representatives will have the right, upon reasonable written notice and during regular business hours, to inspect and audit all such

books, records and accounts of the other party as is necessary to establish and verify the other's compliance with this Agreement

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed and delivered by their respective authorized representatives.

**PROVISTA, LLC**

By:    _____
Name:
Title:
Date:

**CUSTOMER**

By:    _____
Name:
Title:
Date:

**Tax Status**. Customer has checked the number below that correctly reflects Customer's organizational legal structure and tax status, and agrees to provide Provista with written notice of any changes during the term of this Agreement. **Please attach a completed Form W-9.**

☐ 1. Federal tax-exempt entity
☒ 2. Federal taxable entity

*Tax ID
Number:    _____
* Tax ID Number is required for enrollment

## FIRST AMENDMENT TO
## REVOLVING AND TERM LOAN AND SECURITY AGREEMENT

This FIRST AMENDMENT TO REVOLVING AND TERM LOAN AND SECURITY AGREEMENT dated as of January 17, 2013 (this "**Amendment**"), is executed by and among RESTORA HOSPITAL OF MESA, LLC, a Delaware limited liability company, RESTORA HOSPITAL OF SUN CITY, LLC, a Delaware limited liability company (collectively, the "**Borrowers**"), RESTORA HEALTHCARE HOLDINGS, LLC, a Delaware limited liability company (the "**Parent**"), and HEALTHCARE FINANCE GROUP, LLC, a Delaware limited liability company ("**HFG**"), in its capacity as a lender with a Revolving Commitment (together with its successors and permitted assigns in that capacity, the "**Revolving Lenders**"), and its capacity as a lender making the Term Loans (together with its successors and permitted assigns in that capacity, the "**Term Lenders**"; the Revolving Lenders and the Term Lenders, collectively, the "**Lenders**"), and as administrative agent and collateral agent for the Lenders (together with its successors and permitted assigns in those capacities, the "**Agent**").

R E C I T A L S:

A.    Pursuant to that certain Revolving and Term Loan and Security Agreement dated as of June 29, 2012 among the Borrowers, the Parent, the Lenders from time to time signatory thereto, and the Agent (the "**Loan Agreement**"), the Lenders have agreed to make available certain term and revolving loans to the Borrowers.

B.    At the present time, the Borrowers and the Parent request an amendment to the Loan Agreement, and the Agent and the Lenders are agreeable to such request, but only on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

A G R E E M E N T S:

1.    RECITALS. The foregoing Recitals are hereby made a part of this Amendment.

2.    DEFINITIONS. Capitalized words and phrases used herein without definition shall have the respective meanings ascribed to such words and phrases in the Loan Agreement.

3.    AMENDMENT TO THE LOAN AGREEMENT. Section 2.1 of the Loan Agreement, Revolving Advances, is hereby amended by amending and restating subsection (b) thereof in its entirety to read as follows:

"(b)    The aggregate outstanding principal amount of Revolving Advances made by any Revolving Lender shall not at any time exceed the amount of such Revolving Lender's Revolving Commitment. The sum of the principal amount of the Revolving Loan outstanding at any time shall not exceed the Adjusted Borrowing Limit. Notwithstanding any provision in this Agreement to the contrary, the aggregate outstanding principal amount of the Revolving Loans shall not exceed (and the Lenders shall have no obligation to advance Revolving Loans in an aggregate amount in excess of) $2,500,000, until the earliest of the date on which (a) the Trillium Seller Account shall become subject to a Depository Agreement by and among the Trillium Sellers, Merrill Lynch and the Agent, on terms and conditions satisfactory to Agent, (b) the

Trillium Seller Account shall become subject to a Control Agreement by and among the Trillium Sellers, Merrill Lynch and the Agent, to the extent permitted by applicable law, or (c) the Trillium Seller Account is closed and all Obligors have commenced making all payments with respect to Receivables to the applicable Lockbox Accounts pursuant to Section 5.1. Notwithstanding the immediately preceding sentence, solely for the period beginning on January 17, 2013, and ending on February 18, 2013, such maximum aggregate outstanding principal amount of the Revolving Loans shall be $3,000,000; provided, however, that, for the avoidance of doubt, any failure to reduce the outstanding principal amount of the Revolving Loans to $2,500,000 or less at the expiration of such period shall be an immediate Event of Default under this Agreement."

4.    ACKNOWLEDGEMENT OF DEFAULTS; NO WAIVER OR FORBEARANCE. Each of the Borrowers and the Parent hereby acknowledges that (a) as of October 31, 2012, the Borrowers were in default of the financial covenant set forth in Section 11.4 of the Loan Agreement (Ratio of Senior Funded Debt to EBITDAR), (b) as of November 30, 2012, the Borrowers were in default of the financial covenant set forth in Section 11.2 of the Loan Agreement (Fixed Charge Coverage Ratio), (c) as of November 30, 2012, the Borrowers were in default of the financial covenant set forth in Section 11.3 of the Loan Agreement (Ratio of Senior Funded Debt to EBITDA) and (d) as of November 30, 2012, the Borrowers were in default of the financial covenant set forth in Section 11.4 of the Loan Agreement (Ratio of Senior Funded Debt to EBITDAR) which acknowledged defaults (collectively, the "**Existing Defaults**") each constituted Events of Default under the Loan Agreement, and which entitles the Agent and the Lenders to exercise their respective rights and remedies under the Loan Agreement, applicable law, or otherwise, including without limitation, the implementation of the interest rate applicable after the occurrence of a Default or Event of Default under Section 2.6(d) of the Loan Agreement (the "**Default Rate**"). At this time, the Agent and the Lenders have elected to accrue interest at the Default Rate effective as of October 31, 2012, but at this time have not yet elected to charge the Borrowers for such Default Rate interest. Each Borrower hereby acknowledges and agrees that as of January 15, 2013, $48,250.65 of interest has accrued at the Default Rate (consisting of $23,320.65 with respect to Revolving Loans and $24,930.00 with respect to Term Loans). The Agent and the Lenders have not waived and are not by this Amendment waiving the Existing Defaults or any other Defaults or Events of Default that may now or in the future exist under the Loan Agreement or any of the other Documents, and Agent and the Lenders have not agreed to forbear with respect to any of its rights or remedies concerning the Existing Defaults or any other Defaults or Events of Default that may now or in the future exist under the Loan Agreement or any of the other Documents. The Agent and the Lenders have not at this time elected to exercise any other rights and remedies available in respect of the Existing Defaults.    Pending determination by the Agent and Lenders of how and whether to proceed in light of the Existing Defaults, the Agent and Lenders expressly reserve the right to exercise any and all remedies available to it at law, in equity, under the Loan Agreement or under any of the other Loan Documents at any time in their sole discretion, including, without limitation, charging the Borrowers at the Default Rate accrued as described above. The Agent and the Lenders expressly do not waive either the Existing Defaults or any other such defaults or Events of Default and expressly reserves all rights and remedies in respect of the foregoing, and nothing in this Amendment, and no delay on the part of the Agent or the Lenders in exercising any such rights or remedies, should be construed as a waiver of or forbearance with respect to any such rights or remedies.

In addition, each of the Borrowers and the Parent acknowledges (i) that the Agent and the Lenders have incurred reasonable attorneys' fees in connection with the Existing Defaults, and that such costs, fees and expenses are recoverable by the Agent and the Lenders under the Loan Agreement, and (ii) that the Agent and the Lenders are under no obligation to honor, and shall honor only in their sole and absolute discretion, determined in good faith, any borrowing requests made by the Borrower Representative under the Loan Agreement. Except for the express provisions of this Amendment

2

amending the terms of the Loan Agreement, nothing in this Amendment, any other correspondence, or any oral communications between any Borrower, the Parent, the Agent or any of the Lenders may be construed as a modification to the Loan Agreement or the Loan Documents, course of dealing, course of performance, acquiescence to or waiver of the Existing Defaults or any other defaults or Events of Default, whether now existing or hereafter arising, or as a waiver of or an election not to exercise any of the Lender's rights and remedies under the Loan Documents.

    5.    REPRESENTATIONS AND WARRANTIES. To induce the Agent and the Lenders to enter into this Amendment, each of the Borrowers and the Parent hereby certifies, represents, and warrants to the Agent and the Lenders that:

    5.1.    Authorization. Each of the Borrowers and the Parent is duly authorized to execute and deliver this Amendment, and each Borrower is and will continue to be duly authorized to borrow monies under the Loan Agreement, as amended hereby, and to perform its obligations under the Loan Agreement, as amended hereby.

    5.2.    No Conflicts. The execution and delivery of this Amendment and the performance by each Borrower of its obligations under the Loan Agreement, as amended hereby, do not and will not conflict with any provision of law or of the respective organizational documents of any Borrower or the Parent or of any agreement binding upon any Borrower or the Parent.

    5.3.    Validity and Binding Effect. The Loan Agreement, as amended hereby, is a legal, valid, and binding obligation of each Borrower and the Parent, enforceable against each of them in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditors' rights or by general principles of equity limiting the availability of equitable remedies.

    5.4.    Compliance with Loan Agreement. The representation and warranties set forth in Article 7 of the Loan Agreement, as amended hereby, are true and correct with the same effect as if such representations and warranties had been made on the date hereof, with the exception that all references to the financial statements shall mean the financial statements most recently delivered to the Agent and except for such changes as are specifically permitted under the Loan Agreement. In addition, except for the defaulted covenants giving rise to the Existing Defaults, each Borrower has complied with and is in compliance with all of the covenants set forth in the Loan Agreement, as amended hereby, including, but not limited to, those set forth in Articles 9, 10, and 11 thereof.

    5.5.    No Event of Default. As of the date hereof and except for the Existing Defaults, no Event of Default under Article 11 of the Loan Agreement, or event or condition which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, has occurred or is continuing.

    6.    CONDITIONS PRECEDENT. This Amendment shall become effective as of the date above first written after receipt by Agent of the following:

    6.1.    Amendment. This Amendment executed by each Borrower, the Parent, the Agent, and the Lenders.

    6.2.    Payment of Amendment Fee. Receipt by the Agent, for the account of the Lenders, of an amendment fee of $15,000.00 in immediately available funds, which fee shall be fully earned and non-refundable on the date hereof.

45127536_4

      6.3.    <u>Other Documents</u>. Such other documents, certificates, resolutions, and/or opinions of counsel as the Agent may request.

7.     <u>GENERAL</u>.

      7.1.    <u>Governing Law; Severability</u>. This Amendment shall be construed in accordance with and governed by the laws of State of New York. Wherever possible each provision of the Loan Agreement and this Amendment shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Loan Agreement and this Amendment shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of the Loan Agreement and this Amendment.

      7.2.    <u>Successors and Assigns</u>. This Amendment shall be binding upon each Borrower, the Parent, the Agent, and the Lenders and their respective successors and assigns, and shall inure to the benefit of each Borrower, the Parent, the Agent, and the Lenders and the respective successors and assigns of the Agent and the Lenders.

      7.3.    <u>Continuing Force and Effect of Documents</u>. Except as specifically modified or amended by the terms of this Amendment, all other terms and provisions of the Loan Agreement and the other Loan Documents are incorporated by reference herein, and in all respects, shall continue in full force and effect. Each of the Borrowers and the Parent, by execution of this Amendment, hereby reaffirms, assumes and binds itself to all of the obligations, duties, rights, covenants, terms and conditions that are contained in the Loan Agreement and the other Documents.

      7.4.    <u>References to Loan Agreement</u>. Each reference in the Loan Agreement to "this Agreement", "hereunder", "hereof", or words of like import, and each reference to the Loan Agreement in any and all instruments or documents delivered in connection therewith, shall be deemed to refer to the Loan Agreement, as amended hereby.

      7.5.    <u>Expenses</u>. The terms and provisions of <u>Section 14.5</u> of the Loan Agreement are hereby incorporated herein by reference. Each Borrower agrees to pay all costs and expenses in connection with the preparation of this Amendment and other related loan documents, including, without limitation, reasonable attorneys' fees and time charges of attorneys who may be employees of the Agent or any Lender or any affiliate or parent of the Agent or any Lender. Each Borrower shall pay any and all stamp and other taxes, UCC search fees, filing fees, and other costs and expenses in connection with the execution and delivery of this Amendment and the other instruments and documents to be delivered hereunder, and agrees to save the Agent and the Lenders harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such costs and expenses.

      7.6.    <u>Waiver and Release of Claims</u>. Each of the Borrowers and the Parent hereby waives and releases any and all current existing claims, counterclaims, defenses or set-offs of every kind and nature which it has or may have against the Agent or any Lender arising out of, pursuant to, or pertaining in any way to the Loan Agreement, any and all documents and instruments in connection with or relating to the foregoing, or this Amendment. Each of the Borrowers and the Parent hereby further covenants and agrees not to sue the Agent or any Lender or assert any claims, defenses, demands, actions or liabilities against the Agent or any Lender arising out of, pursuant to, or pertaining in any way to the Loan Agreement, any and all documents and instruments in connection with or relating to the foregoing, or this Amendment. Notwithstanding anything contained in this Section 7.6 to the contrary, the waiver and release of claims and covenant not to sue contained in this Section 7.6 shall apply only with respect to matters arising on or before the date hereof, and no future claims or rights, or rights to sue, are, or are

4

intended to be, waived by Borrower or Parent pursuant to this Amendment.

7.7.    Counterparts. This Amendment may be executed in any number of counterparts, all of which shall constitute one and the same agreement.  Receipt of an executed signature page to this Amendment by facsimile or other electronic transmission shall constitute effective delivery thereof. Electronic records of executed Loan Documents maintained by the Agent shall be deemed to be originals.

**[SIGNATURE PAGE FOLLOWS]**

45127536_4

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Revolving and Term Loan and Security Agreement as of the date first above written.

BORROWERS:

**RESTORA HOSPITAL OF MESA, LLC**

By: _____

Name:  Rod Laughlin

Title:  Manager

**RESTORA HOSPITAL OF SUN CITY, LLC**

By: _____

Name:  Rod Laughlin

Title:  Manager

PARENT:

**RESTORA HEALTHCARE HOLDINGS, LLC**

By: _____

Name:  Rod Laughlin

Title:  Manager

AGENT:

**HEALTHCARE    FINANCE    GROUP,    LLC,**
as the Agent

By: _____

Name:

Title:

LENDERS:

**HEALTHCARE    FINANCE    GROUP,    LLC,**
as a Revolving Lender and a Term Lender

By: _____

Name:

Title:

FIRST AMENDMENT TO REVOLVING AND TERM LOAN AND SECURITY AGREEMENT
SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Revolving and Term Loan and Security Agreement as of the date first above written.

BORROWERS:

**RESTORA HOSPITAL OF MESA, LLC**

By: _____
Name: Rod Laughlin
Title: Manager

**RESTORA HOSPITAL OF SUN CITY, LLC**

By: _____
Name: Rod Laughlin
Title: Manager

PARENT:

**RESTORA HEALTHCARE HOLDINGS, LLC**

By: _____
Name:
Title:

AGENT:

**HEALTHCARE FINANCE GROUP, LLC,**
as the Agent

By: _____
Name:
Title:

LENDERS:

**HEALTHCARE FINANCE GROUP, LLC,**
as a Revolving Lender and a Term Lender

By: _____
Name:
Title:

FIRST AMENDMENT TO REVOLVING AND TERM LOAN AND SECURITY AGREEMENT
SIGNATURE PAGE

## SECOND AMENDMENT AND WAIVER TO
## REVOLVING AND TERM LOAN AND SECURITY AGREEMENT

This SECOND AMENDMENT AND WAIVER TO REVOLVING AND TERM LOAN AND SECURITY AGREEMENT dated as of April 11, 2013 (this **"Amendment"**), is executed by and among RESTORA HOSPITAL OF MESA, LLC, a Delaware limited liability company, RESTORA HOSPITAL OF SUN CITY, LLC, a Delaware limited liability company (collectively, the "**Borrowers**"), RESTORA HEALTHCARE HOLDINGS, LLC**,** a Delaware limited liability company (the "**Parent**"), and HEALTHCARE FINANCE GROUP, LLC, a Delaware limited liability company ("**HFG**"), in its capacity as a lender with a Revolving Commitment (together with its successors and permitted assigns in that capacity, the "**Revolving Lenders**"), and its capacity as a lender making the Term Loans (together with its successors and permitted assigns in that capacity, the "**Term Lenders**"; the Revolving Lenders and the Term Lenders, collectively, the "**Lenders**"), and as administrative agent and collateral agent for the Lenders (together with its successors and permitted assigns in those capacities, the "**Agent**").

R E C I T A L S:

A.    Pursuant to that certain Revolving and Term Loan and Security Agreement dated as of June 29, 2012 among the Borrowers, the Parent, the Lenders from time to time signatory thereto, and the Agent (as amended by that certain First Amendment to Revolving and Term Loan and Security Agreement dated as of January 17, 2013 and as further amended, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), the Lenders have agreed to make available certain term and revolving loans to the Borrowers.

B.    At the present time, the Borrowers and the Parent request an amendment to the Loan Agreement, and the Agent and the Lenders are agreeable to such request, but only on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

A G R E E M E N T S:

1.    RECITALS. The foregoing Recitals are hereby made a part of this Amendment.

2.    DEFINITIONS. Capitalized words and phrases used herein without definition shall have the respective meanings ascribed to such words and phrases in the Loan Agreement.

3.    AMENDMENTS TO THE LOAN AGREEMENT.

3.1.    Section 1.1 of the Loan Agreement, Definitions, is hereby amended by amending and restating the definitions of "Adjusted Borrowing Limit," "Permitted Debt," "Subordinated Debt" and "Subordination Agreement" in their entirety to read as follows:

"'**Adjusted Borrowing Limit**' means an amount equal to the result of (1) the Borrowing Limit, minus (2) Accrued Amounts, minus (3) the Liquidity Reserve, minus (4) any additional reserves that the Agent might establish and maintain from time to time in accordance with the terms of the Agreement."

"'**Permitted Debt**' means:

(1) unsecured Debt in an aggregate amount not to exceed $500,000 outstanding at any one time (without duplication of any Permitted Debt set forth in clauses (2) through (8) of this definition);

(2) the other Debt set forth on Schedule V hereto, and the extension of maturity, refinancing or modification of the terms thereof, so long as (A) such extension, refinancing or modification is pursuant to terms that are not less favorable to the Parent, the Borrowers and their Subsidiaries and the Lenders than the terms of the Debt being extended, refinanced or modified, and (B) after giving effect to such extension, refinancing or modification, the amount of such Debt is not greater than the amount of such Debt outstanding immediately prior to such extension, refinancing or modification plus accrued interest thereon and the fees incurred in connection with the extension, refinancing, or modification;

(3) Debt incurred by any Borrower pursuant to a facility that provides such Borrower financing for equipment, inventory, real property or other asset purchases and other capital expenditures, but solely to the extent such Debt is in an amount, upon such terms and conditions, and subject to documentation in form and substance, reasonably satisfactory to the Agent;

(4) the Lender Debt;

(5) the Trillium Seller Debt;

(6) the Parent Corporate Expense Debt;

(7) the Parent Contribution Debt; and

(8) intercompany Debt arising from loans made in accordance with the terms and conditions of Section 10.14 by (i) the Parent to any Borrower or (ii) any Borrower to any other Borrower."

"'**Subordinated Debt**' means (1) the Trillium Seller Debt, (2) the Parent Corporate Expense Debt, (3) the Parent Contribution Debt and (4) any other unsecured Debt subordinated in right of payment to the Lender Debt on terms acceptable to the Agent."

"**Subordination Agreement**" means (1) the Trillium Subordination Agreement, (2) the Parent Contribution Subordination Agreement and (3) any other subordination agreements or similar agreements among the Loan Parties, the Agent and the holders of Subordinated Debt, in form and substance satisfactory to the Agent, together with all modifications, amendments and restatements of any of the foregoing.

3.2.    Section 1.1 of the Loan Agreement, Definitions, is hereby amended by adding the following definitions of  "Liquidity Reserve," "Parent Contribution Debt", "Parent Contribution Subordination Agreement" and "Second Amendment" in appropriate alphabetical order:

"'**Liquidity Reserve**' means $1,500,000."

2

"'**Parent Contribution Debt**' means the unsecured subordinated Debt owing by Parent to HCCG, LLC, a Texas limited liability company, Rod Laughlin, Greg Sassman and Geoge Dunaway in the original principal amount of $900,000 pursuant to that certain Subordinate Promissory Note dated as of April 11, 2013. The Parent Contribution Debt shall be subordinated to the Lender Debt pursuant to the Parent Contribution Subordination Agreement."

"'**Parent Contribution Subordination Agreement**' means that certain Subordination and Intercreditor Agreement dated as of April 11, 2013, by and among Parent, the Agent and the holders of the Parent Contribution Debt."

"'**Second Amendment'** means that certain Second Amendment and Waiver to Revolving and Term Loan and Security Agreement dated as of April 11, 2013 among the Borrowers, the Parent, the Lenders and the Agent."

3.3.    Section 1.1 of the Loan Agreement, Definitions, is hereby amended by adding the following sentence to the end of the definition of "Fixed Charge Coverage Ratio":

"Notwithstanding the foregoing, any distributions made by Borrower to Parent and payments made by Parent to repay the Parent Contribution Debt shall be excluded from the calculation in clause (2) of the foregoing sentence so long as such distributions and payment are made in accordance with the terms and conditions of this Agreement."

3.4.    Section 2.5 of the Loan Agreement, Term Loans, is hereby amended by amending and restating subsection (b) thereof in its entirety to read as follows:

"(b)    Each Term Lender with a Term Loan B Commitment agrees to lend to the Borrowers, on a joint and several basis, on the Term Loan B Funding Date (which date shall be on or before the Term Loan B Commitment Termination Date), subject to and upon the terms and conditions herein set forth, the amount indicated below such Term Lender's name on the signature page hereto, as a single loan in the aggregate initial principal amount equal to $2,000,000 (the "**Term Loan B**")."

3.5.    Section 7.3 of the Loan Agreement, Conditions Precedent to the Term Loan B, is hereby amended by amending and restating such section as follows:

"7.3    **Conditions Precedent to the Term Loan B**. In addition to the satisfaction of the conditions precedent in Section 7.2 above, the making of the Term Loan B on the Term Loan B Funding Date, will be subject to satisfaction of the following conditions precedent:

(i)    that on the Term Loan B Funding Date and after giving effect to the making of the Term Loan B, the Loan Parties have delivered evidence satisfactory to the Agent demonstrating that each of the following statements are true and correct (and the advance of the Term Loan B will be deemed a representation and warranty by each Borrower that those statements are then true and correct):

3

(A)      the sum of (1) the aggregate amount of cash on hand in operating deposit accounts of the Borrowers and the Parent that are being monitored by the Agent on-line and in real-time, plus (2) the positive difference, if any, between (A) the Adjusted Borrowing Limit and (B) the sum of the then Outstanding Balance of the Revolving Loan, shall not be less than $1,000,000;

(B)      the ratio of Senior Funded Debt to EBITDA (without giving effect to (1) any EBITDA Addbacks, (2) any Cure Amounts applied pursuant to Section 11.5 or (3) any Parent Contribution Addbacks (as defined in the Second Amendment)) of the Borrowers and their Subsidiaries, on a consolidated basis, and calculated on a trailing twelve month basis (or on an annualized basis, if less than 12 consecutive Monthly Reports have been delivered since the Closing Date in accordance with Section 9.5(a)) shall not exceed 2.25:1.00, provided that no more than 4 of such Monthly Reports may reflect internal unaudited results; and

(C)      the Loan Parties shall be in compliance on a pro forma basis with the financial covenants set forth in Sections 11.2 and 11.4 at the respective levels in existence prior to the effectiveness of the Second Amendment.

(ii)      The Agent shall have received such other approvals, opinions or documents as it may reasonably request."

3.6.      Section 10.3 of the Loan Agreement, Subordination, is hereby amended by amending and restating such section as follows:

"10.3      **Subordination**. Except in connection with a Qualified Refinancing no Loan Party shall, directly or indirectly (1) at any time pay any amount of principal or prepay, defease, purchase or redeem any Debt (other than the Debt evidenced by this Agreement and the other Loan Documents), during the continuance of an Event of Default, or (2) pay any amount of principal or cash interest on any Subordinated Debt (including, without limitation, the Trillium Seller Debt), but nothing in this Section 10.3 prohibits payment of non-cash interest "in-kind" thereunder; provided, however, that:

(A) to the extent permitted pursuant to the terms and conditions of Section 10.16, the Borrowers may make Distributions to Parent and the Parent may use such distributed amounts to make payments not more than once per six (6) month period on the Parent Corporate Expense Debt;

(B) to the extent permitted pursuant to the terms and conditions of Section 10.16, the Borrowers may make distributions to Parent in an amount equal to, and the Parent may pay such distributed amounts to the Trillium Sellers to make, (i) scheduled payments of interest on the Trillium Seller Debt, (ii) a single payment of the outstanding principal amount of the Trillium Seller Note A on or after January 1, 2016 and (iii) a single payment of the outstanding principal amount of the Trillium

4

Seller Note B on or after June 30, 2013 from the proceeds of the Term Loan B (if made) or from the proceeds of an Issuance of Equity Interests of the Parent or the issuance of Subordinated Debt by the Parent; and

(C)  to the extent permitted pursuant to the terms and conditions of Section 10.16, the Borrowers may make a distribution to Parent in an amount equal to, and the Parent may pay such distributed amount to the holders of the Parent Contribution Debt to make, a single payment of the outstanding principal and accrued interest of the Parent Contribution Debt on or after December 31, 2013;

provided further, that, in the case of each of the foregoing clauses (A), (B) and (C), such payments may only be made if each of the following conditions are satisfied both prior to and after giving effect to any such payment: (i) no Default or Event of Default exists, (ii) the sum of (x) the aggregate amount of cash on hand in operating deposit accounts of the Borrowers and the Parent that are being monitored by the Agent on-line and in real-time, and (y) the positive difference, if any, between the Adjusted Borrowing Limit and the sum of the then Outstanding Balance of the Revolving Loan, shall not be less than $1,000,000 (provided that the condition specified in this clause (ii) shall not be required to be satisfied in order to permit the payment of scheduled interest payments as described in clause (B)(i) above), and (iii) the Borrowers shall have delivered to Agent evidence that the Loan Parties shall be in compliance on a pro forma basis with the financial covenants set forth in Article 11 (without giving any effect to any Cure Amounts applied pursuant to Section 11.5), provided that solely with respect to the payment described in the foregoing clause (C), if such payment is paid in the calendar month immediately following the delivery of the Monthly Report for November 2012 or December 2012, then the Loan Parties must deliver evidence that the Loan Parties would have been in compliance on a pro forma basis with the financial covenants set forth in Sections 11.2, 11.3 and 11.4 at the respective levels in existence prior to the effectiveness of the Second Amendment.

For the avoidance of doubt, other than as expressly provided in clauses (A), (B) and (C) of the immediately preceding sentence, no payments on the Trillium Seller Debt, the Parent Corporate Expense Debt or the Parent Contribution Debt may be made until the date that is at least 180 days after the Full Payment of all Lender Debt."

3.7.    Section 10.16 of the Loan Agreement, Distributions, is hereby amended by deleting each use of the amount "$2,500,000" in clause (c) thereof and by substituting, in lieu thereof, the amount "$1,000,000".

3.8.    Section 11.1 of the Loan Agreement, Liquidity, is hereby amended by amending and restating such section in its entirety to read as follows:

"11.1    **Liquidity.** At all times on and after the date on which Parent has repaid the Parent Contribution Debt in full, the sum of (1) the aggregate amount of cash on hand in operating deposit accounts of the Borrowers that are being monitored by the Agent on-

line and in real-time, plus (2) the positive difference, if any, between (A) the Adjusted Borrowing Limit and (B) the sum of the then Outstanding Balance of the Revolving Loan, shall at no time be less than $500,000.

3.9. Section 11.2 of the Loan Agreement, Fixed Charge Coverage Ratio, is hereby amended by amending and restating such section in its entirety to read as follows:

"11.2 **Fixed Charge Coverage Ratio**. The Fixed Charge Coverage Ratio maintained by the Borrowers and their respective Subsidiaries, on a consolidated basis and calculated on a trailing twelve month basis, calculated as of the last day of each calendar month, shall not be less than the ratio set forth below for the applicable period:

| Calendar Month Ending | Minimum Fixed Charge Coverage Ratio |
|---|---|
| From the Initial Closing Date through February 28, 2013 | 1.30 to 1.00 |
| March 31, 2013 through July 31, 2013 | 1.10 to 1.00 |
| August 31, 2013 through December 31, 2013 | 1.20 to 1.00 |
| January 31, 2014 and each calendar month thereafter | 1.30 to 1.00" |

3.10. Section 11.3 of the Loan Agreement, Ratio of Senior Funded Debt to EBITDA, is hereby amended by amending and restating such section in its entirety to read as follows:

"11.3 **Ratio of Senior Funded Debt to EBITDA**. The ratio of Senior Funded Debt to EBITDA and calculated on a trailing twelve month basis of the Borrowers and their respective Subsidiaries, on a consolidated basis, calculated as of the last day of each calendar month, shall not exceed the ratio set forth below for the applicable period:

| Calendar Month Ending | Maximum Ratio of Senior Funded Debt to EBITDA |
|---|---|
| From the Initial Closing Date through February 28, 2013 | 2.40 to 1.00 |
| March 31, 2013 through July 31, 2013 | 3.25 to 1.00 |
| August 31, 2013 through | 3.00 to 1.00 |

6

| | |
|---|---|
| December 31, 2013 | |
| January 31, 2014 and each calendar month thereafter | 2.40 to 1.00" |

3.11.   Section 11.4 of the Loan Agreement, <u>Ratio of Senior Funded Debt to EBITDAR</u>, is hereby amended by amending and restating such section in its entirety to read as follows:

"11.4   **Ratio of Senior Funded Debt to EBITDAR**. The ratio of (a) the sum of (1) Senior Funded Debt plus (2) the amount equal to six (6) <u>times</u> the trailing twelve-month rent expense of the Borrowers, to (b) EBITDAR and calculated on a trailing twelve month basis of the Borrowers and their respective Subsidiaries, on a consolidated basis, calculated as of the last day of each calendar month, shall not exceed the ratio set forth below for the applicable period:

| Calendar Month Ending | Maximum Ratio of Senior Funded Debt to EBITDAR |
|---|---|
| From the Initial Closing Date through February 28, 2013 | 4.00 to 1.00 |
| March 31, 2013 through July 31, 2013 | 5.50 to 1.00 |
| August 31, 2013 through December 31, 2013 | 4.50 to 1.00 |
| January 31, 2014 and each calendar month thereafter | 4.00 to 1.00" |

3.12.   Section 11.5 of the Loan Agreement, <u>Cure Right</u>, is hereby amended by amending and restating the penultimate sentence thereof in its entirety to read as follows.

"Notwithstanding anything to the contrary set forth in this Section 11.5, (i) the Specified Financial Covenants shall not be recalculated more than twice during any 12-month period pursuant to the cure right in this Section 11.5 (provided that solely for the purposes of this clause (i), the amendments made pursuant to the Second Amendment shall be deemed to be a recalculation of the Specified Financial Covenants as of the date of the Second Amendment)  and (ii) the cure right in this Section 11.5 shall not be permitted if after giving pro forma effect to thereto a Change of Control would occur."

3.13.   <u>Exhibit II</u> to the Loan Agreement, <u>Form of Borrowing Base Report</u>, is hereby amended by amending and restating such exhibit in its entirety to read as set forth on Exhibit II to this Amendment.

4.     <u>WAIVER</u>.

7

4.1.    Each of the Borrowers and the Parent hereby acknowledges that (a) as of October 31, 2012, the Borrowers were in default of the financial covenant set forth in Section 11.4 of the Loan Agreement (Ratio of Senior Funded Debt to EBITDAR), (b) as of November 30, 2012, December 31, 2012, January 31, 2013 and February 28, 2013, the Borrowers were in default of the financial covenant set forth in Section 11.2 of the Loan Agreement (Fixed Charge Coverage Ratio), (c) as of November 30, 2012, December 31, 2012, January 31, 2013 and February 28, 2013, the Borrowers were in default of the financial covenant set forth in Section 11.3 of the Loan Agreement (Ratio of Senior Funded Debt to EBITDA), (d) as of November 30, 2012, December 31, 2012, January 31, 2013 and February 28, 2013, the Borrowers were in default of the financial covenant set forth in Section 11.4 of the Loan Agreement (Ratio of Senior Funded Debt to EBITDAR) and (e) Events of Default have occurred pursuant to Section 12.1(8) of the Loan Agreement due to the failure by Parent to make payment to the Trillium Sellers for scheduled payments of interest on the Trillium Seller Debt on February 1, 2013 (collectively, the "**Specified Defaults**").

4.2.    The Agent and the Lenders hereby waive the Specified Defaults and the respective remedies of the Agent and the Lenders under the Loan Agreement and applicable law with respect thereto (excluding, subject to Section 5 of this Amendment, their rights to charge the default rate of interest pursuant to Section 2.6(d) of the Loan Agreement for the period commencing October 31, 2012 to the date hereof.) The foregoing waivers shall be narrowly construed and shall not prejudice any rights or remedies which the Agent or any Lender may have or be entitled to with respect to any other default or event of default or any time period not within the definition of "Specified Defaults". The Agent and the Lenders expressly reserve all of their rights and remedies under the Loan Agreement or otherwise in respect of any Default or Event of Default (other than, as and from the date that any waiver with respect thereto becomes effective, the Specified Defaults expressly waived hereby), including their rights to charge the Default Rate of interest in the manner set forth under Section 2.6(d) of the Loan Agreement effective as of the date any Default or Event of Default occurred.

5.    DEFAULT INTEREST. Each Borrower hereby acknowledges and agrees that as of April 10, 2013, $103,328.67 of interest has accrued at the Default Rate (consisting of $51,900.34 with respect to Revolving Loans and $51,428.33 with respect to Term Loans).  The Agent, the Lenders and the Borrowers hereby agree that (a) the Borrowers shall pay, on or before July 1, 2013, to Agent for the benefit of the Lenders, $76,664.33 of such interest and (b) the remaining amount of such interest shall be deemed waived by Agent and Lenders upon the effectiveness of this Amendment. Notwithstanding the foregoing, Agent and Lenders expressly reserve their right to charge interest at the Default Rate for any Default or Event of Default (other than the Specified Defaults) in the manner set forth under Section 2.6(d) of the Loan Agreement effective as of the date any such Default or Event of Default occurred. Borrowers hereby agree that Agent may charge the Revolving Loan for the portion of the default interest described in clause (a) above on or after July 1, 2013.  If Lender is unable to or elects not to charge the Revolving Loan for such default interest, then Borrowers shall pay such default interest upon request in immediately available funds.

6.    REPRESENTATIONS AND WARRANTIES. To induce the Agent and the Lenders to enter into this Amendment, each of the Borrowers and the Parent hereby certifies, represents, and warrants to the Agent and the Lenders that:

6.1.    Authorization. Each of the Borrowers and the Parent is duly authorized to execute and deliver this Amendment, and each Borrower is and will continue to be duly authorized to borrow monies under the Loan Agreement, as amended hereby, and to perform its obligations under the Loan Agreement, as amended hereby.

6.2.    No Conflicts. The execution and delivery of this Amendment and the

8

performance by each Borrower of its obligations under the Loan Agreement, as amended hereby, do not and will not conflict with any provision of law or of the respective organizational documents of any Borrower or the Parent or of any agreement binding upon any Borrower or the Parent.

6.3.    Validity and Binding Effect. The Loan Agreement, as amended hereby, is a legal, valid, and binding obligation of each Borrower and the Parent, enforceable against each of them in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditors' rights or by general principles of equity limiting the availability of equitable remedies.

6.4.    Compliance with Loan Agreement. The representation and warranties set forth in Article 7 of the Loan Agreement, as amended hereby, are true and correct with the same effect as if such representations and warranties had been made on the date hereof, with the exception that all references to the financial statements shall mean the financial statements most recently delivered to the Agent and except for such changes as are specifically permitted under the Loan Agreement. In addition, except for the defaulted covenants giving rise to the Specified Defaults, each Borrower has complied with and is in compliance with all of the covenants set forth in the Loan Agreement, as amended hereby, including, but not limited to, those set forth in Articles 9, 10, and 11 thereof.

6.5.    No Event of Default. As of the date hereof and except for the Specified Defaults, no Event of Default under Article 12 of the Loan Agreement (including, without limitation, any Event of Default pursuant to Section 12.1(21) of the Loan Agreement with respect to the Mesa Mortgage Facility), or event or condition which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, has occurred or is continuing.

7.    CONDITIONS PRECEDENT. This Amendment shall become effective as of the date above first written after receipt by Agent of the following:

7.1.    Amendment. This Amendment executed by each Borrower, the Parent, the Agent, and the Lenders.

7.2.    Parent Contribution Debt. Evidence, in form and substance satisfactory to the Agent, that the Parent has (i) received proceeds of the Parent Contribution Debt of no less than $900,000 from the existing owners of its Equity Interests and (ii) made a cash contribution to Borrower in the amount of such proceeds.  Notwithstanding anything set forth in the Loan Agreement to the contrary, the amount of such contribution to the Borrower (the "**Parent Contribution Addback**") shall be added to the calculation of EBITDA to the extent included in determining net income (or net loss), provided, however, that, the aggregate amount of such Parent Contribution Addback shall, solely for the purposes of calculating EBITDA, be deemed to have occurred on March 29, 2013.

7.3.    Subordination Agreement. A true, complete copy of a Subordination Agreement with respect to the Parent Contribution Debt, in form and substance satisfactory to the Agent, duly executed by HCCG, LLC, Rod Laughlin, Greg Sassman, George Dunaway, the Agent and the Parent. For the avoidance of doubt, such subordination agreement shall be a "Subordination Agreement" under the terms of the Loan Agreement.

7.4.    Trillium Seller Debt Interest Payment. Evidence, in form and substance satisfactory to the Agent, that the Parent has made payment to the Trillium Sellers of all outstanding scheduled payments of interest on the Trillium Seller Debt.

7.5.    Other Documents. Such other documents, certificates, resolutions, and/or

opinions of counsel as the Agent may request.

8.    GENERAL.

8.1.    Governing Law; Severability. This Amendment shall be construed in accordance with and governed by the laws of State of New York. Wherever possible each provision of the Loan Agreement and this Amendment shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Loan Agreement and this Amendment shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of the Loan Agreement and this Amendment.

8.2.    Successors and Assigns. This Amendment shall be binding upon each Borrower, the Parent, the Agent, and the Lenders and their respective successors and assigns, and shall inure to the benefit of each Borrower, the Parent, the Agent, and the Lenders and the respective successors and assigns of the Agent and the Lenders.

8.3.    Continuing Force and Effect of Documents. Except as specifically modified or amended by the terms of this Amendment, all other terms and provisions of the Loan Agreement and the other Loan Documents are incorporated by reference herein, and in all respects, shall continue in full force and effect. Each of the Borrowers and the Parent, by execution of this Amendment, hereby reaffirms, assumes and binds itself to all of the obligations, duties, rights, covenants, terms and conditions that are contained in the Loan Agreement and the other Documents.

8.4.    References to Loan Agreement. Each reference in the Loan Agreement to "this Agreement", "hereunder", "hereof", or words of like import, and each reference to the Loan Agreement in any and all instruments or documents delivered in connection therewith, shall be deemed to refer to the Loan Agreement, as amended hereby.

8.5.    Expenses. The terms and provisions of Section 14.5 of the Loan Agreement are hereby incorporated herein by reference. Each Borrower agrees to pay all costs and expenses in connection with the preparation of this Amendment and other related loan documents, including, without limitation, reasonable attorneys' fees and time charges of attorneys who may be employees of the Agent or any Lender or any affiliate or parent of the Agent or any Lender. Each Borrower shall pay any and all stamp and other taxes, UCC search fees, filing fees, and other costs and expenses in connection with the execution and delivery of this Amendment and the other instruments and documents to be delivered hereunder, and agrees to save the Agent and the Lenders harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such costs and expenses.

8.6.    Waiver and Release of Claims. Each of the Borrowers and the Parent hereby waives and releases any and all current existing claims, counterclaims, defenses or set-offs of every kind and nature which it has or may have against the Agent or any Lender arising out of, pursuant to, or pertaining in any way to the Loan Agreement, any and all documents and instruments in connection with or relating to the foregoing, or this Amendment. Each of the Borrowers and the Parent hereby further covenants and agrees not to sue the Agent or any Lender or assert any claims, defenses, demands, actions or liabilities against the Agent or any Lender arising out of, pursuant to, or pertaining in any way to the Loan Agreement, any and all documents and instruments in connection with or relating to the foregoing, or this Amendment. Notwithstanding anything contained in this Section 7.6 to the contrary, the waiver and release of claims and covenant not to sue contained in this Section 7.6 shall apply only with respect to matters arising on or before the date hereof, and no future claims or rights, or rights to sue, are, or are intended to be, waived by Borrower or Parent pursuant to this Amendment.

10

      8.7.    <u>Counterparts</u>. This Amendment may be executed in any number of counterparts, all of which shall constitute one and the same agreement.  Receipt of an executed signature page to this Amendment by facsimile or other electronic transmission shall constitute effective delivery thereof. Electronic records of executed Loan Documents maintained by the Agent shall be deemed to be originals.

**[SIGNATURE PAGE FOLLOWS]**

11

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment and Waiver to Revolving and Term Loan and Security Agreement as of the date first above written.

BORROWERS:

**RESTORA HOSPITAL OF MESA, LLC**

By: _____
Name:  Rod Laughlin
Title:  Manager

**RESTORA HOSPITAL OF SUN CITY, LLC**

By: _____
Name:  Rod Laughlin
Title:  Manager

PARENT:

**RESTORA HEALTHCARE HOLDINGS, LLC**

By: _____
Name:  Rod Laughlin
Title:  Manager

AGENT:

**HEALTHCARE FINANCE GROUP, LLC.**
as the Agent

By: _____
Name:
Title:

LENDERS:

**HEALTHCARE FINANCE GROUP, LLC.**
as a Revolving Lender and a Term Lender

By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment and Waiver to Revolving and Term Loan and Security Agreement as of the date first above written.

BORROWERS:

**RESTORA HOSPITAL OF MESA, LLC**

By: _____
Name:  Rod Laughlin
Title:   Manager

**RESTORA HOSPITAL OF SUN CITY, LLC**

By: _____
Name:  Rod Laughlin
Title:   Manager

PARENT:

**RESTORA HEALTHCARE HOLDINGS, LLC**

By: _____
Name:
Title:

AGENT:

**HEALTHCARE FINANCE GROUP, LLC,**
as the Agent

By: _____
Name:  John D. Calabro
Title:   Exec VP

LENDERS:

**HEALTHCARE FINANCE GROUP, LLC,**
as a Revolving Lender and a Term Lender

By: _____
Name:  John D. Calabro
Title:   Exec VP

EXHIBIT II
FORM OF BORROWING BASE REPORT


HEALTHCARE FINANCE GROUP, LLC
BORROWING BASE REPORT

Report submission date: [*]
As of date: [*]

| | | |
|---|---|---|
| I. | Gross Receivables Balance as of: [*] | |
| | | |
| II. | Deductions to Gross Receivables: | |
| | Ineligible Receivables | |
| | Cross-aged Balances | |
| | Other Ineligibles | |
| | Total Ineligible A/R | |
| | | |
| III. | Gross Eligible Receivables as of: [*] | |
| | | |
| IV. | Net Value Factor | % |
| | | |
| V. | Expected Net Value | |
| | | |
| VI. | Additions to Expected Net Value | |
| | Expected Net Value of New Receivables | |
| | Adjustments | |
| | | |
| VII. | Deductions to Expected Net Value | |
| | Collections | |
| | Aged Claims | |
| | Deferred Revenue | |
| | Unapplied Cash | |
| | Credit Balances | |
| | Medicare/Medicaid Reserve | |
| | Other Adjustments/Reserves | |
| | | |
| VIII. | Adjusted Expected Net Value | |
| | | |
| IX. | Advance Rate | % |
| | | |
| X. | Borrowing Base | |
| | | |
| XI. | Revolving Commitment | |

46522946_5

| | | |
|---|---|---|
| XII. | Borrowing Limit (Lesser of Revolving Commitment and Borrowing Base) | |
| XIII. | Less: Accrued Amounts | |
| XIV. | Less: Liquidity Reserve | |
| XV. | **[Reserved]** | |
| XVI. | Adjusted Borrowing Limit | |
| XVII. | Outstanding Revolving Loan Balance Prior Report | |
| XVII. | Less: Collections | |
| XIX. | Total Interest, Fees, Charges, and Expenses | |
| XX. | Revolving Advances Request This Report | |
| XXI. | Revolving Loan Balance This Report | |
| XXII. | Net Availability | |
| XXIII. | Protective Advances | |

The undersigned desires to make a borrowing of a Revolving Advance on [*], 20[*], in the amount of $[*].

The undersigned represents and warrants that the foregoing information is true, complete and correct and that the collateral reflected herein complies with and conforms to the Eligibility Criteria set forth in Exhibit I to the Revolving and Term Loan and Security Agreement between the Borrowers and Healthcare Finance Group, LLC, a Delaware limited liability company ("**HFG**"), and any supplements and amendments, if any, thereto (the "**Agreement**"; capitalized terms used herein and not otherwise defined are as defined in the Agreement). The undersigned, on behalf of the Borrowers, promises to pay to HFG the new loan balances reflected above, plus interest, as set forth in the Agreement.

The undersigned represents and warrants as follows: (1) that as of the date hereof, (A) each Borrower is in compliance with each of the terms, covenants, and conditions set forth in the Agreement and that no Default or Event of Default exists or is continuing under the Agreement, (B) all scheduled monthly payments of rental expense of the Borrowers to the Mesa Entities since the date of the most recent Compliance Certificate delivered to the Agent have been timely paid in full, (C) all scheduled monthly payments of amounts due and payable by the Mesa Entities under their mortgage loan documents since the date of the most recent Compliance Certificate delivered to the Agent have been timely paid in full and (D) if this Borrowing Base is being delivered in connection with a request for a Revolving Advance, the representations, warranties and covenants contained in Articles 8, 9, 10, and 11 of the Agreement are and will be true, correct, and in compliance in all material respects both before and after

giving effect to the Revolving Advance requested herein and to the application of the proceeds thereof, as though made on and as of such date (it being understood and agreed that any representation or warranty which by its terms (i) is made on a specified date shall be required to be true and correct only as of such specified date or (ii) contains a materiality qualifier shall be required to be true and correct in all respects); (2) that within 90 days preceding and through the date hereof, no Borrower is aware of receiving any notice from any state or federal regulatory or law enforcement agency citing specific deficiencies that (x) pose immediate jeopardy to the health or safety of the patients in any of any Borrower's facilities; or (y) would otherwise threaten any Borrower's continued participation in the Medicare, Medicaid, and/or any other applicable government program; (3) that within 90 days preceding and through the date hereof, no Borrower is aware of being subject to any investigatory visits by or received any correspondence from any state or federal agency alleging possible improper billing or claims activity**,** (4) the Liquidity is at least the level set forth in Section 11.1, (5) the ratio of Senior Funded Debt to EBITDA does not exceed the ratio set forth in Section 11.3 for the most recent month ended and (6) that the aggregate amount of cost report settlement liability owing to Medicare/Medicaid is $[_____].

As of the date hereof, no Borrower has diverted or permitted to be diverted any such payments on Receivables from the Lockbox Accounts or issued any Revocation Order (as defined in the Depositary Agreements).

[BORROWER REPRESENTATIVE]

By: _____

Name: _____

Title: _____

Date: _____